# EXHIBIT D

Page 1

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

_____

TDY HOLDINGS, LLC, and        §

TDY INDUSTRIES, INC.          §

                              §

            Plaintiffs,       §

                              §

VS.                           § Case No. 07cv0787 JAH

                              §

UNITED STATES OF AMERICA,     §

UNITED STATES DEPARTMENT      §

OF DEFENSE, and ROBERT M.     §

GATES, in his official        §

capacity as SECRETARY OF      §

DEFENSE                       §

                              §

            Defendants.       §

_____


            Videotaped Deposition of

               TOMMY B. JORDAN

             San Antonio, Texas

            Monday, October 10, 2011

                 12:53 p.m.


Reported by:  Micheal A. Johnson, CRR


                      _____

                      DIGITAL EVIDENCE GROUP

            1299 Pennsylvania Ave, NW, Suite 1130E

                 Washington, DC  20004

                  (202) 232-0646

| | |
|---|---|
| 1   Videotaped Deposition of | 1   INDEX |
| 2   TOMMY B. JORDAN | 2   TOMMY B. JORDAN |
| 3 | 3   October 10, 2011 |
| 4   Held at the offices of: | 4 |
| 5   Koole Court Reporters of San Antonio | 5   APPEARANCES                3 |
| 6   711 Navarro Street, Suite 101 | 6 |
| 7   San Antonio, Texas 78205 | 7   PROCEEDINGS              16 |
| 8   (210) 558-9484 | 8 |
| 9 | 9   EXAMINATION OF TOMMY B. JORDAN: |
| 10 | 10     BY MR. BARR              17 |
| 11 | 11 |
| 12   Taken pursuant to notice, before Micheal A. | 12   CERTIFICATE              158 |
| 13   Johnson, Registered Professional Reporter, Certified | 13 |
| 14   Realtime Reporter, and Notary Public in and for the | 14   ERRATA SHEET              161 |
| 15   State of Texas. | 15 |
| 16 | 16 |
| 17 | 17 |
| 18 | 18 |
| 19 | 19 |
| 20 | 20 |
| 21 | 21 |
| 22 | 22 |
| Page 2 | Page 4 |

APPEARANCES — Page 3:

1   APPEARANCES
2   ON BEHALF OF THE PLAINTIFFS:
3     Bradley D. Wine
4     Michael C. Mateer
5     DICKSTEIN SHAPIRO, L.L.P.
6     1825 Eye Street NW
7     Washington, D.C. 20006-5403
8     (202) 420-3607
9
10  ON BEHALF OF THE DEFENDANTS:
11    Lewis M. Barr
      U.S. DEPARTMENT OF JUSTICE
12    601 D Street NW, Suite 8000
      Washington, D.C. 20004
13    (202) 514-9645
14
    VIDEOGRAPHER:
15    Alex Segovia
16
17  ALSO PRESENT:
18    Lauren S. McAndrews
19    Robert Zoch
20
21
22

DEPOSITION EXHIBITS — Page 5:

TOMMY B. JORDAN
October 10, 2011

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 1 | Order Setting Dates for Expert Deposition and Final Pretrial Conference | 17 |
| Exhibit 2 | Notice of Deposition upon Oral Examination | 17 |
| Exhibit 3 | 11/16/09 Supplemental Expert Report of Tommy B. Jordan Regarding government Procurement | 65 |
| Exhibit 4 | 10/36/09 Expert Report of Tommy B. Jordan Regarding Government Procurement Personnel Policies, Procedures and Practices | 65 |
| Exhibit 5 | October 1939 Contract for 30 PT-20 Airplanes Bates US2001158 - US2001197 | 70 |
| Exhibit 6 | 9/27/1940 Contract to Modify Bates US2001215 - US20011230 | 70 |
| Exhibit 7 | 6/30/1942 Contract, Cost-Plus-A-Fixed-Fee Between The United States of America Navy Department and The Ryan Aeronautical Co. Bates TDYRYAN20033846 - TDYRYAN20033868 | 70 |
| Exhibit 8 | 1943 Cost-Plus-Fixed-Fee Contract, Navy Department and The Ryan Aeronautical Co. Bates TDYRYAN00016948 - TDYRYAN00016972 | 70 |

Pages 2 to 5

10/10/2011                    TDY Holdings v. United States of America                    Tommy Jordan

---

**DEPOSITION EXHIBITS**
**TOMMY B. JORDAN**
October 10, 2011

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 9 | 6/28/43 Letter of Intent | 70 |
| | Bates TDYRYAN20034631 - | |
| | TDYRYAN20034633 | |
| Exhibit 10 | 12/2/1943 Cost-Plus-Fixed-Fee | 70 |
| | Contract, Navy Department and The | |
| | Ryan Aeronautical Co. | |
| | Bates TDYRYAN00016995 - | |
| | TDYRYAN00017021 | |
| Exhibit 11 | 1/12/1945 Letter of Intent | 70 |
| | Bates TDYRYAN20034787 - | |
| | TDYRYAN20034892 | |
| Exhibit 12 | The Ryan Aeronautical Co Annual | 77 |
| | Report to Stockholders for the | |
| | Year Ending December 31, 1939 | |
| | Bates TDYRYAN00019245 - | |
| | TDYRYAN00019249 | |
| Exhibit 13 | The Ryan Aeronautical Co. Annual | 77 |
| | Report for the Year 1940 | |
| | Bates TDYRYAN00000001 - | |
| | TDYRYAN00000008 | |
| Exhibit 14 | The Ryan Aeronautical Co. Annual | 77 |
| | Report for the Fiscal Year 1941 | |
| | Bates TDYRYAN00019340 - | |
| | TDYRYAN00019349 | |
| Exhibit 15 | The Ryan Aeronautical Co. Annual | 77 |
| | Report for the Fiscal Year 1942 | |
| | Bates TDYRYAN00000009 - | |
| | TDYRYAN00000016 | |

Page 6

---

**DEPOSITION EXHIBITS**
**TOMMY B. JORDAN**
October 10, 2011

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 23 | 6/2/1967 Award/Contract | 88 |
| | Bates US0061563 - US0061608 | |
| Exhibit 24 | 12/21/1973 Letter, Defense Supply | 88 |
| | Agency to Teledyne Ryan | |
| | Aeronautical | |
| | Bates TDYRYAN00011928 | |
| Exhibit 25 | 2/3/1976 Inter-Department | 91 |
| | Correspondence, Shively to Simley | |
| | Bates TDYRYAN00012770 | |
| Exhibit 26 | Excerpt from Armed Services | 98 |
| | Procurement Regulation, Issued | |
| | March 1951 | |
| | Bates US0064071 - US0064093 | |
| Exhibit 27 | Excerpt from Armed Services | 98 |
| | Procurement Regulation, Revised | |
| | 25 October 1952 | |
| | Bates US0064094 - US0064124 | |
| Exhibit 28 | Excerpt from Armed Services | 98 |
| | Procurement Regulation, 1955 | |
| | Edition | |
| | Bates US0064125 - US0064146 | |
| Exhibit 29 | Excerpt from Armed Services | 98 |
| | Procurement Regulation, Revised | |
| | 18 September 1958 | |
| | Bates US0064170 - US0064214 | |
| Exhibit 30 | Excerpt from Armed Services | 98 |
| | Procurement Regulation, 1963 | |
| | Edition | |
| | Bates US0064233 - US0064261 | |

Page 8

---

**DEPOSITION EXHIBITS**
**TOMMY B. JORDAN**
October 10, 2011

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 16 | 3/16/1943 Verbatim Transcript of | 77 |
| | Proceedings, Annual Meeting of | |
| | Stockholders, The Ryan | |
| | Aeronautical Co. | |
| | Bates TDYRYAN20034973 - | |
| | TDYRYAN20035002 | |
| Exhibit 17 | The Ryan Aeronautical Co. Annual | 77 |
| | Report for the Fiscal Year 1943 | |
| | Bates TDYRYAN00000017 - | |
| | TDYRYAN00000026 | |
| Exhibit 18 | The Ryan Aeronautical Co. Annual | 77 |
| | Report for the Fiscal Year 1944 | |
| | Bates TDYRYAN00000027 - | |
| | TDYRYAN00000036 | |
| Exhibit 19 | Navy Department Bureau of | 80 |
| | Aeronautics Settlement Agreement, | |
| | Contract No. NOa(s) 3107 | |
| | Bates TDYRYAN20034015 - | |
| | TDYRYAN20034024 | |
| Exhibit 20 | Contractor's Release Under | 80 |
| | Contract NOa(s) 314 | |
| | Bates TDYRYAN20034628 | |
| Exhibit 21 | Navy Department Bureau of | 80 |
| | Aeronautics Settlement Agreement, | |
| | Contract No. NOa(s) 1322 | |
| | Bates TDYRYAN20033674 - | |
| | TDYRYAN20033681 | |
| Exhibit 22 | Requisition and Invoice/Shipping | 88 |
| | Document | |
| | Bates TDYRYAN00011459 | |

Page 7

---

**DEPOSITION EXHIBITS**
**TOMMY B. JORDAN**
October 10, 2011

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 31 | Excerpt from Armed Services | 98 |
| | Procurement Regulation, 1973 | |
| | Edition | |
| | Bates US0159087 - US0159088 | |
| Exhibit 32 | Excerpt from Armed Services | 98 |
| | Procurement Regulation, 1974 | |
| | Edition | |
| | Bates US0159091 - US0159092 | |
| Exhibit 33 | Excerpt from Armed Services | 98 |
| | Procurement Regulation, 1976 | |
| | Edition | |
| | Bates US0159101 - US0159104 | |
| Exhibit 34 | 3/1/1966 Negotiated Contract | 101 |
| | Bates US0249154 - US0249221 | |
| Exhibit 35 | 4/25/1968 Award/Contract | 101 |
| | Bates US0030477 - US0030519 | |
| Exhibit 36 | 4/27/1973 Contract Completion | 101 |
| | Statement | |
| | Bates US0159355 - US0159403 | |
| Exhibit 37 | 2/07/1971 Award/Contract | 101 |
| | Bates US0159491 - US0159536 | |
| Exhibit 38 | 7/5/1966 Contractor's Release | 107 |
| | Bates US0150065 | |
| Exhibit 39 | 5/7/1996 Contractor's Release | 107 |
| | Bates US00114289 | |
| Exhibit 40 | 8/9/1966 Contractor's Release | 108 |
| | Bates US00114335 | |

Page 9

Pages 6 to 9

10/10/2011                    TDY Holdings v. United States of America                    Tommy Jordan

---

DEPOSITION EXHIBITS
TOMMY B. JORDAN
October 10, 2011

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 41 | 1/22/1997 Contractor's Release | 108 |
| | Bates US0114948 | |
| Exhibit 42 | Excerpt from Armed Services Procurement Regulation, Revised 1 October 1953 | 111 |
| | Bates US0143293 - US0143296 | |
| Exhibit 43 | Excerpt from Armed Services Procurement Regulation, 3 January 1955 | 111 |
| | Bates US0143297 - US0143300 | |
| Exhibit 44 | Excerpt from Armed Services Procurement Regulation, Revised 1 August 1959 | 111 |
| | Bates US0159316 - US0159319 | |
| Exhibit 45 | Excerpt from Armed Services Procurement Regulation, 1963 Edition | 111 |
| | Bates US0159325 - US0159329 | |
| Exhibit 46 | Excerpt from Armed Services Procurement Regulation, 1973 Edition | 111 |
| | Bates US0159335 - US0159339 | |
| Exhibit 47 | Excerpt from Armed Services Procurement Regulation, 1974 Edition | 111 |
| | Bates US0159262 - US0159272 | |

Page 10

---

DEPOSITION EXHIBITS
TOMMY B. JORDAN
October 10, 2011

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 55 | 3/21/57, Department of Defense Negotiated Contract | 122 |
| | Bates US0080079 - US0080090 | |
| Exhibit 56 | Excerpt from General Provisions | 122 |
| | Bates US0086858 - US0086952 | |
| Exhibit 57 | Award/Contract, Basic Ordering Agreement | 122 |
| | Bates US0151481 - US0151606 | |
| Exhibit 58 | 7/30/1973 Award/Contract | 122 |
| | Bates US0156459 - US0156539 | |
| Exhibit 59 | 1974 Basic Ordering Agreement | 122 |
| | Bates US0239011 - US0239076 | |
| Exhibit 60 | 5/4/1977 Award/Contract | 122 |
| | Bates US0147095 - US0147202 | |
| Exhibit 61 | 10/19/1979 Award/Contract | 122 |
| | Bates US0038229 - US0038527 | |
| Exhibit 62 | 10/01/1986 Solicitation/Contract, Basic Ordering Agreement | 122 |
| | Bates TDYRYAN30002004 - TDYRYAN30002065 | |
| Exhibit 63 | 2/14/1986 Solicitation/Contract | 122 |
| | Bates US0046183 - US0046289 | |
| Exhibit 64 | 12/10/1993 Award/Contract | 122 |
| | Bates US0089092 - US0089258 | |
| Exhibit 65 | Award/Contract | 122 |
| | Bates US0011482 - US0011656 | |

Page 12

---

DEPOSITION EXHIBITS
TOMMY B. JORDAN
October 10, 2011

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 48 | Excerpt from Armed Services Procurement Regulation, 1974 Edition | 111 |
| | Bates US0159340 - US0159344 | |
| Exhibit 49 | Excerpt from Armed Services Procurement Regulation, 1975 Edition | 112 |
| | Bates US0159345 - US0159349 | |
| Exhibit 50 | Excerpt from Armed Services Procurement Regulation, 1 Sep. 1978 | 112 |
| | Bates US0143301 - US0143304 | |
| Exhibit 51 | Excerpt from Armed Services Procurement Regulation, 15 December 1980 | 112 |
| | Bates US0143305 - US0143308 | |
| Exhibit 52 | 10/3/1969 Amendment of Solicitation/Modification of Contract | 118 |
| | Bates US0028727 - US0028739 | |
| Exhibit 53 | 10/31/07 Amendment of Solicitation/Modification of Contract | 118 |
| | Bates US0028720 - US0028723 | |
| Exhibit 54 | 3/27/00 Amendment of Solicitation/Modification of Contract | 119 |
| | Bates US0249498 - US0249503 | |

Page 11

---

DEPOSITION EXHIBITS
TOMMY B. JORDAN
October 10, 2011

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 66 | 9/1/1978 Excerpt, Contract Clauses and Solicitation Provisions | 137 |
| | Bates US0143449 - US0143450 | |
| Exhibit 67 | Excerpts, Code of Federal Regulations | 137 |
| | Bates US0143451 - US0143452 | |
| Exhibit 68 | 10/28/1977, Excerpt, Contract Clauses and Solicitation Provisions | 137 |
| | Bates US0143463 - US0143464 | |
| Exhibit 69 | 12/28/1989 Excerpt, Federal Acquisition Regulation | 137 |
| | Bates US0143469 | |
| Exhibit 70 | Excerpt, Code of Federal Regulations | 137 |
| | Bates US0143473 - US0143475 | |
| Exhibit 71 | 10/14/1992 Memorandum, Defense Contract Audit Agency to Regional Directors, DCAA; Director, Field Detachment | 150 |
| | Bates TDYRYAN50002502 - TDYRYAN50002508 | |
| Exhibit 72 | July 1993 Excerpt, DCAA Contract Audit Manual | 150 |
| | Bates US0250615 - US0250618 | |

Page 13

Pages 10 to 13

---

DEPOSITION EXHIBITS
TOMMY B. JORDAN
October 10, 2011

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 73 | 5/12/1994 Memorandum, Defense Contract Audit Agency to Regional Directors, DCAA; Director, Field Detachment, DCAA Bates TDYRYAN50002509 - TDYRYAN50002521 | 150 |
| Exhibit 74 | Armed Services Procurement Regulation Excerpt, Revised 2 November 1959 Bates US0250474 - US0250479 | 155 |
| Exhibit 75 | Armed Services Procurement Regulation Excerpt, 1 July 1960 Bates US0250480 - US0250487 | 155 |
| Exhibit 76 | Armed Services Procurement Regulation Excerpt, 1 March 1963 Bates US0250490 - US0250513 | 155 |
| Exhibit 77 | Armed Services Procurement Regulation Excerpt, 30 April 1971, Rev. 9 Bates US0250514 - US0250528 | 155 |
| Exhibit 78 | Armed Services Procurement Regulation Excerpt, 16 April 1973 Bates US0250529 - US0250536 | 155 |
| Exhibit 79 | Armed Services Procurement Regulation Excerpt, 1 July 1974 Bates US0250537 - US0250545 | 155 |
| Exhibit 80 | Armed Services Procurement Regulation Excerpt, 1 July 1976 Bates US0250555 - US0250564 | 155 |

Page 14

---

DEPOSITION EXHIBITS

TOMMY B. JORDAN

October 10, 2011

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 81 | Federal Acquisition Regulation Excerpt, Effective Date: April 1, 1984 Bates US0250568 - US0250574 | 155 |
| Exhibit 82 | Federal Acquisition Regulation Excerpt, Effective Date: April 1, 1984 Bates US0250579 - US0250585 | 155 |
| Exhibit 83 | Federal Acquisition Regulation Excerpt, 1990 Edition Bates US0250586 - US0250592 | 156 |

Page 15

---

PROCEEDINGS

THE VIDEOGRAPHER:  This is the start of the deposition of Tommy B. Jordan.  Today is Monday, October 10, 2011.  Time on record now is 12:53.

Will counsel please voice identify yourselves for the record, please.

MR. BARR:  Lewis Barr, United States Department of Justice.

MR. WINE:  Brad Wine for TDY Industries and TDY Holdings.

MR. MATEER:  Mike Mateer for TDY Industries and TDY Holdings.

MR. WINE:  And with us as well is Lauren McAndrews with ATI, also with TDY Holdings and TDY Industries, and Robert Zoch.

THE VIDEOGRAPHER:  Please swear in the witness.

TOMMY B. JORDAN

having been first duly sworn, testified as follows:

Page 16

---

EXAMINATION

BY MR. BARR:

Q.    Good afternoon, Mr. Jordan.  Would you state your full name and address for the record, please.

A.    Tommy Barton, B-a-r-t-o-n, Jordan; address is 2351 Lakewood, Seguin, Texas, 78155.

Q.    We are here today and the next -- other days this week and next, pursuant to an order of the court.  I would like to mark that as Exhibit 1 in this case.

(Deposition Exhibit 1 marked.)

BY MR. BARR:

Q.    And the notice of deposition will be Exhibit 2.

(Deposition Exhibit 2 marked.)

BY MR. BARR:

Q.    Mr. Jordan, I don't have any questions for you on those documents.  That's just a formality for the record.

Let's start by talking about your personal background and qualifications.  You are --

Page 17

---

Pages 14 to 17

1  have been designated as an expert witness in this
2  case by the United States government. Could you
3  briefly describe your education.
4      A.   I graduated from high school in 1956.
5  Enrolled at Southwestern University in Georgetown,
6  Texas. I graduated from Southwestern in 1961 with a
7  bachelor of science degree in chemistry with a minor
8  in psychology and concurrently received a bachelor
9  of arts in economics with a minor in history.
10     Q.   And did you then seek employment?
11     A.   I spent nine months working for my
12 father on a ranch while I looked for employment. I
13 found a job with the United States government at
14 Kelly Air Force base and started my federal career
15 in March of 1962.
16     Q.   And what was your first position there?
17     A.   My first position was a GS-1102 trainee,
18 and we called it in those days a buyer. And then I
19 progressed from there up the ladder, if you will.
20     Q.   How long were you a trainee?
21     A.   Approximately a year. I was promoted
22 from a GS-7 to a GS-9 I think it was in April of
                                                Page 18

1  1963. So I was in a trainee status for about 12,
2  13 months.
3      Q.   And could you describe for the court the
4  training that you received?
5      A.   It was a combination of formal training
6  plus hands-on handling of various contractual
7  documents and actions under the tutelage of an
8  experienced contracting officer.
9      Q.   Was this experienced contracting officer
10 your supervisor?
11     A.   He was not my formal supervisor. He was
12 the GS-12 contracting officer, but he was not a
13 formal supervisor.
14     Q.   And the -- aside from working under the
15 tutelage of this contracting officer, you said you
16 received training. What kind of training did you
17 receive?
18     A.   I received -- I went to various courses.
19 The one that I recall off the top of my head was a
20 basic contracting course at Ft. Lee, Virginia, that
21 was conducted by the army. And I don't remember now
22 whether it was three weeks or four weeks, but it was
                                                Page 19

1  a very intensive basic contracting course.
2      Q.   Now, was this course taught by lawyers
3  or nonlawyers?
4      A.   Best of my recollection, it was not
5  taught by lawyers. It was nonlawyers, but it was
6  people that had been actively engaged in contracting
7  for all of their careers.
8      Q.   Now, are you familiar with the term
9  contracting officer warrant?
10     A.   Yes, I am.
11     Q.   Did you receive one?
12     A.   I received my contracting officer's
13 warrant in December of 1964.
14     Q.   And how long did you hold that warrant?
15     A.   I held the warrant continuously until
16 October of 1990 when I was moved out of the
17 contracting organization into a -- what we call a
18 supply chain management organization.
19     Q.   Now, in order to receive your
20 contracting officer warrant, was someone's approval
21 necessary in particular?
22     A.   It had to be approved by I believe it
                                                Page 20

1  was the installation commander and it had to be
2  certified by my immediate supervisory chain that I
3  had received not only the necessary training but had
4  demonstrated prerequisite judgment, integrity and
5  all of the other prerequisites that were required of
6  contracting officers.
7      Q.   By the way, was the major general an
8  attorney?
9      A.   No.
10     Q.   Now, between the time you were a trainee
11 and when you received your contracting warrant, did
12 you take additional courses?
13     A.   Yes. I went to various contracting
14 courses throughout the entire 30 years that I was
15 in -- actually hands-on contracting.
16     Q.   Can you give the court an idea of the
17 topics that were covered in these courses that you
18 took?
19     A.   It was -- it covered the regulatory
20 foundation of contracting regulations, such as the
21 ASPR and the regulations that we use specifically
22 for the Air Force called AFPIs. Our own --
                                                Page 21

1    Q.   Could you explain what AFPI stands for.
2    A.   Air Force procurement instruction.  Our
3  own internal regulations that implemented those
4  higher levels of regulation, the practices and
5  procedures, customs for such things as negotiation,
6  cost and pricing data, solicitation, preparation for
7  negotiations, the requirements pertaining to
8  preparation of contractual documents, and then what
9  a procuring contracting officer did relative to the
10 administration of those contracts once awarded.
11   Q.   When you mention solicitations, does
12 that include things like request for proposals?
13   A.   Yes.  There are request for proposal on
14 negotiated procurements, and then there was another
15 form of procurements called advertised procurements
16 and those were invitation for bids.
17   Q.   Did the courses that you took include
18 coverage of the use of specifications?
19        MR. WINE:   Objection, leading.
20   A.   Yes, it did.
21 BY MR. BARR:
22   Q.   In what way?

1    A.   The application of specifications to
2  solicitation documents and how those specifications
3  were incorporated into documents, such as purchase
4  descriptions and request for proposals for --
5  contractors submit technical proposals in response
6  to the solicitation.
7    Q.   Are you familiar with the term "source
8  selection"?
9    A.   Yes, I am.
10   Q.   Did you take courses in that issue -- on
11 those issues?
12   A.   I took courses in selection -- in source
13 selection.  I served on several source selection
14 boards and then when I was the director of
15 contracting, I was actually the source selection
16 authority on several procurements.  And then during
17 the closure process from 1995 through 2001, we had a
18 couple of major source selections for depot level
19 maintenance that we had accomplished at Kelly Air
20 Force Base and I served in the capacity of special
21 advisor to the deputy assistant secretary of the Air
22 Force who was the senior acquisition executive and

1  source selection authority on those procurements.
2    Q.   Now, in government contracting parlance,
3  what does "source selection" mean?
4    A.   Source selection is a process that we
5  used where you evaluated things other than price and
6  the contractor's response to the solicitation
7  relative to delivery.  We had a detail evaluation of
8  the technical response of the contractor to meet the
9  requirements of the Air Force, a detail analysis of
10 the cost data that had been submitted by the
11 contractor in response to the solicitation, and then
12 the source selection authority took the
13 recommendations of the source selection board and
14 made a decision as to that contractor whose proposal
15 was most advantageous to the government, price and
16 other factors considered.
17   Q.   Okay.  Now, as a warranted contracting
18 officer, did you have a particular title?
19   A.   Contracting officer and, more
20 specifically, it was a procuring contracting
21 officer, a PCO.
22   Q.   Now, in the 1960s did your grade as an

1  employee of the federal government -- did that
2  change over time?
3    A.   As I indicated, I was promoted to GS-9
4  in I believe it was April of 1964.  I was promoted
5  to GS-12 in I believe it was October of 1965.  I was
6  promoted to GS-13 nonsupervisory contract negotiator
7  I believe it was in February of 1968.  Then in
8  January of 1970 I became a supervisory GS-13
9  contract negotiator.  I was promoted to the rank of
10 GS -- GM-14, pardon me, general manager 14, in
11 October of 1972.
12   Q.   Let me stop you there.  Just want to
13 focus on -- before we get too far ahead -- as in
14 your capacity as a warranted contracting officer
15 over the course of your time as such, did you visit
16 manufacturing plants to address contract-related
17 issues?
18   A.   Yes, I did.
19   Q.   And in the course of those visits, what
20 did you do while you were there?
21   A.   Well, the first contractor that I
22 specifically recall visiting was General Dynamics in

10/10/2011                TDY Holdings v. United States of America                Tommy Jordan

1  Fort Worth.  I was the contracting officer on a
2  major maintenance and modification program for the
3  B-58, which was a supersonic bomber that the Air
4  Force used.  I made a number of visits to the
5  contractor's facility to participate in technical
6  reviews of the contractor's progress towards
7  designing the modification that was intended to
8  correct some inherent performance deficiencies that
9  had been experienced in that aircraft.
10          I recall another contractor that we
11 had for -- that performed the depot level
12 maintenance of an aircraft called a T-38 -- a T-29,
13 T-38 that was down in Brownsville, Texas.  They did
14 maintenance on those aircrafts.
15     Q.   Was there also -- did you have an
16 opportunity to visit McDonnell Douglas in
17 California?
18     A.   Yes, I was --
19          MR. WINE:  Objection, leading.
20     A.   I was the contracting officer for a C-9A
21 medivadical -- pardon me, medical evacuation
22 aircraft, and I was responsible for the logistics
                                              Page 26

1  these defense contractors, did you examine or pay
2  any attention to chemical waste disposal issues?
3          MR. WINE:  Objection, vague.
4     A.   I saw nothing at any of those plants
5  relative to any government involvement in chemical
6  waste disposal.
7  BY MR. BARR:
8     Q.   Now, in terms of your career
9  advancement, if you could just briefly tick off the
10 positions you held and when you held them between
11 1972 and 1990, we can just sort of expedite that.
12     A.   In 1985 I was promoted to the level of
13 general manager --
14     Q.   I'm sorry to interrupt.  Let's start
15 with 1972 and go forward.
16     A.   Okay.  In 1972 I was promoted to GM-14
17 supervisory contract negotiator and I was a branch
18 chief.  I had responsibility for three separate
19 sections, each one headed up by a GM-13.
20     Q.   Which branch was that?
21     A.   That was the reciprocating engine
22 branch.
                                              Page 28

1  support for that contract.  And once the source
2  selection had been completed, where the Air Force
3  selected McDonnell Douglas to satisfy that
4  requirement, I made a number of visits to the
5  McDonnell Douglas plant out in Long Beach.  And I
6  specifically recall attending a two- or three-week
7  course in factory maintenance of that specific
8  aircraft.  But all those visits to McDonnell Douglas
9  were related to the performance of the contractor on
10 technical issues.
11 BY MR. BARR:
12     Q.   Now, the visits to the General Dynamics
13 in Fort Worth, to McDonnell Douglas, did you observe
14 any manufacturing activities?
15     A.   I observed manufacturing activities at
16 all of the plants that I went to -- I visited, and
17 then I observed the actual performance of government
18 employees at those plants and actually met with
19 them, employees such as administrative contracting
20 officers, inspectors and defense contract audit
21 agency auditors.
22     Q.   During any of your visits to any of
                                              Page 27

1     Q.   And then what position did you take
2  after 1972?
3     A.   In 1976 I was moved laterally to the
4  position of chief of the jet engine branch.  And
5  then in I believe it was 1982 I was again moved
6  laterally to the position of chief of the aerospace
7  equipment branch.  And then I believe it was in
8  either late '83 or early '84 I assumed the position
9  of GM-14, chief of the contracts committee, and that
10 was a small group of individuals, all of them, with
11 the exception of me, were GM-13s, and we reviewed
12 and approved all documents that required review at a
13 higher level, either at the director of contracting
14 level or those documents that had to be forwarded to
15 either the installation commander and/or
16 headquarters, Air Force logistics command for
17 approval.
18     Q.   Can you give us an example of what kind
19 of documents would require such review?
20     A.   Based primarily upon the dollar value.
21 We had limited authority at the installation level
22 to manually approve contracts, and I don't remember
                                              Page 29

                                              Pages 26 to 29

10/10/2011                 TDY Holdings v. United States of America                 Tommy Jordan

the dollar value; but, for example, the contracts in
excess of $1 million had to be approved at the
headquarters Air Force logistics command level.
    Q.    Okay.
    A.    And before those documents left the
installation, we had to review all of those
documents in the contracts committee.
    Q.    Okay.  Now, I think we left off at 1984.
What was the next position that you took?
    A.    Next position I was promoted to GM-15
and assumed the position of the deputy chief of the
commodities division.  We had three branches within
that division, each one headed up by a GM-14.  The
chief of the division was a full Air Force colonel.
I was his deputy.  And I continued to serve in that
position until October of 1990.
    Q.    What kind of -- what were your primary
responsibilities as the deputy chief of the
commodities division?
    A.    To provide the -- advice and counsel to
the organization relative to contracting issues.  I
reviewed and approved a lot of correspondence that

Page 30

was generated by subordinates relative to
contracting issues.  I reviewed every contract
document that was required to be approved at a
higher level.  I was responsible for all of the
personnel issues that were within that division
relative to recommendations concerning promotions,
discipline, et cetera.
    Q.    Would it be accurate for the court to
understand that you consulted with and advised those
who were actually negotiating contracts?
        MR. WINE:  Objection, leading.
    A.    Yes.  We had a process for all
procurements where we had to prepare a procurement
plan, if you will, for all major procurements.
Those procurement plans had to be approved at a
higher level above the contracting officer and I
participated in the review of those procurement
plans and, where appropriate, I directed that they
be changed to reflect changes in the processes that
I felt were necessary.
BY MR. BARR:
    Q.    After your promotion in 1985, what was

Page 31

the next position you held?
    A.    Then in 1990 we had a major
reorganization within the Air Force.  The Air Force
made a decision to consolidate the Air Force systems
command and the Air Force logistics command into the
Air Force material command.  And then when that
organization was implemented, we had a subsequent
reorganization of how we were aligned within the air
logistics center and we became an air material area.
And the commander, who was a major general, selected
me to be the deputy chief of a directorate within
that organization.  And within that directorate, the
chief was a full Air Force colonel.  I was his
deputy.  We had --
    Q.    Let me stop you there.  When you say
that "we became an air material area," what is the
"we"?
    A.    San Antonio air logistics center became
the San Antonio air material area.
    Q.    And when you say "San Antonio air
logistics center," was that Kelly Air Force Base or
something else?

Page 32

    A.    Kelly Air Force Base consisted of the
air logistics center, air material area if you will,
and we also had tenants at Kelly Air Force Base such
as the 433rd troop carrier wing, which was an Air
Force reserve squadron that flew C-5s.  We had the
air intelligence agency that handled all of the
intelligence work for the Air Force, and then we had
a Texas Air National Guard unit assigned to Kelly
Air Force Base.  So it was not -- it was more than
just the air -- Kelly Air Force Base consisted of
more than just the air logistics center or
subsequently the air material area.
    Q.    Now, when -- in terms of the air
material area itself, can you give an approximation
as to the size or acreage of the air material area
itself within Kelly?
        MR. WINE:  Objection, relevance.
    A.    We have approximately 12,000 employees
within the air material area, and I believe there
was between 18 and 19,000 employees on Kelly Air
Force Base.  I don't remember the acreage.
BY MR. BARR:

Page 33

Pages 30 to 33

10/10/2011                 TDY Holdings v. United States of America                Tommy Jordan

1      Q.    And what happened after -- in your -- in
2   terms of your career, what happened after 1990?
3      A.    Then in 1994 I competed for and was
4   selected for the position of director of contracting
5   and was promoted from GM-15 to a member of the
6   senior executive service within the Air Force.
7      Q.    Did that promotion require anyone in
8   particular's approval?
9      A.    It required approval by the secretary of
10  the Air Force.  I had to interview before a panel
11  consisting primarily of -- I believe there was
12  either two or three major generals that conducted
13  the interviews, and there may have been one senior
14  executive service member.  And then the
15  recommendations of that panel, if you will, went to
16  the secretary of the Air Force for approval.
17     Q.    In that position where in the hierarchy,
18  if you will, of Air Force contracting did you stand?
19           MR. WINE:  Objection, vague.
20     A.    Best of my recollection, there were ten
21  senior executive service members that were within
22  the GS-1102 series -- contracting series.  There was

Page 34

1   probably more intense when I was at the lower levels
2   as far as negotiations of contracts.  As I moved up
3   the management chain, I actually had less
4   opportunity to actually sit down with a contractor
5   and negotiate the terms and conditions and price of
6   contracts.  However, I did continue to review that
7   contracting process that was executed by lower
8   subordinates throughout my career in contracting.
9           Then if I may, even -- even after I
10  actually left the position of director of
11  contracting in 1994 -- or 1995, pardon me, I
12  continued to be deeply involved in the contracting
13  process throughout the rest of my time until I
14  retired in 2001.  And then even subsequently I've
15  been involved in federal contracting as a consultant
16  and an expert witness on cases such as the
17  Miami-Dade and then this one.
18  BY MR. BARR:
19     Q.    Now, in Miami-Dade, did the court accept
20  you as an expert in government contracting?
21     A.    Yes, they did.
22     Q.    Now, getting back, you mentioned that

Page 36

1   a director of contracting, who was an SCS, at each
2   of the five air material areas.  There was one at
3   the aeronautical systems center at Wright-Patterson
4   Air Force Base.  There was one at headquarters Air
5   Force material area --
6   BY MR. BARR:
7      Q.    I don't think you need to --
8      A.    Okay.
9      Q.    -- describe each of them.  When you say
10  there were ten senior executive service members,
11  were these the highest ranking civilians in the Air
12  Force contracting?
13     A.    Yes, they were.
14     Q.    And you were one of them?
15     A.    Yes.
16     Q.    Now, as far as the -- looking at your
17  career as a whole, how would you characterize your
18  experience in the award and administration of
19  contracts to defense contractors?
20           MR. WINE:  Objection, vague and
21  ambiguous.
22     A.    My actual hands-on experience was

Page 35

1   you had had experience with -- I believe you
2   mentioned General Dynamics and McDonnell Douglas.
3   Can you give us some other examples of defense
4   manufacturing companies with whom you had direct
5   experience?
6      A.    Intercontinental Engine Service in
7   Brownsville.  Gary Aircraft Corporation at San
8   Antonio.  There was a subcontractor to Pratt &
9   Whitney on the F-100 engine in Long Beach -- pardon
10  me, Long Island that I visited on a couple of
11  occasions.  I visited the Pratt & Whitney plant
12  where they did repair and maintenance of F-100
13  engines down in Florida.  I visited the Rolls Royce
14  plant in Scotland.  I visited the General Electric
15  plant in New Hampshire -- pardon me, outside of
16  Boston.  And those are the ones that come
17  immediately to mind.
18     Q.    Did you have any direct experience with
19  Northrop?
20     A.    I was involved in award of contracts to
21  Northrop for the T-38 and F-5 aircraft.  However, I
22  do not recall ever visiting the Northrop plant.

Page 37

Pages 34 to 37

1    Q.    Okay.  Can you estimate the number of
2  defense contractors with whom you negotiated
3  contracts during your career as a warranted
4  contracting officer?
5    A.    I did not keep an inventory of those
6  contracts, but it was certainly in the hundreds of
7  contractors.
8    Q.    And can you estimate the number of
9  contracts that were negotiated by subordinates that
10  you reviewed and approved?
11    A.    Again, I did not keep an inventory of
12  those contracts, but it was probably well in excess
13  of a thousand.
14    Q.    Now, I take it that you were not
15  yourself a government inspector; is that correct?
16    A.    That is correct.
17    Q.    Did you work with government inspectors
18  in the course of your career?
19    A.    Yes, I did.
20    Q.    Can you estimate the number of
21  government inspectors with whom you worked during
22  that period?

1  upon statute.  Statutes required that all
2  procurements be made by formal advertising with the
3  exception of -- and I think there were 17 specific
4  exceptions to the law.  So we had a document which
5  ones of those exceptions was applicable to a
6  specific procurement, and then come up with a
7  written document that authorized the negotiation of
8  a specific contract.
9          And then subsequently the
10  preparation of the solicitation document, if you
11  will, request for proposal, the receipt of the
12  contractor's proposal, a valuation of that proposal
13  to make sure that it was, in fact, responsive to our
14  solicitation, the request for assistance from the
15  defense contract administrative services, or the
16  DCAA auditors, in evaluating the contractor's cost
17  and pricing data submitted in response to that
18  proposal, make sure that they were compliant with
19  the Truth in Negotiations Act, if you will, the
20  TINA.  And then receiving the recommendations of the
21  administrative contracting officer and his staff and
22  the defense contract audit agency evaluating those

1    A.    My best estimate would be in the
2  vicinity of a hundred.
3    Q.    Now, let's get back to your
4  responsibilities as a procuring contracting officer,
5  or PCO.  Could you describe for the court what your
6  responsibilities were as a PCO?
7    A.    It started with the identification of an
8  Air Force requirement by our acquiring activities,
9  such as inventory managers or program managers, and
10  then working with those individuals in the
11  preparation of documents called purchase requests to
12  make sure that they were complete and suitable for
13  our use and to initiate the procurement process.
14    Q.    Did that include working with engineers?
15    A.    Very definitely.
16    Q.    Okay.  Please go ahead.
17    A.    Then the preparation of, as I had
18  indicated earlier, the procurement plan.  And then
19  for every negotiated procurement, we had to prepare
20  a justification and approval to document the
21  authorization for the negotiation of the Armed
22  Services Procurement Regulation which was predicated

1  recommendations, and then actually having
2  face-to-face negotiations with the contractor to
3  arrive at an agreement upon price and delivery and
4  other terms and conditions that would ultimately
5  result in a contract.  And then finally the
6  preparation of the contract document that reflected
7  the agreement between the government and the
8  contractor.
9    Q.    Did the responsibilities of you -- did
10  your responsibilities as a PCO continue after the
11  award of the contract?
12    A.    To the extent that it frequently
13  required us to clarify the intent of documents, such
14  as the purchase description or contract, as it
15  pertained to specifications and then any questions
16  that came up either by the administrative
17  contracting officer or the contract as to the
18  meaning and intent of the contractual document.
19    Q.    Now, you mentioned the administrative
20  contracting officer, so I'd like to talk about that
21  for a minute.
22          Was an administrative contracting

1 officer, that position different from the position
2 that you held?
3     A.   They were different insofar as the roles
4 and responsibilities of a procuring contracting
5 officer.  Essentially led up to the point of
6 contract award, even though there was some
7 involvement subsequent to contract award.  And then
8 the roles and responsibilities of the administrative
9 contracting officer primarily concerned the
10 administration of the contract subsequent to
11 contract award.
12     Q.   And when you say "administration of the
13 contract subsequent," to what extent?  And if you
14 don't understand what I'm getting at --
15     A.   To -- well, to the extent that he was
16 responsible for such things as processing specific
17 requests from the contractor for progress payments.
18 He was responsible for assuring that the contractor
19 complied with the document we called a DD-254, which
20 was the classification of documents pertaining to a
21 specific contract and that the contractor had the
22 proper safeguards for classified information, and

Page 42

1 then all other facets of the contract that pertained
2 to contractor performance.
3     Q.   Is this -- are we talking now at this
4 point on a day-to-day level?
5     A.   On major contracts, very definitely
6 there was a day-to-day involvement of the
7 administrative contractor officer.  On smaller
8 procurements, for example, such as a purchase
9 request for $2,000, he probably had very little in
10 day-to-day involvement.
11     Q.   Were some ACOs stationed at contractors'
12 facilities?
13     A.   Particularly those major contractors
14 such as General Dynamics and McDonnell Douglas, they
15 had a resident administrative contracting officer.
16 For smaller contracts, they had a contracting
17 officer stationed at a central location who
18 administered multiple contracts, had multiple
19 contractor locations, but they were not what I would
20 call major contracts or major contractors.
21     Q.   When you say "a central location," was
22 the central location outside of the contractors'

Page 43

1 facilities?
2     A.   Yes, it was.  For example, in San
3 Antonio we had a defense contract management
4 services office here in San Antonio and they
5 administered all of the smaller contracts within the
6 jurisdiction of their office and it was -- and I
7 don't remember the specifics, but it was like a
8 100-mile radius of San Antonio.
9     Q.   Were administrative contracting officers
10 also involved in the closeout or termination of
11 contracts?
12     A.   They were involved in the closeout of
13 contracts.  The termination settlement was within
14 the jurisdiction of administrative contracting
15 officers.  We had at the procuring activity an
16 individual who was designated as the termination
17 contracting officer.  And so when a decision was
18 made to terminate a contract, either for convenience
19 or default, the -- as we called it, a TCO at the
20 procuring activity processed all of the notices to
21 the contractor relative to the termination, and then
22 it was up to the administrative contracting officer

Page 44

1 to close out and settle that termination and any
2 claims that were incident to that termination.
3     Q.   Just so we have the terminology
4 straight, can a -- contracts have been closed out in
5 ways other than termination?
6     A.   By successful completion and delivery of
7 the product or services that were called out in the
8 contract.
9     Q.   Did the administrative contracting
10 officer have responsibilities relating to the
11 quality assurance program of a contractor?
12     A.   The administrative contracting officer
13 did not have the responsibilities of inspection, but
14 there were inspectors in -- I think there were in
15 the series called GS-1910 that were working with the
16 administrative contracting officer.  I don't think
17 that they actually were under the supervision of the
18 administrative contracting officer, but they were in
19 the same office and worked very closely with the
20 administrative contracting officer and they were
21 charged with the responsibility of monitoring the
22 contractor's inspection system and then inspecting,

Page 45

Pages 42 to 45

10/10/2011                TDY Holdings v. United States of America                Tommy Jordan

1    sometimes on a statistical sampling basis, the
2    product that had been produced by the contractor.
3    And then the signature of a document called DD-250,
4    the material inspection and receiving report, which
5    was a document that authorized the government to
6    make payment for the product produced.
7        Q.    Now, when you said that the inspection
8    was sometimes done on a statistical sampling basis,
9    was there another method by which government
10   inspectors performed their duties?
11       A.    Based upon my experience, primarily what
12   the inspectors would do would be to review the
13   documentation that had been prepared by the
14   contractor on the product as it went through the
15   various stages of processes and production.  There
16   was a system that the procuring contracting
17   officer -- because of quality problems being
18   experienced by the users in the field, we could
19   establish a mandatory inspection of certain physical
20   characteristics of every product.  But absent that
21   what we call mandatory A inspection requirement,
22   best of my knowledge and based upon my experience,

Page 46

1    they never inspected 100 percent of every product
2    that was produced.  It was just physically
3    impossible to check every characteristic.
4        Q.    And can you estimate the number of ACOs
5    with whom you worked over the years?
6        A.    My best estimate would be somewhere in
7    the vicinity of 100, more or less.
8        Q.    Now, as a PCO, was it part of your
9    duties and responsibilities to direct or supervise
10   the prevention of chemical spills or waste disposal
11   activities of any contractors?
12       A.    No, it was not.
13       Q.    Based on your experience over the years,
14   was it part of the duties and responsibilities of
15   the ACOs to do those things?
16       A.    Based upon my experience and my review
17   of documents, it was not the responsibility of the
18   ACO to supervise those kinds of things.
19       Q.    Now, I believe you mentioned this
20   earlier, but -- or this may have been covered in an
21   earlier deposition that you gave in this case.  You
22   indicate that you had been certified at level III in

Page 47

1    contracting?
2            MR. WINE:  Objection, assumes facts
3    not in evidence.
4    BY MR. BARR:
5        Q.    Were you certified at level III in
6    contracting?
7        A.    In 1990 there was a statute which was
8    signed into law called the Defense Work Force --
9    Acquisition Work Force Improvement Act, DWIA, and it
10   had different levels of certification required and
11   then the requirements for being certified at those
12   various levels.  I was certified at a level III
13   under the provisions of the Defense Acquisition Work
14   Force Improvement Act, which is the highest level of
15   certification in contracting.
16       Q.    And when did you get this certification,
17   approximately?
18       A.    I don't remember exactly when it was,
19   but it was sometime in the early 1990s.
20       Q.    Okay.  And what does it mean -- for
21   those of us who are not familiar with defense
22   contracting, what does it mean to receive this

Page 48

1    certification?
2        A.    It carried with it certain
3    responsibilities or continuing education and
4    training.  My recollection is that in order to
5    retain your certification at level III, you had to
6    receive 200 hours of training every two years in
7    contracting-related issues.  And it was, if you
8    will, kind of a badge of honor to be certified at
9    the level III, which is a higher-level
10   certification.
11       Q.    Did you comply with that requirement and
12   receive 200 hours of training every two years?
13       A.    Yes, I did.
14       Q.    For the period of 1995 through 2001,
15   what was your area of concentration?  What was your
16   focus during that period?
17       A.    On the 13th of July of 1995, President
18   Clinton accepted the recommendations of the base
19   closure commission and that started the clock for
20   closure of Kelly Air Force Base.  I raised my hand
21   and volunteered to the installation commander to
22   head up the organization that would oversee those,

Page 49

Pages 46 to 49

1  as we called it, BRAC activities for the
2  installation.  From 1995 through late 1996, I was
3  dual hatted, if you will.  I served both in the
4  capacity of director of contracting and the director
5  of BRAC implementation.  Then it became obvious that
6  it was more than I could handle to say -- say grace
7  over both of those programs, so the Air Force made a
8  decision to bring in an Air Force colonel as the
9  director of contracting.  And then from that point
10 forward I concentrated my energies upon closure
11 activities and all things that were related to that
12 closure.  Then in -- about six months, seven months
13 before closure I was selected as the executive
14 director of the San Antonio air material area and I
15 was the -- if you will, the senior civilian.  For
16 all intents and purposes, I was the vice commander
17 of the installation until we closed, and then I
18 retired in June -- July of 2001.
19      Q.    Mr. Jordan, have you ever been a lawyer?
20      A.    I have not.
21      Q.    To your knowledge, were any of your
22 direct supervisors lawyers?

Page 50

1       A.    Best of my knowledge, they were not.
2       Q.    Now, you mentioned earlier something
3  called the ASPRs.  What does "ASPR" stand for?
4       A.    Armed Services Procurement Regulations.
5       Q.    And could you describe for the court
6  what the ASPRs were?
7       A.    The ASPRs -- the first edition of the
8  ASPR was published in 1948 after the federal
9  government formally established the Department of
10 Defense and the services within the Department of
11 Defense, such as the Air Force and the Navy.  The
12 ASPR was basically a document that contained all of
13 the customs and practices, policies and procedures
14 pertaining to government contracting.  Most of those
15 customs and practices were predicated upon various
16 statutes that had been promulgated by Congress and
17 the administration.
18      Q.    Let me stop you there.  Did you work
19 with the statutes themselves or with the ASPRs?
20      A.    Worked with the ASPRs.
21      Q.    Did the -- did another set of
22 regulations take the place of the ASPRs at some

Page 51

1  point?
2       A.    At some point, I don't remember the
3  exact date, but the ASPRs were superseded by the
4  Federal Acquisition Regulations, the FARs.  Then the
5  FAR became the document that pertained to all
6  government contracts and not just the Department of
7  Defense.  The ASPR was limited to contracts executed
8  by the Department of Defense.  The FAR pertained to
9  all federal contracts.
10      Q.    Did you use the ASPRs and the FARs in
11 the ordinary course of your duties and
12 responsibilities?
13      A.    For most of my career I -- either -- I
14 had a set of ASPRs and/or FARs either in the office
15 within 15 feet of my desk or actually on my desk,
16 and I referred to them most days multiple times
17 every day.
18      Q.    Now, as part of your duties and
19 responsibilities as an Air Force contracting
20 official, did you deal with issues relating to the
21 reasonableness of costs?
22           MR. WINE:  Objection, vague and

Page 52

1  ambiguous.
2       A.    On every contract that was
3  noncompetitive, we had to make a determination as to
4  reasonableness of cost.
5  BY MR. BARR:
6       Q.    Now, is reasonableness of cost -- is
7  that a term of art in government contracting?
8       A.    It is a term of art.  It pertains to an
9  examination of all of the elements of those costs
10 submitted by the contractor to either verify that
11 they had been reviewed and approved by either the
12 administrative contracting officer or a DCAA, such
13 as in the case of overhead accounts.  On many
14 contractors the PCO did not have to negotiate the
15 overhead rates.  Those were established on an annual
16 basis by the administrative contracting officer with
17 the input of the defense contract audit agency.  And
18 so all we had to do was to verify that the rates
19 submitted by the contractor were, in fact,
20 consistent with those rates that had been approved
21 by the ACO and/or DCAA.  Then we negotiated --
22 evaluated and negotiated the material and labor

Page 53

Pages 50 to 53

10/10/2011                 TDY Holdings v. United States of America                 Tommy Jordan

1   content of the price.
2       Q.    Now, are you familiar with the term
3   "direct labor and material"?
4       A.    Yes, I am.
5       Q.    Are those the kinds of cost issues that
6   you negotiated?
7       A.    Yes, they are.
8       Q.    During the course of your career, did
9   the contracts with which you negotiated and
10  awarded -- well, did any of the contracts that you
11  negotiated and awarded include progress payments
12  clauses?
13      A.    Very often, very frequently.
14      Q.    And did you become familiar with the
15  ASPR and FAR provisions relating to progress
16  payments?
17      A.    Yes, I did.
18      Q.    Now, let's shift gears a little bit
19  toward classified information.  I believe you
20  alluded to that a few minutes ago.  To what extent
21  did classified information become a factor in the
22  work that you did?

Page 54

1           MR. WINE:  Objection, vague and
2   ambiguous.
3       A.    I did award several contracts that
4   included classified information or a requirement for
5   the contractor to have access to classified
6   information.  The one that comes immediate to mind
7   is the B-58 contract that I alluded to earlier.  It
8   was a very highly classified program inasmuch as the
9   B-58 at that point in time was the premier bomber
10  for delivery of nuclear ordnance within the Air
11  Force inventory.  It had some performance
12  deficiencies and there was a presidential priority
13  for correcting those deficiencies so that there
14  was -- all of the performance characteristics of
15  those deficiencies and what the contractor was doing
16  to correct those deficiencies was very highly
17  classified.
18  BY MR. BARR:
19      Q.    In any of the contracts with which you
20  were directly associated, did any of the classified
21  information, to your knowledge, pertain to the
22  handling of chemical waste at defense contractors'

Page 55

1   facilities?
2           MR. WINE:  Objection, relevance.
3       A.    They did not.
4   BY MR. BARR:
5       Q.    In any of the contracts with which you
6   were directly associated, did any of the classified
7   information, to your knowledge, pertain to the usage
8   of chemicals in the processing operations of any
9   contractors?
10          MR. WINE:  Same objection.
11      A.    Best of my knowledge, they did not.
12  BY MR. BARR:
13      Q.    As part of your duties and
14  responsibilities between 1962 and the mid 1990s, did
15  you work with the defense contract audit agency?
16      A.    Yes, I did.
17      Q.    Could you explain the nature of your
18  work with that group.
19      A.    It was relative to the preparation for
20  and the negotiation of contracts that were based
21  upon price and cost data submitted by the
22  contractor, and we frequently, during that

Page 56

1   negotiation process and the preparation for the
2   negotiations, met with DCAA to have a more clear
3   understanding of some of the positions taken by
4   DCAA.
5       Q.    What type of background and training did
6   DCAA personnel have, to the best of your knowledge,
7   generally speaking?
8           MR. WINE:  Objection, competence.
9       A.    Best of my knowledge, they were
10  primarily auditors, accountants.
11  BY MR. BARR:
12      Q.    And is that based on your working with
13  them?
14      A.    Yes, it is.
15      Q.    Was your interaction with DCAA personnel
16  limited to preaward to -- let me start over again.
17          Was your interaction with DCAA
18  personnel limited to events before the award of
19  contracts?
20          MR. WINE:  Objection, leading.
21      A.    Primarily, yes.
22  BY MR. BARR:

Page 57

Pages 54 to 57

10/10/2011                    TDY Holdings v. United States of America                    Tommy Jordan

1    Q.    Did any of your work with them include
2  interactions during contract performance or contract
3  conclusion?
4    A.    Not that I recall.
5    Q.    Okay.  Let's focus on ways in which you
6  believe you can assist the court in this case
7  regarding government contracting in terms of
8  specialized knowledge.
9          Can you explain ways that you
10  believe you can help the court?
11    A.    I have spent almost 50 years of my life
12  related in one way or another with the contracting
13  process.  I think I can help the court understand
14  the customs and procedures relative to that
15  contracting process.  There are many terms of art
16  associated with the contracting process that I have
17  obtained over the course of my career that many
18  laymen would not have the same interpretation and
19  understanding of those terms of art that I have
20  through my experience and training.
21          I think I can help the court
22  understand the regulations that govern the

Page 58

1    A.    I reviewed a significant number of
2  documents.
3    Q.    Can you estimate the volume?
4    A.    I estimate that it would be well in
5  excess of 1,000 documents.  I have no way of
6  estimating the number of pages, but it was possibly
7  tens of thousands of pages of documents.  They
8  consisted of contracts that have survived time, the
9  Armed Services Procurement Regulations and the FARs
10  that pertain to the acquisition process, documents
11  that have survived, such as minutes of Ryan
12  stockholder meetings, board of directors' meetings,
13  presentations to the stockholders of the
14  corporation, specifications that were incorporated
15  into contracts that were awarded to the contractor,
16  contractor prepared documents such as -- they're
17  called military process data, MPDs, that were
18  prepared --
19    Q.    I'm sorry, do you mean manufacturing?
20    A.    -- manufacturing process data, MPDs,
21  that were prepared by the contractor for various
22  processes, contractor reports, DCAA audits, minutes

Page 60

1  acquisition process from their earliest inception
2  throughout this entire relevant period of the
3  litigation through the current time, the
4  similarities or changes in those regulations, how
5  those regulations were used to form the basis of
6  contracts that were awarded to the contractor during
7  this relevant period.  The similarities in the
8  contract documents over time.  Why I believe that --
9  even though there are many contracts that have not
10  survived time, that we can relate those terms,
11  conditions of the contracts that have survived to
12  the contracts that have not survived because of the
13  relationship between those contractual documents and
14  the regulations that have, in fact, survived over
15  time.  And then the roles and responsibilities of
16  the various government employees that were actively
17  involved in the award administration or closeout of
18  various contracts with the contractor.
19    Q.    Okay.  Let's focus on the methodology of
20  your work in this case.  Can you review, in general
21  terms of course, the steps that you took in arriving
22  at your conclusions in this case?

Page 59

1  of program reviews that have been conducted at the
2  contractors' facilities on various contracts,
3  correspondence pertaining to subcontracts that have
4  been awarded by various companies to the
5  contractors, such as Hughes Aircraft or the
6  helicopter fuselage sections.
7    Q.    Did the types of documents you reviewed
8  include contracting procedure and policy manuals?
9          MR. WINE:  Objection, leading.
10    A.    Yes, that was part of the ASPR, and
11  there were some other attendant documents that had
12  been prepared by the government, such as the
13  inspector's familiarization manual that was in the
14  World War II era.
15          MR. WINE:  We've been going for over
16  an hour.  Can we take a break?
17          MR. BARR:  Actually I'd rather go
18  for another few minutes.
19          MR. WINE:  How much longer do you
20  have?
21          MR. BARR:  Well, before we break, I
22  want to -- maybe another 15 minutes.

Page 61

Pages 58 to 61

BY MR. BARR:

    Q.   Mr. Jordan, have you also reviewed the expert reports and depositions of any of TDY's experts in this case?

    A.   I have reviewed a number of depositions pertaining to this case, yes, I have.

    Q.   Do you recall the names of some of those that you reviewed?

    A.   McGill --

    Q.   Well, I'm referring to experts for the moment.

    A.   The experts, I reviewed Dr. Carlisle's and Mr. Zoch's. Those are the two that come immediately to mind.

    Q.   Okay. And did you review the available fact witness depositions as well?

    A.   Yes, I did.

    Q.   Now, after you reviewed the various documents that you have described, what did you do with that information?

    A.   I used that information to formulate various opinions that were expressed either in my

*Page 62*

expert report or which I expressed in my two depositions I gave in December of 2009 and then my preparation for this deposition.

    Q.   How did -- how, if at all, did your personal experience over the years assist you in forming your opinions?

    A.   As I indicated earlier, my experience has allowed me to become familiar with a lot of the terms of art in review of contractual documents and those documents that are related to the contracts. And so I can easily take a contract that had been prepared and awarded to Teledyne and review it and have a very good understanding of what the intent of that contract was.

    Q.   In terms of the research that you did in the preparation of reports and in preparation to testify both in 2009 and today, did you perform personal word searches in the Justice Department document databases?

    MR. WINE: Objection, leading.

    A.   I was given access to the DOJ database and I performed a significant number of searches

*Page 63*

within that database. I think as I indicated in my December of 2009 deposition, I did not keep a specific inventory of all those word searches so I can't tell you exactly what words I searched for, how many I did; but I did do a significant number of word searches.

BY MR. BARR:

    Q.   Did some of those word searches reveal documents that you found to be significant?

    MR. WINE: Objection.

    A.   Yes, they did. And then I also found a significant number of documents that had no bearing upon the case whatsoever.

BY MR. BARR:

    Q.   Did you request additional word searches be done for you by Justice Department personnel?

    A.   I did request a relatively significant number of documents from DOJ. I don't know how many word searches were conducted by DOJ to retrieve those documents, but, yes, I did request specific documents and those were provided to me.

    Q.   Now, did you speak to former auditors --

*Page 64*

former government auditors who had worked at the site?

    A.   As I indicated in prior deposition, I did have a conversation with Theresa Lawson who was a DCAA auditor and Mr. Woodworth who was an administrative contracting officer.

    Q.   I would like to mark as Exhibits 3 and 4 the two reports that you prepared in this case.

    (Deposition Exhibit 3 marked.)

    (Deposition Exhibit 4 marked.)

BY MR. BARR:

    Q.   For the moment the only questions I'll have for you are whether you recognize them.

    A.   Yes, I do.

    Q.   Is that your signature on each one?

    A.   Yes, it is.

    Q.   All right. Now, in some documents that have been used in this case the word "cognizance" is used. Do you recall that?

    A.   Yes, I do.

    Q.   In the defense contracting context what does "cognizance" mean?

*Page 65*

10/10/2011                  TDY Holdings v. United States of America                  Tommy Jordan

---

**Page 66**

1          MR. WINE: Objection, vague and
2   ambiguous.
3      A.   Cognizance means that a specific agency
4   or individual has been assigned administrative
5   responsibility for a specific contract or a specific
6   program, and it had no other meaning other than that
7   they have been designated, if you will, as the lead
8   agency for administration of a specific contractor
9   at a specific location.
10  BY MR. BARR:
11     Q.   Does cognizance mean responsibility for
12  supervision or direction of contractor personnel?
13         MR. WINE: Objection, leading.
14     A.   It has no connotation whatsoever
15  relative to administrative -- or administering the
16  contract in such a way that it can be construed as
17  supervision of a contractor or contractor's
18  employees.
19         MR. BARR: All right. This would be
20  a good time. Let's just take a ten-minute break.
21         THE VIDEOGRAPHER: Going off record.
22  Time now is 2:07.

---

**Page 67**

1          (Recess Taken From 2:07 p.m. To
2   2:23 p.m.)
3          THE VIDEOGRAPHER: Going back on
4   record. Time now is 2:23.
5   BY MR. BARR:
6      Q.   Mr. Jordan, I wanted to follow up on
7   your last answer regarding not -- cognizance not
8   being construed as supervision of a contract or a
9   contractor's employees. Can you explain a little
10  bit more what that means?
11     A.   Cognizance really means that just the
12  government was aware of what was going on in a
13  contractor's facility. There is nothing either in
14  regulation or in practice that had any connotation
15  that they had the authority or actually did
16  supervise contractor employees. Conversely, there
17  are depositions by former contractor employees where
18  they said they specifically never observed
19  government employees directing or supervising
20  contractor employees.
21         MR. WINE: Objection to the
22  response, assume facts not in evidence and is

---

**Page 68**

1   nonresponsive to the question.
2   BY MR. BARR:
3      Q.   Let's look at World War II time period
4   for a bit. But before we do that, just a little bit
5   of basic terminology. Mr. Jordan, what is a supply
6   contract?
7      A.   A supply contract is a contract awarded
8   by the government for delivery of a specific piece
9   of hardware, a product, if you will, and it is
10  distinguished from a service contract where the
11  contractor performed a service for the government.
12  And in the supply contract it was a specifically
13  identified product.
14     Q.   And what is a prime contract?
15     A.   Prime contract is a contract directly
16  between the government and the contractor for
17  delivery of a specific product and/or service.
18     Q.   And is that different from a
19  subcontract?
20     A.   A subcontract is a contract between the
21  prime contractor and one of his suppliers for
22  delivery of specified components and/or subproducts,

---

**Page 69**

1   if you will, to be used by the contractor in
2   performance of the prime contract.
3      Q.   Now, focusing on World War II, did you
4   review contracts between Ryan and the military
5   during the World War II period?
6          MR. WINE: Objection, goes beyond
7   the area of expertise of the expert.
8      A.   Yes, I did review those contracts.
9   BY MR. BARR:
10     Q.   And did you review those contracts in
11  light of your experience as a government contracting
12  officer?
13         MR. WINE: Same objection.
14     A.   Yes, I did.
15  BY MR. BARR:
16     Q.   I'll mark as -- I believe this will be
17  Exhibits --
18         MR. WINE: 5.
19  BY MR. BARR:
20     Q.   -- 5 through 12 -- or 5 through 11, I'm
21  not quite sure -- a number of documents, and I'll
22  ask you if you have seen these before.

---

10/10/2011                 TDY Holdings v. United States of America                 Tommy Jordan

1            (Deposition Exhibit 5 marked.)
2            (Deposition Exhibit 6 marked.)
3            (Deposition Exhibit 7 marked.)
4            (Deposition Exhibit 8 marked.)
5            (Deposition Exhibit 9 marked.)
6            (Deposition Exhibit 10 marked.)
7            (Deposition Exhibit 11 marked.)
8            (Witness Reviews Documents.)
9       A.   Yes, I have.
10  BY MR. BARR:
11      Q.   Now, one of these exhibits is a 1943
12  letter of intent.
13           MR. WINE:  Which exhibit?
14  BY MR. BARR:
15      Q.   Do you have that in front of you,
16  Mr. Jordan?
17      A.   Yes.  It's Exhibit No. 9.
18      Q.   What is a letter of intent?
19      A.   It is a document issued by the
20  government to a contractor that it intends to issue
21  a formal contract for specified services.  They were
22  used more frequently in the World War II era than
                                              Page 70

1       Q.   Did you -- were you involved in awarding
2   contracts for which letters of intent had previously
3   been issued?
4       A.   No.
5            MR. WINE:  Objection.
6   BY MR. BARR:
7       Q.   What was the nature of your experience
8   with letters of intent?
9            MR. WINE:  Objection, asked and
10  answered.
11      A.   Strictly I was aware of the fact that
12  letters of intent had been used.  They were
13  superseded by definitive contracts and in this case
14  this specific letter of intent was superseded by a
15  contract identified as Exhibit No. 10.
16  BY MR. BARR:
17      Q.   Is that consistent with your experience
18  during your career?
19           MR. WINE:  Objection, witness has
20  testified he's not -- has not had experience in his
21  career working with letters of intent; therefore, he
22  lacks the requisite knowledge to give expert
                                              Page 72

1   they were during my actual experience as a
2   contracting officer.
3            MR. WINE:  And on that basis, I
4   would like to object to the response as being
5   outside the scope of the witness' area of expertise.
6            MR. BARR:  All right.  Thank you.
7   BY MR. BARR:
8       Q.   Mr. Jordan, were you familiar with
9   letters of intent during your time as a government
10  contracting officer?
11      A.   Yeah --
12           MR. WINE:  Objection, relevance.
13      A.   Yes.
14  BY MR. BARR:
15      Q.   Did you use or encounter letters of
16  intent periodically in the course of your
17  experience?
18           MR. WINE:  Objection, vague and
19  ambiguous.
20      A.   I did not use letters of intent during
21  my experience.
22  BY MR. BARR:
                                              Page 71

1   testimony in the subject matter.
2   BY MR. BARR:
3       Q.   Could you answer the question?
4       A.   It is consistent with my understanding
5   of the purpose and intent of documents entitled
6   "letters of intent."
7       Q.   And how did you gain this understanding
8   as to the purpose and intent of letters of intent?
9       A.   Strictly through the -- my familiarity
10  with the regulations and then some of the training
11  courses I had received relative to the history of
12  government regulations.
13      Q.   In your review of these documents that
14  we've marked as Exhibits -- I believe it's 5 through
15  11, did your review of them allow you to determine
16  what kinds of supply contracts these were?
17           MR. WINE:  Objection, foundation,
18  hearsay.
19      A.   Yes, it did.
20  BY MR. BARR:
21      Q.   What kinds of contracts were these?
22           MR. WINE:  Objection -- same
                                              Page 73

Pages  70  to  73

1 objections.
2     A.    I think they were basically cost plus a
3 fixed-fee contract.
4          THE REPORTER:  Hold on.  I need you
5 to repeat that.
6          THE WITNESS:  Cost plus a
7 fixed-fee-type contract.
8          MR. WINE:  Also assert the objection
9 it calls for a legal conclusion.
10 BY MR. BARR:
11     Q.    If you could look through these, were
12 any of these fixed-price contracts?
13          MR. WINE:  Objection, vague and
14 ambiguous.  Lacks proper foundation.  Also calls for
15 a legal conclusion.
16          (Witness Reviews Document.)
17          MR. WINE:  Also assert the objection
18 that the documents go beyond the scope of the expert
19 report as they are not referenced in the expert
20 report.  Correction, an analysis of the documents is
21 not referenced in the expert report.
22     A.    It appears that Exhibits 5 and 6 are a

Page 74

1 fixed price.
2 BY MR. BARR:
3     Q.    Okay.
4     A.    On a cursory review.
5     Q.    Now, based on your experience during the
6 time that you were a government contracting officer,
7 is a cost-reimbursement contract a desirable form of
8 contracting?
9          MR. WINE:  Objection, vague and
10 ambiguous, leading.  Calls for a legal conclusion --
11 strike the last objection.
12          MR. BARR:  Anything else?
13          MR. WINE:  I'll come up with it in a
14 second.
15     A.    As a contracting officer, we consider
16 cost-type contracts to be the least desirable form
17 of contracts.
18 BY MR. BARR:
19     Q.    And why is that?
20     A.    Because it placed the maximum cost risk
21 upon the government.  In a fixed-price contract the
22 cost risk was placed upon the contractor, not the

Page 75

1 government.  They were more difficult to award and
2 to administer than a fixed-price contract and so it
3 was least desirable.
4          MR. WINE:  Also object to the answer
5 on relevance grounds.
6 BY MR. BARR:
7     Q.    Did you also become familiar with the
8 extent to which Ryan during World War II was a
9 subcontractor?
10          MR. WINE:  Objection, leading.
11     A.    Yes, I did.
12 BY MR. BARR:
13     Q.    And what did you -- just by way of
14 background and in general terms, what did you
15 determine?
16     A.    The documents that I reviewed indicated
17 that during the war that Ryan performed as a
18 subcontractor to other prime contractors on aircraft
19 components, and my recollection is that the primary
20 product that they produced by the contractor was
21 manifolds.
22     Q.    Let me show you some -- of World War II

Page 76

1 documents and have these marked as exhibits starting
2 with No. 12.
3          MR. WINE:  We done with 5 through
4 11?
5          MR. BARR:  For now.
6          (Deposition Exhibit 12 marked.)
7          (Deposition Exhibit 13 marked.)
8          (Deposition Exhibit 14 marked.)
9          (Deposition Exhibit 15 marked.)
10          (Deposition Exhibit 16 marked.)
11          (Deposition Exhibit 17 marked.)
12          (Deposition Exhibit 18 marked.)
13 BY MR. BARR:
14     Q.    Mr. Jordan, if you would briefly review
15 those, just glance through them, and I ask you if
16 you have reviewed these documents before.
17          (Witness Reviews Documents.)
18     A.    I believe that I have.
19 BY MR. BARR:
20     Q.    Were these documents that you reviewed
21 in order to get some background as to the extent to
22 which Ryan was a subcontractor during the war?

Page 77

1     A.   These are some of the documents that I
2  reviewed that led me to that conclusion, yes.
3     Q.   All right.  Now, the next subject I'd
4  like to move to is the question of releases.  Are
5  you familiar with the term "releases" in the
6  government contracting context?
7          MR. WINE:  Objection, vague and
8  ambiguous.
9     A.   Yes, I am.
10  BY MR. BARR:
11     Q.   And did you derive that understanding in
12  the course of your work and experience between 1962
13  and 2001 -- or 1990?
14     A.   Somewhat, yes.
15     Q.   When you say "somewhat," can you
16  explain?
17     A.   I was aware that the -- some of the
18  contracts that we awarded contained specific
19  requirements for releases.  The actual documents
20  themselves, the releases, that was a responsibility
21  of the administrative contracting officer, so I was
22  not involved in actually securing contractor's

Page 78

1  signature of those releases.
2     Q.   Were you familiar during the course of
3  your experience as a government contracting official
4  with the required form and content of releases?
5          MR. WINE:  Objection.
6     A.   Yes, I was.
7  BY MR. BARR:
8     Q.   Did you review any Ryan releases of
9  claims against the government with respect to World
10  War II cost-reimbursement contracts?
11          MR. WINE:  Objection, assumes facts
12  not in evidence and beyond the scope of the witness'
13  expertise.
14     A.   Yes, I did.
15  BY MR. BARR:
16     Q.   Generally speaking, what is the purpose
17  of releases -- of such releases?
18          MR. WINE:  Objection, calls for a
19  legal conclusion.
20     A.   To bring closure and finality to
21  contractors, opportunity to submit claims to the
22  government against performance under those

Page 79

1  contracts.
2  BY MR. BARR:
3     Q.   Is this -- is that something that you
4  learned in the course of your training and tutelage
5  under more experienced government contracting
6  personnel?
7          MR. WINE:  Objection.
8     A.   Yes, it is.
9  BY MR. BARR:
10     Q.   Let me start with No. 19.  Going to mark
11  three additional exhibits.
12          (Deposition Exhibit 19 marked.)
13          (Deposition Exhibit 20 marked.)
14          (Deposition Exhibit 21 marked.)
15  BY MR. BARR:
16     Q.   Mr. Jordan, if you'd take a moment to
17  look through those documents, and I'll ask you if
18  you have reviewed those before.
19          (Witness Reviews Document.)
20  BY MR. BARR:
21     Q.   With respect to Exhibit 21, while you're
22  doing that, let me direct your attention in

Page 80

1  particular to pages 77 through 80.
2          MR. WINE:  Objection, foundation.
3     A.   I can't find 77.  Page 77 is --
4          MR. WINE:  Right down here.  That
5  page 77.
6     A.   That's it.  Okay.  That's the --
7          MR. WINE:  Bates number.
8     A.   -- TDYR number, not the page number.
9  BY MR. BARR:
10     Q.   That's correct.
11     A.   Okay.
12     Q.   I apologize for the confusion.
13          (Witness Reviews Document.)
14     A.   Okay.
15  BY MR. BARR:
16     Q.   Are these the three release documents
17  that you reviewed in this matter?
18          MR. WINE:  Objection, leading.
19     A.   21 is one of the release documents; the
20  other two are the other release documents.
21  BY MR. BARR:
22     Q.   We'll go backwards and then we'll come

Page 81

Pages 78 to 81

1  back to these releases.  In the course of the
2  deposition, Mr. Jordan, I'm going to use the term
3  "hazardous substances," and for purposes of the
4  deposition to save time and breath, let's understand
5  if we -- if you don't mind, that hazardous
6  substances includes chlorinated solvents, chromium
7  compounds and PCBs, as well as other things that are
8  defined in law as hazardous substances.
9      A.   I understand.
10     Q.   Now, in the course of your work on this
11 case have you found any evidence that -- as to the
12 World War II era or later in the 1940s of any
13 government plan or intent to dispose of hazardous
14 substance at the Harbor Drive Plant?
15          MR. WINE:  Objection, vague and
16 ambiguous, beyond the area of expertise of the
17 witness.  The witness is not qualified to give an
18 opinion.
19     A.   I found no such evidence.
20 BY MR. BARR:
21     Q.   And, again, with respect to -- have you
22 found any evidence with respect to the World War II

Page 82

1  or later in the 1940s of any contractual purpose
2  other than Ryan's manufacture and delivery of end
3  item military hardware products?
4          MR. WINE:  Objection, compound,
5  vague and ambiguous, calls for a legal conclusion,
6  goes to an ultimate issue.
7      A.   I have found no evidence that any of the
8  contracts had any purpose other than the delivery of
9  a specified product.
10 BY MR. BARR:
11     Q.   Likewise, have you found any evidence of
12 any government contracts with Ryan during World
13 War II or later in the 1940s that called for the
14 company to test any military-owned hardware that
15 arrived at the plant containing any hazardous
16 substances?
17          MR. WINE:  Same objections.
18     A.   I have not.
19 BY MR. BARR:
20     Q.   Have you found any evidence that during
21 World War II or later in the 1940s the government
22 contracted to deliver any government-owned hardware

Page 83

1  containing hazardous substances so that Ryan could
2  refurbish or repair that equipment?
3          MR. WINE:  Same objections.
4      A.   I have not.
5  BY MR. BARR:
6      Q.   Have you found any evidence that during
7  World War II or later in the 1940s any Ryan
8  contracts with the government provided for the
9  delivery of quantities of hazardous substances to
10 the Harbor Drive Plant in excess of those needed for
11 contract performance?
12          MR. WINE:  Same objections.
13     A.   I have found no evidence that they
14 provided any hazardous materials to the contractor
15 regardless of whether it's in excess of that needed
16 or not.
17 BY MR. BARR:
18     Q.   Okay.  When you say -- let me scroll
19 back.  When you say "they," are you referring to --
20 who are you referring to?
21     A.   The government provided no hazardous
22 materials to the contractor for performance of any

Page 84

1  contracts awarded by the Department of Defense.
2          MR. WINE:  Object to the answer on
3  the basis of foundation and assuming facts not in
4  evidence.
5  BY MR. BARR:
6      Q.   And have you found any evidence that
7  during World War II or later the government owned or
8  possessed any of the hazardous substances used by
9  Ryan during its contract performance?
10          MR. WINE:  Same series of
11 objections.  Also relevance in light of the court's
12 ruling on TDY's motion for partial summary judgment.
13     A.   I have found no such evidence.
14 BY MR. BARR:
15     Q.   Have you found any evidence that during
16 World War II or later in the 1940s the government
17 made any decisions relating to the disposal of
18 chemical waste generated at that plant?
19          MR. WINE:  Same objections.
20     A.   In the contractual documents that I
21 reviewed, there is no such evidence.
22          MR. WINE:  Testimony also goes

Page 85

Pages  82  to  85

1 beyond the scope of the expert report.  It is
2 therefore inadmissible.
3 BY MR. BARR:
4     Q.   Based on your knowledge of military
5 contracts and your experience in the field, did any
6 of the World War II contracts that you reviewed
7 direct or mandate Ryan's chemical waste handling
8 decisions, facilities or activities?
9         MR. WINE:  Same series of
10 objections, as well as the witness is not qualified
11 to give this opinion because it goes beyond his area
12 of expertise as defined in his qualifications by
13 counsel.  Same objections.
14     A.   In the contractual documents I reviewed,
15 there is no such evidence.
16 BY MR. BARR:
17     Q.   The releases that we've marked as
18 Exhibits 19, 20 and 21, are these, in your opinion,
19 similar in form and content to those with which you
20 were familiar during the course of your career?
21         MR. WINE:  Objection, foundation,
22 assumes facts not in evidence.

Page 86

1     A.   Yes, they are.
2 BY MR. BARR:
3     Q.   I'd like to move ahead to a different
4 time period of the 1950s through the 1970s.  And
5 we're going to talk about Air Force facilities
6 contracts.  Were you familiar with facilities
7 contracts during the course of your career as a
8 government contracting official?
9     A.   Yes, I --
10         MR. WINE:  Objection, leading, vague
11 and ambiguous, assumes facts not in evidence.
12     A.   Yes, I was.
13 BY MR. BARR:
14     Q.   And did you review any facilities
15 contracts between Ryan or TRA and the military in
16 this case?
17     A.   Yes, I did.
18     Q.   Mr. Jordan, how many facilities
19 contracts between Ryan or TRA and the military did
20 you review in this case?
21     A.   I believe there were three.
22     Q.   Did you review three or did you see

Page 87

1 references to --
2     A.   Pardon me.  There was -- I reviewed one.
3 There were references to two others.  I believe that
4 there were other facilities contracts that have not
5 been identified.
6         MR. WINE:  Objection, assumes facts
7 not in evidence.
8 BY MR. BARR:
9     Q.   Let me direct your attention -- we're
10 going to mark as Exhibits 22 through -- be five
11 exhibits starting with 22.  Actually it will be four
12 exhibits.
13         (Deposition Exhibit 22 marked.)
14         (Deposition Exhibit 23 marked.)
15         (Deposition Exhibit 24 marked.)
16         MR. WINE:  So we're marking
17 Exhibits 22 through 24, three exhibits?
18         MR. BARR:  Yes.  Correct.  There's
19 no 25 at the moment.
20 BY MR. BARR:
21     Q.   Mr. Jordan, I am going to, for the sake
22 of expediting things, put a tape flag on Exhibit 23

Page 88

1 on the page with the Bates number ending in 565 as
2 something I'd like you to focus on.  And then I'll
3 hand you the three exhibits that we've marked.
4         (Witness Reviews Document.)
5     A.   Okay.
6 BY MR. BARR:
7     Q.   Mr. Jordan, one of those documents, I
8 believe the one where I put the taped flag on -- is
9 that the facilities contract that you reviewed in
10 this case?
11     A.   Yes, it is.
12     Q.   And let me direct your attention to the
13 other documents that we handed you, the first one.
14 Do you see there's a reference to two facilities
15 contracts in there as one replacing the other?
16     A.   Yes.
17     Q.   What are the numbers of those two
18 facilities contracts?
19         MR. WINE:  Objection, foundation,
20 assumes facts not in evidence, lacks foundation.
21     A.   Under Exhibit No. 22 it says
22 accountability terminated under contract number

Page 89

Pages 86 to 89

1  ending in 16731, transferred to contract numbers
2  ending in 41665.
3  BY MR. BARR:
4      Q.   Now, how do you know that those are both
5  facilities contracts?
6          MR. WINE:  Objection, assumes facts
7  not in evidence, foundation.
8      A.   They make specific reference to
9  accountability.  Then it says, "The attached
10 tabulated list consists of nine (9) pages and lists
11 one hundred eighty-six (186) stock-listed facility
12 items transferred from Contract 16731 to Contract
13 41665."
14         MR. WINE:  I'll also object to the
15 extent the document is incomplete.
16     A.   In Exhibit No. 24 --
17 BY MR. BARR:
18     Q.   Well, hang on.  Let me -- let me get to
19 that.  What is -- what is the -- is there a
20 facilities contract referenced in Exhibit 24?
21         MR. WINE:  Objection, assumes facts
22 not in evidence.  Same objections as before.  Also

Page 90

1  to the extent this series of questions goes beyond
2  the scope of the expert report, it is objectionable
3  as such.
4      A.   The subject of the letter dated 21
5  December '73 is "Utilization of Government
6  Equipment."  And it says, "It is requested
7  therefore" -- in paragraph 2 -- "that you furnish to
8  this office a complete justification retention or an
9  idle declaration (DD-1342) for the following items,"
10 and it has a list of facility-type items.
11 BY MR. BARR:
12     Q.   Is there a facilities contract number
13 referenced in that document?
14         MR. WINE:  Same objections.
15     A.   Yes.
16 BY MR. BARR:
17     Q.   What is the number?
18     A.   72-C-1080.
19     Q.   Let's mark as Exhibit 25 a one-page
20 document.
21         (Deposition Exhibit 25 marked.)
22     A.   Are we through with twenty --

Page 91

1  BY MR. BARR:
2      Q.   Not just yet.
3      A.   Okay.
4      Q.   Now, before I give you, Mr. Jordan,
5  Exhibit 25, if I could direct your attention to the
6  exhibit where I put a taped flag on one page.
7      A.   Okay.
8      Q.   Now, you indicated -- which exhibit
9  number is this, again?
10     A.   No. 23.
11     Q.   Now, if you would look at that page
12 where I put the taped flag, do you see there's a
13 preface at the top?
14         MR. WINE:  Objection,
15 mischaracterizes the document.
16     A.   There's a preamble.
17 BY MR. BARR:
18     Q.   Oh, preamble.  I beg your pardon.  Does
19 that document -- does that preamble refer to a prior
20 facilities contract?
21         MR. WINE:  Objection, foundation,
22 assumes facts not in evidence.

Page 92

1      A.   Yes, it does.
2  BY MR. BARR:
3      Q.   And how do you know that?
4      A.   "The parties hereto have entered into
5  Contract" -- numbers ending in 41665 -- "whereunder
6  certain facilities have been provided to the
7  Contractor by the Government for the Target Drone
8  and XC-142 programs.
9          "The use authorization in said
10 contract expires 2 June 1967, and it is desired
11 hereunder to continue to provide said facilities for
12 the purpose stated above."
13         So it's a continuation of
14 authorization to use those facilities under this
15 contract ending in 1645.
16         MR. WINE:  Object to the extent the
17 witness has characterized the document without
18 proper foundation and providing a legal conclusion
19 as to the meaning of the document.
20 BY MR. BARR:
21     Q.   Mr. Jordan, what is a facilities
22 contract?  Is that -- is that something different

Page 93

Pages 90 to 93

1  from a supply contract?
2      A.   A facilities contract is a term of art
3  that we use for those contractual documents that
4  authorize the contractor to use certain items that
5  are identified as facilities-type items.
6      Q.   And what is meant by "facilities"?  Is
7  that a term of art?
8      A.   It is -- it is a term of art that
9  basically implies that there are pieces of
10 equipment, such as large machine tools and/or real
11 estate, real property.  Primarily, in my experience,
12 they were limited to identified production
13 tooling -- or not tooling, but production equipment.
14         MR. WINE:  I'll object to the series
15 of questions calling for a legal conclusion as to
16 the meaning of the term "facilities contract" and
17 its legal implications.
18 BY MR. BARR:
19     Q.   Let me show you what we've marked as
20 Exhibit 25.  I'll ask if you've reviewed that as
21 well?
22     A.   Yes, I have.

Page 94

1      Q.   Does that, in your understanding, refer
2  to a facilities contract?
3          MR. WINE:  Objection, foundation,
4  assumes facts not in evidence, calls for hearsay
5  testimony.
6      A.   Yes, it does.
7  BY MR. BARR:
8      Q.   And what's the basis of your conclusion?
9          MR. WINE:  Same objections.
10     A.   It identifies a specific piece of
11 equipment manufactured by a company called
12 Worthington.
13 BY MR. BARR:
14     Q.   And how does it identify it?
15         MR. WINE:  Same objections.
16     A.   "Subject item has been physically
17 checked and was in fact manufactured by Worthington
18 Corp.  Therefore, the Facilities Tab Run should be
19 corrected accordingly."
20 BY MR. BARR:
21     Q.   What about -- let me direct your
22 attention to the subject line.

Page 95

1          MR. WINE:  Objection, leading.
2      A.   It says, "Subject:  Worthington Air
3  Compressor," contract ID number so and so, contract
4  ending in numbers 1080.
5  BY MR. BARR:
6      Q.   How is the -- when you say it's a --
7  there's a piece of equipment.  How is it -- how is
8  that equipment identified?
9          MR. WINE:  Same objections.
10     A.   It's identified by a specific government
11 identification number.
12 BY MR. BARR:
13     Q.   And how do you know it's a government
14 identification number?
15     A.   It says "Government ID #261202."
16     Q.   Okay.  Let me borrow that Exhibit 25
17 back from you just one moment.  Now, you have a --
18 if you would, please, to the facilities
19 contract that we do have --
20         MR. WINE:  Objection, assumes facts
21 not in evidence.
22 BY MR. BARR:

Page 96

1      Q.   -- that is Exhibit 23 --
2      A.   Yes.
3      Q.   -- is that, in fact, based on your
4  experience and training a facilities contract?
5          MR. WINE:  Same objections.
6      A.   Yes, it is.
7  BY MR. BARR:
8      Q.   Let me direct your attention to the page
9  with the Bates number 575.
10     A.   Okay.
11     Q.   Is there a clause there that pertains to
12 indemnification?
13         MR. WINE:  Objection, leading,
14 foundation.
15     A.   Clause No. 20, indemnification of the
16 government.
17 BY MR. BARR:
18     Q.   Now, with respect to the indemnification
19 provisions, were you familiar in the ASPRs as to
20 whether such provisions were required?
21         MR. WINE:  Objection, calls for a
22 legal conclusion.

Page 97

Pages 94 to 97

1    A.   Yes, they were.
2    BY MR. BARR:
3        Q.   Let's mark a series of excerpts from the
4    ASPRs.  We'll start with Exhibit 26.
5            (Deposition Exhibit 26 marked.)
6            (Deposition Exhibit 27 marked.)
7            (Deposition Exhibit 28 marked.)
8            (Deposition Exhibit 29 marked.)
9            (Deposition Exhibit 30 marked.)
10           (Deposition Exhibit 31 marked.)
11           (Deposition Exhibit 32 marked.)
12           (Deposition Exhibit 33 marked.)
13           MR. WINE:  26 through 33?
14           MR. BARR:  Correct.
15           (Witness Reviews Documents.)
16       A.   Okay.
17   BY MR. BARR:
18       Q.   Mr. Jordan, with respect to -- just
19   focusing on indemnification for the moment, do these
20   ASPR provisions over the years relate to
21   indemnification provisions?
22           MR. WINE:  Objection, foundation.

Page 98

1    Documents Bates -- marked Exhibits 26 through 33 are
2    excerpts from ASPRs from a variety of years skipping
3    years.  So, for example, Jordan 26 is from 1948 and
4    then it goes to '52 in Exhibit 27; Exhibit 28 is
5    '55; Exhibit 29 is '58; Exhibit 30 is '63;
6    Exhibit 31 is '73; Exhibit 32 is '74; Exhibit 33 is
7    '76.  And the documents are incomplete.  Also calls
8    for a legal conclusion.
9    BY MR. BARR:
10       Q.   Mr. Jordan, do each of these exhibits
11   contain provisions relating to indemnification under
12   facilities contracts?
13       A.   Yes, they do.
14           MR. WINE:  Also object to the extent
15   that the documents go beyond the scope of those
16   documents referenced in the expert report and
17   therefore outside the scope.
18   BY MR. BARR:
19       Q.   Mr. Jordan, did you review each of the
20   indemnification provisions in those excerpts from
21   the ASPRs?
22           MR. WINE:  Same objections.

Page 99

1    A.   Yes, I did.
2    BY MR. BARR:
3        Q.   Did you form an opinion as to the
4    consistency or whether they changed over a period of
5    time?
6            MR. WINE:  Same objection.  Also
7    calls for a legal conclusion.
8        A.   It is my opinion that they remained
9    remarkably consistent through time, and I don't
10   recall any substantive changes from the initial
11   publication of the ASPR in 1948 through the latest
12   edition that I reviewed.
13   BY MR. BARR:
14       Q.   Now, have you also reviewed facilities
15   contracts between the Air Force and other defense
16   contractors in this matter?
17           MR. WINE:  Objection, vague and
18   ambiguous, relevance.
19       A.   Yes, I have.
20   BY MR. BARR:
21       Q.   Staring with Exhibit 34, we'll mark four
22   exhibits.

Page 100

1            (Deposition Exhibit 34 marked.)
2            (Deposition Exhibit 35 marked.)
3            (Deposition Exhibit 36 marked.)
4            (Deposition Exhibit 37 marked.)
5    BY MR. BARR:
6        Q.   Mr. Jordan, I'll hand those to you.  If
7    you could briefly review those, and I'll ask you if
8    you've reviewed those in connection with your work
9    in this case?
10           MR. WINE:  While the witness is
11   reviewing, I'll object on the basis of relevance,
12   foundation and hearsay.
13           (Witness Reviews Documents.)
14       A.   Yes, I have reviewed these contracts.
15   BY MR. BARR:
16       Q.   Do these contain indemnification
17   provisions?
18           MR. WINE:  Objection.
19       A.   Yes, they do.
20   BY MR. BARR:
21       Q.   In your opinion, are these
22   indemnification provisions similar or the same or

Page 101

Pages 98 to 101

1  different from the indemnification provision you saw
2  in the facilities contract between Ryan and the
3  government?
4       MR. WINE:  Same objections.  Also
5  calls for a legal conclusion.
6       A.   Yes, they are.
7            MR. WINE:  They're also beyond the
8  scope of the expert report insofar as they weren't
9  referenced in the expert report and therefore
10 inadmissible.
11 BY MR. BARR:
12      Q.   When you say, "yes, they are," are they
13 similar, the same or different?
14           MR. WINE:  Same objections.
15      A.   Best of my recollection, they are the
16 same.
17 BY MR. BARR:
18      Q.   Now, are you familiar with TDY's
19 argument in this case that government personnel
20 engaged in a course of dealing and administering
21 1980s and 1990s supply contracts that waived
22 indemnification provisions in the facilities

Page 102

1  question inherently calls for a legal conclusion and
2  therefore is improper.  Also goes beyond the scope
3  of the expert witness' report.
4       A.   Yes, I have.
5  BY MR. BARR:
6       Q.   Have you found any facts to support that
7  course of dealing argument?
8            MR. WINE:  Same objections.
9       A.   I have found no such facts.
10 BY MR. BARR:
11      Q.   Could you explain your answer?
12           MR. WINE:  Same objections.
13      A.   I know of nothing in regulation that
14 gives any government employee, such as the
15 administrative contracting officer or the DCAA
16 auditors, the authority to waive provisions in prior
17 contracts such as that existed earlier in the period
18 prior to the -- this period that you were talking
19 about in the '80s and '90s.
20 BY MR. BARR:
21      Q.   Are you --
22      A.   There simply is no authority for them to

Page 104

1  contracts --
2            MR. WINE:  Objection, insofar as it
3  mischaracterizes --
4            MR. BARR:  Excuse me.
5            MR. WINE:  -- the position of TDY.
6  BY MR. BARR:
7       Q.   Are you familiar with TDY's argument in
8  this case that government personnel engaged in the
9  course of dealing and administering 1980s and 1990s
10 supply contracts that waived indemnification
11 provisions in the facilities contracts between Ryan
12 at TRA and the Air Force?
13      A.   Yes, I am --
14           MR. WINE:  Objection insofar as it
15 mischaracterizes the position of TDY.
16 BY MR. BARR:
17      Q.   Without offering legal opinions and
18 based on your experience on your review of documents
19 and testimony in this case, have you formed an
20 opinion as to whether there are any facts relevant
21 to this course of dealing argument?
22           MR. WINE:  Objection insofar as the

Page 103

1  waive those privileges.
2            MR. WINE:  Now, objection and move
3  to strike the answer because the response provides a
4  legal analysis that was premised -- that goes to the
5  heart of the objection that was made to the question
6  propounded.
7            MR. BARR:  Of course we'll oppose
8  your motion.
9  BY MR. BARR:
10      Q.   Now, in terms of authority, the answer
11 regarding authority that you just gave, or lack of
12 authority, is that based on your experience and
13 training?
14      A.   Based on my --
15           MR. WINE:  Objection, calls for a
16 legal conclusion.
17      A.   Based on my experience and training, my
18 review of the regulations and the review of the
19 position descriptions for contracting officers, and
20 there's nothing in those documents that I referenced
21 that gives an administrative contracting officer
22 such authority.

Page 105

Pages 102 to 105

10/10/2011                    TDY Holdings v. United States of America                    Tommy Jordan

---

1   BY MR. BARR:
2       Q.    Now, have you found any evidence that
3   any 1980s or 1990s government contracting officers
4   or cost auditors were aware of the provisions of the
5   facilities contracts that had existed up until
6   1970s?
7             MR. WINE:  Same objections and
8   assumes facts not in evidence.  And also goes beyond
9   the scope of the witness' expert report and is
10  therefore inadmissible.
11      A.    I have seen no such evidence that they
12  were aware of those waiver provisions and releases.
13  BY MR. BARR:
14      Q.    When you say "waiver provisions," did
15  you mean to say indemnification provision?
16      A.    Yes.
17            MR. WINE:  Objection, leading,
18  mischaracterizes the witness' testimony.
19  BY MR. BARR:
20      Q.    Did you misspeak, Mr. Jordan?
21      A.    Yes, I misspoke.
22            MR. WINE:  Do you need a break?

Page 106

---

1             (Deposition Exhibit 40 marked.)
2             (Deposition Exhibit 41 marked.)
3   BY MR. BARR:
4       Q.    Mr. Jordan, one quick question.  Were
5   releases, as you have described them, used in all
6   kinds of government contracts or just certain
7   specific kinds?
8             MR. WINE:  Objection, vague and
9   ambiguous.
10            MR. BARR:  I'm not sure the witness
11  heard my question.
12  BY MR. BARR:
13      Q.    Mr. Jordan --
14      A.    Yes.
15      Q.    -- were -- were releases, of the kind we
16  were discussing earlier and as you've described them
17  in this deposition, used in all kinds of government
18  contracts or certain kinds only?
19            MR. WINE:  Same objection.
20      A.    Best of my knowledge, in all types of
21  contracts.
22  BY MR. BARR:

Page 108

---

1             MR. BARR:  I'll let you know when
2   we'll take a break.
3             MR. WINE:  No, I was just asking the
4   witness.
5             THE WITNESS:  I'm fine.
6   BY MR. BARR:
7       Q.    Did you, in the course of your work on
8   this case, find any evidence that TRA and the
9   government discussed facilities contract
10  indemnification provisions --
11            MR. WINE:  Same --
12  BY MR. BARR:
13      Q.    -- in the context of government payment
14  of any costs of TRA?
15            MR. WINE:  Same objections.  Assumes
16  facts not in evidence.
17      A.    I found no such evidence.
18  BY MR. BARR:
19      Q.    All right.  Let's look at another group
20  of exhibits starting with Exhibit 38.
21            (Deposition Exhibit 38 marked.)
22            (Deposition Exhibit 39 marked.)

Page 107

---

1       Q.    Were they used in fixed price or cost
2   reimbursement or both?
3       A.    Both.
4             MR. WINE:  Same objections.
5   BY MR. BARR:
6       Q.    The exhibits that we've marked as 38
7   through 41, have you reviewed these releases before?
8       A.    I believe I have, yes.
9       Q.    Have you reviewed -- well, have you
10  formed an opinion as to whether similar releases
11  were executed by Ryan and TRA in connection with
12  other contracts?
13            MR. WINE:  Objection, assumes facts
14  not in evidence, calls for a legal conclusion beyond
15  the scope of the witness' expertise.
16      A.    Inasmuch as the releases are required by
17  government regulation, ASPRs, and inasmuch as there
18  has been a remarkable consistency in those
19  regulations through the years, it is my opinion that
20  the releases were executed on all contracts during
21  that relevant period regardless of whether or not we
22  have a copy of the release or not.

Page 109

---

Pages 106 to 109

1    MR. WINE:  Also going to object to
2  the extent that the witness is giving testimony that
3  goes beyond the information conveyed in his expert
4  report.  It is inadmissible as such.
5          MR. BARR:  Go off the record.
6          THE VIDEOGRAPHER:  Going off record.
7  Time now is 3:29.
8          (Recess Taken From 3:29 p.m. To
9  3:29 p.m.)
10         THE VIDEOGRAPHER:  Going back on
11  record.  Time now is 3:29.
12         MR. WINE:  For the purpose of the
13  record, the document that's been marked Jordan
14  Exhibit 39 appears to be an excerpt from a larger
15  document referenced in the expert report that was
16  Bates labeled US0114285 through 2981 and as such is
17  an incomplete document.
18  BY MR. BARR:
19     Q.    All right.  Let's look at some
20  additional excerpts from the ASPRs.  By the way,
21  Mr. Jordan, the ASPRs, how voluminous would you say
22  these -- those documents were?

1     A.    Including all the appendix, several feet
2  of documents.
3     Q.    Let's mark as some additional
4  excerpts -- we'll start with Exhibit 42.
5          MR. WINE:  These are different than
6  the ASPR excerpts that we previously marked?
7          MR. BARR:  Correct.
8          (Deposition Exhibit 42 marked.)
9          (Deposition Exhibit 43 marked.)
10         (Deposition Exhibit 44 marked.)
11         (Deposition Exhibit 45 marked.)
12         (Deposition Exhibit 46 marked.)
13         (Deposition Exhibit 47 marked.)
14         MR. BARR:  Hang on just one second.
15  Off the record.
16         THE VIDEOGRAPHER:  Going off record.
17  Time now is 3:32.
18         (Recess Taken From 3:32 p.m. To
19  3:35 p.m.)
20         THE VIDEOGRAPHER:  Going back on
21  record.  Time now is 3:35.
22         (Deposition Exhibit 48 marked.)

1          (Deposition Exhibit 49 marked.)
2          (Deposition Exhibit 50 marked.)
3          (Deposition Exhibit 51 marked.)
4          (Witness Reviews Documents.)
5     A.    Okay.
6  BY MR. BARR:
7     Q.    Mr. Jordan, have you reviewed what we've
8  marked as Exhibits 42 through 51 just now?
9          MR. WINE:  TDY asserts the same
10  objections that it asserted with respect to Jordan
11  Exhibits 26 through 33.
12         MR. BARR:  Okay.
13  BY MR. BARR:
14     Q.    Mr. Jordan, have you reviewed those
15  exhibits?
16     A.    Yes.
17     Q.    Had you reviewed those exhibits
18  previously in this matter?
19     A.    Yes.
20     Q.    Do these excerpts from the ASPRs pertain
21  to releases?
22         MR. WINE:  Objection, leading.

1     A.    Yes, they do.
2  BY MR. BARR:
3     Q.    Do these excerpts from the ASPRs pertain
4  to a particular type of contract?
5          MR. WINE:  Same objection.
6     A.    These releases pertain to
7  fixed-price-type contracts -- pardon me, cost-type
8  contracts, not fixed price.
9  BY MR. BARR:
10     Q.    Did you misspeak earlier when you
11  referred to releases pertaining to fixed-price
12  contracts?
13         MR. WINE:  Objection.
14     A.    I may have.
15  BY MR. BARR:
16     Q.    In reviewing these ASPR provisions over
17  the period of time that they cover, have you formed
18  an opinion as to whether they are consistent or
19  changed in material ways over time?
20         MR. WINE:  Objection, calls for a
21  legal conclusion, goes beyond the scope of the
22  witness' expertise.

10/10/2011                TDY Holdings v. United States of America                Tommy Jordan

1      A.    Based upon a reading of the regulations,
2    they appear to be remarkably consistent over time.
3    BY MR. BARR:
4      Q.    Did the -- with respect to the releases
5    that are described, are the releases that are
6    described mandatory or other than mandatory?
7          MR. WINE:  Objection, assumes facts
8    not in evidence, calls for a legal conclusion, vague
9    and ambiguous.  Also goes beyond the scope of the
10   witness' expert report.
11     A.    The regulations say they are required so
12   that would make them mandatory.
13   BY MR. BARR:
14     Q.    Did these requirements -- the
15   requirement for releases continue in effect when the
16   FARs came into being?
17          MR. WINE:  Same objection, assumes
18   facts not in evidence.
19     A.    Yes, they did.
20   BY MR. BARR:
21     Q.    And is that based on your knowledge and
22   experience?

                                            Page 114

1          MR. WINE:  Same objection.
2      A.    Knowledge and experience and in reading
3    of the regulations.
4    BY MR. BARR:
5      Q.    In the course of your work on this case,
6    have you found any evidence -- well, let me -- let
7    me back up a second.
8          As a foundational question, is it
9    true that one of the provisions calls for a contract
10   to provide written notice in certain respects under
11   these release forms?
12          MR. WINE:  Objection, assumes facts
13   not in evidence, hearsay, calls for a legal
14   conclusion and goes beyond the scope of the witness'
15   expert report, and it's leading.
16     A.    Yes, they did.
17   BY MR. BARR:
18     Q.    Have you found any evidence in this case
19   that Ryan or TRA provided any written notice to a
20   government contracting officer regarding the kinds
21   of claims that TDY makes in this case?
22          MR. WINE:  Same objections.

                                            Page 115

1      A.    I have not seen any such evidence.
2          MR. BARR:  Let's take a break now.
3          THE VIDEOGRAPHER:  Going off record.
4    Time now is 3:40.
5          (Recess Taken From 3:40 p.m. To
6    3:53 p.m.)
7          THE VIDEOGRAPHER:  Going back on
8    record.  Time now is 3:53.
9    BY MR. BARR:
10     Q.    All right.  Mr. Jordan, let's turn to
11   novation agreements.
12     A.    Okay.
13     Q.    In your experience as a government
14   contracting official, did you deal with novation
15   agreements from time to time?
16     A.    Yes, I did.
17     Q.    What is a novation agreement?
18          MR. WINE:  Objection, calls for a
19   legal conclusion.
20     A.    A novation agreement is an agreement
21   between a contractor and the government relative to
22   either sale of a corporation from one entity to

                                            Page 116

1    another or a change of name.
2    BY MR. BARR:
3      Q.    Does it -- does a novation agreement
4    accomplish other things?
5          MR. WINE:  Objection, vague and
6    ambiguous, calls for a legal conclusion.
7      A.    Novation agreements transfers
8    accountability from one corporate entity to another.
9    And in the case of the two novation agreements that
10   we are aware of -- or I am aware of relative to Ryan
11   or TDY, they specifically include language relative
12   to waiver of claims against the government arising
13   from performance under contracts that had been
14   issued prior to the date of those novation
15   agreements.
16          MR. WINE:  Object to the response as
17   providing a legal analysis and conclusion that goes
18   beyond the scope of the witness' expertise and goes
19   beyond the scope of his expert report.
20   BY MR. BARR:
21     Q.    Did the novation agreements that you
22   reviewed -- that you came in -- that you had

                                            Page 117

                                      Pages 114 to 117

1 experience with as a government contracting
2 official, did they accomplish similar objectives?
3        MR. WINE: Same objections. Also
4 vague and ambiguous as to which period of time
5 counsel is referring to.
6    A.   To the best of my knowledge, yes, it
7 did.
8 BY MR. BARR:
9    Q.   And you understand that I'm referring to
10 the period of time in which you were a government
11 contracting official.
12    A.   Yes.
13    Q.   This will be Exhibits 52, 53 and 54.
14        (Deposition Exhibit 52 marked.)
15        (Deposition Exhibit 53 marked.)
16        MR. BARR: I may have misspoken. It
17 may just be two, 52 and 53.
18        MR. WINE: Is this another document?
19 This will be 54. You've given me three documents.
20 52, 53 and this would be 54.
21        MR. BARR: Maybe I better look at
22 them again.

Page 118

1    A.   Yes, they are.
2    Q.   Now, let me go back to a part of
3 deposition that you gave almost two years to the
4 day, and in response to some questions from
5 Mr. Wine, I would like to follow up on a couple of
6 those. Mr. Wine used the term whether it was
7 gratuitous for the government to have agreed to pay
8 a million dollars under a 1996 advance agreement.
9 Do you recall that question?
10    A.   Yes, I do.
11        MR. WINE: Objection, assumes facts
12 not in evidence.
13    A.   Yes, I do.
14 BY MR. BARR:
15    Q.   Is gratuity a government contracting
16 term that you have ever used?
17        MR. WINE: Objection, assumes facts
18 not in question. Mischaracterizes counsel's
19 question.
20    A.   Gratuity is a term that we used only in
21 relation to the clause that was required to be
22 included in all contracts called a covenant against

Page 120

1        MR. WINE: All of them?
2        MR. BARR: Yes, please. And does
3 the reporter also have three? Okay. I was right
4 the first time.
5        (Deposition Exhibit 54 marked.)
6        (Witness Reviews Documents.)
7    A.   Okay.
8 BY MR. BARR:
9    Q.   Mr. Jordan, are these the novation
10 agreement documents that you reviewed in connection
11 with your work in this case?
12        MR. WINE: Objection, assumes facts
13 not in evidence, foundation, and to the extent the
14 exhibits in their entirety do not -- are not
15 referenced in the expert report, goes beyond the
16 scope of the witness' expert report and opinions.
17    A.   Yes, they are.
18 BY MR. BARR:
19    Q.   Now, are these documents consistent with
20 your understanding and experience that you gained as
21 a government contracting official with respect to
22 other novation agreements?

Page 119

1 gratuities, and it pertained to anything of value
2 offered to a government employee and it was a
3 prohibition against accepting those kinds of gifts
4 and gratuities.
5 BY MR. BARR:
6    Q.   From whom?
7    A.   From anyone.
8    Q.   Now, have you found any evidence that
9 the contracting officer involved in the 1996
10 agreement was aware of any releases or facilities
11 contract indemnification provisions or novations --
12        MR. WINE: Objection, foundation,
13 assumes facts not in evidence, calls for a legal
14 conclusion.
15    A.   I have seen --
16 BY MR. BARR:
17    Q.   And -- excuse me. To finish my
18 question, any such documents in the context of --
19 that were executed by Ryan or TRA?
20        MR. WINE: Same objections. Also
21 calls for hearsay.
22    A.   I have seen no such evidence.

Page 121

Pages 118 to 121

1    BY MR. BARR:
2        Q.    Okay.  Let's move to the subject of the
3    1950s through the 1990s and the prime contracts
4    between Ryan and TRA and the government.
5        A.    Okay.
6        Q.    I'll mark a substantial number of
7    documents and we'll try to do these in one large
8    group.
9              MR. WINE:  Starting at 55?
10             MR. BARR:  I believe that is right.
11             (Deposition Exhibit 55 marked.)
12             (Deposition Exhibit 56 marked.)
13             (Deposition Exhibit 57 marked.)
14             (Deposition Exhibit 58 marked.)
15             (Deposition Exhibit 59 marked.)
16             (Deposition Exhibit 60 marked.)
17             (Deposition Exhibit 61 marked.)
18             (Deposition Exhibit 62 marked.)
19             (Deposition Exhibit 63 marked.)
20             (Deposition Exhibit 64 marked.)
21             (Deposition Exhibit 65 marked.)
22    BY MR. BARR:

Page 122

1        Q.    Now, Mr. Jordan, you'll be pleased to
2    know that I won't have a whole lot of questions on
3    these per se at the moment, but I would ask that you
4    review these documents and tell me if you've
5    reviewed each of them in connection with your work
6    on this case.
7              MR. WINE:  To the extent that one of
8    the 11 documents marked as Exhibits 55 through 65
9    includes one or more documents that are not
10   referenced in the witness' expert report, we would
11   object as being beyond the scope of the witness'
12   expert report and therefore move for their
13   exclusion.
14             MR. BARR:  Oppose.
15             MR. WINE:  Is the government willing
16   to stipulate that all of these documents are
17   referenced in his report?
18             MR. BARR:  I don't -- we don't need
19   to enter into any stipulation.
20             MR. WINE:  I'm just trying to --
21             MR. BARR:  Our position is it
22   doesn't matter whether this is specifically

Page 123

1    referenced in his report or not.
2              MR. WINE:  Okay.  And in the absence
3    of a stipulation from the government that all of
4    these documents have been referenced in the expert
5    report, we reserve our right to the extent that any
6    one or more documents was not referenced in the
7    report as the basis of an opinion.  We move for its
8    exclusion.
9              MR. BARR:  Thank you.  And we oppose
10   that motion, as with your other motions.
11             MR. WINE:  Also to the extent that
12   the documents are incomplete, lack of foundation.
13   We'll preserve our objections as we have with the
14   prior exhibits offered en masse.
15       A.    Best of my recollection, these are
16   contracts that I have reviewed.
17   BY MR. BARR:
18       Q.    Now, do these include fixed-price as
19   well as cost-reimbursement contracts?
20             MR. WINE:  Objection, calls for a
21   legal conclusion, leading.
22       A.    As well as basic ordering agreements.

Page 124

1    BY MR. BARR:
2        Q.    What is a --
3              THE REPORTER:  I didn't hear that.
4              THE WITNESS:  As well as basic
5    ordering agreements.
6    BY MR. BARR:
7        Q.    Ordering?
8        A.    Ordering.
9        Q.    What is a basic ordering agreement?
10       A.    A basic ordering agreement is an
11   agreement between the government and a contractor
12   relative to the standard as we called it boilerplate
13   terms and conditions.  And by preagreeing to those
14   standard terms and conditions, the government and
15   the contractor could agree on specific orders that
16   could be issued against that basic ordering
17   agreement for a specifically identified product or
18   service.  And then by having all of the basic terms
19   and conditions preagreed to, it made the issuance of
20   the order much simpler and all you had to do was
21   negotiate price and delivery and anything that was
22   peculiar to the individual order, such as progress

Page 125

Pages 122 to 125

10/10/2011                    TDY Holdings v. United States of America                    Tommy Jordan

1   payments.

2       Q.   Now, focusing on the 1950s through the

3   1990s, Mr. Jordan, did you determine in your review

4   of the documents and testimony in this case whether

5   or not during that time period the government

6   contracted to deliver any government-owned military

7   hardware containing any hazardous substances to the

8   Harbor Drive Plant in order for Ryan or TRA to

9   refurbish or repair that hardware?

10          MR. WINE:  Objection, foundation,

11  assumes facts not in evidence, calls for a legal

12  conclusion.

13      A.   I saw no such evidence in any of the

14  contracts that I reviewed.

15          MR. WINE:  Also goes beyond the

16  scope of the witness' expert report and is therefore

17  inadmissible.

18  BY MR. BARR:

19      Q.   Did you determine, Mr. Jordan, in your

20  review of documents and testimony in this case

21  whether or not any government contracts with Ryan or

22  TRA during this period called for the company to

Page 126

1   test any government-owned military hardware that

2   contained hazardous substances at the Harbor Drive

3   Plant?

4           MR. WINE:  Same objections.

5       A.   I saw no such evidence.

6   BY MR. BARR:

7       Q.   Did you determine in your review of

8   documents and testimony in this case whether or not

9   during this time period any Ryan or TRA contracts

10  called for the provision by anyone of quantities of

11  hazardous substance raw materials in excess of those

12  needed for contract performance?

13          MR. WINE:  Same objections.

14      A.   I saw nothing in the contract documents

15  that I reviewed that the government provided any

16  hazardous substances to the contractor as

17  government-furnished material.

18  BY MR. BARR:

19      Q.   Did you determine in your review of

20  documents and testimony in this case whether or not

21  any of the military contracts indicated any

22  government plan or intent to dispose of hazardous

Page 127

1   substances at the Harbor Drive Plant?

2           MR. WINE:  Objection, calls for --

3   same objections.  Also calls for speculation, calls

4   for hearsay testimony, assumes facts not in

5   evidence.  Calls for a legal conclusion.

6       A.   In the contract documents that I

7   reviewed, there is no indication that the government

8   had any such plans to dispose of hazardous

9   materials.

10  BY MR. BARR:

11      Q.   In any other documents did you perceive

12  any such intent?

13          MR. WINE:  Same objections.

14      A.   In all of the documents I looked at,

15  there is no such evidence.

16  BY MR. BARR:

17      Q.   Did you determine in your review of

18  documents and testimony in this case whether or not

19  any of these military prime contracts that we've

20  marked just now -- whether it indicated any

21  contractual purpose other than the manufacture and

22  delivery of end item military hardware products?

Page 128

1           MR. WINE:  Objection, the documents

2   speak for themselves, lacks foundation, assumes

3   facts not in evidence.  To the extent that the

4   question calls for testimony beyond the scope of the

5   witness' expert report is inadmissible.

6       A.   There's nothing contained in these

7   documents that indicates any purpose other than the

8   delivery of specified product to the government.

9   BY MR. BARR:

10      Q.   Did some of the contracts -- or did one

11  or more of the contracts call for research to

12  develop engineering information to your

13  recollection?

14          MR. WINE:  Objection, leading.

15      A.   I -- my recollection is that there were

16  some contractual documents.  I'm not sure whether

17  they're included in this group or not, where the

18  government had issued a performance-type

19  specification and the contractor had the requirement

20  to design a product that met those performance

21  specifications and then to deliver data to the

22  government covering that design.

Page 129

Pages 126 to 129

1    BY MR. BARR:
2       Q.   Now, the -- I'd like you to -- just for
3    clarity's sake, we're going to address the progress
4    payment entitled vesting provisions later in this
5    deposition, but for now we're going to put those to
6    one side.
7            With that understanding, did you
8    determine in your review of documents and testimony
9    in this case whether or not the government owned,
10   possessed or supplied any hazardous substances used
11   by Ryan or TRA at the Harbor Drive Plant?
12           MR. WINE:  Objection, calls for a
13   legal conclusion, assumes facts not in evidence,
14   goes beyond the scope of the witness' expert report,
15   goes to an ultimate issue in the case reserved for
16   the finder of fact.
17      A.   There is no evidence that I saw in any
18   contract or related documents that indicated that
19   the government had provided any such hazardous
20   materials to the contractor of government-furnished
21   material.
22           MR. WINE:  Does counsel's question

1    decisions, nor do I know of any document that gives
2    them the authority to make that kind of -- or
3    responsibility of making those kinds of decisions.
4    BY MR. BARR:
5       Q.   Did you determine in your review of
6    documents and testimony in this case whether or not
7    any of the 1950s through 1990s contracts between the
8    military and Ryan and TRA directed or mandated their
9    chemical waste handling decisions, facilities or
10   activities at the Harbor Drive Plant?
11           MR. WINE:  Objection, compound.
12   Same objections to the prior question.
13      A.   I saw nothing in either the contracts or
14   the specifications that I reviewed that indicated
15   any responsibility on the part of the government
16   relative to disposal of hazardous materials.
17   BY MR. BARR:
18      Q.   Now, is the document -- are the
19   documents and testimony in this case with respect to
20   this last series of questions that I have asked
21   you -- is that consistent or inconsistent with your
22   experience as a government contracting officer?

1    also relate to testimony in the case?
2            MR. BARR:  Yes.
3            MR. WINE:  Just want to make sure we
4    have a clear record.
5    BY MR. BARR:
6       Q.   Was that your understanding as well,
7    Mr. Jordan?
8       A.   Could you repeat that, please?
9       Q.   Sure.  Did you determine in your review
10   of documents and testimony in this case whether or
11   not the government owned, possessed or supplied any
12   of the hazardous substances used by Ryan or TRA in
13   performing contracts at the Harbor Drive Plant?
14      A.   I saw no evidence that the government
15   owned any such material.
16      Q.   And did you determine in your review of
17   the documents and testimony in this case whether
18   the -- whether any government personnel made any
19   decisions regarding the disposal of chemical waste
20   generated at that plant during that time period?
21           MR. WINE:  Same objections.
22      A.   I saw no evidence that they made any

1            MR. WINE:  Same objections.
2       A.   It is extremely consistent with my
3    experience and all of the contracts that I reviewed
4    as either a contracting officer and/or an executive
5    of a contracting organization.
6    BY MR. BARR:
7       Q.   Now, with respect to responsibilities
8    for environmental matters, I want to break this up
9    into two time periods:  The early 1960s up until
10   approximately the mid 1970s, and the mid 1970s
11   forward.  You with me so far?
12      A.   With you.
13      Q.   With respect to environmental
14   responsibilities as a government contracting
15   officer, what was your understanding as to who was
16   responsible for the contractor's environmental
17   matters?
18           MR. WINE:  Objection, compound,
19   vague and ambiguous with regard to the use of the
20   terms environmental matters or environmental
21   responsibilities, vague with respect to which time
22   period counsel's referring to.  Also calls for a

1  legal conclusion.
2  BY MR. BARR:
3      Q.    Let's go backwards.  With respect to
4  environmental responsibilities, in other words, the
5  handling of chemical waste or contamination
6  facilities --
7      A.    Okay.
8      Q.    -- procedures, did you have an
9  understanding as to who was responsible for those
10 matters in the period between the early 1960s and
11 the mid 1970s?
12          MR. WINE:  Objection, calls for a
13 legal conclusion, assumes facts not in evidence,
14 relevance.
15     A.    I'm not aware of anything specifically
16 in the regulation relative to who had the
17 responsibility for environmental issues during that
18 period of the '60s through approximately 1975.
19 BY MR. BARR:
20     Q.    Do you draw a conclusion from the fact
21 there was nothing specific?
22          MR. WINE:  Objection.

Page 134

1      Q.    Did you have an understanding as to
2  whether it was the contractor's responsibility or
3  the government's responsibility?
4          MR. WINE:  Objection, asked and
5  answered.  The witness has testified he had no -- it
6  is not part of the national -- hold on.  I just want
7  to make sure I don't misstate it.  Hold on one
8  second.
9          MR. BARR:  We can --
10         MR. WINE:  I'm sorry, I missed the
11 answer.
12         MR. BARR:  We can move along.
13 BY MR. BARR:
14     Q.    Question -- new question for you,
15 Mr. Jordan.  In the mid 1970s, did contractor
16 obligations regarding environmental matters as we've
17 described them -- were those articulated in the
18 ASPRs?
19     A.    The Armed Services Procurement
20 Regulations were amended in I believe it was 1975 to
21 include a requirement to put a clean air and water
22 clause into contracts requiring contractors to

Page 136

1      A.    Other than it was not a part of the
2  national consciousness relative to environmental
3  issues during that period of time.
4  BY MR. BARR:
5      Q.    Did you have an opinion as a government
6  contracting official during that period of 19 -- the
7  early 1960s to 1975 that -- as to -- as between the
8  contractor and the government who had such
9  responsibilities?
10         MR. WINE:  Objection, vague and
11 ambiguous.  Is counsel asking if he had an opinion
12 in the '60s and '70s or does he have an opinion now
13 as to the period in the '60s and '70s?
14 BY MR. BARR:
15     Q.    You can answer the question.
16     A.    During --
17         MR. WINE:  Objection, vague and
18 ambiguous.  Calls for a legal conclusion.
19     A.    During the period of the '60s and '70s
20 we paid no attention to the environmental issues
21 from the procuring contracting side of the equation.
22 BY MR. BARR:

Page 135

1  comply with the Clean Air and Water Act.  Then in I
2  believe it was 1977 there was a -- another required
3  clause to be included in contracts relative to
4  marking and identification of hazardous materials.
5          Then there was a --
6      Q.    Go ahead.
7      A.    Then there was also at about the same
8  time a requirement that if in the event of
9  administration of a contract a government employee
10 became aware of a violation of any of those
11 provisions, they were to notify their supervisor.
12     Q.    Okay.  We'll come back to that last --
13 let's mark as some additional exhibits --
14         MR. WINE:  Can we put 55 through 66
15 [sic] to the side?
16         MR. BARR:  Yes, please.  We'll start
17 with 66.
18         (Deposition Exhibit 66 marked.)
19         (Deposition Exhibit 67 marked.)
20         (Deposition Exhibit 68 marked.)
21         (Deposition Exhibit 69 marked.)
22         (Deposition Exhibit 70 marked.)

Page 137

Pages 134 to 137

1    MR. WINE: So we're through 70 -- 69
2  through 70 -- or 66 through 70. I'm sorry.
3         (Witness Reviews Documents.)
4    MR. WINE: For the record, TDY
5  asserts the same objections that it asserted for
6  ASPR excerpts 26 through 33 and 42 through 51.
7    A.  Okay.
8  BY MR. BARR:
9    Q.  Mr. Jordan, are what we've marked as
10 Exhibits 66 through 70 the clean air and water and
11 material safety data provisions that you referenced
12 a moment ago?
13       MR. WINE: Objection, leading,
14 assumes facts not in evidence, calls for a legal
15 conclusion.
16   A.  Yes, they are.
17 BY MR. BARR:
18   Q.  Have you reviewed these documents before
19 today?
20   A.  Yes, I have.
21   Q.  In your opinion, did these effect
22 changes in the division of responsibilities as

Page 138

1  between contractors and the government?
2        MR. WINE: Objection, calls for a
3  legal conclusion, vague and ambiguous, beyond the
4  scope of the witness' expert report.
5    A.  It specifically put requirements upon
6  the contractor. The government -- the term
7  government may be a little bit misleading because
8  there were different governments involved. There
9  were no responsibilities that I'm aware of relative
10 to the responsibilities of the Department of Defense
11 officials. However, at approximately this time the
12 EPA had responsibilities for enforcement of these
13 kinds of provisions.
14 BY MR. BARR:
15   Q.  In terms -- I should -- I should sharpen
16 up the question. In terms of effecting changes as
17 between who was responsible for the environmental
18 matters we discussed at a contractor's plant, did
19 these provisions make changes in terms of who was
20 responsible?
21       MR. WINE: Same objections.
22   A.  They articulated the fact that the EPA

Page 139

1  was responsible and that -- but to the best of my
2  knowledge, it changed -- they made no changes
3  relative to the responsibilities of employees of the
4  Department of Defense.
5        MR. BARR: Off the record.
6        THE VIDEOGRAPHER: Going off record.
7  Time now is 4:28.
8        (Recess Taken From 4:28 p.m. To
9  4:29 p.m.)
10       THE VIDEOGRAPHER: Going back on
11 record. Time now is 4:29.
12 BY MR. BARR:
13   Q.  Mr. Jordan, I am going to hand you back
14 Exhibit 65. This is a 1994 contract
15 N00019-94-C-0087. This is the one -- one of the
16 documents we discussed earlier.
17       MR. WINE: Objection, assumes facts
18 not in evidence, foundation.
19       (Witness Reviews Document.)
20 BY MR. BARR:
21   Q.  Mr. Jordan, I'm going to direct your
22 attention to page 5 -- with the Bates numbers 526.

Page 140

1  Do you see a provision there regarding environmental
2  controls?
3    A.  Yes, I do.
4    Q.  To the best of your recollection, during
5  your experience as a government contracting official
6  was this a standard provision?
7        MR. WINE: Objection, calls for a
8  legal conclusion, vague and ambiguous. The document
9  speaks for itself, relevance. Also outside the
10 scope of the witness' expert report.
11   A.  I do not specifically recall this
12 clause. If you'll note that -- it has a date of
13 1991 and references a naval air document. I don't
14 recall whether a similar provision was included in
15 the Air Force requirements or not.
16 BY MR. BARR:
17   Q.  Okay.
18       MR. WINE: Move to strike. His
19 testimony goes beyond the scope of the witness'
20 knowledge and expertise.
21       MR. BARR: Oppose the motion.
22 BY MR. BARR:

Page 141

Pages 138 to 141

1    Q.   Mr. Jordan, obviously -- assuming that
2  only 14 or 15 contracts in the 1950s to the 1990s
3  are available to either of the parties in this case,
4  how do we know that they're representative of the
5  many others that we know existed between the
6  parties?
7         MR. WINE:  Objection, assumes facts
8  not in evidence, goes beyond the scope of the
9  witness' area of expertise, goes beyond his expert
10  opinion and report, lacks a sufficient basis to make
11  an opinion -- to offer an opinion in this matter on
12  the propounded question.  Calls for a legal
13  conclusion.
14    A.   Based upon my experience and knowledge
15  of the customs and practices within the federal
16  government for writing contracts based upon the
17  existing set of regulations embodied within the
18  Armed Services Procurement Regulations and the fact
19  that there was a high degree of consistency in those
20  regulations from year to year over time within the
21  relevant period of the contract, it is a -- almost a
22  certainty that all contracts written within that

Page 142

1  regulations such as the Armed Services Procurement
2  Regulations.
3  BY MR. BARR:
4    Q.   Did that extend to the FAR as well?
5    A.   Yes, it does.  The FAR even goes
6  further.  It applies to all federal activities.
7    Q.   Not just the military is what you're --
8    A.   Not just the military.
9    Q.   Now, during the course of your career as
10  a government contracting official, did any of the
11  defense contractors, in your opinion, who agreed to
12  comply with military contracts and specifications
13  transfer responsibility for their operations to the
14  government?
15         MR. WINE:  Objection, calls for a
16  legal conclusion, vague and ambiguous, assumes facts
17  not in evidence.
18    A.   Terms and conditions of contracts that I
19  was personally involved in and the contracts that I
20  have reviewed and my familiarity with government
21  regulations pertaining to the contracting process,
22  responsibility for performance under government

Page 144

1  time and period would have contained the same terms
2  and conditions as the contracts that we have found
3  that have survived time.
4  BY MR. BARR:
5    Q.   Now, are contracts -- or government --
6  or defense contracts entered into by government
7  personnel in one location in the United States or in
8  multiple locations?
9         MR. WINE:  Objection, vague and
10  ambiguous.
11    A.   They're entered into at multiple
12  locations.  Within the Air Force we had five air
13  material areas that are -- if you will, air logistic
14  centers.  The Navy had a number of activities that
15  issued contracts.  Within the Air Force there were
16  base contracting organizations at virtually every
17  Air Force Base within the Air Force.  And then the
18  Army had similar activities within its command that
19  had the authority to issue contracts.  So, yes, very
20  clearly they were issued at multiple locations by
21  multiple contracting officers, and that's why it
22  became important to have a consistent set of

Page 143

1  contracts was expressly that of the contractor and
2  not the government.
3  BY MR. BARR:
4    Q.   And, again, during the course of your
5  career as a government contracting official and your
6  experience with contracts and specifications, did
7  the contract -- did any contract and specification
8  requirements that certain chemicals be used in a
9  manufacturing process -- were those requirements
10  related or unrelated as to how or where waste
11  chemicals from that process would be disposed of?
12         MR. WINE:  Objection, vague and
13  ambiguous, compound, calls for a legal conclusion,
14  relevance.
15    A.   I have seen nothing either in the
16  specific contract itself or any of the
17  specifications that I have reviewed that spoke to
18  the issue of disposal of hazardous chemicals.
19  BY MR. BARR:
20    Q.   My question was more general.  And that
21  related to your experience during your career as a
22  government contracting official with all of the

Page 145

Pages 142 to 145

10/10/2011                 TDY Holdings v. United States of America                 Tommy Jordan

1    other contracts and specifications with which you
2    came in contact.
3         MR. WINE:  Same objections.
4         A.   In my experience, none of the contracts
5    that I was personally involved in spoke to the issue
6    of disposal of hazardous chemicals.
7    BY MR. BARR:
8         Q.   Is that also true for the specifications
9    with which you came in contact?
10        MR. WINE:  Same --
11        A.   I use the term contracts generically to
12   include all the exhibits and attachments thereto.
13        MR. WINE:  Same objections.
14   BY MR. BARR:
15        Q.   Let's turn our attention to another
16   subject, and that's TDY's argument that the
17   government paid TRA's environmental costs as part of
18   their overhead.  You're familiar with that issue?
19        A.   Yes, I am.
20        MR. WINE:  Objection to the extent
21   it goes beyond the scope of the witness' expert
22   report.

Page 146

1    BY MR. BARR:
2         Q.   Now, are you familiar with their
3    argument -- TDY's argument that the government would
4    now pay for its environmental site cleanup costs as
5    part of its overhead cost pools if TRA were still
6    performing government contracts at the site?
7         MR. WINE:  Objection to the extent
8    it mischaracterizes TDY's legal position, assumes
9    facts not in evidence.
10        A.   I'm familiar with that argument, yes.
11        MR. WINE:  Also beyond the scope of
12   the witness' knowledge and expertise.
13   BY MR. BARR:
14        Q.   Mr. Jordan, over the course of your
15   career, did you become familiar from time to time
16   with reimbursement of overhead cost issues?
17        A.   Yes, I did.
18        Q.   Now, with respect to TDY's argument that
19   the government would now pay for the environmental
20   site cleanup costs as part of overhead cost pools,
21   in your opinion, is that a reasonable assumption?
22        MR. WINE:  Same objections.  Also

Page 147

1    calls for a legal conclusion.
2         A.   In my opinion, it is not a reasonable
3    assumption.
4         MR. WINE:  Goes beyond the scope of
5    the witness' expert report.
6    BY MR. BARR:
7         Q.   Generally speaking, and without getting
8    into detail, what is the basis of your opinion?
9         MR. WINE:  Objection.  To ask the
10   witness to give an opinion without going into detail
11   deprives TDY of the opportunity to cross-examine the
12   witness and to determine the ability of the witness
13   to offer competently the opinion proffered by the
14   government.  Therefore, we object to the question.
15   We also believe that the question goes beyond the
16   scope of the witness' expert report and beyond the
17   expertise of the witness.
18        A.   The basic ground rules for including
19   costs in a contractor's overhead that was recognized
20   by the government for inclusion in those costs that
21   were reimbursed to the contractor, either under
22   government contracts and/or subcontracts and/or

Page 148

1    commercial contracts, the government had to make a
2    positive determination that the costs were
3    allowable, allocable and reasonable.
4    BY MR. BARR:
5         Q.   And where would the basic principles, as
6    far as costs are concerned -- where would those be
7    found?
8         MR. WINE:  Objection, leading, calls
9    for a legal conclusion, goes beyond the scope of the
10   witness' expertise and his expert opinion.
11        A.   There is a --
12   BY MR. BARR:
13        Q.   I don't mean specific provisions, I just
14   mean general.
15        A.   Generally it's the regulations that the
16   auditors use for use in the determination of
17   allowability and allocability and reasonableness of
18   costs.
19        Q.   And are those -- were those -- are they
20   contained in the ASPRs and the FARs?
21        MR. WINE:  Same objections.
22        A.   Contained in the ASPRs, the FARs and

Page 149

10/10/2011                  TDY Holdings v. United States of America                  Tommy Jordan

1  there was a specific auditor manual that they used
2  in helping them to make those determinations.
3  BY MR. BARR:
4      Q.   Were there -- were there more -- was
5  there more than one government guidance document
6  concerning environmental costs that you're aware of?
7          MR. WINE:  Same objections.
8      A.   The documents that I'm aware of were a
9  specific guidance document that had been issued by a
10 defense contract audit agency and then one or two
11 supplemental guidance documents that had been issued
12 by DCAA relative to environmental costs.
13 BY MR. BARR:
14     Q.   And, in fact, you were asked about one
15 of those documents by Mr. Wine a couple of years
16 ago.  Do you recall that?
17     A.   I think so, yes.
18     Q.   We're going to mark three documents,
19 Exhibit 71, 72 and 73.
20         (Deposition Exhibit 71 marked.)
21         (Deposition Exhibit 72 marked.)
22         (Deposition Exhibit 73 marked.)

1  BY MR. BARR:
2      Q.   I'll correct what I said.  Mr. Wine
3  actually asked you about two of them, although he
4  gave you the wrong number on one of them.
5          MR. WINE:  Object to the extent it
6  characterizes facts not in evidence.
7          (Witness Reviews Documents.)
8          MR. WINE:  Also to the extent that
9  counsel's referencing the testimony of Mr. Jordan in
10 the past as a 30(b)(6) witness, we would object as
11 being beyond the scope of the present exercise.
12         MR. BARR:  Well, there's no
13 limitations posed by 30(b)(6) in that regard.
14         MR. WINE:  He's here as an expert
15 witness, not as a 30(b)(6) deponent.
16         MR. BARR:  You certainly didn't
17 follow that distinction in 2009.
18         MR. WINE:  Well, I know you feel
19 that way.
20     A.   Okay.
21 BY MR. BARR:
22     Q.   Mr. Jordan, have you reviewed these

1  documents in connection with your work on this case?
2      A.   Yes, I have.
3      Q.   And were you generally familiar with
4  these documents during your time as a government
5  contracting official?
6      A.   I was generally aware of, but not
7  specifically.
8          MR. WINE:  I would move to strike
9  any testimony related to the documents that the
10 witness was not familiar with specifically on the
11 basis of his knowledge for which he's being offered
12 as an expert.
13 BY MR. BARR:
14     Q.   Now, let me direct your attention to the
15 first of these three documents, the October 1992
16 DCAA guidance.  Were you aware, generally speaking,
17 of this document?
18         MR. WINE:  Objection.
19     A.   Generally, yes.
20 BY MR. BARR:
21     Q.   Same question with respect to the
22 July 1993 DCAA contract audit manual, section -- or

1  paragraph 7-1920.
2      A.   Again, I was generally aware of it, yes.
3          MR. WINE:  Same objections.
4  BY MR. BARR:
5      Q.   And how did you become generally aware
6  of these documents?
7      A.   Just through the ordinary course of
8  becoming familiar with the rules and regulations of
9  governing contracts awarded by the government.
10     Q.   Do you recall whether or not any of
11 these would have been covered in any of the various
12 courses that you took as part of your continuing
13 training?
14     A.   I don't specifically recall content of
15 those training courses, but very possible.
16         MR. WINE:  Same objections.
17 BY MR. BARR:
18     Q.   And did you become generally aware of
19 the May 1994 DCAA guidance that we've marked as
20 Exhibit 73?
21         MR. WINE:  Same objections.
22     A.   Generally aware, yes.

1    MR. WINE:  Also to the extent that
2    the documents were not referenced in the witness'
3    expert report and go beyond the scope of his expert
4    opinion, they are offered -- they represent
5    improper -- this represents improper opinion
6    testimony.
7    BY MR. BARR:
8        Q.    Now, during your time as a government
9    procurement official were you aware of the -- of
10   ASPR and FAR provisions relating to advance
11   agreements?
12           MR. WINE:  Objection, assumes facts
13   not in evidence, calls for a legal conclusion, vague
14   and ambiguous with respect to the use of the term
15   advance agreements.
16       A.    Yes, I was.
17   BY MR. BARR:
18       Q.    Do you know what an advance agreement
19   is?
20       A.    Yes, I do.
21       Q.    Could you explain it to the court,
22   please.

Page 154

1        A.    Advance agreement is a specific written
2    agreement between a contractor and the government
3    relative to how certain costs would be incurred to
4    preclude subsequent misunderstandings and
5    disagreements between the parties relative to the
6    allowability of certain costs.
7        Q.    Okay.  Let's use another set of excerpts
8    from the ASPRs.  Mr. Jordan, before I give you these
9    documents, did you review from time to time ASPR and
10   FAR provisions relating to advance agreements during
11   your career as a government contracting officer?
12       A.    Best of my recollection, yes.
13       Q.    We're going to start with 74.
14           (Deposition Exhibit 74 marked.)
15           (Deposition Exhibit 75 marked.)
16           (Deposition Exhibit 76 marked.)
17           (Deposition Exhibit 77 marked.)
18           (Deposition Exhibit 78 marked.)
19           (Deposition Exhibit 79 marked.)
20           (Deposition Exhibit 80 marked.)
21           (Deposition Exhibit 81 marked.)
22           (Deposition Exhibit 82 marked.)

Page 155

1            (Deposition Exhibit 83 marked.)
2            MR. WINE:  Through 83?
3            MR. BARR:  Correct.
4            (Witness Reviews Documents.)
5            MR. WINE:  TDY propounds the same
6    objections that it has made with respect to the
7    prior ASPR excerpts, Exhibits 26 through 33, 42
8    through 51 and 66 through 70.  Also to the extent
9    that the compilations include regulations pertaining
10   to contracts that are not relevant to the matter in
11   dispute, we'd object on the basis of relevance.
12           (Witness Reviews Documents.)
13       A.    These appear to be regulations that I
14   had previously reviewed.
15   BY MR. BARR:
16       Q.    And do these relate to advance
17   agreements?
18       A.    Yes, they do.
19           MR. WINE:  Objection, previous.
20   BY MR. BARR:
21       Q.    In your opinion, do these advance
22   agreements -- is the language, form and content of

Page 156

1    these excerpts over time consistent or did they
2    change in material ways?
3            MR. WINE:  Objection, calls for a
4    legal conclusion and the regulations speak for
5    themselves.
6        A.    Substantially consistent.
7    BY MR. BARR:
8        Q.    Did you learn of any such advance
9    agreements between TRA and the government?
10           MR. WINE:  Objection, assumes facts
11   not in evidence, calls for a legal conclusion.
12       A.    I'm only aware of one advance agreement
13   executed between the government and the contractor.
14           MR. BARR:  I think -- it's 5:00.  I
15   think that this would be a good place for us to stop
16   for today.  I know we're going to -- I had
17   originally planned to go a little bit longer, but I
18   think under the circumstances we'll call it a day.
19           MR. WINE:  Okay.
20           THE VIDEOGRAPHER:  Going off record.
21   Time now is 4:59.
22           (Deposition Recessed At 4:59 p.m.)

Page 157

Pages 154 to 157

CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

1   I, Micheal A. Johnson, Registered
Professional Reporter, the officer before whom the
foregoing deposition was taken, do hereby certify
that the foregoing transcript is a true and correct
record of the testimony given; that said testimony
was taken by me stenographically and thereafter
reduced to typewriting under my supervision; and
that I am neither counsel for, related to, nor
employed by any of the parties to this case and have
no interest, financial or otherwise, in its outcome.

GIVEN UNDER MY HAND AND SEAL of office
on this _____ day of _____, 2011.

_____
MICHEAL A. JOHNSON, RPR, CRR
NCRA Registered Professional Reporter
NCRA Certified Realtime Reporter
NCRA Realtime System Administrator
Certified LiveNote Reporter

Notary Public in and for the
State of Texas
My Commission Expires:  8/8/2012

Page 158

---

Digital Evidence Group, L.L.C.
1299 Pennsylvania Ave NW, Suite 1130E
Washington, D.C. 20004
(202) 232-0646

SIGNATURE PAGE

Case Name: TDY Holdings v. United States of America
Witness Name: Tommy Jordan
Deposition Date: 10/10/11
I do hereby acknowledge that I have read
and examined the foregoing pages
of the transcript of my deposition and that:

(Check appropriate box):
( ) The same is a true, correct and
complete transcription of the answers given by
me to the questions therein recorded.
( ) Except for the changes noted in the
attached Errata Sheet, the same is a true,
correct and complete transcription of the
answers given by me to the questions therein
recorded.

_____        _____
DATE                 WITNESS SIGNATURE

Page 160

---

Tommy Jordan c/o
DICKSTEIN SHAPIRO, L.L.P.
1825 Eye Street NW
Washington, D.C. 20006-5403

Case: TDY Holdings v. United States of America
Date of deposition: 10/10/11
Deponent: Tommy Jordan

Please be advised that the transcript in the above
referenced matter is now complete and ready for signature.
The deponent may come to this office to sign the transcript,
a copy may be purchased for the witness to review and sign,
or the deponent and/or counsel may waive the option of signing.
Please advise us of the option selected.
Please forward the errata sheet and the original signed
signature page to counsel noticing the deposition, noting the applicable
time period allowed for such by the governing Rules of Procedure.
If you have any questions, please do not hesitate to call our office at
(202)-232-0646.

Sincerely,

Digital Evidence Group
Copyright 2011 Digital Evidence Group
Copying is forbidden, including electronically, absent express written consent

Page 159

---

Digital Evidence Group, L.L.C.
1299 Pennsylvania Ave NW, Suite 1130E
Washington, D.C. 20004
(202) 232-0646

E R R A T A   S H E E T

Case Name: TDY Holdings v. United States of America
Witness Name: Tommy Jordan
Deposition Date: 10/10/11
    Page No.   Line No.        Change

_____        _____
Signature                      Date

Page 161

Pages 158 to 161

Page 162

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

_____

TDY HOLDINGS, LLC, and       §

TDY INDUSTRIES, INC.         §

                             §

        Plaintiffs,          §

                             §

VS.                          § Case No. 07cv0787 JAH

                             §

UNITED STATES OF AMERICA,    §

UNITED STATES DEPARTMENT      §

OF DEFENSE, and ROBERT M.    §

GATES, in his official       §

capacity as SECRETARY OF     §

DEFENSE                      §

                             §

        Defendants.          §

_____


Videotaped Deposition of

TOMMY B. JORDAN

San Antonio, Texas

Wednesday, October 12, 2011

10:03 a.m.

VOLUME 2

Reported by:  Steven Stogel, CSR, CLR


_____

DIGITAL EVIDENCE GROUP

1299 Pennsylvania Ave, NW, Suite 1130E

Washington, DC  20004

(202) 232-0646

1  VOLUME 2
2  Videotaped Deposition of
3  TOMMY B. JORDAN
4
5  Held at the offices of:
6      Koole Court Reporters of San Antonio
7      711 Navarro Street, Suite 101
8      San Antonio, Texas 78205
9      (210) 558-9484
10
11
12      Taken pursuant to notice, before Steven
13  Stogel, Certified Shorthand Reporter and Certified
14  LiveNote Reporter in and for the State of Texas.
15
16
17
18
19
20
21
22

Page 163

---

1  INDEX
2  TOMMY B. JORDAN
3  October 12, 2011
4
5  APPEARANCES                           164
6
7  PROCEEDINGS                           181
8
9
10  EXAMINATION OF TOMMY B. JORDAN:
11
12      BY MR. BARR (CONTINUED)          181
13
14
15  CERTIFICATE                          321
16
17  ERRATA SHEET                         324
18
19
20
21
22

Page 165

---

1          APPEARANCES
2  ON BEHALF OF THE PLAINTIFFS:
3      Bradley D. Wine
4      Michael C. Mateer
5      DICKSTEIN SHAPIRO, L.L.P.
6      1825 Eye Street NW
7      Washington, D.C. 20006-5403
8      (202) 420-3607
9
10  FOR THE DEFENDANTS:
11      Lewis M. Barr
12      U.S. DEPARTMENT OF JUSTICE
13      601 D Street NW, Suite 8000
14      Washington, D.C. 20004
15      (202) 514-9645
16
17  VIDEOGRAPHER:
17      Pete Resendez
18
19  ALSO PRESENT:
20      Lauren S. McAndrews
21      Robert Zoch
22

Page 164

---

1          DEPOSITION EXHIBITS
            TOMMY B. JORDAN
2           October 12, 2011
3
   NUMBER       DESCRIPTION       MARKED
4
   Exhibit 84  3/10/95 Memorandum for Record    183
5      by M.J. Lawrence with
       Enclosures
6      Bates US0192099 - US0192118
   Exhibit 85  7/3/95 Defense Contract Audit    183
7      Agency Audit Report
       Bates US0190207 - US0190221
8  Exhibit 86  1/22/96 Letter from Arden        183
       Honrud with Enclosed Schedules
9      Bates US0011302 - US0011305
   Exhibit 87  6/16/95 Allowability of          183
10     Environmental Costs Related to
       Convair Lagoon
11     Bates US30072382 - US30072388
   Exhibit 88  July 1996 Settlement and Advance  183
12     Agreement
       Bates US0011297 - US0011299
13  Exhibit 89  10/17/88 Waste Minimization      191
       Planning Minutes of Meeting
14     Bates TDYRYAN20044071 -
15     TDYRYAN20044072
16  Exhibit 90  5/12/89 Waste Treatment          191
17     Facilities Update
18     Bates TDYRYAN50028522 -
19     TDYRYAN50028523
20  Exhibit 91  Ryan Aeronautical Company        195
21     Information
22     Bates US2002089 - US2002106

Page 166

Pages 163 to 166

10/12/2011      TDY Holdings v. United States of America      Tommy Jordan

**DEPOSITION EXHIBITS**
**TOMMY B. JORDAN**
October 12, 2011

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 92 | Narrative History of the San Diego Area AF Office from 7/1/48 to 12/31/48 Bates TDYRYAN00004728 - TDYRYAN00004801 | 195 |
| Exhibit 93 | Narrative History of San Diego Area AF Office from 7/1/49 to 12/31/49 Bates TDYRYAN00004860 - TDYRYAN00004961 | 195 |
| Exhibit 94 | Report from the Office of the Inspector General, USAF Norton Air Force Base, California Bates TDYRYAN00003287 - TDYRYAN00003304 | 195 |
| Exhibit 95 | Ryan Aeronautical Company Information Bates US0027027 - US0027088 | 195 |
| Exhibit 96 | 7/1/42 List of Naval Aircraft and Naval Catapults by E.M. Condra, Jr. Bates US0026170 - US0026172 | 213 |
| Exhibit 97 | 9/16/42 List of Subcontractors and Vendors from the Office of Inspector of Naval Aircraft Bates US122486 | 213 |
| Exhibit 98 | 2/10/1908 Articles of Agreement Between Signal Corps, United States Army and the Wright Brothers | 214 |

Page 167

**DEPOSITION EXHIBITS**
**TOMMY B. JORDAN**
October 12, 2011

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 106 | History of the San Diego Air Procurement District 1 January 1961 - 30 June 1961 Bates US0121843 - US0121867 | 222 |
| Exhibit 107 | 4/23/65 Quality and Reliability Assurance Handbook Bates US0061491 - US0061485 | 222 |
| Exhibit 108 | August 1976 Procurement Quality Assurance Bates US0064803 - US0064936 | 222 |
| Exhibit 109 | 5/19/48 Armed Services Procurement Regulation, Section VII Bates US0249504 - US0249508 | 228 |
| Exhibit 110 | 1/3/55 Armed Services Procurement Regulation, Section VII Bates US0249509 - US0249517 | 228 |
| Exhibit 111 | 7/1/60 Armed Services Procurement Regulation, Section VII Bates US0249518 - US0249532 | 228 |
| Exhibit 112 | 3/1/63 Armed Services Procurement Regulation, Section VII Bates US0249533 - US0249547 | 228 |
| Exhibit 113 | 4/28/72 Armed Services Procurement Regulation, Section VII Bates US0249552 - US0249564 | 228 |
| Exhibit 114 | 4/28/72 Armed Services Procurement Regulation, Section VII Bates US0249548 - US0249551 | 228 |

Page 169

**DEPOSITION EXHIBITS**
**TOMMY B. JORDAN**
October 12, 2011

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 99 | 3/1/43 Army Air Forces Inspector's Familiarization Manual Bates US0061140 - US0061353 | 216 |
| Exhibit 100 | 1945 Bureau of Aeronautics Manual Bates US0060621 - US0060644 | 216 |
| Exhibit 101 | Instruction to War Department Inspection Bates US0061354 - US0061442 | 216 |
| Exhibit 102 | 10/2/40 The Chief of the Material Division, OCAC, Report of Inspection Trip Bates TDYRYAN00004184 - TDYRYAN00004190 | 218 |
| Exhibit 103 | 4/2/51 Directorate Office Instruction No. 74-1 Bates US0061019 - US0061097 | 222 |
| Exhibit 104 | History of the San Diego Air Procurement District 1 July 1954 - 31 December 1954 Bates TDYRYAN00005151 - TDYRYAN00005253 | 222 |
| Exhibit 105 | History of the San Diego Air Procurement District 1 January - 30 June 1957 Bates US0121273 - US0121380 | 222 |

Page 168

**DEPOSITION EXHIBITS**
**TOMMY B. JORDAN**
October 12, 2011

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 115 | 4/16/73 Armed Services Procurement Regulation, Section VII Bates US0249569 - US0249584 | 228 |
| Exhibit 116 | 4/16/73 Armed Services Procurement Regulation, Section VII Bates US0249565 - US0249568 | 228 |
| Exhibit 117 | 7/1/74 Armed Services Procurement Regulation, Section VII Bates US0249591 - US0249604 | 228 |
| Exhibit 118 | 7/1/74 Armed Services Procurement Regulation, Section VII Bates US0249585 - US0249590 | 228 |
| Exhibit 119 | 10/1/75 Armed Services Procurement Regulation, Section VII Bates US0249609 - US0249622 | 228 |
| Exhibit 120 | 10/1/75 Armed Services Procurement Regulation, Section VII Bates US0249605 - US0249608 | 228 |
| Exhibit 121 | 7/1/76 Armed Services Procurement Regulation, Section VII Bates US0249627 - US0249640 | 228 |
| Exhibit 122 | 7/1/76 Armed Services Procurement Regulation, Section VII Bates US249623 - US0249626 | 228 |
| Exhibit 123 | 11/26/82 DAC #76-40 Contract Clauses and Solicitation Provisions Bates US0249641 - US0249654 | 228 |

Page 170

Pages 167 to 170

10/12/2011                    TDY Holdings v. United States of America                    Tommy Jordan

## Page 171

DEPOSITION EXHIBITS
TOMMY B. JORDAN
October 12, 2011

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 124 | Statement by Secretary of the Air Force<br>Bates US0064793 - US0064794 | 238 |
| Exhibit 125 | June 1959 Supervisory Manual<br>Bates US2002393 - US2002499 | 250 |
| Exhibit 126 | 4/2/90 Teledyne Ryan Aeronautical Manufacturing Process Data Sheets<br>Bates TDYRYAN50000479 - TDYRYAN50000488 | 256 |
| Exhibit 127 | 9/12/94 Teledyne Ryan Aeronautical Manufacturing Process Data Sheets<br>Bates TDYRYAN50023329 - TDYRYAN50023342 | 256 |
| Exhibit 128 | 10/27/82 Teledyne Ryan Aeronautical Manufacturing Process Data Sheets<br>Bates TDYRYAN50031090 - TDYRYAN50031124 | 256 |
| Exhibit 129 | 8/4/78 Teledyne Ryan Aeronautical Manufacturing Process Data Sheets<br>Bates TDYRYAN50030497 - TDYRYAN50030505 | 256 |
| Exhibit 130 | 2/7/85 Teledyne Ryan Aeronautical Manufacturing Process Data Sheets<br>Bates TDYRYAN20043735 - TDYRYAN20043751 | 256 |

Page 171

## Page 172

DEPOSITION EXHIBITS
TOMMY B. JORDAN
October 12, 2011

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 131 | 3/15/90 Teledyne Ryan Aeronautical Manufacturing Process Data Sheets<br>Bates TDYRYAN20011833 - TDYRYAN20011850 | 256 |
| Exhibit 132 | 1/28/93 Teledyne Ryan Aeronautical Manufacturing Process Data Sheets<br>Bates TDYRYAN50014187 - TDYRYAN50014197 | 256 |
| Exhibit 133 | 11/8/71 Teledyne Ryan Aeronautical Manufacturing Process Data Sheets<br>Bates TDYRYAN20042050 - TDYRYAN20042053 | 256 |
| Exhibit 134 | 4/29/83 Teledyne Ryan Aeronautical Manufacturing Process Data Sheets<br>Bates TDYRYAN20042043 - TDYRYAN20042049 | 256 |
| Exhibit 135 | 3/25/88 Teledyne Ryan Aeronautical Manufacturing Process Data Sheets<br>Bates TDYRYAN50030508 - TDYRYAN50030515 | 256 |
| Exhibit 136 | 8/20/74 Teledyne Ryan Aeronautical Manufacturing Process Data Sheets<br>Bates TDYRYAN50030594 - TDYRYAN50030606 | 256 |

Page 172

## Page 173

DEPOSITION EXHIBITS
TOMMY B. JORDAN
October 12, 2011

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 137 | 9/24/80 Teledyne Ryan Aeronautical Manufacturing Process Data Sheets<br>Bates TDYRYAN50030575 - TDYRYAN50030587 | 256 |
| Exhibit 138 | 8/24/82 Teledyne Ryan Aeronautical Manufacturing Process Data Sheets<br>Bates TDYRYAN50030558 - TDYRYAN50030572 | 256 |
| Exhibit 139 | 12/19/85 Teledyne Ryan Aeronautical Manufacturing Process Data Sheets<br>Bates TDYRYAN20043795 - TDYRYAN20043809 | 256 |
| Exhibit 140 | 9/30/88 Teledyne Ryan Aeronautical Manufacturing Process Data Sheets<br>Bates TDYRYAN20043781 - TDYRYAN20043794 | 256 |
| Exhibit 141 | 1/29/93 Teledyne Ryan Aeronautical Manufacturing Process Data Sheets<br>Bates TDYRYAN50009521 - TDYRYAN50009534 | 256 |
| Exhibit 142 | 1/6/70 Hughes Tool Company Process Specifications<br>Bates TDYRYAN20012675 - TDYRYAN20012687 | 258 |

Page 173

## Page 174

DEPOSITION EXHIBITS
TOMMY B. JORDAN
October 12, 2011

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 143 | 4/4/74 Northrop Corporation Process Specification<br>Bates US4000247 - US4000250 | 258 |
| Exhibit 144 | Hughes Helicopters Product Specifications<br>Bates TDYRYAN40041860 - TDYRYAN40041886 | 258 |
| Exhibit 145 | Hughes Helicopters Product Specifications<br>Bates TDYRYAN40041672 - TDYRYAN40041690 | 258 |
| Exhibit 146 | March 1951 ASPR Appendix B Manual for Control of Government Property in Possession of Contractors<br>Bates US0064480 - US0064497 | 262 |
| Exhibit 147 | 1963 Edition of the Armed Services Procurement Regulation, Appendix B<br>Bates US0064596 - US0064618 | 262 |
| Exhibit 148 | 1969 Edition of the Armed Services Procurement Regulation, Appendix B<br>Bates US0064647 - US0064675 | 262 |
| Exhibit 149 | 7/17/96 Letter from Peter Woodworth with Enclosed Settlement and Advance Agreement<br>Bates TDYRYAN20028215 - TDYRYAN20028217 | 265 |

Page 174

Pages 171 to 174

10/12/2011                    TDY Holdings v. United States of America                    Tommy Jordan

---

DEPOSITION EXHIBITS
TOMMY B. JORDAN
October 12, 2011

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 150 | 10/16/57 Management Information Bulletin | 268 |
| | Bates US2002260 - US 2002261 | |
| Exhibit 151 | 6/9/83 Letter from D.E. Hurst to Mr. D.K. Wilson | 268 |
| | Bates US0004856 | |
| Exhibit 152 | 2/10/89 Letter from G.L. Woods to Mr. K.L. Juengel | 268 |
| | Bates TDYRYAN20062034 - TDYRYAN20062035 | |
| Exhibit 153 | 8/31/91 Agreement for Firm Fixed Price Subcontract Number MDHC 90014A | 268 |
| | Bates TDYRYAN50005515 - TDYRYAN50005683 | |
| Exhibit 154 | The Ryan Aeronautical Company Annual Report for the Fiscal Year 1945 | 279 |
| | Bates TDYRYAN00000041 - TDYRYAN00000061 | |
| Exhibit 155 | 5/25/59 ASPR Excerpt | 283 |
| | Bates US0251500 - US0251509 | |
| Exhibit 156 | 4/1/60 ASPR Excerpt | 283 |
| | Bates US0251609 - US0251614 | |
| Exhibit 157 | 3/1/63 ASPR Excerpt | 283 |
| | Bates US0251627 - US0251639 | |
| Exhibit 158 | 4/16/73 ASPR Excerpt | 283 |
| | Bates US0251640 - US0251643 | |

Page 175

---

DEPOSITION EXHIBITS
TOMMY B. JORDAN
October 12, 2011

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 170 | 7/1/76 ASPR, Appendix E | 283 |
| Exhibit 171 | ASPR Excerpts | 283 |
| | Bates US0251522 - US0251538 | |
| Exhibit 172 | The Ryan Aeronautical Company Annual Report for the Fiscal Year 1946 | 297 |
| | Bates US0026459 - US0026477 | |
| Exhibit 173 | The Ryan Aeronautical Company Annual Report for the Fiscal Year 1947 | 297 |
| | Bates US0026440 - US0026458 | |
| Exhibit 174 | The Ryan Aeronautical Company Annual Report for the Fiscal Year 1948 | 297 |
| | Bates US0026422 - US0026439 | |
| Exhibit 175 | The Ryan Aeronautical Company Annual Report for the Fiscal Year 1949 | 297 |
| | Bates US0026401 - US0026421 | |
| Exhibit 176 | Ryan Annual Report for the Fiscal Year 1951 | 297 |
| | Bates TDYRYAN00000085 - TDYRYAN00000096 | |
| Exhibit 177 | Ryan Annual Report for the Fiscal Year 1952 | 297 |
| | Bates TDYRYAN00000097 - TDYRYAN00000108 | |

Page 177

---

DEPOSITION EXHIBITS
TOMMY B. JORDAN
October 12, 2011

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 159 | 7/1/74 ASPR Excerpt | 283 |
| | Bates US0251644 - US0251647 | |
| Exhibit 160 | 10/1/75 ASPR Excerpt | 283 |
| | Bates US0251648 - US0251650 | |
| Exhibit 161 | 7/1/76 ASPR Excerpt | 283 |
| | Bates US0251651 - US0251654 | |
| Exhibit 162 | 3/12/79 ASPR Excerpt | 283 |
| | Bates US0251655 - US0251667 | |
| Exhibit 163 | 9/1/82 ASPR Excerpt | 283 |
| | Bates US0251668 - US0251674 | |
| Exhibit 164 | 4/1/84 Federal Acquisition Regulation Excerpt | 283 |
| | Bates US0251675 - US0251679 | |
| Exhibit 165 | 4/1/84 Federal Acquisition Regulation Excerpt | 283 |
| | Bates US0251510 - US0251511 | |
| Exhibit 166 | Federal Acquisition Regulation 1984 Edition Excerpt | 283 |
| | Bates US0251512 - US0251514 | |
| Exhibit 167 | 1990 FAR Excerpt | 283 |
| | Bates US0251686 - US0251691 | |
| Exhibit 168 | June 1997 FAR Excerpt | 283 |
| | Bates US0251692 - US0251697 | |
| Exhibit 169 | June 1997 FAR Excerpt | 283 |
| | Bates US0251519 - US0251521 | |

Page 176

---

DEPOSITION EXHIBITS
TOMMY B. JORDAN
October 12, 2011

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 178 | Ryan Annual Report for the Fiscal Year 1953 | 297 |
| | Bates TDYRYAN00000109 - TDYRYAN00000120 | |
| Exhibit 179 | Ryan Annual Report for the Fiscal Year 1954 | 297 |
| | Bates TDYRYAN00000121 - TDYRYAN00000134 | |
| Exhibit 180 | Ryan Annual Report for the Fiscal Year 1955 | 297 |
| | Bates TDYRYAN00000135 - TDYRYAN00000148 | |
| Exhibit 181 | Ryan Annual Report for the Fiscal Year 1956 | 297 |
| | Bates TDYRYAN00000149 - TDYRYAN00000162 | |
| Exhibit 182 | Ryan Annual Report for the Fiscal Year 1957 | 297 |
| | Bates TDYRYAN00000163 - TDYRYAN00000176 | |
| Exhibit 183 | Ryan Annual Report for the Fiscal Year 1958 | 297 |
| | Bates TDYRYAN00000177 - TDYRYAN00000191 | |
| Exhibit 184 | Ryan Annual Report for the Fiscal Year 1959 | 297 |
| | Bates US0063674 - US0063707 | |

Page 178

Pages 175 to 178

```
1              DEPOSITION EXHIBITS
                TOMMY B. JORDAN
2                 October 12, 2011
3
    NUMBER         DESCRIPTION        MARKED
4
    Exhibit 185 Ryan Annual Report for the Fiscal  297
5           Year 1960
            Bates US0063708 - US0063743
6   Exhibit 186 Ryan Annual Report for the Fiscal  297
            Year 1961
7           Bates US0063744 - US0063778
    Exhibit 187 Ryan Annual Report for the Fiscal  297
8           Year 1962
            Bates US0063779 - US0063814
9   Exhibit 188 Ryan Annual Report for the Fiscal  297
            Year 1963
10          Bates US0063815 - US0063850
    Exhibit 189 Ryan Annual Report for the Fiscal  297
11          Year 1964
            Bates US0063851 - US0063886
12  Exhibit 190 Ryan Annual Report for the Fiscal  297
            Year 1965
13          Bates US0063887 - US0063921
14  Exhibit 191 Ryan Annual Report for the Fiscal  297
15          Year 1966
16          Bates US0063923 - US0063962
17  Exhibit 192 Ryan Annual Report for the Fiscal  297
18          Year 1967
19          Bates US0063963 - US0063987
20  Exhibit 193 ASPR Excerpts          307
21          Bates US0064277 - US0064281
22
                                      Page 179
```

```
1              PROCEEDINGS
2          THE VIDEOGRAPHER:  This marks the
3   start of the continuing deposition of Tommy B.
4   Jordan, Volume 2.  Today is Wednesday, October
5   the 12th, 2011.  The time on the record is 10:03.
6          TOMMY B. JORDAN
7   having been previously sworn, continued to testify
8   as follows:
9          EXAMINATION (CONTINUED)
10  BY MR. BARR:
11     Q.   Good morning, Mr. Jordan.
12     A.   Good morning.
13     Q.   This is a continuation of your
14  deposition, which -- for trial testimony purposes,
15  which we began on Monday of this week, October
16  the 10th, and you understand, I take it, that you
17  remain under oath?
18     A.   I understand.
19     Q.   When we adjourned on Monday the 10th, it
20  appeared that you had -- you were fairly fatigued
21  at that point, at least it did to me.
22          Was my conclusion accurate?
                                      Page 181
```

```
1              DEPOSITION EXHIBITS
2               TOMMY B. JORDAN
3                October 12, 2011
4
5   NUMBER         DESCRIPTION        MARKED
6
7   Exhibit 194 ASPR The 1969 Edition Excerpts   307
8           Bates US0159156 - US0159161
9   Exhibit 195 ASPR The 1976 Edition Excerpts   307
10          Bates US0159178 - US0159182
11  Exhibit 196 4/1/84 FAR Excerpt          307
12          Bates US0251418 - US0251422
13  Exhibit 197 1990 FAR Excerpt            307
14          Bates US0251427 - US0251431
15  Exhibit 198 June 1997 FAR Excerpt       307
16          Bates US0251432 - US0251437
17
18
19
20
21
22
                                      Page 180
```

```
1      A.   I was fairly tired, yes.
2      Q.   When we left off, we were talking about
3   advance agreements.  And did you learn in this case
4   of any advance agreements between TRA and the
5   government?
6          MR. WINE:  Objection, assumes facts
7   not in evidence.
8      A.   Yes, there was one advance agreement
9   that I reviewed.
10  BY MR. BARR:
11     Q.   And very briefly, can you describe what
12  led up to that advance agreement?
13     A.   There was a --
14         MR. WINE:  Object --
15     A.   I'm sorry.
16         MR. WINE:  Objection, assumes facts
17  not in evidence, leading.
18     A.   There was a series of discussions
19  relative to a DCAA audit that had disallowed
20  certain costs associated with cleanup of the
21  so-called Convair Lagoon and a recognition by the
22  parties that it would be very difficult to make a
                                      Page 182
```

Pages 179 to 182

1  determination that those costs were allowable and
2  allocable and reasonable, and then based upon some
3  prior DCAA guidance, starting, I believe, in 1992,
4  the parties agreed to negotiate and execute an
5  advance and settlement agreement.
6  BY MR. BARR:
7      Q.  Okay.  Let me mark as some additional
8  exhibits in this case four documents.  I'll ask you
9  to review them briefly, and then I'll have just a
10  couple of questions for you.
11          MR. BARR:  I may have misspoken.  I
12  think it's five exhibits.
13          (Exhibit Nos. 84 through 88 marked)
14  BY MR. BARR:
15      Q.  Mr. Jordan, I've -- if you'd please take
16  a look at these, and after you have, I ask you if
17  you recall reviewing these documents in connection
18  with your work in this case.
19          MR. WINE:  While the witness is
20  reviewing the documents, I'd like to state for the
21  record that we object on the -- to the documents on
22  the basis of hearsay, that the documents go beyond

Page 183

1  Q.  And at the time you were unable to find
2  the audit report or the DCAA document that you
3  had -- you had in mind.
4          MR. WINE:  Assumes facts not in
5  evidence.
6  BY MR. BARR:
7      Q.  Do you recall that?
8      A.  Yes, I do.
9      Q.  Is this the document that you had in
10  mind?
11      A.  Yes, it is.
12      Q.  Or I should say:  Is this one of the
13  documents you had in mind?
14      A.  Yes.
15      Q.  Turning to 85 -- Exhibit 85, if you
16  would turn, please, to the page with the Bates
17  number ending in 190210.
18      A.  Okay.
19      Q.  Is this also one of the documents that
20  you had in mind relating to a questioning of
21  $300,000 in environmental expenses?
22          MR. WINE:  Objection insofar as it

Page 185

1  the scope of the witness' area of expertise and to
2  the extent that they go beyond the opinions
3  expressed or those documents referenced in his
4  expert report are beyond the scope of his opinion
5  and, therefore, inadmissible.
6      A.  Yes, these are documents that I
7  reviewed.
8  BY MR. BARR:
9      Q.  Now, let me direct your attention to --
10  I believe it's 84 with the Bates number ending in
11  192104.  I've put a red tape flag on there.
12      A.  Okay.
13          MR. WINE:  I'm sorry.  192104?
14  BY MR. BARR:
15      Q.  Now, you had been asked back in December
16  of 2009 about whether the DCAA had ever questioned
17  or disallowed any environmentally related costs
18  pertaining to the Harbor Drive site.  Do you recall
19  those -- that discussion with Mr. Wine?
20      A.  Yes, I do.
21          MR. WINE:  Same line of objections.
22  BY MR. BARR:

Page 184

1  mischaracterizes the document and assumes facts not
2  in evidence.
3      A.  Yes, it is.
4  BY MR. BARR:
5      Q.  And again, let me direct your attention
6  to Exhibit 87.  This is the January 22, 1996 letter
7  from Mr. Honrud.
8          MR. WINE:  Which exhibit are you
9  referring to, Counsel?
10          MR. BARR:  87.
11          MR. WINE:  Objection insofar as it
12  mischaracterizes the document.
13      A.  That's 86, I believe, not 87.
14  BY MR. BARR:
15      Q.  Okay.  Thank you.  This is a document
16  with the first page Bates number is U.S. 0011302?
17      A.  Yes.
18      Q.  Would you turn to the last page of this
19  Exhibit 86?
20      A.  Okay.
21          MR. BARR:  Now, for the record,
22  Counsel, I'll represent that the vertical line on

Page 186

Pages 183 to 186

10/12/2011                 TDY Holdings v. United States of America                 Tommy Jordan

1    the first page next to the -- on the left next to
2    the bottom paragraph and the circle on the last
3    page were not on the originals.  We will provide
4    clean copies for those, both to the reporter and to
5    you, at our earliest opportunity.
6    BY MR. BARR:
7        Q.   Mr. Jordan, is this one of the documents
8    from which you had derived your conclusion that the
9    DCAA had questioned approximately $300,000 in
10   environmental cleanup costs?
11           MR. WINE:  Objection, it assumes
12   facts not in evidence, mischaracterizes the
13   document.
14       A.   Yes, it is.
15           MR. WINE:  I also object to the line
16   of the questions insofar as they exceed the scope
17   of the witness' expert report and are, therefore,
18   inadmissible.
19   BY MR. BARR:
20       Q.   Let's talk briefly on another subject,
21   and that is the extent to which Ryan and TRA
22   performed defense subcontracts in the years between

Page 187

1        Q.   Now, back in the '50s and '60s, do you
2    recall Ryan producing certain products for other
3    prime contractors?
4            MR. WINE:  Objection, assumes facts
5    not in evidence, leading.
6        A.   There were other prime contractors that
7    they produced parts for.
8    BY MR. BARR:
9        Q.   Do you recall the nature of those
10   products?
11       A.   They were primarily aircraft components
12   and/or parts for various aircraft.
13       Q.   Do you recall the nature of those parts?
14           MR. WINE:  Objection, vague and
15   ambiguous.
16       A.   There were a lot of parts that were high
17   temperature alloys such as stainless steel.  There
18   were other components that were basically sheet
19   metal components of the fuselage sections for --
20   for example, McDonnell Douglas.
21   BY MR. BARR:
22       Q.   Now, when you say "fuselage sections,"

Page 189

1    the end of World War II and the site closure in
2    1999.
3            Briefly stated, what kinds of products
4    did you determine the company had produced during
5    that period?
6            MR. WINE:  Objection, assumes facts
7    not in evidence.
8        A.   The documentation that I reviewed as
9    part of my review of the documents pertaining to
10   this case indicate that Ryan had produced
11   components for other manufacturers such as
12   manifolds, exhaust components.
13           They had a series of contracts with
14   General Electric for engine components.  They had a
15   major subcontract with Hughes and subsequently
16   McDonnell Douglas for major structural components
17   and fuselage sections for the helicopter being
18   produced by Hughes and then subsequently McDonnell
19   Douglas.
20   BY MR. BARR:
21       Q.   Was that the Apache helicopter?
22       A.   Yes, it was.

Page 188

1    what do you mean?
2        A.   They were, like, for example, flaps and
3    wings sections and the external part of an aircraft
4    rather than the internal part of an aircraft.
5        Q.   What kinds of documents did you find
6    this information in?
7        A.   There were various reports that I read.
8    There was correspondence concerning those
9    subcontracts, and then there was also documentation
10   contained in, for example, the Ryan report to their
11   stockholders that spoke to subcontracts.
12       Q.   Okay.  We will get to annual reports
13   later.  Let me just show you a couple of documents
14   and ask you if these are the kinds of documents
15   that you have in mind.
16           Before we get to that, let me circle
17   back.  With respect to the issue of reimbursement
18   of environmental costs, did you locate in your work
19   in the course of this case documents which you feel
20   shed additional light on the matter?
21           MR. WINE:  Objection, vague and
22   ambiguous, leading.

Page 190

Pages 187 to 190

1    A.  Yes, I did.
2         MR. WINE:  Also questions of that
3    nature go beyond the scope of this witness' area of
4    expertise and are, therefore, inadmissible.
5         (Exhibit Nos. 89 and 90 marked)
6    BY MR. BARR:
7    Q.  The court reporter has marked
8    Exhibits 89 and 90.  And take a moment to review
9    those documents.  I'll have a couple of questions
10   for you.
11        MR. WINE:  While the witness is
12   reviewing the documents, I'll state for the record
13   the documents -- there's a lack of foundation for
14   the documents.  They assume facts not in evidence.
15   They constitute hearsay, and they exceed the scope
16   of the witness' area of expertise for which he is
17   qualified to give an opinion and, therefore,
18   inadmissible.
19   A.  Yes, I have reviewed these documents.
20        MR. BARR:  And again, for the
21   record, it's my understanding that on -- I believe
22   it's Exhibit 80 -- 89, the circled material in the

1    A.  Yes, I did.
2    BY MR. BARR:
3    Q.  And just to remind the Court,
4    Mr. Jordan, did you encounter issues from time to
5    time in the course of your career as an Air Force
6    contracting official relating to the reimbursement
7    of contractor costs?
8    A.  Yes, I did.
9    Q.  Often or seldom?
10   A.  Very frequently.
11        MR. WINE:  Just a question for
12   clarification, are we talking about contractor
13   costs or environmental costs?
14        MR. BARR:  The question stands as it
15   is, as -- as does the answer.
16   BY MR. BARR:
17   Q.  Mr. Jordan, what --
18        MR. WINE:  Then I object.
19   BY MR. BARR:
20   Q.  -- conclusions did you draw?
21   A.  That costs had to be determined to be
22   allowable, allocable, and reasonable before the

1    notes were not on the original.  So clean copies of
2    those will be provided to the court reporter.
3         MR. WINE:  I'm not sure I see where
4    you're referring to, Counsel.  Those are initials?
5         MR. BARR:  Initials, a date, there's
6    some circled information.
7         MR. WINE:  Do you have a different
8    version than I do?
9         MR. BARR:  Apparently I do.  So
10   we'll just leave those copies as they are.
11   A.  Okay.
12   BY MR. BARR:
13   Q.  Mr. Jordan, in the context of
14   reimbursement of environmental costs, did you draw
15   any conclusions on the basis of these documents?
16        MR. WINE:  Objection.  Again, the
17   question goes beyond the scope for which the
18   witness has been qualified as an expert.  It goes
19   beyond his area of expertise and, therefore, is
20   inadmissible.  Additionally, the question lacks a
21   sufficient basis for which the witness can give an
22   opinion.

1    government would reimburse the contractor either as
2    a direct item of the cost or allow the contractor
3    to include those costs in their overhead, which was
4    submitted against government contracts.
5    Q.  And what -- was there a concern relating
6    to the nature of those costs or the amount of those
7    costs expressed in these documents?
8         MR. WINE:  Objection, calls for a
9    legal conclusion, assumes facts not in evidence,
10   goes beyond the scope of the witness' area of
11   expertise.  It goes beyond the witness' expert
12   report as well and is, therefore, inadmissible.
13   A.  Yes, it does go to the issue of the
14   amount of the cost that the contractor was looking
15   at.
16   BY MR. BARR:
17   Q.  And -- and what did that concern suggest
18   to you?
19   A.  It concern -- it -- had come to the
20   conclusion that they were concerned about the
21   excessive costs of waste minimization, and I failed
22   to understand what their concern was if these costs

10/12/2011                TDY Holdings v. United States of America                Tommy Jordan

1   were considered to be those kinds of costs that
2   they would include in their overhead and pass to
3   the government.
4        MR. WINE:  Objection to the response
5   to the extent it relies upon inadmissible hearsay.
6   BY MR. BARR:
7        Q.   Now, with respect to the subject of the
8   nature and extent of Ryan and TRA subcontracting
9   work, let me show you a number of documents.
10       MR. BARR:  Actually, I correct
11  myself.  These relate, I believe, to Ryan only, not
12  to TRA.
13       MR. WINE:  Then I object to
14  relevance.
15       (Exhibit Nos. 91 through 95 marked)
16  BY MR. BARR:
17       Q.   Mr. Jordan, if you would briefly take a
18  look at those, and when you're done, please let me
19  know if you recall reviewing those in connection
20  with your work on this case.
21       MR. WINE:  Just for clarification,
22  are you asking with respect to his work on this

1   case or his formulation of his expert opinions in
2   this matter?  Because he's also been designated as
3   a 30(b)(6) witness.
4        MR. BARR:  In connection with his
5   expert work.
6        MR. WINE:  Okay.  While the witness
7   is reviewing, I'll state for the record:  To the
8   extent the documents are not reflected in the
9   expert report, we would object to their admission
10  and inclusion in testimony as going beyond the
11  scope of that report and, therefore, inadmissible.
12  Additionally, the documents constitute hearsay and
13  have no relevance to this matter and are,
14  therefore -- and we object as such.
15       A.   These are among the documents that I did
16  review.
17  BY MR. BARR:
18       Q.   Now, Mr. Jordan, are these the kinds of
19  reports from which you derived information
20  concerning the nature and extent of the companies
21  of Ryan's subcontract work?
22       A.   These and others, yes.

1        Q.   Let's turn to the subject of government
2   inspectors, contracting officers, auditors, and
3   property administrators.
4        First, with respect to government
5   inspectors, have you formed opinions in this case
6   as to what kinds of government inspectors
7   accomplished inspection work at contractors' plants
8   and how they did so?
9        MR. WINE:  Objection, compound,
10  vague and ambiguous and calls for a narrative.
11       A.   Yes, I have.
12  BY MR. BARR:
13       Q.   Were the -- within the -- within your
14  experience over the years, were government
15  inspectors military officers or civilian personnel?
16       MR. WINE:  Objection to the extent
17  that it calls for periods that go beyond the area
18  of expertise of the witness.  It is outside of his
19  scope of knowledge and, therefore, inadmissible
20  opinion testimony.
21       A.   Those inspectors that I came in contact
22  with during my career were all civilian employees

1   of the Federal government.
2   BY MR. BARR:
3        Q.   Did you ever hear about inspectors who
4   were military officers?
5        MR. WINE:  Same objection.
6        A.   I never heard about an inspector being a
7   military officer.
8   BY MR. BARR:
9        Q.   And as civilians, how would they dress
10  when they went to contractors' plants?
11       A.   They would dress in civilian clothes and
12  unless you were personally familiar with the
13  inspectors, they were virtually indistinguishable
14  from contractor inspectors.
15       Q.   And do you have a recollection as -- in
16  the course of your career, as to how they performed
17  their duties relating to inspection?
18       MR. WINE:  Objection, vague and
19  ambiguous.
20       A.   Yes, I do.  I have a definite opinion
21  based upon my personal experience and observation.
22  BY MR. BARR:

www.DigitalEvidenceGroup.com        Digital Evidence Group C'rt 2011                202-232-0646

Q.   And what is that opinion?

A.   They relied primarily upon review of contractor records of inspections that had been accomplished by the contractor's inspectors.  They periodically, either on a random sample or statistical sampling basis, would physically inspect product that was being produced by the contractor to confirm that the contractor's record of inspections were complete and accurate.

And then prior to final acceptance of the product, they would review all of the contractor documentation that had been prepared as that product went through the various stages of manufacturing and the various processes to ensure that everything had been done properly before they executed a document called a DD 250, which was a material inspection and receiving report, which authorized the contractor to receive payment for that product.

Q.   Now, are you aware of any evidence that government inspectors at Ryan during World War II did their business any differently from the way

Page 199

they did their business during your time?

MR. WINE:  Objection to the extent that it goes beyond the witness' area of expertise, beyond -- and predates his period of work with the United States.  He is not qualified to give an opinion in this matter on that time frame.

A.   All the documents that I reviewed indicate that the duties and responsibilities of government inspectors remained substantially the same from World War II era through the end of the relevant period.

BY MR. BARR:

Q.   Now, broadening our focus a little bit here to include government contracting personnel, did you determine in your review of documents in this case whether any government contracting or inspection personnel during World War II supervised or directed Ryan employees or executives concerning the actual day-to-day manufacturing operations or processes at the plant?

MR. WINE:  Objection, calls for a legal conclusion, goes beyond the scope of the

Page 200

witness' area of expertise, lacks an appropriate foundation.  To the extent it's not -- it requests an opinion not articulated in the witness' expert report it is ad -- is inadmissible.  It also contains undefined terms and is, therefore, vague and ambiguous.

A.   All the documentation that I reviewed pertaining to this issue indicate that there was no -- none, whatsoever -- indication that the government employees, either inspectors or contract -- contracting officers directed the contractor to do anything outside the scope and breadth of contracts that existed between the government and the contractor.

BY MR. BARR:

Q.   Well, let me focus it just more precisely.  Did you determine on your review of documents whether or not any government contracting or inspection personnel during the war supervised or directed any of the actual day-to-day manufacturing or processes at the plant?

MR. WINE:  Same objections.

Page 201

A.   There was no documentation that I found that indicated that the government employees had supervised contractor employees or directed supervisor or contractor management to do anything outside the contract.

BY MR. BARR:

Q.   And that would include -- am I understanding you correctly that they would not be supervising the day-to-day operations or processes?

MR. WINE:  Objection, leading, same objections as before.

A.   That is correct.  There was no day-to-day supervision of contractor employees during the processing of the product.

BY MR. BARR:

Q.   Did your determine in your review of documents in this case whether or not any government contracting or inspection personnel during the war supervised or directed Ryan personnel as to the day-to-day usage of chemicals by company personnel?

MR. WINE:  Same objections.

Page 202

Pages 199 to 202

1    A.   There was no documentation that I saw
2  that indicated that government employees had
3  supervised the manner in which Ryan and/or TDY used
4  hazardous chemicals in the day-to-day processing of
5  the product.
6  BY MR. BARR:
7    Q.   And did you determine in your review of
8  documents in this case whether or not any
9  government contracting or inspection personnel
10 during World War II supervised or directed Ryan
11 personnel concerning methods or facilities for the
12 disposal of chemical waste generated during
13 operations at the plant?
14          MR. WINE:  Same objections as
15 before, and to state a point that hasn't been
16 previously raised, the witness is not qualified as
17 a historian and has made previous testimony that he
18 is not qualified as a historian and, therefore, to
19 the extent that the question calls for historical
20 testimony, he is not qualified at all for an
21 opinion in that regard.
22    A.   There is no documentation that I saw

Page 203

1  during World War II period that indicated the
2  government had supervised any action relative to
3  the handling and/or disposal of hazardous
4  materials.
5  BY MR. BARR:
6    Q.   And did you determine in your review of
7  documents in this case whether or not any
8  government contracting or inspection personnel
9  during the war supervised or directed Ryan
10 personnel concerning the handling of any PCB fluids
11 that may have been discharged from any plant
12 equipment?
13          MR. WINE:  Same objections.
14    A.   I saw no documentation in the volumes of
15 documents that I reviewed that indicated that the
16 government in any way, shape, form, or fashion had
17 issued instructions to the contractor relative to
18 the handling of PCB waste.
19 BY MR. BARR:
20    Q.   Now, the personnel that we've been
21 discussing in the context of World War II,
22 government contracting officers and government

Page 204

1  inspectors, in summary, what is your
2  understanding -- based on your experience and
3  training and review of documents in this case, what
4  would -- how would you summarize their essential
5  responsibilities?
6          MR. WINE:  Objection.  Same
7  objections as before.  Also goes beyond the scope
8  of the witness' expert report and is, therefore,
9  inadmissible.
10    A.   Their basic duties or responsibilities
11 were to assure that the government received that
12 which it had contracted for.  It had the
13 prerequisite safety, reliability, and in all
14 aspects complied with the contracts between the
15 government and the contractors.
16 BY MR. BARR:
17    Q.   Would the Court be correct in
18 understanding that these responsibilities related
19 to the end product?
20          MR. WINE:  Objection, leading.
21    A.   That is correct.
22 BY MR. BARR:

Page 205

1    Q.   And what aspect of the end product would
2  these personnel be focused upon?
3          MR. WINE:  Same as prior objections.
4    A.   The degree to which they complied with
5  the terms and conditions of the contract and all
6  the specifications that were incorporated into
7  those contracts.
8  BY MR. BARR:
9    Q.   Are you familiar with the term "end
10 product"?
11    A.   Yes, I am.
12    Q.   What does that mean in the scope of your
13 experience?
14    A.   It is the product that was specifically
15 identified in the contract to be delivered to the
16 government.
17    Q.   And would that focus include the
18 processes used in the manufacturing?
19    A.   It would include the processes that were
20 used by the contractor to produce that product up
21 to the point where it was ready for presentation to
22 the government for inspection and acceptance.

Page 206

Pages 203 to 206

1    Q.   In terms of end product characteristics,
2  what kind of characteristics would the government
3  personnel be concerned with?
4         MR. WINE:  Objection, vague and
5  ambiguous, calls for a legal conclusion.
6    A.   They would be concerned with the degree
7  to which the contractor complied with the
8  specifications.  They would be concerned with the
9  safety, strength, reliability of the product, and
10 whether or not it would satisfy its intended
11 military usage.
12        They would be concerned with the
13 baseline that had been established by mutual
14 agreement prior to contract award as to the
15 technical -- or technological facets of the product
16 that had to be completed prior to delivery to the
17 government.
18        They would be considered with such
19 things as standardization and predictability of
20 form, fit, and function.  They would be concerned
21 with whether or not the specifications that had
22 been incorporated into the contract were, in fact,

1  complied with and the contractor had, in all
2  material aspects, complied with the contract.
3  BY MR. BARR:
4    Q.   Now, was this -- was -- the description
5  you've just given, was that true to the best of
6  your -- based on what you've been able to
7  determine, was that true both during World War II
8  and in the post-war period?
9         MR. WINE:  Are you talking in
10 general or with respect to the Ryan site, Counsel?
11        MR. BARR:  Off the record.
12        THE VIDEOGRAPHER:  Going off the
13 record, 10:43.
14        (Recess:  10:43 a.m. to 10:44 a.m.)
15        THE VIDEOGRAPHER:  Back on the
16 record, 10:44.
17 BY MR. BARR:
18   Q.   Mr. Jordan, the answer that you just
19 gave, was that speaking in general terms?
20   A.   Based upon my training and personal
21 experience, yes, in general terms.
22   Q.   Would your answer be any different in

1  the context of Ryan or during World War II?
2         MR. WINE:  Objection, vague, lacks
3  foundation, goes beyond the area of expertise and
4  scope of the witness, asks for an opinion that goes
5  beyond the scope of the witness' expert report and
6  is, therefore, inadmissible.
7  BY MR. BARR:
8    Q.   Mr. Jordan, did you encounter any
9  evidence in this case that would indicate that the
10 functions and scope of things that the government
11 personnel would consider during World War II was
12 any different then than in the post-war period?
13        MR. WINE:  Same objections, also
14 vague and ambiguous as to whether Counsel is
15 referring to an absence of fact or facts confirming
16 the prior opinions.
17   A.   Based upon the volume of documents that
18 I reviewed, my opinion is it would be the same
19 during World War II and subsequent to World War II
20 is my general impression.
21 BY MR. BARR:
22   Q.   When you say your general impression,

1  you --
2    A.   That was stated earlier.
3    Q.   Okay.  And when you said "general
4  impression," are those your -- is that -- are those
5  your opinions in the post -- as to the post-war
6  period?
7    A.   Yes, it is.
8    Q.   Now, did you determine in your review of
9  documents in this case whether or not any
10 government personnel in the post-war period after
11 World War II had any responsibility for determining
12 what had caused a product to be not in conformance
13 with the requirements of a contract?
14        MR. WINE:  Objection, vague and
15 ambiguous.  Yeah, I'm --
16   A.   I found no evidence that the government
17 at any point in time had rejected a product because
18 it had determined that a product was not in
19 conformance with the contract.
20 BY MR. BARR:
21   Q.   Okay.  We may have misunderstood one
22 other.  Generally speaking, with respect to --

1 based on your background and training in the
2 post-war period, did you determine whether or not
3 any government personnel had responsibilities for
4 determining what had caused a contractor's product
5 to be not in conformance with the prod --
6 requirements of a contract?
7        MR. WINE:  Objection, assumes facts
8 not in evidence.
9    A.   Their response --
10        MR. WINE:  And it lacks foundation.
11   A.   Their responsibilities were not
12 necessarily to determine what had caused the
13 nonconformance, but to identify those products were
14 in nonconformance with the terms and conditions of
15 the contract.
16 BY MR. BARR:
17   Q.   Whose responsibility was it to determine
18 the cause of nonconformance?
19        MR. WINE:  Objection, calls for a
20 legal conclusion.
21   A.   It was the contractor's responsibility
22 based upon the responsibilities of the contractor

1 assumes facts not in evidence, foundation.
2 BY MR. BARR:
3    Q.   Did you -- did you encounter such
4 evidence, Mr. Jordan?
5    A.   At other manufacturers' plants during
6 World War II, I don't recall seeing that.
7    Q.   Mr. Jordan, I'm going to show you two
8 additional exhibits.
9        (Exhibit Nos. 96 and 97 marked)
10        MR. WINE:  While the witness is
11 reviewing, given the date of the documents, because
12 the witness has not been qualified as a historian,
13 the witness is not qualified to give an opinion on
14 this matter.  Also to the extent that the documents
15 are not referenced in or relied upon in the
16 witness' expert report and go beyond the scope of
17 that report, they are inadmissible.
18   A.   I misspoke in my prior answer.  I did
19 review both of these documents, and they do
20 indicate that the government had inspectors at
21 other contractor facilities.
22 BY MR. BARR:

1 to conduct inspections of the product at all points
2 during the manufacturing process.
3 BY MR. BARR:
4    Q.   Now, did you encounter any evidence with
5 respect to the World War II period whether any
6 government personnel had such responsibilities for
7 determining what had caused a product to be not in
8 conformance with the terms of a contract?
9        MR. WINE:  Objection, vague and
10 ambiguous, assumes facts not in evidence, lacks a
11 legal foundation, and calls for a legal conclusion.
12   A.   Based upon the documents that I
13 reviewed, I saw no such evidence.
14 BY MR. BARR:
15   Q.   And this is in the context of Ryan.
16 Correct?
17   A.   That's correct.
18   Q.   Now, did you encounter evidence relating
19 to the presence of inspection personnel at other
20 war plants or other defense contractors during
21 World War II?
22        MR. WINE:  Objection, relevance,

1    Q.   Now, as of the time of -- that World
2 War II broke out -- and again, I want to harken
3 back to your training as a contracting officer.
4        Did you learn whether or not government
5 inspection of what contractors delivered was a new
6 phenomenon or not?
7        MR. WINE:  Objection, vague and
8 ambiguous, unintelligible.  Again, the witness has
9 not been qualified as a historian, and to the
10 extent that Counsel is asking questions about what
11 would -- occurred during the World War II period
12 and that predated his government employment by over
13 a decade, the witness is not qualified to offer an
14 opinion on that time frame.
15   A.   Based upon my training, I was made aware
16 of specific instances where the government had
17 employed inspection of products decades before the
18 beginning of World War II.
19        MR. BARR:  And let me show you a
20 document that we'll mark as the next in order.
21        (Exhibit No. 98 marked)
22 BY MR. BARR:

1    Q.   And I'll ask you if you recognize that
2   document?
3            MR. WINE:  Objection regarding the
4   relevance.
5    A.   This is one of the contracts that I
6   became aware of during my training.  It is a
7   contract between the Signal Corps of the United
8   States Army and the Wright brothers for one
9   heavier-than-air aircraft.  It was the first flying
10  machine, if you will, procured by the government.
11  BY MR. BARR:
12   Q.   Does it refer to the use of inspection
13  by government personnel?
14   A.   Under Article 3, it says, "All supplies,
15  materials, furnished and work done under this
16  contract shall, before being accepted, be subject
17  to a rigid inspection by an inspector appointed
18  by -- on the part of the government and such
19  as do -- as do not conform to the specifications,
20  this contract shall be rejected."
21            MR. WINE:  Objection.  The document
22  speaks for itself.  Also, Counsel, do you have a

Page 215

1   Bates -- Bates labeled version of this document?
2            MR. BARR:  I do not.
3            MR. WINE:  We move for its exclusion
4   on that basis, as it was not produced in the
5   discovery in this matter.
6            MR. BARR:  It was -- it was
7   referenced, certainly, in Mr. Jordan's report, and
8   we can provide a Bates numbered copy.
9   BY MR. BARR:
10   Q.   Now, Mr. Jordan, are there documents
11  that you have encountered or reviewed in the course
12  of your expert work in this case that pertain to
13  the duties and responsibilities of government
14  inspectors during World War II?
15            MR. WINE:  Objection, vague and
16  ambiguous.
17   A.   Yes.
18            (Exhibit Nos. 99 through 101 marked)
19            MR. WINE:  While the witness is
20  reviewing the documents, I'll state for the record
21  we object to the documents on the basis of
22  foundation, completeness.  The documents appear to

Page 216

1   contain Bates labels and exhibit numbers from other
2   litigation.
3            To the extent that the documents are
4   not referred to or relied upon by the witness in
5   his expert report, they go beyond the scope of that
6   report.  We'd object on that basis.  Because they
7   deal with time periods that predate his federal
8   service employment, the witness lacks qualification
9   to give an opinion on the basis of these documents.
10   A.   Yes, I have reviewed these documents.
11  BY MR. BARR:
12   Q.   Were these documents that you reviewed
13  in the course of your expert work in this case?
14   A.   Yes, and I specifically believe that
15  Exhibit No. 99 was referenced in my expert report.
16  Insofar as --
17   Q.   In fact, we believe they were all
18  referenced, but that -- that will be for another
19  day.
20            Now, without referencing or without
21  digging out the World War II contracts between the
22  military and Ryan during World War II, in your

Page 217

1   opinion and based on your experience and training,
2   do these contracts indicate that these kinds of
3   policies and procedures as far as government
4   inspectors are concerned were followed in the
5   dealings between the military and Ryan?
6            MR. WINE:  Objection, compound,
7   calls for a legal conclusion, vague and ambiguous,
8   goes beyond the opinions articulated in the expert
9   report and are, therefore, inadmissible.
10   A.   Based upon the documents that I
11  reviewed, the duties and responsibilities of
12  government inspectors remained constant throughout
13  the entire period of -- the relevant period from
14  World War II subsequently.
15            MR. BARR:  Mr. Jordan, let me show
16  you an additional document dated October 2, 1940.
17            (Exhibit No. 102 marked)
18  BY MR. BARR:
19   Q.   And I'll ask you to review that, please.
20            MR. WINE:  While the witness is
21  reviewing the document, I'll object on the basis --
22  on the basis that it exceeds the scope of his area

Page 218

Pages 215 to 218

10/12/2011            TDY Holdings v. United States of America            Tommy Jordan

1  of expertise, calls for hearsay testimony, lack of
2  foundation, relevance.
3      A.   I have reviewed this document.
4  BY MR. BARR:
5      Q.   Now, can you briefly, without
6  summarizing the contents, since the document will
7  speak for itself -- but can you briefly summarize
8  what this document relates to?
9          MR. WINE:  Same objections.
10     A.   It relates to the poor performance of an
11 engine that had been included -- incorporated into
12 one of the aircraft produced by Ryan and the
13 subsequent determination that there was a better
14 engine for that aircraft available.
15         MR. WINE:  Object to the response to
16 the extent it mischaracterizes the document.  The
17 document speaks for itself.  To the extent that the
18 witness has attempted to characterize the document,
19 such testimony is impermissible.
20 BY MR. BARR:
21     Q.   Mr. Jordan, does the document, in your
22 opinion, tell us anything regarding what these --

Page 219

1  experience and on your review of documents and
2  testimony in this case, have you formed an opinion
3  as to the basic purposes of military inspection
4  between the end of World War II and 1999?
5          MR. WINE:  Objection to the extent
6  the opinion being elicited from the witness either
7  exceeds or is not reflected in his expert report
8  and, therefore, is inadmissible.  Moreover, I
9  object that opinion is not formulated or necessary
10 to assist the finder of fact and is, therefore, not
11 a proper area of testimony or opinion for an expert
12 in this matter.
13     A.   Yes, I have formed an opinion.
14 BY MR. BARR:
15     Q.   And what is that opinion?
16     A.   The documents that I have reviewed in my
17 experience indicate that in the post-World War II
18 period, the purpose and intent of government
19 inspection was essentially the same as it has been
20 in that period during World War II, and that was to
21 ensure that the products produced by the contractor
22 met the specification and intent of the contracts

Page 221

1  regarding what any resident military inspectors did
2  at the Ryan plant?
3          MR. WINE:  Objection, the document
4  speaks for itself, calls for hearsay testimony that
5  is inadmissible through this witness.
6      A.   They conducted some tests on the engine
7  and determined that it had been -- based upon its
8  performance in the field and the cost of supporting
9  that engine through repair, subsequent delivery was
10 excessive.  That the engine that had been
11 incorporated in the first aircraft delivered was
12 not acceptable to the government.
13         MR. WINE:  Object to the response to
14 the extent it mischaracterizes the document and
15 assumes facts not in evidence.  The document speaks
16 for extent -- itself.  To the extent that the
17 witness is attempting to characterize the document,
18 such testimony is impermissible.
19 BY MR. BARR:
20     Q.   Okay.  Let's turn our focus, if we can,
21 to the post-World War II period.  And my first
22 question in this regard is:  Based on your

Page 220

1  between the contractor and the government.
2      Q.   And you mentioned the documents.  Let me
3  show you a group of additional exhibits that we'll
4  mark for purposes of your testimony, and after
5  you've reviewed them briefly, I'll ask you if these
6  are documents that you reviewed in the course of
7  your expert work in this matter.
8          (Exhibit Nos. 103 through 108
9  marked)
10 BY MR. BARR:
11     Q.   All right.  Mr. Jordan, if you would,
12 please take a look -- look at those exhibits and
13 let us know when you're finished.
14         MR. WINE:  While the witness is
15 reviewing the documents, we'll object, as we have
16 before, to this series of documents as lacking a
17 foundation, containing hearsay.  It is not
18 admissible via this witness.
19         To the extent that the documents
20 provided to Counsel and to the witness labeled
21 Jordan Exhibits 103 through 108 are not reflected
22 in the witness' expert report, they are, therefore,

Page 222

Pages 219 to 222

1  outside of the scope of that report and are
2  inadmissible on that -- on that basis.  I also
3  object on the basis of relevance.
4      A.   These are among the documents that I
5  reviewed in order for me to come up with my
6  opinion.
7  BY MR. BARR:
8      Q.   And just so the record is clear, the
9  opinions you just expressed related to the purpose
10 and activities of military inspectors.  Is that
11 correct?
12         MR. WINE:  In general or at -- at
13 the Ryan site?
14         MR. BARR:  Generally speaking.
15         MR. WINE:  Objection, relevance,
16 then.
17 BY MR. BARR:
18     Q.   Is that correct?
19     A.   That is correct.
20     Q.   Do you have any reason to think that any
21 military personnel at the Ryan plant or what became
22 the TRA plant conducted themselves in a manner

Page 223

1  the nature of their job?
2          MR. WINE:  With respect to general
3  government contracting or at the Ryan site?
4          MR. BARR:  Both.
5          MR. WINE:  Then compound, objection.
6      A.   The auditors -- let me back up.  DCAA,
7  the Defense Contract Audit Agency, is a completely
8  separate agency from the Defense Contract
9  Management Agency or the administrative contracting
10 officers inspectors work.  They report through an
11 entirely different chain of command up through the
12 Department of Defense.
13         Based upon my personal experience, they
14 were primarily accountants and auditors, and their
15 duties and responsibilities were to evaluate the
16 contractors' cost submissions to make sure that
17 they were in compliance with the -- both the truth
18 in negotiations and the accounting standards that
19 existed at -- at the various points in time.
20 BY MR. BARR:
21     Q.   Now, in the course of your career, did
22 you become familiar with various property

Page 225

1  contrary to these documents?
2          MR. WINE:  Objection, calls for
3  speculation, lack of foundation, assumes facts not
4  in evidence.
5      A.   I saw no documentation that indicated
6  that any behavior or performance of government
7  inspectors -- and they were civilian inspectors,
8  not military inspectors to the best of my
9  knowledge -- behaved any differently than
10 envisioned by these documents.
11 BY MR. BARR:
12     Q.   Now, we had spoken earlier about
13 procuring contracting officers and you held that
14 position and we also spoke earlier about
15 administrative contracting officers.
16         From time to time, there's been
17 considerable discussion in this case regarding
18 defense contract audit agency personnel.  Do you
19 recall that we --
20     A.   Yes, I do.
21     Q.   Essentially, what was -- what were these
22 defense contract audit agency personnel?  What was

Page 224

1  administrators over time?
2          MR. WINE:  Objection, vague and
3  ambiguous.
4      A.   Yes, I did.
5  BY MR. BARR:
6      Q.   And what were property administrators?
7  Were these government personnel?
8      A.   The property administrator was a
9  government employee who worked under the auspices
10 of the Defense Contract Management Agency, or
11 DCASR, if you will, prior to the -- becoming an
12 agency.
13     Q.   I'm sorry.  Let me stop you there.  Was
14 that DCAS?
15     A.   D-C -- DCASR, D-C-A-S-R, it was a
16 region -- it was a region initially, and then it
17 became an agency, DCMA, Defense Contract Management
18 Agency.  And I don't remember exactly when it
19 became a separate agency, but within the last 15 or
20 20 years.  Initially it was under the Defense
21 Supply Agency and then they moved it to a separate
22 agency that reported directly to the Department of

Page 226

Pages 223 to 226

1    Defense.
2        Q.   Now, on the basis of your knowledge and
3    experience during the course of your career, what
4    essentially were the duties of property
5    administrators?
6        A.   It was to review the contractors'
7    written records of all government property and to
8    make sure that the contractor had a good system for
9    accountability of that property that had been
10   provided to the contractor, the government
11   furnished property.
12       Q.   Okay.  I believe we'll come back to
13   property administrators in a little while.  Let me
14   shift back, if I can, to federal inspection
15   personnel.  And if I slip up every now and then and
16   call them military inspection personnel, we'll all
17   understand that these were civilians in -- working
18   on behalf of the military?
19       A.   Yeah.
20           MR. WINE:  Objection, assumes facts
21   not in evidence.
22   BY MR. BARR:

1        Q.   Is what I just said a correct statement,
2    Mr. Jordan?
3        A.   That is correct.
4            MR. WINE:  Same objection.
5            MR. BARR:  Okay.  Let's mark this
6    next group of exhibits.  Then we can take our first
7    break.
8    BY MR. BARR:
9        Q.   Before I do that, Mr. Jordan, is it your
10   understanding or do you believe that your opinions
11   regarding the duties and responsibilities of
12   government -- of civilian inspection personnel at
13   both Ryan, TRA, and other defense contractors are
14   supported by ASPR provisions?
15           MR. WINE:  Objection, calls for a
16   legal conclusion, assumes facts not in evidence,
17   leading.  It goes beyond the scope of the witness'
18   expert report.
19       A.   Based upon my experience and documents
20   that I have reviewed, yes, they are based upon
21   provisions of ASPR.
22           (Exhibit Nos. 109 through 123

1    marked)
2            MR. WINE:  For the record, with
3    respect --
4            MR. BARR:  Well -- okay.  Go ahead.
5            MR. WINE:  For the record, with
6    respect to the documents Counsel has marked as
7    Jordan Exhibits 109 through 123, TDY will assert
8    the same objections it asserted in day one of
9    Mr. Jordan's deposition regarding excerpts taken
10   from ASPR's related regulations and assert them as
11   made at the time -- at this time now.
12   BY MR. BARR:
13       Q.   Mr. Jordan, just a quick question.  When
14   you needed to refer to an ASPR provision during the
15   course of your career, did you review the entire
16   set of ASPR volumes?
17       A.   No, I did not.  I reviewed only that
18   portion of the procurement and regulation that
19   pertained to the issue that I was concerned with at
20   that particular point in time.
21           MR. BARR:  All right.  Let's take
22   our first break.

1            THE VIDEOGRAPHER:  We're going off
2    the record, 11:20.
3            (Recess:  11:20 a.m. 11:34 a.m.)
4            THE VIDEOGRAPHER:  Back on record at
5    11:34.
6    BY MR. BARR:
7        Q.   All right.  Let's continue on.
8    Mr. Jordan, to follow up on the last question I
9    asked you just before our break, when the Justice
10   Department, in the course of your work on this
11   case, has sent you various excerpts of the ASPRs
12   and the FARs on various topics, have you ever asked
13   us -- or ever advised us that you needed additional
14   excerpts from other parts of the ASPRs or FARs to
15   make sense of what we had sent you?
16       A.   No, I did not.
17       Q.   Now, based on your training and
18   experience, the ASPR provisions -- the excerpts
19   that we've just marked, do these experts --
20   experts -- excuse me.  Do these excerpts reflect
21   the inspection clauses for contracts during the
22   period of essentially 1948 through 1976?

10/12/2011                TDY Holdings v. United States of America                Tommy Jordan

1      MR. WINE: Objection. The set of
2  documents provided is incomplete for that period.
3  Additionally, the documents speak for themselves,
4  lack of foundation. The clauses are also
5  particular to certain types of contracts that may
6  or may not be at issue in this case.
7      A. Yes, they do.
8  BY MR. BARR:
9      Q. Mr. Jordan, as you reviewed the
10 excerpts, do they pertain to both fixed price and
11 cost plus contracts -- cost reimbursement
12 contracts?
13      MR. WINE: Objection, then, instead
14 of asking him about all the exhibits, we should go
15 exhibit through exhibit.
16      A. The exhibits marked 109 through 123
17 pertain to fixed price contracts.
18 BY MR. BARR:
19      Q. If you could take a closer look, do some
20 of them pertain to cost reimbursement contracts as
21 well?
22      MR. WINE: Same objection, vague and

Page 231

1  ambiguous.
2      A. I misspoke. I didn't go deep enough
3  into the documents, but, for example, Exhibit
4  No. 111 on Bates number ending in 9521 does refer
5  to clauses for cost reimbursable type contracts.
6      MR. WINE: I object to counsel's
7  preface regarding the period of time relevant.
8  There are no regulations or ASPR provisions
9  provided relating to cost based contracts until the
10 mid-1950s.
11 BY MR. BARR:
12      Q. Now, based on your knowledge and
13 experience as a government contracting officer,
14 when the FARs came into being, did the FARs in the
15 1980s and 1990s change the nature, purpose, or
16 methods of government inspection that had been
17 expressed in the ASPRs?
18      MR. WINE: Objection, calls for a
19 legal conclusion, assumes facts not in evidence,
20 relevance.
21      A. Based upon my experience and training
22 and the documents I have reviewed, the provisions

Page 232

1  relative to inspection remain constant throughout
2  the entire period.
3  BY MR. BARR:
4      Q. Now, we focused earlier on the World
5  War II period. Let's focus on the post-war period.
6      Did you determine in your review of
7  documents and testimony in this case whether or not
8  any DOD personnel supervised or directed Ryan or
9  TRA personnel in the actual day-to-day
10 manufacturing operations or processes at the plant?
11      MR. WINE: Objection, compound,
12 vague and ambiguous, calls for a legal conclusion,
13 goes beyond the scope of the witness' expert
14 report.
15      A. Based upon the documents that I reviewed
16 in preparation for this deposition, there's no
17 such -- I saw no such evidence.
18 BY MR. BARR:
19      Q. And did you review documents in that
20 regard in the preparation of your expert report?
21      A. Yes, I did.
22      Q. And did you determine in your review of

Page 233

1  documents and testimony in this case whether or not
2  any DOD personnel in this post-war period
3  supervised or directed Ryan or TRA employees or
4  executives in the day-to-day usage of chemicals in
5  manufacturing operations or processes?
6      MR. WINE: Same objection.
7      A. Based upon the volume of the documents
8  that I reviewed, I no -- I saw no such evidence.
9  BY MR. BARR:
10      Q. Did you determine in your review of
11 documents and testimony in this case whether or not
12 any DOD personnel in the post-war period supervised
13 or directed Ryan or TRA personnel concerning
14 methods or facilities for the disposal of chemical
15 waste generated during operations at the Harbor
16 Drive plant?
17      MR. WINE: Same objections.
18      A. Based upon the volume of documents that
19 I reviewed, I saw no such evidence.
20 BY MR. BARR:
21      Q. And did you determine in your review of
22 documents and testimony in this case whether or not

Page 234

Pages 231 to 234

1  any DOD personnel in the post-war period supervised
2  or directed company personnel in the handling of
3  any PCB containing fluids that came out of any
4  plant machinery or equipment?
5          MR. WINE:  Same objections.
6      A.  Based upon the documents that I
7  reviewed, I saw no such evidence.
8  BY MR. BARR:
9      Q.  Now, in your career experience as a
10  contracting officer and executive, did you ever
11  learn of a situation in which any DOD personnel
12  supervised or directed contractor employees or
13  executives concerning the actual day-to-day
14  manufacturing operations or processes at the
15  contractors' plants?
16          MR. WINE:  Objection, vague and
17  ambiguous, calls for a legal conclusion, goes
18  beyond the scope -- irrelevant and goes beyond the
19  scope of the witness' expert report and, therefore,
20  is inadmissible.
21      A.  In my 30-odd -- odd years of direct
22  experience in administration and/or award of

Page 235

1  documentation relative to Hughes inspectors.
2      Q.  Is it your recollection that there were
3  others?
4          MR. WINE:  Objection, leading.
5      A.  I do believe there were others, but I
6  can't recall specifically the names of those
7  contractors.
8  BY MR. BARR:
9      Q.  In the course of your career as a
10  government contracting official, did you encounter
11  prime contractor resident inspectors at contractor
12  plants from time to time?
13          MR. WINE:  Objection, relevance,
14  beyond the scope, lack of foundation.
15      A.  Yes, I did.  I specifically alluded to a
16  contractor in Long Island, New York, I had visited
17  that was a subcontractor to Pratt & Whitney, and I
18  also had contracts with the contractor for
19  production of spare parts in support of the F100
20  engine.  The contractor was producing parts as a
21  subcontractor to Pratt & Whitney for production of
22  new F100 engines, and I was procuring parts from

Page 237

1  government contracts, I no -- I saw no evidence
2  that indicated that the government had in any way
3  supervised or directed contractors in how to handle
4  and/or dispose of hazardous chemicals.
5  BY MR. BARR:
6      Q.  Now, did you become aware in the course
7  of your work in this case that there were
8  inspectors located at the Ryan and TRA facility
9  acting on behalf of other customers?
10          MR. WINE:  During what period?
11          MR. BARR:  The entire post-war
12  period.
13          MR. WINE:  Objection, vague and
14  ambiguous, leading.
15      A.  Yes, I did see evidence that there were
16  certain prime contractors who had subcontracts with
17  Ryan and/or TRA that had inspectors located at the
18  Ryan facility.
19  BY MR. BARR:
20      Q.  Do you recall which prime contractors
21  had such representatives at the plant?
22      A.  I specifically recall seeing

Page 236

1  the same contractor as spare parts.  And there were
2  Pratt & Whitney inspectors at that facility when I
3  visited the plant.
4          (Exhibit No. 124 marked)
5          MR. WINE:  We're at 124?
6          MR. BARR:  I believe that's right.
7  BY MR. BARR:
8      Q.  Mr. Jordan, if you would take a moment
9  to read through that document, and after you have,
10  let us know if you recall reviewing this in
11  connection with your expert work in this case, and
12  then I'll have an additional question for you.
13          MR. WINE:  Objection, lacks
14  foundation, assumes facts not in evidence, goes
15  beyond the scope of the witness' expert report for
16  which the witness is qualified to give expert
17  opinion testimony and is, therefore, inadmissible.
18  Also objection on the basis of relevance.
19      A.  I have reviewed this letter.
20  BY MR. BARR:
21      Q.  This appears to be a statement by the
22  secretary of the Air Force at that time.

Page 238

Pages 235 to 238

1    Is my understanding of that correct?
2        MR. WINE:  Objection, the document
3    speaks for itself, mischaracterizes the document.
4        A.   That is my interpretation of this
5    letter, yes, it is.
6    BY MR. BARR:
7        Q.   Now, if -- let me direct your attention
8    to, in particular, the last paragraph on the second
9    page.
10       A.   Okay.
11       Q.   I believe the paragraph starts, "Other
12   factors."
13       A.   That's correct.
14       Q.   Is this 1953 Air Force statement
15   consistent with your understanding and experience
16   from the 1960s through 1990s?
17       MR. WINE:  Objection, relevance,
18   hearsay, beyond the scope of the witness' expert
19   report and beyond the witness' area of expertise in
20   that it predates his employment with the federal
21   government.
22       A.   Yes, it is consistent with my training

Page 239

1    beyond the scope of the witness' expert report.
2        A.   Yes, I did.
3    BY MR. BARR:
4        Q.   And this was in the post-war period?
5        A.   Yes, it was.
6        Q.   Do you recall the nature of the
7    documents which so indicated?
8        A.   They were documents identified as
9    history of the San Diego Air Procurement District,
10   which was an umbrella organization that had
11   administrative responsibility for all of the
12   companies in the San Diego area, including Ryan.
13       Q.   And we have marked as exhibits here
14   today, and perhaps on Monday, a number of those
15   reports?
16       MR. WINE:  Objection, vague and
17   ambiguous.
18   BY MR. BARR:
19       Q.   Do you recall that?
20       A.   Yes, I do.
21       Q.   In the 1950s, do the reports -- these
22   Air Force reports that you have reviewed, do they

Page 241

1    and experience.
2        MR. WINE:  And insofar as the
3    document is not referenced by the witness in his
4    expert report, it goes beyond the scope of his
5    report and is, therefore, inadmissible.
6        MR. BARR:  Off the record for a
7    moment.
8        THE VIDEOGRAPHER:  Going off the
9    record, 11:48.
10       (Recess:  11:48 a.m. to 11:49 a.m.)
11       THE VIDEOGRAPHER:  Back on record,
12   11:49.
13   BY MR. BARR:
14       Q.   Mr. Jordan, let me switch gears slightly
15   and focus on government inspectors in the context
16   of the larger San Diego area, not just at the Ryan
17   plant.
18       Did you encounter evidence in this case,
19   documents indicating that government inspectors
20   were located at other defense contractor plants in
21   the San Diego area?
22       MR. WINE:  Objection, relevance,

Page 240

1    indicate how many Air Force inspectors generally
2    were assigned to the Ryan plant?
3        MR. WINE:  Objection, the documents
4    speak for themselves and the best evidence.  The
5    testimony that Counsel seeks to elicit from this
6    witness should be used as the source of the
7    information sought.
8        A.   Yes, they do.
9    BY MR. BARR:
10       Q.   Do you have a recollection as to the
11   range, in terms of the number of such inspectors --
12   Air Force inspectors, assigned to the Ryan plant
13   during the 1950s?
14       MR. WINE:  Same objection.  Also
15   calls for speculation.  The documents, to the
16   extent they speak to that, can speak directly to
17   the number for a particular period of time as
18   opposed to speculation of the witness' recollection
19   of that document.
20   BY MR. BARR:
21       Q.   Are you speculating, Mr. Jordan?
22       A.   I am not speculating.  I recall

Page 242

Pages 239 to 242

10/12/2011                TDY Holdings v. United States of America                Tommy Jordan

1  precisely what the documents say.  They said
2  relative to the numbers, and it ranged between four
3  and eight.
4       MR. WINE:  And the response assumes
5  facts not in evidence to the extent we're not
6  referring specifically to a document that resides
7  in a stack of 124 exhibits over two days.
8  BY MR. BARR:
9       Q.   Now, during your career, Mr. Jordan, did
10  you become familiar with something known as
11  "process inspection"?
12       A.   Yes, I did.
13       Q.   What is it?  What is process inspection?
14       A.   Process inspection is the inspection
15  primarily under the responsibility of the
16  contractor inspectors to inspect material as it
17  goes through the various stages or processes that
18  lead up to the final inspection and acceptance of
19  that product.
20       Q.   And why is process inspection done?
21       A.   It is very frequently, based upon my
22  experience and training, virtually impossible to

Page 243

1  vendors to General Electric who made the billit, if
2  you will, and that is the material from which the
3  forging was made for the disk -- and the disk is
4  the machine -- the component of a jet engine --
5       Q.   Is that billit, b-i-l-l-i-t?
6       A.   Yes, it is a foundry product that is
7  then subject to forging and machining.
8       But, anyway, the company that had
9  produced that billit had produced, previously,
10  another alloy, and they had failed to properly
11  clean the crucible in which the various components
12  of that billit were melted.  And there were foreign
13  substances introduced into the billit that
14  subsequently ended up in the disk, and those
15  foreign substances introduced a weak spot, if you
16  will, in that disk, and that subsequently resulted
17  in a failure of the disk and a catastrophic
18  explosion of the engine.
19       Q.   Now, in terms of processing, is heat
20  treating an example of processing?
21       A.   Heat treating is one of the many
22  processes that some components are subjected to.

Page 245

1  determine certain characteristics of the finished
2  product unless you pay very close attention to the
3  processes of the components as you go through the
4  manufacturing process.
5       Q.   Can you give an example of what kind of
6  process that would be?
7       A.   I can give you an example based upon my
8  experience, and I think that I alluded to it either
9  in my earlier deposition or my expert report -- I
10  don't remember which -- but we had a contract with
11  General Electric for the J85 engine component.  And
12  the J85 was the engine -- jet engine that was used
13  on the T38 trainer based primarily at Randolph Air
14  Force Base here in San Antonio.
15       I don't remember the exact date, but
16  sometime during the '80s, there was a catastrophic
17  failure of an engine on a T38.  I seem to recall
18  that we lost the -- both the pilot and the
19  trainer -- trainee in that catastrophic engine
20  failure because the engine virtually exploded.
21       The accident investigation determined
22  that during the manufacturing process, one of the

Page 244

1  For example, an electronic component would not be
2  subject to heat treating, but many of the metal --
3  metal components would be subject to heat treating.
4       Q.   Now, why is metal heat treated?
5       MR. WINE:  Objection.
6       A.   Based upon my experience and training,
7  metal is heat treated to -- both to release
8  stresses and to make it harder and more suitable
9  for use in the end product.
10       MR. WINE:  Object to the response to
11  the extent the witness is not qualified to offer an
12  opinion on the purpose of heat treating either by
13  training, qualification, or by experience.
14  BY MR. BARR:
15       Q.   During the course of your career,
16  Mr. Jordan, did you become aware that heat treating
17  was a process to which metals were subjected?
18       MR. WINE:  Objection.  Awareness
19  isn't a basis for an expert opinion.
20       A.   Yes, I did, both at engine
21  manufacturers, such as General Electric, and
22  aircraft manufacturers, such as General Dynamics,

Page 246

Pages 243 to 246

1   and McDonnell Douglas.
2   BY MR. BARR:
3       Q.   And did this awareness come as a result
4   of direct experience with these manufacturers?
5           MR. WINE:  The line of questioning
6   goes beyond the -- the attempted qualification of
7   the witness' expertise in government contracting.
8       A.   Based upon my personal observation
9   during visits to those contractors' facilities.
10  BY MR. BARR:
11      Q.   And in terms of how government
12  inspection personnel fit into process inspection,
13  how do they go about doing their work?
14          MR. WINE:  Objection, beyond the
15  scope, vague, ambiguous, leading.
16      A.   It is primarily based upon a review of
17  the contractor documentation of the contractor's
18  inspection during the various processes that the
19  parts are subjected to, and then the ability of the
20  government inspectors to conduct periodic or
21  statistical sampling of inspections of those
22  products as they go through the processes.

Page 247

1   relating to process inspection are the contents of
2   the documents with respect to process inspection --
3   are those consistent with your experience and
4   training during the course of your career?
5           MR. WINE:  Objection, assumes facts
6   not in evidence, the documents speak for themselves
7   and provide the best source of evidence in this
8   matter.
9       A.   Yes, they are.
10  BY MR. BARR:
11      Q.   And do you recall that some of the
12  documents that we've marked as exhibits here today
13  have discussions relating to process inspection?
14          MR. WINE:  Objection, vague and
15  ambiguous to the extent that Counsel is referring
16  to a universe of now 124 exhibits.
17      A.   Yes, they do.
18  BY MR. BARR:
19      Q.   Did you -- do you recall encountering a
20  document in the course of your expert work in this
21  case relating to Ryan's understanding of process
22  specifications?

Page 249

1   BY MR. BARR:
2       Q.   Now, is -- based on your experience and
3   training, did process inspection include inspection
4   of contractor disposal of chemicals when they were
5   waste and could no longer be used in the processes?
6           MR. WINE:  Objection.
7       A.   I would not consider the disposal to be
8   a process, but none of the documents that I
9   reviewed, nor in my experience did I ever observe
10  or read about the government involvement in the
11  disposal of hazardous materials once they were
12  considered to be, quote/unquote, spent.
13  BY MR. BARR:
14      Q.   And is your understanding of process
15  inspection -- aside from your experience and
16  training during your career, is it based on
17  documents that you have reviewed in the course of
18  your work as an expert in this case?
19          MR. WINE:  Objection.
20      A.   Yes, it is.
21  BY MR. BARR:
22      Q.   The documents that you've reviewed

Page 248

1           MR. WINE:  Objection.  Calls --
2   object to the form of the question.
3       A.   Yes, I do.
4           (Exhibit No. 125 marked)
5   BY MR. BARR:
6       Q.   Mr. Jordan, do you recall having
7   reviewed this document before in connection with
8   your expert work in this case?
9       A.   Yes, I do.
10      Q.   Let me direct your attention to page --
11  with the Bates number 482.
12          MR. WINE:  Object for the record;
13  the document lacks a foundation and contains
14  hearsay that is not admissible via this witness.
15      A.   Okay.
16  BY MR. BARR:
17      Q.   Is this discussion, in what we've marked
18  as Exhibit 125, consistent, in your opinion, with
19  your experience and the government documents that
20  you've reviewed in this case?
21          MR. WINE:  Objection, calls for
22  speculation.  The document speaks for itself.

Page 250

Pages 247 to 250

1    A.   Yes, it is.
2         MR. WINE:  I also object to the
3    extent Counsel has been inquiring with the witness
4    about process inspection and the reference document
5    in which the pages refer to process specifications.
6    BY MR. BARR:
7    Q.   Mr. Jordan, do you believe that there's
8    a difference in terms of the context as far as
9    process specifications and the responsibilities
10   that are outlined in this document?
11        MR. WINE:  Objection, calls for
12   speculation, the document speaks for itself.  Also
13   calls for hearsay testimony, assumes facts not in
14   evidence.
15   A.   They are consistent in my opinion.
16   BY MR. BARR:
17   Q.   Are you familiar with the term
18   "manufacturing process data document"?
19   A.   Yes, I am.
20   Q.   Based on your experience and training,
21   is there a relationship -- or has there been a
22   relationship between military specifications and a

Page 251

1    assumes facts not in evidence insofar as it seeks
2    to characterize the purpose at Ryan for certain
3    documentation that the witness is testifying about.
4    BY MR. BARR:
5    Q.   Mr. Jordan, have you reviewed a number
6    of Ryan and/or TRA manufacturing process data
7    documents?
8    A.   Yes, I have.
9    Q.   And is it your understanding, based on
10   your knowledge and experience that the essential
11   contents of those documents were the same or
12   similar to the process documentation that you
13   encountered at other contractors?
14        MR. WINE:  Objection, assumes facts
15   not in evidence, mischaracterizes the content of
16   documents, calls for a legal analysis.
17   A.   Yes, they were.
18   BY MR. BARR:
19   Q.   Now, in terms of the MPDs, did these MPD
20   documents go through a review and approval process
21   at the -- between Ryan and government inspectors?
22        MR. WINE:  Objection, calls for

Page 253

1    contractor's MPDs?
2         MR. WINE:  Objection, calls for a
3    legal conclusion, assumes facts not in evidence.
4    A.   Yes, there is.
5    BY MR. BARR:
6    Q.   Are you aware of contractors other than
7    Ryan and/or TRA who used documents such as -- used
8    manufacturing process data documents?
9         MR. WINE:  Objection, vague and
10   ambiguous.
11   A.   Based upon my experience and personal
12   observation, I have seen contractors use similar
13   type documents.  They may not have been called
14   MPDs, manufacturing process data documents, but
15   they had the same purpose and intent as the MPDs
16   that were prepared by Ryan.
17        MR. WINE:  Objection.
18   BY MR. BARR:
19   Q.   The documents that --
20        MR. WINE:  Wait.  Hold on.
21        MR. BARR:  Sorry.
22        MR. WINE:  Objection.  The response

Page 252

1    speculation, calls -- assumes facts not in
2    evidence, goes beyond the scope of the witness'
3    expert report and his area of expertise, call --
4    assumes facts not in evidence.
5    A.   Based upon the MPDs that I reviewed,
6    there is no evidence on the face of those documents
7    that they had been reviewed and approved by
8    government personnel.  However, deposition
9    testimony by Mr. Iannucci indicated that they were
10   subject to review by the government inspectors,
11   and, if you will, they were frequently or sometimes
12   returned to Ryan for changes, and so they
13   subsequently, then, became a mutually agreed to
14   document for various processes.
15        MR. WINE:  Objection to the
16   characterization of the documents that speak for
17   themselves or to the characterization of
18   Mr. Iannucci's testimony.
19   BY MR. BARR:
20   Q.   Now, with respect to the MPDs that you
21   reviewed that were issued by TRA -- and by the way,
22   let me -- let me step back.  Who was the

Page 254

Pages 251 to 254

1  originator -- who had responsibility, as you
2  understood it, for the initial draft and
3  origination of the MPDs?
4      MR. WINE:  Objection, assumes facts
5  not in evidence, beyond the scope of the witness'
6  knowledge and expertise, beyond the scope of the
7  witness' expert report.
8      A.   Based upon my review of the documents,
9  the responsibility for preparation of the MPDs was
10  that of the contractor to take the specifications
11  that were incorporated into the contract and then,
12  if you will, translate them into a form that was
13  usable for various manufacturing processes at the
14  contractor's facility.
15  BY MR. BARR:
16      Q.   And in any of the TRA MPD documents that
17  you reviewed, did any of them speak about chemical
18  waste disposal methods or practices?
19      MR. WINE:  Objection, assumes facts
20  not in evidence, the documents speak for
21  themselves.
22      A.   I saw no evidence whatsoever in any of

Page 255

1  witness.  To the extent that there are exhibits
2  between Exhibits 126 and 141 that are not
3  referenced in the witness' expert report, they are
4  beyond the scope of his report and, therefore,
5  inadmissible.
6      A.   I have reviewed these documents.
7  BY MR. BARR:
8      Q.   And are these, in your view,
9  representative of the MPDs that are available to
10  the parties in the record?
11      MR. WINE:  Objection to the extent
12  Counsel has used the term "representative," the
13  documents speak for themselves.  To the extent
14  there are further documents, those documents speak
15  for themselves as well.
16      A.   Yes, they are.
17  BY MR. BARR:
18      Q.   Now, you mentioned a moment ago -- are
19  these the -- are these MPDs -- are these some of
20  the documents which serve as the basis for your
21  opinions concerning the disposal of chemical
22  waste dispose -- the disposal of chemical waste?

Page 257

1  the documents that spoke to disposal and/or
2  handling of chemical waste.
3      MR. BARR:  Let's go off the record,
4  and while we're off the record, before you do that,
5  I'll have another group of exhibits marked.
6      THE VIDEOGRAPHER:  Going off the
7  record, 12:11.
8      (Recess:  12:11 p.m. to 12:14 p.m.)
9      THE VIDEOGRAPHER:  Back on record,
10  12:14.
11      (Exhibit Nos. 126 through 141
12  marked)
13  BY MR. BARR:
14      Q.   Mr. Jordan, if you would, please take a
15  moment to scan through these documents.  I'll have
16  a -- just my initial question will be if you recall
17  reviewing these documents in the course of your
18  expert work in this case.
19      MR. WINE:  For the record, while the
20  witness is reviewing the documents, TDY objects
21  with respect to foundation, with respect to
22  completeness of the compilation provided to the

Page 256

1      MR. WINE:  Objection, assumes facts
2  not in evidence.
3      A.   They are among the -- the group of
4  documents upon which I based my opinion, yes.
5  BY MR. BARR:
6      Q.   Now, you mentioned a moment ago that you
7  had encountered other defense contractors which
8  used similar documents, even if they didn't
9  describe them as MPDs.  Correct?
10      A.   That's correct.
11      MR. BARR:  I'm going to have marked
12  four additional exhibits.
13      (Exhibit Nos. 142 through 145
14  marked)
15      MR. BARR:  Now, while you're doing
16  that, I'll just mention for the record that three
17  of these are Hughes Corporation -- or Hughes Tool
18  Company specifications, and one is a Northrop
19  Corporation process specification.
20      MR. WINE:  For the record, plaintiff
21  objects to the documents on the basis of relevance,
22  foundation, and that the documents speak for

Page 258

Pages 255 to 258

1    themselves.
2        A.   I have reviewed these documents.
3    BY MR. BARR:
4        Q.   And have you reviewed these documents in
5    the course of your expert work in this case?
6        A.   Yes, I have.
7        Q.   Based on your experience and training
8    over the course of your career, are these documents
9    examples of, in effect, MPDs written by other
10   aerospace manufacturers?
11            MR. WINE:  Objection.  The question
12   calls for a -- for testimony that goes beyond the
13   witness' area of expertise and beyond the area
14   which he is sought to be qualified as an expert.
15       A.   Based upon my experience and education,
16   yes, they are.
17   BY MR. BARR:
18       Q.   And are these documents that we've
19   marked -- I'm sorry.  What was the exhibit numbers
20   on this?
21       A.   142 through 145.
22       Q.   Were Exhibits -- are Exhibits 142

Page 259

1    BY MR. BARR:
2        Q.   Mr. Jordan, is your testimony on this
3    subject, is that based on your recollection?
4        A.   Yes, it is.
5            MR. WINE:  Same objections.
6    BY MR. BARR:
7        Q.   All right.  Let's talk about property
8    administrators, and then I think we'll be in a
9    position to break for lunch.
10           And I believe you testified in
11   general terms as to the duties and responsibilities
12   of property administrators for the government
13   earlier.  In what kinds of documents did you find
14   information as to the duties and responsibilities
15   of property administrators at Ryan?
16           MR. WINE:  Objection, foundation,
17   the documents speak for themselves, vague and
18   ambiguous.
19       A.   The property administrators specifically
20   use ASPR Appendix B on government property, and
21   then I also, in my expert report, alluded to the
22   job description for the series identified as

Page 261

1    through 145 similar to the kinds of process
2    specifications or MPD-like documents that you
3    encountered during the course of your career?
4            MR. WINE:  Objection, relevance,
5    calls for speculation, beyond the scope of the
6    witness' area of expertise.
7        A.   Yes, they are.
8    BY MR. BARR:
9        Q.   Are you speculating, Mr. Jordan?
10       A.   No, I am no not.
11           MR. WINE:  Also, to the extent that
12   the documents are not referenced in or relied upon
13   in the witness' expert report, they go beyond the
14   scope of that report and are, therefore,
15   inadmissible.
16           Also, vague and ambiguous in the use
17   of the term "similarity" as to whether or not the
18   documentation is similar or whether the processes
19   described therein are similar.  If the latter, the
20   witness is not qualified to opine.  If the former,
21   then the documents speak for themselves.
22

Page 260

1    government Property Administrators and The Duties
2    and Responsibilities of Property Administrators
3    that Work for the government and -- those two basic
4    documents, and then the other ASPR references to
5    government property form my opinion.
6    BY MR. BARR:
7        Q.   Were your opinions or testimony also
8    based, to some extent, on reports by the Air Force
9    during, let's say, the 1950s?
10       A.   There was --
11           MR. WINE:  Objection, leading.
12       A.   There was a reference in the history of
13   the San Diego Air Procurement District to the
14   property administrators.
15   BY MR. BARR:
16       Q.   Now, you mentioned ASPR Appendix B.  Let
17   me mark as the next three exhibits three examples
18   of what I believe are Appendix B.
19           (Exhibit Nos. 146 through 148
20   marked)
21   BY MR. BARR:
22       Q.   All right, Mr. Jordan.  I'm going to

Page 262

Pages 259 to 262

1 hand you these three exhibits, 146 through 148,
2 and, if you would, take a moment to just determine
3 what they are.
4      MR. WINE:  While the witness is
5 reviewing the documents, TDY asserts the same
6 objections to Exhibits 146 through 148 that's
7 asserted to other excerpts and incomplete
8 compilations of ASPRs previously sought to be
9 introduced by the United States in this matter --
10 or in this deposition.
11      The documents speak for themselves
12 and are the best source of information to the
13 extent the United States is seeking to elicit the
14 role and responsibility of property administrators.
15      Also, the three documents are for
16 varied periods of time.  So to the extent that
17 Counsel seeks to elicit testimony regarding certain
18 periods of time not provided herein, there is
19 incomplete information.  There is -- the question
20 assumes facts not in evidence.
21      A.  I have reviewed these documents.
22

Page 263

1 BY MR. BARR:
2      Q.  Are these the Appendix B's manuals that
3 you referred to a moment ago?
4      A.  Yes, they are.
5      Q.  Do these, in fact, have descriptions of
6 the duties and responsibilities of property
7 administrators?
8      A.  Yes, they do.
9      Q.  Are these descriptions consistent with
10 your understanding of the duties of -- and
11 responsibilities of property administrators that
12 you developed during your career as a government
13 contracting officer?
14      A.  Yes, they are.
15      MR. BARR:  All right.  Let's break
16 for lunch.
17      THE VIDEOGRAPHER:  Going off the
18 record at 12:28.
19      (Recess:  12:28 p.m. to 1:21 p.m.)
20      THE VIDEOGRAPHER:  Going back on
21 record at 1:21.
22

Page 264

1 BY MR. BARR:
2      Q.  Mr. Jordan, let's -- let's continue.
3 One housekeeping matter -- one thing I did not
4 include in the record, we had talked about advance
5 agreements, and we had talked about an advance
6 agreement between TRA and the Department of
7 Defense.  Do you recall that?
8      A.  Yes.
9      MR. BARR:  We'll mark as the next
10 exhibit in order a three-page document.
11      (Exhibit No. 149 marked)
12 BY MR. BARR:
13      Q.  Mr. Jordan, is this the settlement and
14 advance agreement that you had in mind?
15      A.  Yes, it is.
16      Q.  And now getting back to the subject of
17 property administrators, which we were talking
18 about before we broke for lunch.  In essence, based
19 on your experience, how did the property
20 administrator go about discharging his
21 responsibilities at a contractor's location?
22      MR. WINE:  Objection, calls for

Page 265

1 speculation.
2      A.  The Appendix B specifically states that
3 the official contract record will be those
4 maintained by the contractor in discharge of his
5 duties and responsibilities.  He primarily reviewed
6 those contractor prepared records of property that
7 had been provided to the contractor of government
8 furnished property.
9 BY MR. BARR:
10      Q.  Is there any requirement in either
11 appendix -- any of the Appendix B documents or in
12 any other government document of which you're aware
13 for the property administrator to inspect items of
14 government machinery and equipment or repair them?
15      MR. WINE:  Objection, the documents
16 speak for themselves, calls for a legal conclusion,
17 goes to the ultimate issue.
18      A.  The documents that I have reviewed do
19 not indicate that the contractor did, in fact,
20 inspect government furnished equipment.  They had
21 the right to inspect it, but I found no documents
22 on the record that they had, in fact, conducted

Page 266

Pages 263 to 266

10/12/2011                    TDY Holdings v. United States of America                    Tommy Jordan

1    those kinds of inspections.
2    BY MR. BARR:
3        Q.   Now, in your last answer you said the
4    documents that you had reviewed did not indicate
5    that the contractor had inspected government
6    furnished equipment.
7        A.   Okay. I misspoke. That the government
8    inspectors had --
9        Q.   The property administrators?
10       A.   Property administrator.
11       Q.   Now, we've mentioned in -- this morning
12   your awareness of prime contractor resident
13   inspectors at various contractors. Do you recall
14   that?
15           MR. WINE: Objection, relevance.
16       A.   Yes, I recall.
17   BY MR. BARR:
18       Q.   And do you recall our discussion -- your
19   testimony relating to prime contractor resident
20   inspectors at Ryan and TRA?
21           MR. WINE: Same objection.
22       A.   Yes, I do.

                                          Page 267

1    referenced in or reflected in the expert's report,
2    it exceeds the scope of that report and are,
3    therefore, inadmissible.
4        A.   I do recall reviewing these documents.
5    BY MR. BARR:
6        Q.   Let me direct your attention to what
7    we've marked as Exhibit 150. That's the October
8    1957 edition of the Ryan Management information
9    bulletin.
10       A.   Okay.
11       Q.   Do you see the references in that
12   document to Boeing personnel?
13       A.   Yes.
14           MR. WINE: Objection, the document
15   speaks for itself. Same objections as before.
16   BY MR. BARR:
17       Q.   Does that refresh your memory as to
18   other sub -- other prime contractors who had
19   representatives resident at the Ryan plant?
20           MR. WINE: Objection,
21   mischaracterizes prior testimony.
22       A.   Yes, it does.

                                          Page 269

1            MR. BARR: We'll mark three
2    exhibits. I'll correct myself. It's four.
3            (Exhibit Nos. 150 through 153
4    marked)
5    BY MR. BARR:
6        Q.   Now, Mr. Jordan, with respect to 153, I
7    put a red tape flag. And as you review those
8    documents, when you get to that one, I direct your
9    attention to the page that has a Bates number 523.
10       A.   Okay.
11           MR. WINE: For the record, while the
12   witness is reviewing the documents, we object on
13   the basis of foundation, assumes facts not in
14   evidence, and that the documents speak for
15   themselves.
16           Also, to the extent that the
17   documents constitute hearsay, this witness can't --
18   cannot be used to offer that evidence that is
19   otherwise inadmissible.
20           Also, just for complete --
21   completeness of the record, to the extent the
22   documents constituting Exhibits 150 to 153 are not

                                          Page 268

1    BY MR. BARR:
2        Q.   And these documents that we've marked as
3    150 through 153, are these documents that form some
4    of the bases for your opinions as to prime
5    contractors' representatives at Ryan and TRA?
6            MR. WINE: Objection to the extent
7    it exceeds the opinions expressed in the report.
8        A.   Yes, they do.
9    BY MR. BARR:
10       Q.   Okay. Let's turn to military contract
11   vest -- titled, "Vesting Provisions."
12           Are you familiar with TDY's argument in
13   this case that the chemicals that Ryan and TRA used
14   in their processes and the chemical waste that they
15   generated became government property when the
16   government made progress payments to Ryan and TRA?
17           MR. WINE: Objection to the extent
18   it mischaracterizes the legal position of TDY.
19       A.   I am familiar with that argument, yes.
20   BY MR. BARR:
21       Q.   Now, progress payments are made in what
22   type of contracts?

                                          Page 270

                                          Pages 267 to 270

10/12/2011                TDY Holdings v. United States of America                Tommy Jordan

```
1        A.   Progress payments are made on fixed
2   price contracts because there is no provision for
3   progress payments under cost contracts because
4   cost -- under a cost type contract, the contractor
5   receives payments as he incurs those costs in
6   support of a specific contract.
7        Q.   Now, are you aware of any evidence in
8   this matter that Ryan or TRA ever maintained
9   separate chemical processing tanks or degreasing
10  equipment for different customers?
11           MR. WINE:  Objection, assumes facts
12  not in evidence, leading.
13       A.   I saw no such evidence that they
14  maintained separate tanks.
15           MR. WINE:  It also exceeds the scope
16  of the witness' expert report and as such is
17  inadmissible.  It also exceeds the witness' area of
18  expertise.
19  BY MR. BARR:
20       Q.   Other than United States government
21  customers, what other kinds of customers did Ryan
22  and TRA work for during the history of the Harbor
                                        Page 271
```

```
1   conclusion that goes to the ultimate issue and
2   exceeds the scope of the witness' expert report.
3        A.   Based upon the documents that I reviewed
4   in my observation of multiple contractors, it's my
5   opinion, based upon those contractors whom I
6   personally visited, that it would be impractical
7   for them to maintain separate processing tanks and,
8   therefore, segregate the chemicals between those
9   used in support of a commercial contractor, a
10  foreign government, and/or the United States
11  government.
12           MR. WINE:  Object and move to strike
13  the response as based on speculation.
14           MR. BARR:  Well, I'll oppose that.
15  BY MR. BARR:
16       Q.   If there are no separate chemical
17  processing tanks or degreasing equipment, would
18  there be any way to separate or segregate chemicals
19  or chemical waste as between different contracts?
20           MR. WINE:  Objection, assumes facts
21  not in evidence --
22       A.   Based upon --
                                        Page 273
```

```
1   Drive plant?
2            MR. WINE:  From inception to
3   closure?
4            MR. BARR:  Correct.
5            MR. WINE:  Objection --
6        A.   Based --
7            MR. WINE:  -- broad and ambiguous.
8        A.   Based upon the documentation that I
9   reviewed, they supported certain subcontracts for
10  military type hardware from other prime
11  contractors.  They had commercial contracts, and
12  then they provided products to certain foreign
13  governments.
14  BY MR. BARR:
15       Q.   Now, what is the significance, in your
16  opinion based on your experience and knowledge, of
17  the fact that -- or the fact that you have found no
18  evidence that Ryan or TRA maintained separate
19  chemical processing tanks or degreasing equipment
20  for different kinds of customers?
21           MR. WINE:  Objection, leading,
22  assumes facts not in evidence, calls for a legal
                                        Page 272
```

```
1            MR. WINE:  -- calls for a
2   hypothetical.
3        A.   Based upon those contractor facilities
4   that I have personally visited and observed, there
5   would be no such way to segregate those materials.
6            MR. WINE:  Same objection to the
7   prior response as being based on speculation.
8   BY MR. BARR:
9        Q.   Now, let's start with the available
10  World War II contracts with respect to title
11  vesting provisions.  I believe you previously
12  testified regarding the types of contracts, as to
13  whether they were fixed price or cost type
14  contracts.
15       A.   Yes.
16       Q.   Do you recall that testimony?
17           MR. WINE:  Objection,
18  mischaracterizes prior testimony.
19  BY MR. BARR:
20       Q.   Now, to the extent that these contracts
21  called for payments before the finished product was
22  delivered, did they contain requirements, to your
                                        Page 274
```

Pages 271 to 274

10/12/2011                    TDY Holdings v. United States of America                    Tommy Jordan

1  recollection, regarding documentation to support
2  such request for payments by Ryan?
3          MR. WINE:  Objection, the document
4  speaks for itself.
5      A.  Yes, they did.
6  BY MR. BARR:
7      Q.  Now, to the best of your knowledge, are
8  any such supporting documents for Ryan requests for
9  such payments during World War II available?
10         MR. WINE:  Objection.
11     A.  Not that I have seen in my review of the
12 documents pertaining to this -- this issue.
13 BY MR. BARR:
14     Q.  Now, without such supporting documents,
15 can we tell whether the government got title to or
16 a lien on any chemicals or chemical wastes that
17 were generated at the Ryan plant --
18         MR. WINE:  Objection.
19 BY MR. BARR:
20     Q.  -- during the war?
21         MR. WINE:  Objection, calls for a
22 legal conclusion, goes to the ultimate issue, calls

1  for speculation.
2      A.  There is no way that I know of that they
3  could assume title absent that kind of
4  documentation.
5  BY MR. BARR:
6      Q.  Well, the question was a little bit
7  different.  So let me refocus it.
8          Without the supporting documentation,
9  can we make a determination whether the government
10 got title to or a lien on any of those materials?
11         MR. WINE:  Same objections as
12 before.
13     A.  Such a determination would be impossible
14 based upon my judgment.
15         MR. WINE:  Based on what?
16         THE WITNESS:  My judgment.
17         MR. WINE:  Thank you.
18 BY MR. BARR:
19     Q.  And is that based on your experience and
20 training?
21     A.  Yes, it is.
22     Q.  Now, did some of the contracts use the

1  word "materials" in this context?
2          MR. WINE:  Objection, assumes facts
3  not in evidence, mischaracterizes documents, vague
4  and ambiguous.
5      A.  Yes, they did.
6  BY MR. BARR:
7      Q.  Did any of the contracts which used that
8  word, "materials," define that word?
9          MR. WINE:  Same objection; assumes
10 facts not in evidence and mischaracterizes
11 documents that haven't been identified by Counsel
12 for this line of questioning.
13     A.  Based upon my recollection, they were
14 basically defined as those things that had value
15 and those materials that were entered into and made
16 a part of the product being produced by the
17 government.
18         MR. WINE:  Object to the response as
19 nonresponsive and mischaracterizes documents.
20 BY MR. BARR:
21     Q.  Now, you understand, Mr. Jordan, that
22 the documents I'm referring to are the World War II

1  contracts that we looked at on Monday?
2      A.  Yes, I am.
3          MR. WINE:  Same objection to the
4  extent that we're referring to documents that exist
5  in a record now of 153 documents without
6  identifying it with greater specificity.
7          Also, to the extent that this line
8  of questioning is not reflected in the witness'
9  expert report, it exceeds the scope of that report
10 and is, therefore, inadmissible.
11 BY MR. BARR:
12     Q.  Now, Mr. Jordan, yesterday we marked a
13 number of Ryan annual reports, and those were
14 Exhibits 13, 14, 15, and 17 for the years 1940,
15 '41, '42, and '43 and '44, so that would be
16 Exhibit 18.
17         Do you recall our looking at these Ryan
18 annual reports?
19         MR. WINE:  Objection to the extent
20 it calls for speculation.  The documents that have
21 been marked and are going to be referenced, and
22 testimony has been elicited.  We should look at the

1   specific documents if there is going to be
2   questions about them.
3       A.   Yes, I do.
4   BY MR. BARR:
5       Q.   Okay.  Now, let me mark as an additional
6   annual report the 1945 annual report, which I
7   neglected to mark yesterday.
8            MR. WINE:  TDY asserts the same
9   objections with respect to Exhibit 154 as it did to
10  the earlier referenced exhibits.  I believe Counsel
11  referred to Exhibits 13, 14, 15, and 17.
12           MR. BARR:  And 18.
13           MR. WINE:  And 18.
14           (Exhibit No. 154 marked)
15  BY MR. BARR:
16      Q.   And, Mr. Jordan, for each of the
17  referenced stockholder annual reports, did you
18  examine the balance sheets in each of these
19  reports?
20      A.   Yes, I did.
21      Q.   And did you observe anything with
22  respect to progress payments on those balance

Page 279

1   sheets?
2            MR. WINE:  Objection, vague and
3   ambiguous, also beyond the scope of the witness'
4   expert report and beyond his area of expertise.
5       A.   On some of the annual reports -- and I
6   don't recall whether they were included in that
7   bunch -- but they had included inventories less
8   progress payments and then for those years that
9   they had received progress payments; and then for
10  the years where they had not received progress
11  payments, they did not make that deduction from the
12  value of the inventories.
13           MR. WINE:  Again, we'll assert the
14  documents speak for themselves and contain the best
15  source of evidence as to the underlying
16  information.
17  BY MR. BARR:
18      Q.   Now, in your opinion, based on your
19  experience and training in the post-war era, do the
20  available documents permit a conclusion as to
21  whether hazardous substances were among the
22  materials for which Ryan sought cost reimbursement?

Page 280

1            MR. WINE:  Objection, calls for a
2   legal conclusion, assumes facts not in evidence and
3   goes to an ultimate issue.  Also exceeds the scope
4   of the witness' expert report and is, therefore,
5   inadmissible.
6       A.   I saw no evidence whatsoever that any of
7   the contractor requests for progress payments
8   included requests for reimbursement for hazardous
9   materials.
10  BY MR. BARR:
11      Q.   And as to cost reimbursement type
12  contracts, is that also your opinion?
13           MR. WINE:  Same objections; calls
14  for a legal conclusion.
15      A.   Yes, it is.
16  BY MR. BARR:
17      Q.   And in your opinion based on your
18  training and experience in the post-war period, did
19  the available documents permit a conclusion that
20  hazardous substances were among the materials to
21  which the government had title during the war?
22           MR. WINE:  Same set of objections;

Page 281

1   calls for a legal conclusion.  And again, to the
2   extent that the witness did not opine on this
3   subject in his expert report, it exceeds the scope
4   of his expert opinion and is, therefore,
5   inadmissible.
6       A.   In my opinion, there was no
7   documentation that indicated that the government
8   had title at any point in time to any hazardous
9   material or hazardous waste.
10  BY MR. BARR:
11      Q.   Okay.  I'd like to focus on progress
12  payment clauses in fixed price contracts
13  specifically.  And in that regard, I'll show you a
14  number of ASPR and FAR provisions that have been
15  produced in this case.
16           MR. BARR:  Why don't we go off the
17  record.
18           THE VIDEOGRAPHER:  Going off the
19  record, 1:46.
20           (Recess:  1:46 p.m. to 1:50 p.m.)
21           THE VIDEOGRAPHER:  Back on record,
22  1:50.

Page 282

Pages 279 to 282

1          (Exhibit Nos. 155 through 171
2     marked)
3     BY MR. BARR:
4          Q.   Before I give you these documents,
5     Mr. Jordan, I'll state for the record that one of
6     these is a complete -- what we understand to be a
7     complete copy of Appendix E, Defense Contract
8     Financing Regulations, dated on the front page
9     July 1, 1976, although other pages indicate
10    subsequent amendments of certain provisions.  The
11    internal pagination is E1 through E88, and a copy
12    of that will be produced with Bates numbers to the
13    plaintiffs shortly.
14          MR. WINE:  While the witness is
15    reviewing the documents, TDY asserts the same
16    objections to this compilation of exhibits,
17    Exhibit 155 through 171, that it has asserted with
18    respect to prior ASPR excerpts that the government
19    has produced.
20          Additionally, at least some of the
21    exhibits -- in particular Exhibit 155 -- appear to
22    be pages from various ASPRs going over a period of

1     A.   They represent parts of the Appendix E
2     on financing, and then there is also specific ASPR
3     clauses for progress payments.
4     BY MR. BARR:
5          Q.   And does the time period cover both the
6     period of the ASPRs after World War II through the
7     relevant period in which the FARs were in effect?
8          MR. WINE:  Objection, assumes facts
9     not in evidence.  The set is incomplete.
10         A.   Yes, they do.
11    BY MR. BARR:
12         Q.   Now, let's focus on FAR.  And I don't
13    think we need to refer specifically to particular
14    exhibits, but do you recall which section of the
15    FAR pertained to title to property?
16         MR. WINE:  Objection, calls for a
17    legal conclusion.
18         A.   Those provisions are contained in the
19    government property clause in Appendix E on
20    financing.
21    BY MR. BARR:
22         Q.   And what about the FAR?  Was there a

1     years and does not appear to be -- it appears to
2     be a compilation.  It does not appear to be a single,
3     unitary document, but it's difficult to tell given
4     the manner in which it's been produced.  We assert
5     the same objections.
6          Additionally, the materials produced
7     cover a variety of time periods in a variety of
8     orders, jumping back and forth during various
9     periods of time, most of which seem to predate the
10    late 1950s.
11         A.   Okay.
12    BY MR. BARR:
13         Q.   Mr. Jordan, now that you've had a chance
14    to review these -- the set of exhibits, is it fair
15    to say, in order to summarize this, that these
16    are -- or contain or are the FAR and ASPR
17    provisions relating to progress payments and fixed
18    priced contracts?
19         MR. WINE:  Objection, assumes facts
20    not in evidence, mischaracterizes the documents,
21    calls for a legal conclusion.  The documents are an
22    incomplete set for an incomplete period of time.

1     part of section -- Part 52?
2          MR. WINE:  Objection, leading.
3          A.   Yes, I believe there was.
4     BY MR. BARR:
5          Q.   Do you recall the section number?
6          MR. WINE:  Objection.
7          A.   Not specifically, no.
8     BY MR. BARR:
9          Q.   If I could have that group of documents
10    back from you for one moment.
11         Let me direct your attention to
12    Exhibit 164.
13         A.   Okay.
14         Q.   Do you see the reference to
15    Section 52.232-16?
16         A.   Yes, I do.
17         Q.   Is there a subsection within that
18    section which refers to title to property?
19         A.   Yes.
20         Q.   And what subsection is that?
21         A.   Subsection D.
22         Q.   Well, let's step back for a minute and

1  ask:  Based on your training and experience, what
2  have been the basic uses and purposes of progress
3  payment clauses?
4        MR. WINE:  Objection, calls for
5  legal conclusion, exceeds the scope of the witness'
6  area of expertise, goes beyond the opinions
7  articulated in his expert report and are,
8  therefore, inadmissible.
9     A.   As a contracting officer, we included
10 progress payment provisions in contracts upon
11 request of the contractor for progress payments as
12 a means to provide financing to the contractor for
13 performance of the contract.
14 BY MR. BARR:
15    Q.   And in providing this financing, was
16 there an understanding that you had as to what
17 kinds of property were involved in financing?
18       MR. WINE:  Objection, relevance,
19 also goes to an ultimate issue, calls for a legal
20 conclusion, goes beyond the scope of the witness'
21 expert report and is, therefore, inadmissible.
22    A.   My understanding as a contracting

Page 287

1  officer was that the progress payments would be
2  made upon those things of value that were required
3  by the contractor for performance of the contract.
4        And when the contractor did acquire such
5  property that had identifiable value, then the
6  government assumed a lien to that property in the
7  event the contractor defaulted on payment, and we
8  had to protect the government's interest to the
9  monies that were advanced to the contractor through
10 progress payments.
11 BY MR. BARR:
12    Q.   Now, when you say "a lien," are you
13 trying to make a legal conclusion as to whether
14 that was title or something less than title?
15       MR. WINE:  Objection, inherently
16 calls for a legal conclusion.
17    A.   The language indicates a lien.  Now,
18 whether -- I am not going to make a legal
19 conclusion as to the difference between a lien and
20 title, but I do know that the language in the
21 clauses spoke to a lien.
22

Page 288

1  BY MR. BARR:
2     Q.   Would you look at Subsection D again?
3        MR. WINE:  We're in Exhibit 164?
4        MR. BARR:  Correct.
5        MR. WINE:  What Bates page are you
6  on?
7        THE WITNESS:  1677.
8     A.   I misspoke.  It does speak to -- speak
9  to title.
10       MR. WINE:  I will object to the line
11 of questioning to the extent that the document
12 speaks for itself.  It also calls for a legal
13 conclusion.
14 BY MR. BARR:
15    Q.   Now, are you familiar with the term
16 "liquidation of progress payments"?
17       MR. WINE:  Objection, calls for a
18 legal conclusion.
19    A.   Yes, I am.
20 BY MR. BARR:
21    Q.   Could you explain that for the Court?
22       MR. WINE:  Same objection.

Page 289

1     A.   Liquidation is a process that the
2  government used to reduce the total exposure of the
3  government to monies advanced to the contractor
4  through progress payments by those items that had
5  been produced by the contractor and delivered to
6  the government.
7  BY MR. BARR:
8     Q.   Now, when you say "liquidation is a
9  process," who performs this liquidation process?
10       MR. WINE:  Same objection.
11    A.   Basically, the administrative
12 contracting officer.
13 BY MR. BARR:
14    Q.   And how would the amount of monies
15 advanced to the contractor be liquidated?
16       MR. WINE:  Same objection.
17    A.   By reducing from that total value of
18 monies advanced to the contractor the value of
19 parts delivered and payments made to the contractor
20 under the contract.
21 BY MR. BARR:
22    Q.   Did the contractor reduce that total

Page 290

Pages 287 to 290

1  value of monies advanced?
2          MR. WINE:  Same objections.
3      A.  It was a process.  Now, whether the
4  contractor reduced the -- the value or it was a
5  function of the administrative contracting
6  officer -- it is probably a combination of the two.
7  BY MR. BARR:
8      Q.  Did -- did the contractor repay monies
9  advanced in the form of progress payments?
10         MR. WINE:  Objection, relevance,
11 calls for a legal conclusion.  It also exceeds the
12 scope of the witness' opinion and expert report.
13     A.  In effect, they were reduced from the
14 value of the property that was delivered.  So, if
15 you will, if the government had advanced $1,000 to
16 the contractor through progress payments, then they
17 delivered back to the government $1,200 of
18 completed product, then that liquidation would
19 amount to $1,000 of the monies advanced to the
20 contractor as progress payments.
21 BY MR. BARR:
22     Q.  Is -- is another -- is a layman's way to

Page 291

1  understand that repayment of loan?
2      A.  It operated much the same way as a loan,
3  yes, in repayment of a loan.
4      Q.  The -- to the extent that the government
5  took title to property, is there a way to express
6  that in layman's terms in terms of the actions of
7  the government?
8          MR. WINE:  Objection, vague and
9  ambiguous.
10     A.  In layman's terms, it was a way the
11 government, through operation of the progress
12 payments clause, protected its interest in the
13 monies paid to the contractor under progress
14 payments.
15 BY MR. BARR:
16     Q.  Is another way to put that a security or
17 to -- or securing its interests?
18         MR. WINE:  Objection, leading, also
19 calls for a legal conclusion, assumes facts not in
20 evidence.
21     A.  Yes, it is.
22

Page 292

1  BY MR. BARR:
2      Q.  And was that essentially your
3  understanding during the time you were a
4  contracting officer?
5      A.  Yes, it is.
6      Q.  Now, in terms of progress payments, if
7  the government advances -- if the military
8  advance -- makes progress payments or agrees to
9  make progress payments to a contractor, does the
10 contractor still need to go out and borrow money
11 from commercial lenders?
12         MR. WINE:  Objection, beyond the
13 scope of the witness' expertise, beyond the scope
14 of his expert opinion and asserted qualifications
15 to give an opinion, also relevance.
16     A.  It may or may not, depending upon the
17 contractor's financial condition.
18 BY MR. BARR:
19     Q.  Okay.  Do progress payments, to the
20 extent they're made to a contractor, save the
21 government money?
22         MR. WINE:  Same objections.

Page 293

1      A.  Based on my experience and training,
2  yes, they do.
3  BY MR. BARR:
4      Q.  In what way or ways?
5          MR. WINE:  Same objections.
6      A.  It provides financing to the contractor
7  for performance of the contract.  It makes it
8  easier for the contractor to complete the contract
9  as negotiated and awarded, and it, if you will,
10 assures that the contractor will deliver the
11 products on time.  It reduces from the contractor
12 expenses interest, even though interest itself is
13 not an allowable item of cost, and just assures
14 that the contractor will produce the -- the
15 contracted for items.
16 BY MR. BARR:
17     Q.  In the operation of the progress payment
18 clause, are all the progress payments ultimately
19 repaid by the contractor?
20         MR. WINE:  Objection, calls for a
21 legal conclusion.
22     A.  Unless the contractor defaults on the

Page 294

Pages 291 to 294

1   contract and we have to pursue termination for
2   default.
3   BY MR. BARR:
4       Q.  Okay.  Let's focus in a little more
5   detail on 52.232-16(d)(6).  And again, you can look
6   at that same exhibit.
7       A.  And that was in what exhibit?
8       Q.  I believe that was in 164.
9       A.  Okay.
10      Q.  Have you found 16(d)(6)?
11          MR. BARR:  Off the record.
12          THE VIDEOGRAPHER:  Going off the
13  record, 2:15.
14          (Recess:  2:15 p.m. to 2:15 p.m.)
15          THE VIDEOGRAPHER:  Back on record,
16  2:15.
17      A.  Okay.  That paragraph is on Bates number
18  ending in numbers 1678.
19  BY MR. BARR:
20      Q.  Okay.  Let me ask you if you could
21  translate that into layman's terms.
22          MR. WINE:  Objection, calls for a

Page 295

1   52.232-16(d)(6) in the ASPRs?
2       A.  Yes, there were.
3           MR. WINE:  Objection, calls for a
4   legal conclusion.
5   BY MR. BARR:
6       Q.  And have we marked as exhibits in this
7   last group of exhibits such ASPR provisions?
8           MR. WINE:  Objection, assumes facts
9   not in evidence.
10      A.  I believe we have.
11          MR. BARR:  I think this would be a
12  good time for us to take a break.
13          THE VIDEOGRAPHER:  Going off the
14  record, 2:18.
15          (Recess:  2:18 p.m. to 2:34 p.m.)
16          THE VIDEOGRAPHER:  Back on record,
17  2:34.
18          (Exhibit Nos. 172 through 192
19  marked)
20  BY MR. BARR:
21      Q.  All right.  Mr. Jordan, while we were
22  off the record, we took the opportunity to mark a

Page 297

1   legal conclusion and a legal analysis.  The
2   regulation speaks for itself.
3       A.  When the contractor completes all of its
4   obligations to the government and finishes delivery
5   of all the supplies called for in that contract,
6   then the title to all residual property not
7   delivered to and accepted by the government or
8   incorporated into the supplies accepted --
9   delivered to and accepted by the government shall
10  vest in the contractor.
11  BY MR. BARR:
12      Q.  Now, as you read that, does that
13  include -- does the property that -- where title
14  vested in the contractor, does that include
15  chemical waste?
16          MR. WINE:  Objection, calls for a
17  legal conclusion, assumes facts not in evidence.
18      A.  Since that chemical waste would not be
19  part of the product delivered to and accepted by
20  the government, yes, it would.
21  BY MR. BARR:
22      Q.  Now, were there parallel provisions to

Page 296

1   number of additional exhibits.  We'll get to those
2   in just a moment.
3           But before we get off the subject of
4   progress payments in the context of fixed priced
5   contracts, I wanted to shift our focus to the term
6   "scrap."
7           Was "scrap" a term that had a particular
8   meaning in the context of government defense
9   contracting?
10      A.  Yes, it did.
11      Q.  Were there provisions pertaining to
12  scrap in the ASPRs and FARs pertaining to scrap?
13          MR. WINE:  Objection, the documents
14  speak for themselves, assumes facts not in
15  evidence, calls for a legal conclusion.
16      A.  Yes, there were.
17  BY MR. BARR:
18      Q.  And have we included in the group of
19  documents that we marked earlier which provide for
20  the handling of scrap?
21          MR. WINE:  Same objections.
22      A.  Yes.

Page 298

Pages 295 to 298

BY MR. BARR:

1    Q.   And in terms of the handling of scrap,
could you summarize what those provisions in the
ASPRs and FARs provided?

        MR. WINE:  Objection, assumes facts
not in evidence, calls for a legal conclusion.  The
documents speak for themselves and are the best
source of information and, therefore, should be
read in their entirety rather than summarized.  It
also exceeds the scope of the witness' expert
report.

    A.   Based on my experience, scrap was that
material that had some intrinsic value, either to
be sold as a complete entity or its mercurial
content had some value.

        I specifically recall one contract that
we had for overhaul of radial reciprocating
engines; and during that process of overhaul of the
engines, many of the components that were removed
from those engines that were input for overhaul
were determined to be beyond economical repair.
So, therefore, they become scrap.

Page 299

1    They had significant value in material
contact -- content.  The contractor segregated
those parts that were generated from government
engines, and he would periodically conduct a sale
of that scrap material and then credit the proceeds
of that scrap sale back to the government contract.

        The provisions that are included in
these provisions of the ASPR gave the authority to
sell scrap without specific approval from the
government and then to credit those sales back to
the contract -- back to the government.

BY MR. BARR:

    Q.   Now, when you saw --

        MR. WINE:  Object to -- object to
the response as exceeding the scope of the witness'
expert report in providing a legal analysis and,
therefore, inadmissible.

BY MR. BARR:

    Q.   Now, when you say the proceeds being
"credited," credited against what?

    A.   Back to the contract from which the
scrap was generated.

Page 300

1    Q.   When you say "back to the contract,"
you're talking about the contract cost of
performance?

    A.   Yes.

    Q.   Now, at any time during the post-war
period in which the ASPRs and FARs were in effect,
have you found any evidence indicating that Ryan or
TRA considered chemical waste to be scrap that they
could sell?

        MR. WINE:  Objection, assumes facts
not in evidence, calls for a legal conclusion.

    A.   I found no such evidence.

        MR. WINE:  Also goes beyond the
scope of the witness' expert report and is,
therefore, inadmissible.

BY MR. BARR:

    Q.   Likewise, have you found any evidence
indicating that Ryan or TRA credited the cost of
the sales of chemical waste against the cost of
contract performance?

        MR. WINE:  Same objections.

    A.   I found no evidence that they even sold

Page 301

1    any chemical waste, much less credited the proceeds
of those sales back to the government.

BY MR. BARR:

    Q.   All right.  Let me hand you a stack of
annual reports from the Ryan Aeronautical Company.
We've marked these as Exhibits 172 through 192.
And again, if you could, just briefly glance at
these, and I'll ask you if you have reviewed these
in the context of your expert work in this case,
either in preparation of your report or in
preparation for this deposition?

        MR. WINE:  Counsel, we have
Exhibits 172 to 193.

        MR. BARR:  Then I misspoke.

BY MR. BARR:

    Q.   Mr. Jordan, could you look at the
last --

    A.   I have through 192.

    Q.   Mr. Jordan, you can continue just
glancing through them.

        MR. WINE:  We've got 193 exhibits.
So there's either something omitted from his set

Page 302

10/12/2011                 TDY Holdings v. United States of America                 Tommy Jordan

1  that's in our set or something extra in our set
2  that's not in his set.
3        MR. BARR:  If you don't mind -- yes.
4  You have two copies of the report for 1947.
5        MR. WINE:  Okay.
6        MR. MATEER:  I'll renumber.
7        MR. WINE:  Okay.  We'll take care of
8  it.
9        MR. BARR:  So we'll just mark this
10  out of order as the Exhibit --
11        MR. WINE:  No, you don't have to
12  remark anything.  We have to remark our copy,
13  unless his appears twice as well.
14        MR. BARR:  Well, his may be missing,
15  the 1947.
16        MR. WINE:  That means that the
17  numbering is -- yeah.  Right.
18        MR. BARR:  No.  Actually, let me
19  take that back.  There are two versions, one
20  produced by the government with U.S. Bates numbers
21  and one produced by TDY.  So let's use the one that
22  has 173 on it.

Page 303

1        MR. WINE:  But then that doesn't
2  explain why there's one more in his set than there
3  is in ours.
4        MR. BARR:  Well, no.  There was one
5  more in yours.  This is off the record, please.
6        THE VIDEOGRAPHER:  Going off the
7  record, 2:43.
8        (Recess:  2:43 p.m. to 2:53 p.m.)
9        THE VIDEOGRAPHER:  Back on record,
10  2:53.
11  BY MR. BARR:
12    Q.  Mr. Jordan, I appreciate your patience
13  in taking the time to walk through these exhibits.
14      These are all annual reports from the
15  Ryan Aeronautical Company, are they not?
16        MR. WINE:  Objection, foundation,
17  assumes facts not in evidence.  Also, to the extent
18  that the documents were not referenced in or cited
19  by the expert in his expert report, they're
20  inadmissible.
21    A.  Yes, they are.
22

Page 304

1  BY MR. BARR:
2    Q.  And you have reviewed these annual
3  reports in connection with your work in this case?
4        MR. BARR:  You're talking about his
5  work as a 30(b)(6) witness or an expert witness?
6        MR. BARR:  Expert.
7    A.  I recall reviewing all of these reports
8  prior to today.
9  BY MR. BARR:
10    Q.  And did you review these in the context
11  of preparing for your testimony today?
12    A.  Yes, I did.
13        MR. WINE:  Objection.
14  BY MR. BARR:
15    Q.  And as we discussed in the context of
16  the World War II annual reports, did you review the
17  balance sheets of the company that are contained in
18  these annual reports?
19    A.  Yes, I did.
20    Q.  And did you observe -- make an
21  observation as to notations regarding progress
22  payments in those balance sheets?

Page 305

1        MR. WINE:  Objection to the extent
2  that it exceeds the area of expertise of the
3  witness and goes beyond the areas in which he is
4  qualified to give an opinion.
5      Also, to the extent that it offers
6  opinion testimony that is not contained in his
7  expert report, it is inadmissible as such.
8    A.  On those portions of the -- of the
9  reports that speak to assets, on certain years,
10  they have the value of the assets listed, and then
11  it says, "less progress payments received."
12      Apparently those are years in which they
13  received progress payments, and for the years that
14  they did not receive progress payments, there is no
15  deduction for progress payments received.
16        MR. WINE:  Object to the response to
17  the extent that it assumes facts not in evidence to
18  which there is not a proper foundation, calls for
19  speculation.
20  BY MR. BARR:
21    Q.  All right.  Let's talk about title
22  provisions as they relate to cost reimbursement

Page 306

Pages 303 to 306

1  contracts.

2          MR. BARR:  We can go off the record.

3          THE VIDEOGRAPHER:  Going off the

4  record, 2:56.

5          (Recess 2:56 p.m. to 2:59 p.m.)

6          THE VIDEOGRAPHER:  Back on record,

7  2:59.

8          (Exhibit Nos. 193 through 198

9  marked)

10  BY MR. BARR:

11     Q.  Mr. Jordan, I'm handing you another set

12  of ASPR and FAR provisions.  I'll ask you to just

13  briefly review those, and then I'll ask you if you

14  have seen those before.

15          MR. WINE:  While the witness reviews

16  the documents, TDY asserts the same objections that

17  it has for prior excerpts of ASPRs and notes that

18  the exhibits marked, Jordan Exhibits 193 through

19  198, pertain to the years 1968, 1969, 1976, 1984,

20  1990, and 1997.

21     A.  Okay.

22

Page 307

1  BY MR. BARR:

2     Q.  Mr. Jordan, do these ASPR and FAR

3  excerpts pertain to cost reimbursement contracts?

4          MR. WINE:  Objection, the documents

5  speak for themselves, calls for a legal conclusion.

6     A.  Yes, they do.

7  BY MR. BARR:

8     Q.  During the course of your career as a

9  government contracting officer, were you familiar

10  with these provisions?

11     A.  Yes, I was.

12     Q.  Do these provisions contain -- do these

13  sections of the FAR and the ASPR contain provisions

14  relating to the passage of title?

15          MR. WINE:  Objection, document

16  speaks for itself, calls for a legal conclusion.

17     A.  Yes, they do.

18  BY MR. BARR:

19     Q.  And if you could, summarize how and to

20  what the government took title pursuant to such

21  provisions.

22          MR. WINE:  Same objection; this

Page 308

1  document speaks for itself and is the best source

2  of evidence in response to Counsel's question,

3  calls for a legal conclusion.

4     A.  The paragraph contained on Bates number

5  4278 --

6  BY MR. BARR:

7     Q.  In what exhibit?

8     A.  Exhibit No. 193, Paragraph C.

9          And I will quote it:  "Title to all

10  property furnished by the government shall remain

11  in the government.  Title to all property purchased

12  by the contractor for the cost of which the

13  contractor is entitled to be reimbursed as a direct

14  item of cost under this contract shall pass to and

15  vest in the government upon delivery of such

16  property by the vendor."

17          And I underscore the "direct item of

18  cost," and that is representative of the same

19  provision in the other editions of the ASPR and the

20  other exhibits that you gave me.

21     Q.  Including the FAR?

22     A.  Yes.

Page 309

1          MR. WINE:  Objection, again, insofar

2  as the exhibits provided in 193 and 198 are an

3  incomplete set of documents.

4  BY MR. BARR:

5     Q.  To the extent we're missing any editions

6  in this set of exhibits, Mr. Jordan, is it your

7  understanding that these provisions changed in

8  those other so-called missing editions?

9          MR. WINE:  Objection, calls for

10  speculation, calls for a legal conclusion.  The

11  best source of evidence is the document themselves,

12  which has not been introduced into evidence, and

13  therefore the witness should not be permitted to

14  testify about documents that have not been

15  presented.

16     A.  Based upon my knowledge of the

17  regulations, it would not be affected by other

18  provisions of the ASPR that are not included in

19  these exhibits.

20  BY MR. BARR:

21     Q.  Well --

22          MR. WINE:  Objection, not

Page 310

Pages 307 to 310

10/12/2011                TDY Holdings v. United States of America                Tommy Jordan

1   responsive.
2   BY MR. BARR:
3       Q.   The question is a little bit different,
4   Mr. Jordan.  To the extent we don't have editions
5   of the ASPRs or the FARs in this group of
6   documents, would the provisions, based on your
7   experience, have changed in those editions and then
8   reverted back to the form in which we have in front
9   of us?
10          MR. WINE:  Same objections; calls
11  for speculation.
12      A.   They would not.
13  BY MR. BARR:
14      Q.   To the title provision as you understood
15  them when you were a government contracting
16  officer, were these essentially based on cost
17  accounting timing?
18          MR. WINE:  Objection, vague and
19  ambiguous, calls for a legal conclusion, also
20  exceeds the scope of the witness' knowledge and
21  expertise in the area in which he's been offered as
22  an expert witness, also seeks to provide an opinion

Page 311

1           MR. BARR:  Actually, why don't we
2   just take a quick break.  That will -- that will
3   solve my problem.
4           THE VIDEOGRAPHER:  Going off record,
5   3:10.
6           (Recess:  3:10 p.m. to 3:21 p.m.)
7           THE VIDEOGRAPHER:  Back on record,
8   3:21.
9   BY MR. BARR:
10      Q.   Mr. Jordan, I'm going to ask you to
11  look, please, at what we've marked as -- I believe
12  it is Exhibits 193, 94, 95, 96, and 98.  193 is
13  missing from that stack.  So I'm going to hand that
14  to you now.
15      A.   Okay.  That's why I couldn't find it.
16      Q.   For your convenience, I've put a red
17  tape flag next to provisions relating to final
18  accounting.
19          MR. WINE:  What Bates numbers,
20  Counsel?
21          THE WITNESS:  On Exhibit No. 193,
22  it's Bates number 4281.

Page 313

1   that's not contained in his expert report and is,
2   therefore, inadmissible.
3       A.   It would be based upon timing and the
4   type of material for which payment was made.
5   BY MR. BARR:
6       Q.   Would it also depend -- would the
7   passage of title also depend on the ability of the
8   contractor to identify the property to a specific
9   cost reimbursable contract?
10          MR. WINE:  Same objections.
11      A.   Very definitely it would.
12  BY MR. BARR:
13      Q.   Mr. Jordan, let me direct your attention
14  to Exhibits 194, 195, and 196.
15      A.   Okay.
16      Q.   And let's start with 194.  If you would,
17  look at the page pertaining to -- well, ending in
18  the Bates numbers 61.  Actually, strike that.
19  Let's come back to that.  I apologize.
20          Mr. Jordan --
21      A.   Okay.
22      Q.   -- we're going to come back to that.

Page 312

1           MR. WINE:  Thank you, Mr. Jordan.
2           THE WITNESS:  On 194, it's
3   Bates 160.
4           MR. WINE:  Thank you, sir.
5   BY MR. BARR:
6       Q.   Actually, to speed this up, rather than
7   have you do it, Mr. Jordan, it should be
8   Subparagraph (i) on each of those exhibits.  That's
9   little Roman (i).
10          MR. WINE:  And we're not looking at
11  little Roman numeral (i) in Exhibit 197 for this
12  examination?
13          MR. BARR:  No, we're not.
14      A.   Okay.
15  BY MR. BARR:
16      Q.   Now, Mr. Jordan, these provisions, as I
17  read it -- and just so we can summarize it, the --
18  is it your understanding that the substance of
19  these provisions remain constant over time?
20          MR. WINE:  Objection, the documents
21  speak for themselves.  It calls for a legal
22  conclusion.  Also, to the extent that one of the

Page 314

Pages 311 to 314

1  documents in the series is not included goes to the
2  question being asked to the witness.
3      A.  To the best of my knowledge, yes.
4  BY MR. BARR:
5      Q.  Now, would you look at Exhibit 197 and
6  see if you can find this final accounting
7  provision.
8          Have you found it, Mr. Jordan?
9      A.  Not yet.
10         MR. WINE:  You can direct him to a
11 page, if you want.  431.
12 BY MR. BARR:
13     Q.  Let me come around and show you --
14     A.  I thinks it's 14, 1 -- 431.
15     Q.  Okay.  Yeah.  If you will please review
16 that, we'll include that in the questioning.
17     A.  Okay.
18     Q.  Having looked at Exhibit -- the clause
19 little Roman (i) in 190 -- in Exhibit 197, did you
20 detect any material differences in the language in
21 the clause there compared to the other exhibits
22 that I directed your attention to?

Page 315

1  actions or events?
2          MR. WINE:  Objection, the document
3  speaks for itself, calls for a legal conclusion,
4  beyond the scope of the witness' expertise and
5  beyond the scope of his expert opinion.
6      A.  Yes, they do.
7  BY MR. BARR:
8      Q.  Have you found any evidence in the
9  record in this case that any of those events
10 occurred with respect to Ryan or TRA?
11         MR. WINE:  Objection, assumes fact
12 not in evidence, goes beyond the area of expertise
13 of the witness and goes beyond the scope of his
14 expert opinion.
15         Moreover, Counsel has not offered
16 sufficient basis for which to elicit an opinion
17 from the witness.  Therefore, it's inadmissible.
18     A.  Based upon the documents I reviewed, I
19 saw no such evidence.
20 BY MR. BARR:
21     Q.  Now, did you determine in your review of
22 contemporaneous documents in the record in this

Page 317

1          MR. WINE:  Same objections; the
2  documents speak for themselves, calls for a legal
3  conclusion, goes beyond the scope of the witness'
4  expert report and area of expertise.
5      A.  Not that I noted.
6  BY MR. BARR:
7      Q.  Were you familiar with these various
8  provisions -- they're different numbers, but were
9  you familiar with the provisions in their -- with
10 their various numbering over the course of your
11 career as a government contracting officer?
12     A.  I'm basically familiar, yes.
13         MR. WINE:  Objection with respect to
14 any opinions or testimony given to the extent that
15 the witness has qualified his knowledge as basic or
16 basic familiarity, therefore, not qualified to
17 offer opinion on the subject matter being elicited
18 by Counsel.
19 BY MR. BARR:
20     Q.  Now, in these clauses, is it fair to say
21 that each of them in their various numberings call
22 for or refer to a number of different kinds of

Page 316

1  case whether or not TRA and Ryan personnel ever
2  considered the processing chemicals or chemical
3  waste to be government property at any time?
4          MR. WINE:  Objection.  Same
5  objections as before; also calls for a legal
6  conclusion, assumes facts not in evidence, calls
7  for -- seeks an opinion from the witness for which
8  there is an insufficient basis for such an opinion
9  and goes beyond the scope of his expert report and
10 is, therefore, inadmissible.
11     A.  Based upon the volume of documents I
12 reviewed, I saw no such evidence.
13 BY MR. BARR:
14     Q.  And similarly -- a similar question:
15 Did you determine in your review of contemporaneous
16 documents in this case as to whether any government
17 personnel ever considered the processing chemicals
18 or chemical waste at the Ryan plant or the TRA
19 plant to be government property at any time?
20         MR. WINE:  Same objections.
21     A.  Based upon the volume of documents that
22 I reviewed, I saw no such evidence.

Page 318

Pages 315 to 318

BY MR. BARR:

Q. Now, in your 30 plus years of experience in Air Force contracting, can you recall any instance in which processing chemicals or their wastes were understood to be government property?

MR. WINE: Objection, calls for a legal conclusion, goes to the ultimate issue in the case, goes beyond the scope of the witness' expert report, goes beyond the area of his expertise, and lacks a sufficient basis for which he can give an opinion.

A. Based upon my 30 plus years of experience in government contracting, I saw no examples where the government or the contractor considered hazardous chemical waste to be government property.

MR. WINE: Objection insofar as the response is nonresponsive to Counsel's question. Counsel's question was compound and asked both as to processing chemicals as well as waste.

BY MR. BARR:

Q. Mr. Jordan, did you ever encounter a

Page 319

situation where the government or the contractor considered processing chemicals to be government property at any time?

MR. WINE: Same objections.

A. Not to my knowledge.

MR. BARR: All right. I think we are at a convenient stopping point for today. So -- I think the witness is getting tired, and hearing no objection from the witness, I think we should adjourn.

MR. WINE: I'm not going to object.

THE VIDEOGRAPHER: This marks the end of today's deposition. We're going off the record at 3:33.

(Deposition Recessed at 3:33 p.m.)

Page 320

CERTIFICATE OF SHORTHAND REPORTER

I, Steven Stogel, Certified Shorthand Reporter, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

GIVEN UNDER MY HAND AND SEAL of office on this _____ day of _____, 2011.

_____

STEVEN STOGEL, CSR, CLR

Texas Certified Shorthand Reporter

CSR No. 6174

Certified LiveNote Reporter

Expiration Date: 12/31/2012

Page 321

Tommy Jordan c/o

DICKSTEIN SHAPIRO, L.L.P.

1825 Eye Street NW

Washington, D.C. 20006-5403

Case: TDY Holdings v. United States of America

Date of deposition: 10/12/11

Deponent: Tommy Jordan

Please be advised that the transcript in the above referenced matter is now complete and ready for signature. The deponent may come to this office to sign the transcript, a copy may be purchased for the witness to review and sign, or the deponent and/or counsel may waive the option of signing. Please advise us of the option selected. Please forward the errata sheet and the original signed signature page to counsel noticing the deposition, noting the applicable time period allowed for such by the governing Rules of Procedure. If you have any questions, please do not hesitate to call our office at (202)-232-0646.

Sincerely,

Digital Evidence Group

Copyright 2011 Digital Evidence Group

Copying is forbidden, including electronically, absent express written consent.

Page 322

10/12/2011                   TDY Holdings v. United States of America                   Tommy Jordan

```
1   Digital Evidence Group, L.L.C.
2   1299 Pennsylvania Ave NW, Suite 1130E
3   Washington, D.C. 20004
4   (202) 232-0646
5
    SIGNATURE PAGE
6
7
8   Case Name: TDY Holdings v. United States of America
9   Witness Name: Tommy Jordan
10  Deposition Date: 10/12/11
11  I do hereby acknowledge that I have read
    and examined the foregoing pages
12  of the transcript of my deposition and that:
13
14  (Check appropriate box):
15  (  ) The same is a true, correct and
    complete transcription of the answers given by
16  me to the questions therein recorded.
17  (  ) Except for the changes noted in the
    attached Errata Sheet, the same is a true,
18  correct and complete transcription of the
    answers given by me to the questions therein
19  recorded.
20
21  _____   _____
22     DATE             WITNESS SIGNATURE
                                    Page  323
```

```
1   Digital Evidence Group, L.L.C.
2   1299 Pennsylvania Ave NW, Suite 1130E
3   Washington, D.C. 20004
4   (202) 232-0646
5
       E R R A T A   S H E E T
6
7
8   Case Name: TDY Holdings v. United States of America
9   Witness Name: Tommy Jordan
10  Deposition Date: 10/12/11
11     Page No.   Line No.     Change
12
13
14
15
16
17
18
19
20
21  _____    _____
22     Signature                Date
                                    Page  324
```

Pages  323 to 324

Page 325

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

_____

TDY HOLDINGS, LLC, and        §

TDY INDUSTRIES, INC.          §

                              §

        Plaintiffs,           §

                              §

VS.                           § Case No. 07cv0787 JAH

                              §

UNITED STATES OF AMERICA,     §

UNITED STATES DEPARTMENT      §

OF DEFENSE, and ROBERT M.     §

GATES, in his official        §

capacity as SECRETARY OF      §

DEFENSE                       §

                              §

        Defendants.           §

_____


Videotaped Deposition of

TOMMY B. JORDAN

VOLUME 3

San Antonio, Texas

Friday, October 14, 2011

9:56 a.m.


Reported by:  Steven Stogel, CSR, CLR


_____

DIGITAL EVIDENCE GROUP

1299 Pennsylvania Ave, NW, Suite 1130E

Washington, DC  20004

(202) 232-0646

```
 1          VOLUME 3
 2     Videotaped Deposition of
 3        TOMMY B. JORDAN
 4
 5  Held at the offices of:
 6     Koole Court Reporters of San Antonio
 7     711 Navarro Street, Suite 101
 8     San Antonio, Texas 78205
 9     (210) 558-9484
10
11
12     Taken pursuant to notice, before Steven
13  Stogel, Certified Shorthand Reporter and Certified
14  LiveNote Reporter in and for the State of Texas.
15
16
17
18
19
20
21
22
                                        Page 326
```

```
 1              INDEX
 2         TOMMY B. JORDAN
 3         October 14, 2011
 4
 5  APPEARANCES                        327
 6
 7  PROCEEDINGS                        335
 8
 9
10  EXAMINATION OF TOMMY B. JORDAN:
11
12     BY MR. BARR (CONTINUED)        335
13
14
15  CERTIFICATE                       437
16  ERRATA SHEET                      440
17
18
19
20
21
22
                                        Page 328
```

```
 1          APPEARANCES
 2  ON BEHALF OF THE PLAINTIFFS:
 3     Bradley D. Wine
 4     Michael C. Mateer
 5     DICKSTEIN SHAPIRO, L.L.P.
 6     1825 Eye Street NW
 7     Washington, D.C. 20006-5403
 8     (202) 420-3607
 9
10  FOR THE DEFENDANTS:
11     Lewis M. Barr
12     U.S. DEPARTMENT OF JUSTICE
13     601 D Street NW, Suite 8000
14     Washington, D.C. 20004
15     (202) 514-9645
16
17  VIDEOGRAPHER:
18     Alex Segovia
19
20  ALSO PRESENT:
21     Robert Zoch
22
                                        Page 327
```

```
 1         DEPOSITION EXHIBITS
              TOMMY B. JORDAN
 2            October 14, 2011
 3
    NUMBER          DESCRIPTION          MARKED
 4
    Exhibit 199  5/14/71 Award/Contract with      335
 5      Attached Schedule
        Bates US0086999 - US0087091
 6  Exhibit 200  ASPR The 1976 Edition,           338
        Appendix B
 7      Bates US0064764 - US0064792
    Exhibit 201  Securities and Exchange          339
 8      Commission, Form S-1 Amendment
        No. 1 to Registration Statement
 9      Under the Securities Act of 1933
        Bates TDYRYAN00002029 -
10      TDYRYAN00002055
    Exhibit 202  10/17/44 Memorandum              341
11      Bates TDYRYAN00004121
    Exhibit 203  4/8/98 Letter from Jerome C.     345
12      David
        Bates US 0250102 - US250107
13  Exhibit 204  10/27/49 Department of the Army  352
14      Document Entitled "Procurement
15      of Supplies and Equipment"
16      Bates US0143377 - US0143385
17  Exhibit 205  ASPR Excerpts                    352
18      Bates US0120672, US0120673,
19      US0120678, US0120681, US0120688,
20      US0120697, US0120707, US0120717,
21      US0120718, US0120726, US0120737
22      and US0120739
                                        Page 329
```

Pages 326 to 329

10/14/2011                TDY Holdings v. United States of America                Tommy Jordan

**DEPOSITION EXHIBITS**
**TOMMY B. JORDAN**
October 14, 2011

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 206 | Teledyne Ryan Aeronautical Fabrication Handbook Bates TDYRYAN20066289 - TDYRYAN20066378 | 352 |
| Exhibit 207 | 7/29/49 MIL-S-5002 Bates US0143342 - US0143348 | 359 |
| Exhibit 208 | 9/15/63 MIL-S-5002A Bates US0143386 - US0143393 | 359 |
| Exhibit 209 | 11/30/66 MIL-S-5002B Bates US0143395 - US0143409 | 359 |
| Exhibit 210 | 7/26/71 MIL-S-5002C Bates US0143413 - US0143431 | 359 |
| Exhibit 211 | 11/30/89 MIL-S-5002D Bates US0143349 - US0143364 | 359 |
| Exhibit 212 | 6/4/65 MIL-A-8625B Bates TDYRYAN20012635 - TDYRYAN20012654 | 359 |
| Exhibit 213 | 6/30/85 MIL-A-8625D Bates TDYRYAN20012655 - TDYRYAN20012674 | 359 |
| Exhibit 214 | 4/25/88 MIL-A-8625E Bates US0120571 - US0120589 | 359 |
| Exhibit 215 | 9/10/93 MIL-A-8625F Bates US0120595 - US0120613 | 359 |

Page 330

**DEPOSITION EXHIBITS**
**TOMMY B. JORDAN**
October 14, 2011

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 216 | 4/14/81 MIL-C-5561C Bates TDYRYAN20043827 - TDYRYAN20043834 | 359 |
| Exhibit 217 | 11/30/90 MIL-C-5541E Bates US0120614 - US0120624 | 359 |
| Exhibit 218 | 5/12/42 Agreement of Lease Bates US0010948 - US0010958 | 365 |
| Exhibit 219 | ASPR The 1969 Edition Excerpt Bates US0159156 - US0159161 | 370 |
| Exhibit 220 | ASPR The 1973 Edition Excerpt Bates US0159162 - US0159167 | 370 |
| Exhibit 221 | ASPR The 1974 Edition Excerpt Bates US0159168 - US0159172 | 370 |
| Exhibit 222 | ASPR The 1975 Edition Excerpt Bates US0159173 - US0159177 | 370 |
| Exhibit 223 | 7/1/76 ASPR Excerpt Bates US0249656 - US0249662 | 374 |
| Exhibit 224 | 9/14/51 MIL-Q-5923A Bates US0061098 - US0061106 | 383 |
| Exhibit 225 | 12/16/63 MIL-Q-9858A Bates US0061110 - US0061118 | 383 |
| Exhibit 226 | 1/25/39 Letter from T. Claude Ryan with Enclosure Bates TDYRYAN20034156 - TDYRYAN20034160 | 394 |

Page 331

**DEPOSITION EXHIBITS**
**TOMMY B. JORDAN**
October 14, 2011

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 227 | 7/3/40 FBI Plant Survey Bates TDYRYAN20001761 - TDYRYAN20001839 | 394 |
| Exhibit 228 | 1/17/42 War Department Memorandum Bates US0032086 - US0032090 | 394 |
| Exhibit 229 | 10/24/44 Ryan Aeronautical Company Organizational Chart Bates US0024730 | 394 |
| Exhibit 230 | 5/4/53 Ryan Aeronautical Company Letter Bates TDYRYAN40074840 | 394 |
| Exhibit 231 | 1/9/87 Teledyne Ryan Aeronautical Memorandum Bates TDYRYAN20000318 | 394 |
| Exhibit 232 | 3/1/63 ASPR Excerpt Bates US0143456 - US0143457 | 395 |
| Exhibit 233 | 3/21/44 Minutes of Annual Meeting of Stockholders of The Ryan Aeronautical Company Bates TDYRYAN20035026 - TDYRYAN20035038 | 401 |
| Exhibit 234 | 3/8/65 Big Safari Program Bates TDYRYAN00005368 - TDYRYAN00005375 | 406 |

Page 332

**DEPOSITION EXHIBITS**
**TOMMY B. JORDAN**
October 14, 2011

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 235 | 2/8/66 Memo for the Record by Roger J. Weinland Bates US0141101 | 406 |
| Exhibit 236 | 3/14/66 Department of the Air Force Special Order G-9 Bates US0141104 - US0141105 | 406 |
| Exhibit 237 | 4/13/66 Letter from Roger J. Weinland Bates US0141102 | 406 |
| Exhibit 238 | June 1942 Telegrams Bates TDYRYAN20034186 - TDYRYAN20034188 | 417 |
| Exhibit 239 | 3/1/46 Letter from W.O. Locke Bates US0060140 | 422 |
| Exhibit 240 | 9/25/46 Letter Bates US0010962 - US0010964 | 422 |
| Exhibit 241 | 8/23/48 Document from Bill Wagner Bates US2002047 | 422 |
| Exhibit 242 | 3/21/60 Letter from R.R. Schwanhausser Bates TDYRYAN00003499 - TDYRYAN00003500 | 422 |
| Exhibit 243 | 5/1/67 Ryan Aeronautical Company Aerospace Systems Bidding Operations Plan 67-30(A) Bates TDYRYAN20015035 - TDYRYAN20015079 | 422 |

Page 333

Pages 330 to 333

```
1          DEPOSITION EXHIBITS
              TOMMY B. JORDAN
2               October 14, 2011
3
     NUMBER        DESCRIPTION        MARKED
4
     Exhibit 244  6/3/76 Teledyne Ryan        422
5         Aeronautical Inter-Department
          Correspondence from B.J.
6         Shillito
          Bates US0155575
7    Exhibit 245  5/28/79 Letter from E.D. Menard  422
          Bates US0039811 - US0039813
8    Exhibit 246  October 1985 Comments on      422
          Operations
9         Bates TDYRYAN20013632 -
          TDYRYAN20013634
10   Exhibit 247  12/6/93 Letter from Robert A.K.  422
          Mitchell
11        Bates TDYRYAN20053773 -
          TDYRYAN20053774
12   Exhibit 248  8/26/80 Letter from E.C.       426
          Chapman, Jr.
13        Bates TDYRYAN20058647 -
14        TDYRYAN20058648
15   Exhibit 249  12/3/80 Memorandum from R.S.    426
16        McCarter
17        Bates TDYRYAN20056146 -
18        TDYRYAN20056147
19   Exhibit 250  4/8/93 Letter               426
20        Bates MDHC000864 - MDHC0000866
21   Exhibit 251  Complaint for Breach of Contract  426
22        Bates US0025819 - US0025832
                                        Page 334
```

```
1                 PROCEEDINGS
2         THE VIDEOGRAPHER:  This is the start
3    of the deposition for Tommy B. Jordan, Volume 3.
4    Today is Friday, October 14th, 2011.  The time on
5    record now is 9:56.
6            TOMMY B. JORDAN
7    having been previously sworn, continued to testify
8    as follows:
9         EXAMINATION (CONTINUED)
10   BY MR. BARR:
11       Q.  Good morning, Mr. Jordan.
12       A.  Good morning.
13       Q.  I'd like to start today by tying up some
14   loose ends from the prior two days of your
15   testimony in this matter.  And to do that, I'd like
16   the court reporter to mark a 1971 contract between
17   the Navy and TRA.
18           (Exhibit No. 199 marked)
19   BY MR. BARR:
20       Q.  Mr. Jordan, I'm going to hand you that.
21   I have tabbed some pages near the beginning, and if
22   you would take a moment to review those pages
                                        Page 335
```

```
1    ending in Bates numbers 87000 and 87002 and 3.
2         MR. WINE:  While the witness is
3    reviewing the referenced pages, I'll note for the
4    record that TDY objects on the basis of foundation.
5         A.  Okay.
6    BY MR. BARR:
7         Q.  Mr. Jordan, are you generally familiar
8    with the nature and format and contents of a
9    contract like this?
10        A.  Yes, I am.
11        Q.  Mr. Jordan, I have flagged pages which
12   have references to provisions relating to
13   inspection of progress payments and military
14   security.  Do you see those?
15        A.  Yes, I do.
16        Q.  Based on your experience, were those
17   standardized provisions?
18        MR. WINE:  Objection, calls for a
19   legal conclusion.
20        A.  Yes, they were.
21   BY MR. BARR:
22        Q.  Now, one of the questions I have, if you
                                        Page 336
```

```
1    would look on Page 87000, the reference to progress
2    payment, Section F-12.
3         A.  Yes.
4         Q.  What does that parenthetical refer to
5    where it says, "(1969 DEC)"?
6         MR. WINE:  Objection, the document
7    speaks for itself.
8         A.  That is the edition of the Armed
9    Services Procurement Regulation from which that
10   clause came.
11   BY MR. BARR:
12        Q.  That was Exhibit 195?
13        A.  199.
14        Q.  199.  Thank you.
15        MR. BARR:  In addition, I'd like to
16   mark as the next exhibit the 1976 edition of
17   Appendix B of the Armed Services Procurement
18   Regulations.
19        MR. WINE:  And we'll note for the
20   record the same objections that you -- that TDY
21   raised with respect to other ASPR excerpts, as well
22   as specifically to the ASPRs relating to Appendix B
                                        Page 337
```

Pages 334 to 337

1  previously sought to be introduced by Counsel for
2  the United States.
3        (Exhibit No. 200 marked)
4  BY MR. BARR:
5     Q.   If you would, take a moment, Mr. Jordan,
6  to take a look at that.  I've tabbed a couple of
7  pages, Pages 64768 and 6479 -- excuse me -- 791.
8        Mr. Jordan, based on your knowledge and
9  experience as a government contracting officer, do
10 you recognize this as Appendix B to the ASPRs as of
11 1976?
12       MR. WINE:  Objection, the document
13 speaks for itself.
14    A.   Yes, I do.
15 BY MR. BARR:
16    Q.   Does this government -- does this
17 document, what we've marked as Exhibit 200, relate
18 to your opinions pertaining to property
19 administrators and the contractor's obligations
20 concerning maintenance and care of government
21 property?
22       MR. WINE:  Objection to the extent

                                        Page 338

1  that those opinions have not been defined in this
2  matter -- in this deposition or in the witness'
3  expert report.  We object as vague and ambiguous.
4     A.   Yes, they do.
5  BY MR. BARR:
6     Q.   Mr. Jordan, do you recall discussing the
7  duties and responsibilities of property
8  administrators on Wednesday?
9     A.   Yes, I do.
10    Q.   And the same question as to contractor
11 maintenance and care of government property.  Do
12 you recall discussing that subject on Wednesday?
13       MR. WINE:  Same objections.
14    A.   Yes, I do.
15 BY MR. BARR:
16    Q.   The next document I'd like you to look
17 at -- and we'll mark this -- I guess this is
18 Exhibit 201.
19       (Exhibit No. 201 marked)
20 BY MR. BARR:
21    Q.   Mr. Jordan, this is a filing by the Ryan
22 Aeronautical Company with the Securities and

                                        Page 339

1  Exchange Commission in June of 1959.  I have
2  directed your attention through tape flags to
3  Pages 2037, 2 -- 2039, and 2041.
4        MR. WINE:  While the witness is
5  reviewing the document, TDY objects on the basis of
6  foundation.  Also, it exceeds the scope of the
7  witness' expert report and is, as such,
8  inadmissible.  It also exceeds the witness' area of
9  expertise.
10 BY MR. BARR:
11    Q.   Mr. Jordan, was this one of the
12 documents that you consulted in the course of your
13 expert work in this case concerning the company's
14 use of facilities contracts as well as the nature
15 and extent of their subcontracting work?
16    A.   Yes, it was.
17       MR. WINE:  Is that the extent of the
18 questions on that document?
19       MR. BARR:  Yes, for now.
20       THE REPORTER:  I'm sorry.  I didn't
21 hear you.
22       MR. WINE:  I asked if that was the

                                        Page 340

1  extent of questions on that document.
2  BY MR. BARR:
3     Q.   Okay.  Mr. Jordan, I'm going to place in
4  front of you a one-page document produced by TDY in
5  this litigation.  It's an October 17, 1944
6  memorandum -- a Navy memorandum.  And because of
7  the poor legibility of the document, we had it --
8  it was retyped into your supplemental report.
9        So I'm going to place the supplemental
10 report, which has been marked as Exhibit 3 in this
11 deposition, in front of you, along with this
12 exhibit.
13       (Exhibit No. 202 marked)
14       MR. WINE:  While the witness is
15 reviewing the document, we'll object on the basis
16 of foundation.
17    A.   Okay.
18 BY MR. BARR:
19    Q.   Now, Mr. Jordan, do you recall that
20 Dr. Carlisle referred to this document in his
21 expert report in this matter?
22       MR. WINE:  Objection to the extent

                                        Page 341

                                 Pages 338 to 341

10/14/2011                    TDY Holdings v. United States of America                    Tommy Jordan

| | |
|---|---|
| 1  it assumes facts not in evidence. | 1      MR. WINE:  Same objections. |
| 2      A.   Yes, I do. | 2      A.   Technical control, as used throughout |
| 3  BY MR. BARR: | 3  this -- this case, refers to control of the |
| 4      Q.   And in your opinion based on your | 4  technical aspects of the product and not of the |
| 5  knowledge of government contracting, does the | 5  contractor's operation. |
| 6  memorandum suggest that the Navy was exerting | 6  BY MR. BARR: |
| 7  control over all activities of the entire company | 7      Q.   And when you say the "technical |
| 8  during the war? | 8  aspects," what kind of technical aspects? |
| 9      MR. WINE:  Objection, lack of | 9      MR. WINE:  Same objections.  Also, |
| 10 foundation, exceeds the area of expertise of the | 10 assumes facts not in evidence. |
| 11 witness and, therefore, is inadmissible.  It also | 11     A.   Performance of the product and its |
| 12 calls for a legal conclusion. | 12 capability to meet the military requirements. |
| 13     A.   Based upon my experience and training, | 13 BY MR. BARR: |
| 14 it does not connotate or infer that the government | 14     Q.   Are these -- is another way to put that |
| 15 had control of all aspects of the contractor's | 15 design qualities? |
| 16 operation. | 16     MR. WINE:  Objection, leading. |
| 17 BY MR. BARR: | 17     A.   Yes, it is. |
| 18     Q.   Now, Dr. Carlisle referred to the phrase | 18 BY MR. BARR: |
| 19 in Paragraph 2 "direct technical control" in | 19     Q.   And is -- is that consistent with your |
| 20 support of his position on the subject.  Do you | 20 experience in the course of your career? |
| 21 recall that? | 21     MR. WINE:  Again, objection.  The |
| 22     A.   Yes, I do. | 22 witness does not have experience from the World |
| Page 342 | Page 344 |

| | |
|---|---|
| 1      MR. WINE:  That assumes facts not in | 1  War II era. |
| 2  evidence. | 2      A.   Absolutely consistent. |
| 3  BY MR. BARR: | 3  BY MR. BARR: |
| 4      Q.   Now, in your opinion, do you believe | 4      Q.   Okay.  Now, on Wednesday the 12th, we |
| 5  that Dr. Carlisle -- and again, based on your | 5  were talking about the issues pertaining to the |
| 6  experience as a government contracting officer, do | 6  passage of title to the government under both cost |
| 7  you believe that Dr. Carlisle has interpreted this | 7  reimbursement and fixed price contracts with |
| 8  document correctly? | 8  progress payments. |
| 9      MR. WINE:  Again, assumes facts not | 9      Do you recall that discussion? |
| 10 in evidence.  It's beyond the area of expertise. | 10     A.   Yes, I do. |
| 11 Dr. Carlisle has offered opinion testimony as a | 11     Q.   Did you encounter in your work in this |
| 12 historian, and the witness has admitted he has no | 12 matter a document authored by a TRA vice president |
| 13 training as a historian. | 13 stating their views on those subjects? |
| 14      Also, the document was authored at a | 14     MR. WINE:  Again, we'll object as |
| 15 time that predated the witness' tenure in | 15 the testimony sought to be elicited by Counsel |
| 16 government contracting and, therefore, he lacks | 16 exceeds the scope of the witness' expert report and |
| 17 sufficient knowledge on which to opine. | 17 is, therefore, inadmissible. |
| 18     A.   I do not believe that Dr. Carlisle | 18     A.   Yes, I did. |
| 19 interpreted correctly. | 19      (Exhibit No. 203 marked) |
| 20 BY MR. BARR: | 20     MR. WINE:  While the witness is |
| 21     Q.   And could you explain why you believe he | 21 reviewing the document, we'll object on the basis |
| 22 is wrong? | 22 of foundation, also hearsay. |
| Page 343 | Page 345 |

Pages 342 to 345

BY MR. BARR:

Q.   Mr. Jordan, have you finished looking over this document?

A.   Yes, I have.

Q.   Is this the document that you had in mind?

MR. WINE:  Same objections.

A.   Yes, it is.

BY MR. BARR:

Q.   Did this, in your opinion, set out TRA's views as to cost reimbursement and fixed price contracts regarding the passage of title of property to the government?

MR. WINE:  Objection, calls for speculation, hearsay, foundation, calls for a legal conclusion, exceeds the witness' area of expertise and exceeds the opinions upon which he opined or offered in his expert report and, therefore, is inadmissible.

A.   Yes, it does.

BY MR. BARR:

Q.   And to summarize so that the Court can

Page 346

get a better sense of the significance of the document, does this summarize TRA's views as to when title passed to the government on various aspects of inventory?

MR. WINE:  Objection.  The witness is not qualified to testify regarding TRA's views on anything, nor is a summary appropriate.  If Counsel wishes to ask him questions about a document, the document speaks for itself, and he can read it.

But to summarize a document for which he was not an author and his only qualification is that he has read the document does not allow him to testify on it.  It would be inadmissible hearsay and, therefore, not admissible through his testimony at this time.

A.   Yes, it does.

BY MR. BARR:

Q.   All right.  Thank you, Mr. Jordan.  Okay.  Let's change subjects.  I'd like to talk now about military contract specifications.

Are you aware of TDY's argument in this

Page 347

case relating to military control over company operations through the use of specifications?

MR. WINE:  Object to the extent that it mischaracterizes TDY's position in this matter.

A.   Yes, I am.

BY MR. BARR:

Q.   In your opinion, based on your experience for 30-plus years, do you believe that claim is consistent or inconsistent with your knowledge and experience?

MR. WINE:  Calls for a legal conclusion, ultimate issue of fact and law for the Court to decide.

A.   Based upon my experience and training in government contracts, it is inconsistent with my understanding and knowledge of government contracts.

BY MR. BARR:

Q.   Now, again, based on your training and experience, what is your understanding of the term "specifications" in the context of defense contracting?

Page 348

A.   Specification is used to define the technical -- technological base, if you will, for the product being produced.  It establishes the framework to control the contractor's technical production of the contract.

It does not in any way, shape, form, or fashion tell a contractor how to manage his workforce or how to manage his company, but it does establish a basis for which the contractor and the government can understand the duties and responsibilities of a contractor from a technical standpoint.

Q.   Now, is the understanding -- based on documents that you have seen and your training when you first came to the Air Force, was the basic nature of specifications any different during the World War II period?

MR. WINE:  Objection.  The witness lacks expertise in the area in the sense -- to the extent that he began his tenure as a federal employee roughly a decade after the end of World War II.

Page 349

Pages 346 to 349

10/14/2011                     TDY Holdings v. United States of America                     Tommy Jordan

1      A.   Based upon the documents that I have
2    read, the scope and intent of specifications during
3    World War II was the same as it was during --
4    throughout my entire career in the federal
5    government.
6    BY MR. BARR:
7      Q.   Now, when you came to the Air Force
8    through your basic training course and the
9    instructions of the more experienced contracting
10   officers in the Air Force, did you have reference
11   in that training to materials that predated your
12   arrival?
13     A.   Yes, I did.  And the contracting
14   officers under whom -- tutelage I worked when I was
15   a trainee, to the best of my knowledge, they were
16   employees of the federal government and in the
17   contracting process during and subsequent to World
18   War II.
19     Q.   Now, if you could, explain for the Court
20   why and how the government uses specifications in
21   defense contracting.
22           MR. WINE:  Objection to the extent

Page 350

1    it calls for a legal conclusion.
2      A.   As I indicated both Wednesday and few
3    minutes ago, it used specifications to establish
4    the technical parameters of the product being
5    produced.  It established the requirements from a
6    technical standpoint based upon form, fit,
7    function, and performance of the product being
8    produced by the contractor and its capabilities of
9    meeting the stated military purpose of the
10   contract.
11   BY MR. BARR:
12     Q.   Now, what, if any, role does
13   standardization play in the use of specifications?
14     A.   It plays a very significant role because
15   a lot of the products are used in relation to other
16   products in the military inventory.  And absent
17   standardization, you would not have what they call
18   interoperability of products.  One product would
19   not be capable of being used with other products in
20   the Air Force -- or the military inventory.
21     Q.   And this concept of standardization,
22   does it apply across different contractors as well?

Page 351

1      A.   Because the specifications are never
2    written for one specific contractor or one specific
3    product, yes, they are applicable nationwide to all
4    contractors being -- or under contract to produce
5    products.  And to the best of my knowledge, most
6    specifications used by the military are predicated
7    upon best industry standards, and they do have a
8    commercial counterpart.
9      Q.   Now, in addition to your training and
10   experience in the course of your career as a
11   government contracting officer, have you reviewed
12   documents in the course of this litigation which
13   further support your views?
14     A.   Yes, I have.
15           (Exhibit Nos. 204 through 206
16   marked)
17           MR. WINE:  While the witness is
18   reviewing the document, we'll object on the basis
19   of foundation.  We'll also object to these
20   documents and assert the same line of objections
21   that we have asserted to the government's attempt
22   to admit excerpts of ASPRs over the last -- over

Page 352

1    the course of the last three days.
2    BY MR. BARR:
3      Q.   Mr. Jordan, have you finished reviewing
4    these documents?
5      A.   Yes, I have.
6      Q.   Looking at them as a group and directing
7    your attention in particular to Exhibit 206, the
8    fabrication manual.
9      A.   Okay.
10     Q.   You see I've tabbed a page.  I believe
11   it's 298.
12          Do you see the definition in that
13   document pertaining to specifications?
14           MR. WINE:  298 of that document is
15   Chapter 1, "Engineering Drawings, Specifications,
16   and Planning."
17     A.   I think it's 299.
18   BY MR. BARR:
19     Q.   Try 299.
20           MR. WINE:  We'll object to the use
21   of this document as hearsay to the extent that it
22   is a corporate document of Teledyne Ryan

Page 353

Pages 350 to 353

1  Aeronautical of which the witness does not have
2  authorship or receiver status and, therefore, the
3  document constitutes hearsay.
4  BY MR. BARR:
5      Q.   If you would -- in your opinion based on
6  your knowledge and training in government
7  contracting and experience, is the TRA definition
8  of specifications comparable in substance to the
9  definition in the other documents that I've given
10 you?
11     A.   Yes, it is.
12     Q.   And, for the record, if you'd look at
13 Page 302, it's a sample form used by TRA.  Do you
14 see a date on that document?
15         MR. WINE:  Object -- objection to
16 the extent it mischaracterizes the document and
17 assumes facts not in evidence.
18     A.   Yes, I do.
19 BY MR. BARR:
20     Q.   And what is that date?
21     A.   5/19/90.
22     Q.   Okay.  Now, with respect to

Page 354

1  contractors and the using commands?
2          MR. WINE:  Objection, assumes facts
3  not in evidence.  The witness has never testified
4  that he was involved in the development of mil
5  specs and, therefore, the testimony sought exceeds
6  his area of expertise.
7      A.   The purpose was to solicit comments from
8  those activities that used those specifications in
9  an effort to assure the continual improvement of
10 the specifications and to eliminate any
11 inconsistencies or ambiguities that were
12 incorporated into earlier editions of the
13 specifications.
14 BY MR. BARR:
15     Q.   And how did you come by this knowledge?
16     A.   There is a form that we appended to
17 every solicitation that could be used by the users
18 to submit their comments to the agency that was
19 responsible for preparation of that particular
20 specification.
21     Q.   And you did that in the course of your
22 work as a government contracting officer?

Page 356

1  specifications in general -- and we're going to
2  mark a number of specifications in a moment that
3  are pertinent in this case.  But we talked about
4  standardization a moment ago in the context of
5  government -- of military specifications.
6          In the course of your experience, has
7  the military in developing and revising its
8  specifications sought input from users of those
9  specifications?
10     A.   Yes, they have.
11     Q.   And when we say "users of those
12 specifications," what -- who comes to mind when we
13 use that phrase, "users of the specifications"?
14         MR. WINE:  Objection, leading.
15     A.   The government solicited input from
16 contractors who used those specifications as well
17 as from the using commands that employed those
18 products produced as the specifications in the
19 field.
20 BY MR. BARR:
21     Q.   And what was the objective, based on
22 your experience, in seeking input from the defense

Page 355

1      A.   Yes, I did.
2          MR. BARR:  Is there a technical
3  problem?
4          MR. WINE:  Yeah.  Our last entry is
5  10:27:04.
6          MR. BARR:  Do we need to take a
7  break?
8          THE VIDEOGRAPHER:  Going off record.
9  The time now is 10:28.
10         (Recess:  10:28 a.m. to 10:31 a.m.)
11         THE VIDEOGRAPHER:  We're going back
12 on record.  The time now is 10:31.
13 BY MR. BARR:
14     Q.   Now, with respect further to the use of
15 specifications in the course of your early training
16 when you came to the Air Force, did you learn about
17 an early use of specifications in aviation?
18         MR. WINE:  Objection.
19     A.   Yes, I did.
20 BY MR. BARR:
21     Q.   What was that example that you learned
22 about?

Page 357

Pages 354 to 357

10/14/2011                  TDY Holdings v. United States of America                  Tommy Jordan

1      A.   The earliest example that I was aware of
2   was the contract for procurement of the first
3   heavier-than-air machine from the Wright brothers.
4      Q.   And is that that 1908 contract that we
5   referred to earlier in this depo testimony?
6      A.   Yes, it is.
7      Q.   And you became aware of that during your
8   training course?
9      A.   Yes, I did.
10     Q.   Did your training course trace the use
11  of specifications in the -- generally during the
12  time period between 1908 and the time you came to
13  the Air Force?
14     A.   To the best of my recollection, yes, it
15  did.
16         THE WITNESS:  Pardon me.  I think
17  you gave them the wrong copy.
18         MR. BARR:  Oh, I beg your pardon.
19         MR. MATEER:  Sorry.  I'm fast.
20         MR. BARR:  You can just put the
21  sticker over that.  Do we have another one?
22         MR. WINE:  Why don't you just take

Page 358

1   the tab off?
2          MR. BARR:  Good idea.  Even better.
3          (Exhibit Nos. 207 through 217
4   marked)
5          MR. WINE:  For the purposes of the
6   record, while --
7          MR. BARR:  Go ahead.
8          MR. WINE:  -- while the witness is
9   reviewing the documents, TDY will assert the same
10  objections with respect to Exhibits 207 through
11  26 -- no, I'm sorry -- 217 that it has asserted
12  with respect to excerpts of ASPRs.
13  BY MR. BARR:
14     Q.   Mr. Jordan, if you would, look briefly
15  through those exhibits, and I'll ask you if you
16  have reviewed them in the context of your expert
17  work in this case.
18     A.   Yes, I have previously reviewed these
19  documents.
20     Q.   Now, considering these as a group, do
21  any of these military specifications refer to any
22  government responsibilities for the handling,

Page 359

1   control, or use of chemicals in the Ryan or TRA
2   processes?
3          MR. WINE:  Objection, documents
4   speak for themselves and calls for a legal
5   conclusion.
6      A.   No, they do not.
7   BY MR. BARR:
8      Q.   Do any of these military specifications
9   refer to any government responsibilities relating
10  to the disposal of chemical waste from those
11  processes?
12         MR. WINE:  Same objection.
13     A.   No, they do not.
14  BY MR. BARR:
15     Q.   Do any of these military specifications
16  refer to any government responsibilities to
17  supervise or direct Ryan or TRA personnel who did
18  perform the actions that we have just talked about
19  in the last two questions?
20         MR. WINE:  Same objections.
21     A.   No, they do not.
22

Page 360

1   BY MR. BARR:
2      Q.   Have you encountered any other military
3   specifications in the record in this case which do
4   include any of these -- any such government
5   responsibilities?
6          MR. WINE:  Same objection.
7      A.   I have not.
8   BY MR. BARR:
9      Q.   And, likewise, have you encountered any
10  military specifications or manuals of any kind that
11  directed or provided instructions for Ryan's or
12  TRA's handling of any PCB containing fluids
13  discharged from any machinery or equipment at the
14  Harbor Drive plant --
15         MR. WINE:  Same --
16  BY MR. BARR:
17     Q.   -- during or after World War II?
18         MR. WINE:  Same objections.
19     A.   No, I have not.
20         MR. WINE:  I also just want to note
21  for the record that the mil specs represented at
22  207 through 217 deal exclusively with chemical

Page 361

Pages 358 to 361

1    conversion coatings on -- hold on one second.
2          MR. BARR:  No, they don't.
3          MR. WINE:  Let me make sure --
4    surface treatments in metallic coatings for
5    metallic surfaces or weapon systems.  Therefore, to
6    the extent that representations are being made with
7    respect to all mil specs in general in this matter
8    through the use of a subset of mil specs, we object
9    on that basis.
10   BY MR. BARR:
11        Q.   Mr. Jordan, with respect -- harkening
12   back now to MPDs.  Do you recall we discussed MPDs
13   to some extent yesterday?
14        A.   Yes, I recall.
15        Q.   Let me show you what was marked as
16   Exhibit 136.  I'll direct your attention to page --
17   with the -- ending with the Bates number 597 and
18   the paragraph which appears to be 4.5-1 relating to
19   equipment control.
20        A.   Okay.
21        MR. WINE:  Again, for the record, we
22   assert the same objections with respect to the

                                                    Page 362

1    introduction of this document.  The document is a
2    TRA document.  So there's a lack of foundation to
3    introduce this document via this witness.  Also --
4    go ahead.  We'll assert further objections later.
5    BY MR. BARR:
6         Q.   Mr. Jordan, have you -- have you seen
7    provisions similar to the one to which I've
8    directed your attention in other MPDs of this
9    company?
10        MR. WINE:  Same objections.
11        A.   Yes, I have.
12   BY MR. BARR:
13        Q.   And could you direct the Court's
14   attention to the language which pertains to who is
15   responsible for the operation of process equipment?
16        MR. WINE:  Objection to the extent
17   it attempts to characterize the document outside of
18   its context, lack of foundation, the document
19   speaks for itself.
20        A.   It is the contractor's department that
21   is operating the equipment -- or the processes
22   responsible for the equipment.

                                                    Page 363

1          MR. WINE:  Same objections to the
2    response.
3    BY MR. BARR:
4         Q.   Mr. Jordan, I'll take that exhibit back
5    from you, if you don't mind.
6          MR. WINE:  Also, for purposes of the
7    record, to the extent that the document and the
8    witness' testimony related thereto exceeds the
9    scope of the witness' expert report, it is
10   inadmissible as such.
11   BY MR. BARR:
12        Q.   Let's change topics, Mr. Jordan.  Let's
13   talk about company obligations regarding government
14   owned equipment.
15        A.   Okay.
16        Q.   We've touched on that subject from time
17   to time in the course of the last two days of your
18   testimony, but I'd like to explore that a little
19   further with you.
20        Did you determine in your review of
21   documents and testimony in this case whether Ryan
22   was solely responsible for repair and maintenance

                                                    Page 364

1    of government owned machine tools and equipment in
2    their possession during World War II?
3          MR. WINE:  Objection, calls for a
4    legal conclusion.
5         A.   Yes, I did.
6    BY MR. BARR:
7         Q.   And do you recall a particular document
8    which -- on which you drew in reaching that
9    conclusion?
10        A.   Yes, I did.
11        Q.   Let me show you what we'll have marked
12   as the exhibit next in order, a May 12, 1942
13   agreement of lease between the Defense Plant
14   Corporation and the Ryan Aeronautical Company.
15        (Exhibit No. 218 marked)
16        MR. WINE:  Again, we'll object on
17   the basis of lack of foundation and to the extent
18   it's interpreting a legal document calling for a
19   legal conclusion.
20   BY MR. BARR:
21        Q.   Mr. Jordan, I'll direct your attention
22   to the page with the Bates number ending in 54,

                                                    Page 365

                                          Pages 362 to 365

1   Paragraph 15.
2       A.   Okay.
3       Q.   Is this the provision that you had in
4   mind regarding the nature and extent of Ryan's
5   responsibilities?
6           MR. WINE:  Objection, leading.
7       A.   Yes, it is.
8           MR. WINE:  Again, the document
9   speaks for itself as well.
10  BY MR. BARR:
11      Q.   Is this -- is part -- the provision that
12  we've discussed here, is that essentially the same,
13  in sum and substance, as provisions that you
14  encountered relating to contractor obligations for
15  government facilities in the post-war period?
16          MR. WINE:  Objection.
17      A.   Yes, it is.
18  BY MR. BARR:
19      Q.   And does that include the facilities
20  contract -- the 1967 facilities contract that we
21  looked at the other day?
22          MR. WINE:  Same objection, assumes

Page 366

1   facts not in evidence.
2       A.   Yes, it is.
3           MR. WINE:  Also, to the extent that
4   the referenced provision is being introduced or
5   offered for dealing with repair and maintenance,
6   the clause is silent on such.
7   BY MR. BARR:
8       Q.   Now, do you recall, Mr. Jordan, that we
9   looked at a number of ASPR provisions pertaining to
10  cost reimbursement contracts and -- do you recall
11  that, Mr. Jordan?
12          MR. WINE:  Objection, assumes facts
13  not in evidence, vague and ambiguous.
14      A.   Yes, I do.
15  BY MR. BARR:
16      Q.   Let me show you what were previously
17  marked as Exhibits 26, 27, 28, 29, and 30, and I'll
18  direct your attention to the pages on which I've
19  placed tape flags.
20          MR. BARR:  For the record, in 26,
21  these appear on Pages 87, 88, and 90; on 27, they
22  appear on 112 and 114; on 28, the tape flags appear

Page 367

1   on 141 and 143; on 29, they appear on Pages 194,
2   195, and 197; and on Exhibit 30, they appear on
3   Pages 256, 257, and 259.
4           MR. WINE:  TDY reasserts the same
5   objections raised when these documents were
6   introduced on day one and also objects on the basis
7   of leading with respect to the specific references
8   to particular page numbers.
9           MR. BARR:  We can go off the record.
10          THE VIDEOGRAPHER:  Going off record.
11  The time now is 10:52.
12          (Recess 10:52 a.m. to 10:55 a.m.)
13          THE VIDEOGRAPHER:  Going back on
14  record.  The time now is 10:55.
15  BY MR. BARR:
16      Q.   Mr. Jordan, you've had a chance to
17  review the portions that I mentioned in Exhibits 26
18  through 30.  Can you summarize the topics that
19  those portions relate to?
20          MR. WINE:  Objection, the documents
21  speak for themselves.
22      A.   The first portion pertains to the

Page 368

1   contract responsibility for maintaining the
2   facilities provided to it as far as sound and
3   industrial practices.  It is consistent throughout
4   the entire period.
5           The second provision that was marked
6   refers to a requirement placed upon the contractor
7   for preparation of an inventory of all government
8   property provided to it that was not consumed in
9   the production of the end product.
10  BY MR. BARR:
11      Q.   And are there also title provisions
12  tabbed in the documents that I handed you?
13      A.   Yes, there --
14          MR. WINE:  Objection, leading.
15      A.   Yes, there are.
16  BY MR. BARR:
17      Q.   And is the -- are those provisions
18  consistent over time as well?
19      A.   Yes, they are.
20      Q.   All right.  May I have those back,
21  please?  Thank you.
22          All right.  I'd like to mark additional

Page 369

Pages 366 to 369

1  exhibits on the subject of these cost reimbursement
2  provisions in the ASPRs over time.  And I will have
3  these marked and then ask you some questions about
4  them.
5          (Exhibit Nos. 219 through 222
6  marked)
7  BY MR. BARR:
8      Q.   Mr. Jordan, just for the record, on
9  Exhibit 219, I put tape flags on Pages 157, 158; on
10  Exhibit 220, on Pages 163, 165, and 166; on 221, on
11  Pages 169, 170, and 172; on Exhibit 222, on
12  Pages 174, 175, and 177.
13          MR. WINE:  While the witness is
14  reviewing the documents, TDY asserts the same
15  objections that it's asserted throughout this
16  deposition regarding the introduction of excerpts
17  of ASPRs for disparate periods of time.
18          MR. BARR:  We can go off the record.
19          THE VIDEOGRAPHER:  Going off the
20  record.  The time now is 11:00 a.m.
21          (Recess:  11:00 a.m. to 11:02 a.m.)
22          THE VIDEOGRAPHER:  Going back on the

Page 370

1  record.  The time now is 11:02.
2  BY MR. BARR:
3      Q.   Mr. Jordan, have you had a chance to
4  review what we've marked as -- I believe this is --
5          MR. WINE:  219 to 222.
6  BY MR. BARR:
7      Q.   -- 219 to 222.
8          MR. BARR:  Thank you.
9      A.   Yes.  Yes, I have.
10  BY MR. BARR:
11      Q.   Do these also relate -- as far as what I
12  have directed your attention to, do these also
13  relate to cost reimbursement contracts?
14          MR. WINE:  Objection, leading.
15      A.   Yes, they do.
16  BY MR. BARR:
17      Q.   Do these also relate -- the portions to
18  which I have directed your attention relate to
19  title, contractor obligations regarding government
20  property, and the handling of government property
21  upon contract completion?
22      A.   Yes, they do.

Page 371

1          MR. WINE:  Objection, leading.
2  BY MR. BARR:
3      Q.   Were you familiar with these provisions
4  during the course of your government contracting
5  career?
6      A.   Yes, I was.
7      Q.   And in your opinion, are these the same
8  or similar in substance to the earlier provisions
9  relating to cost reimbursement contracts that we
10  looked at here?
11          MR. WINE:  Objection, calls for a
12  legal conclusion, lacks foundation, exceeds the
13  area of expertise of the witness, and exceeds his
14  expert report.
15      A.   In my opinion they are consistent.
16          MR. WINE:  Also assumes facts not in
17  evidence.
18  BY MR. BARR:
19      Q.   Now, in terms of your experience in the
20  context of government contracting, your training,
21  your experience, who was responsible for inspecting
22  government owned machinery and equipment in the

Page 372

1  hands of a contractor to determine whether the
2  contractor was maintaining that machinery and
3  equipment properly?
4          MR. WINE:  Assumes facts not in
5  evidence.
6      A.   It was the responsibility of the
7  contractor to do that inspection.
8  BY MR. BARR:
9      Q.   And during your time as a government
10  contracting officer, did the government have a
11  policy as to the maintenance of contractor property
12  control records?
13      A.   Yes, they did.
14      Q.   And what was that policy?
15      A.   The official contract records would be
16  considered to be the contractor-maintained records.
17  The government did not maintain a separate set of
18  records or books, if you will, of property
19  furnished to the contractors -- government
20  furnished property.  We relied upon the
21  contractors' records as the official contract
22  records.

Page 373

Pages 370 to 373

1    MR. BARR:  All right.  I think this
2  would be a good time for us to take our first
3  break.
4    THE VIDEOGRAPHER:  Going off the
5  record.  The time now is 11:06.
6    (Recess:  11:06 a.m. to 11:20 a.m.)
7    THE VIDEOGRAPHER:  Going back on the
8  record.  The time now is 11:20.
9  BY MR. BARR:
10    Q.  Mr. Jordan, before we broke, we were
11  talking about contractor obligations pertaining to
12  government property.  Do you recall that?
13    A.  Yes, I do.
14    Q.  Let me have you review the next exhibit.
15  Again, this is an excerpt from the 1976 ASPRs.
16    (Exhibit No. 223 marked)
17    MR. WINE:  What page is Counsel
18  designating?
19  BY MR. BARR:
20    Q.  Mr. Jordan, I have put a tape flag on
21  the page ending with the Bates number 60.  I'm
22  directing your attention to Paragraph 7-702.6.

Page 374

1  not in evidence and misinterprets the document --
2  mischaracterizes the document.
3    A.  It speaks specifically to facilities,
4  not all government property.
5  BY MR. BARR:
6    Q.  Okay.  And is this consistent with your
7  understanding as to contractor obligations for
8  inspection of government facilities and the
9  government's actions on this subject?
10    A.  Yes --
11    MR. WINE:  Objection.  It
12  mischaracterizes the document.
13    A.  Yes, it does.
14    MR. WINE:  Assumes facts not in
15  evidence.
16    MR. BARR:  Off the record for one
17  moment, please.
18    THE VIDEOGRAPHER:  Going off the
19  record.  The time is 11:24.
20    (Recess 11:24 a.m. to 11:24 a.m.)
21    THE VIDEOGRAPHER:  Going back on the
22  record.  The time now is 11:24.

Page 376

1    MR. WINE:  TDY asserts the same
2  objection with respect to this ASPR excerpt.
3    A.  Okay.
4  BY MR. BARR:
5    Q.  Now, do you see the parenthetical next
6  to the title word "Inspection"?  It says, "1964
7  SEP"?
8    A.  Yes, I do.
9    Q.  Again, what does that refer to?
10    A.  That is the date of the Armed Services
11  Procurement Regulation from which this particular
12  clause came from.
13    Q.  Does that indicate that it was the same
14  provision that existed between September 1964 and
15  this 1976 version?
16    A.  Yes, it does.
17    Q.  And is this Provision 7-702.6, is that
18  consistent with your understanding as to contractor
19  obligations for inspection of government property
20  and the government's obligations or
21  responsibilities in this subject?
22    MR. WINE:  Objection, assumes facts

Page 375

1  BY MR. BARR:
2    Q.  All right.  Now, we've spoken about
3  government inspection personnel and their
4  responsibilities.  Let's look at the other side of
5  the coin and Ryan's and TRA's quality control
6  department obligations.
7    Based on your experience and training
8  during the time you were a government contracting
9  officer, who, as between the government and the
10  contractor, had responsibility for proper
11  inspection of their products and processes?
12    MR. WINE:  Objection, vague and
13  ambiguous with respect to the use of the word -- or
14  term "proper inspection," calls for a legal
15  conclusion.
16    A.  It was the responsibility of the
17  contractor to maintain an inspection system and to
18  maintain documentation of the inspections conducted
19  by the contractor.
20  BY MR. BARR:
21    Q.  And did you encounter documents in this
22  case, some of which we've marked already -- did you

Page 377

Pages 374 to 377

1   encounter documents in this case that indicated
2   that Ryan and TRA complied with those obligations?
3         MR. WINE:  Objection, leading.
4   A.  Yes, I did.
5   BY MR. BARR:
6   Q.   Do you recall the nature of those
7   documents?
8   A.   There were some various reports that had
9   been prepared concerning the contractor's
10  operations, and they concluded that the contractor
11  had conducted proper inspection.
12  Q.   Were these Air Force reports?
13  A.   To the best of my recollection, yes,
14  they were.
15  Q.   Based on the Air Force reports that you
16  recall reviewing, do you have a general sense as to
17  how many Ryan inspection personnel were in its
18  quality control division in -- in, we'll say, the
19  1950s?
20        MR. WINE:  Objection, assumes facts
21  not in evidence, calls for speculation.
22  A.   The reports that I've read indicated, to

Page 378

1   the best of my recollection, that the number of
2   Ryan inspectors was somewhere between 250 and 600.
3         MR. BARR:  Let's go off the record,
4   please.
5         THE VIDEOGRAPHER:  We're going off
6   the record.  The time now is 11:28.
7         (Recess:  11:28 a.m. to 11:29 a.m.)
8         THE VIDEOGRAPHER:  Going back on
9   record.  The time now is 11:29.
10  BY MR. BARR:
11  Q.   Mr. Jordan, I'm going to place in front
12  of you what was previously marked in your testimony
13  as Exhibit 125.  This is the January -- excuse
14  me -- June 1959 Ryan supervisory manual with a
15  forward by T. Claude Ryan.  And I'm going to direct
16  your attention with a tape flag to Pages 2402 to
17  2403.
18        MR. WINE:  While the witness is
19  reviewing the document, we'll assert the same
20  objections that we asserted when the government
21  sought to initially mark Jordan Exhibit 125.
22  A.   Okay.

Page 379

1   BY MR. BARR:
2   Q.   These pages relate to the
3   responsibilities of the company's director of
4   quality control, do they not?
5         MR. WINE:  Objection, the document
6   speaks for itself, assumes facts not in evidence.
7   A.   Yes, they do.
8   BY MR. BARR:
9   Q.   Is the description of the company's
10  director of quality control consistent with your
11  experience in the course of your government
12  contracting career?
13        MR. WINE:  Same objections.
14  A.   Yes, it is.
15  BY MR. BARR:
16  Q.   Where it refers to the director of
17  quality control being responsible to the president
18  of the company, were you familiar with that type of
19  reporting organization?
20        MR. WINE:  Same objections.
21  A.   Yes, I was.
22

Page 380

1   BY MR. BARR:
2   Q.   And were you familiar with another type
3   of reporting structure for the head of quality
4   control in contractors?
5         MR. WINE:  Objection, relevance.
6   A.   Yes, I was.
7   BY MR. BARR:
8   Q.   What was that other kind of reporting
9   structure that -- with which you became familiar?
10        MR. WINE:  Same objection.
11  A.   In some few companies, the director of
12  quality control reported to the chief of
13  production, and we objected to those kinds of
14  organizational structures and found it to be a
15  weakness in the company's organizational structure
16  because that allowed the chief of production to put
17  pressure upon the chief of quality to accept a
18  product that was less than compliant with the terms
19  and conditions of the contract in order to assure
20  production on time.
21  BY MR. BARR:
22  Q.   Did you take the kind of reporting

Page 381

10/14/2011                    TDY Holdings v. United States of America                    Tommy Jordan

---

**Page 382**

1    structure for quality control into account in the
2    award of contracts?
3        A.   That was one of the things that we
4    considered, especially on competitive procurements.
5    Prior to award of any contract, we had to make an
6    affirmative determination responsibility, and if a
7    contractor had an organizational structure, whether
8    it was the chief of quality reported to the chief
9    of production, we viewed that as a deficiency in
10   the contractor's capability and it may have
11   resulted in a determination of non-responsibility.
12       Q.   If you encountered a contractor which
13   had a structure where the chief of quality reported
14   to the chief of production, did you or any other
15   contracting officer order or direct that company to
16   change their management structure?
17       A.   We did not.
18       Q.   If you would, turn to the pages marked
19   with the Bates numbers 2489 and then 2492.
20           Do you see the references to various
21   types of inspection services provided by the
22   quality control division?

---

**Page 383**

1        A.   Yes, I do.
2        Q.   And again, was this type of -- set of
3    responsibilities consistent with your experience in
4    working with contractors during the course of your
5    career?
6            MR. WINE:  Objection, assumes facts
7    not in evidence, misinterprets the document.
8        A.   Yes, it was.
9    BY MR. BARR:
10       Q.   I'd like to show you two additional
11   military specifications.  One is military
12   specification MIL-Q-5923A, dated 14 September 1951,
13   pertaining to quality control of aircraft and
14   associated equipment.
15           The second is MIL-Q-9858A dated
16   16 December 1963, entitled, "Quality Program
17   Requirements."
18           (Exhibit Nos. 224 and 225 marked)
19           MR. WINE:  While the witness is
20   reviewing the documents, TDY asserts the same
21   objections to Exhibits 224 and 225 as it did to the
22   prior mil specs sought to be introduced by the

---

**Page 384**

1    government.
2        A.   I'm familiar with both of these
3    documents.
4    BY MR. BARR:
5        Q.   In your opinion and based on your
6    experience and training as a government contracting
7    officer, are these consistent with your opinions or
8    do these support your opinions concerning
9    contractor responsibilities for quality control
10   systems?
11           MR. WINE:  Same objections.  It also
12   calls for a legal conclusion.
13       A.   Yes, they do.
14   BY MR. BARR:
15       Q.   May I have a look, please, at
16   Exhibit 225?  Thank you.  Okay.  Thank you.
17           Now, I believe today we marked as
18   exhibits a number of editions of MilS5002 as was
19   revised over time.  Do you recall that?
20       A.   Yes, I do.
21       Q.   Let me place those back in front of you.
22   That's Exhibits 2007 (sic) through 211.

---

**Page 385**

1            Now, let me first ask you to look,
2    please, at 207.  If my notes are correct, that is
3    the 1949 edition of MilS5002.
4        A.   That's correct.
5        Q.   If you would, look, please, at the page
6    ending with Bates number 47.  Do you see a
7    provision there that pertains to inspection?
8        A.   Yes, I do.
9        Q.   Based on your knowledge and experience,
10   does that provision impose any obligation on the
11   government to inspect the work that the contractor
12   is performing?
13           MR. WINE:  Objection, the document
14   speaks for itself.
15       A.   It does not inspect an obligation -- it
16   has the -- the government has a right to inspect,
17   but not an obligation.
18           MR. WINE:  Objection,
19   mischaracterizes the document.  If the document is
20   going to be characterized, it should be read
21   verbatim.  It's inconsistent with the witness'
22   testimony.

---

Pages 382 to 385

10/14/2011                TDY Holdings v. United States of America                Tommy Jordan

BY MR. BARR:

1   BY MR. BARR:

2      Q.   In your opinion and based on your
3   experience and knowledge as a government
4   contracting officer, does that provision -- what is
5   the paragraph number of that provision so we have
6   clarity?

7      A.   4.1.

8      Q.   Does that Provision 4.1 relieve the
9   contractor of any of its inspection or quality
10  control obligations?

11         MR. WINE:  Objection, the document
12  speaks for itself, calls for a legal conclusion.

13     A.   It does not.

14  BY MR. BARR:

15     Q.   Now, if you could, look at the other
16  exhibits.  I believe they would be 208, 209, 210,
17  and 211.

18         Starting with 208, if you would look at
19  the page ending with the Bates number 93, do you
20  see a provision there pertaining to contractor
21  obligations concerning quality assurance?

22     A.   Yes, I do.

Page 386

1   BY MR. BARR:

2      Q.   Let's turn our attention to contractor
3   responsibilities for plant security and classified
4   information.

5          Could you describe for the Court your
6   experiences as a government contracting officer
7   regarding contractor plant security and the
8   handling of classified information?

9          MR. WINE:  During what period of
10  time?

11         MR. BARR:  His entire period as a
12  government contracting officer.

13         MR. WINE:  Objection, relevance.

14     A.   Based upon my experience and training as
15  a contracting officer, the responsibility for
16  securing classified material and information was
17  the responsibility of the contractor.

18  BY MR. BARR:

19     Q.   And what about industrial plant
20  security, the physical security of the plant
21  itself?

22         MR. WINE:  Same objections.

Page 388

1      Q.   And what is the sum and substance of
2   that provision?

3          MR. WINE:  Objection, the document
4   speaks for itself, calls for a legal conclusion.

5      A.   It specifically states the supplier is
6   responsible for performance of all inspection
7   requirements.  It is more -- has more specificity
8   than the 1949 edition of the same regulation.  It
9   is basically the same responsibilities.

10         MR. WINE:  Objection,
11  mischaracterizes the document.

12  BY MR. BARR:

13     Q.   And looking at Exhibit 209 with respect
14  to 40 -- Page 407 -- maybe we can take these as a
15  group -- and then Exhibit 210 at Pages 28 and 29,
16  and then Exhibit 211 at Pages 60 and 61.

17         Is the language and substance in those
18  exhibits essentially the same on this point as was
19  found in Exhibit 208?

20         MR. WINE:  Objection, the documents
21  speak for themselves.

22     A.   Yes, it is.

Page 387

1      A.   Throughout my career, based upon my
2   experience and personal observation of contractor
3   facilities, the responsibility for plant security
4   was that of the contractor.

5          THE REPORTER:  I'm sorry.  What was
6   the end?

7          THE WITNESS:  Was the responsibility
8   of the contractor.

9          THE REPORTER:  Thank you.

10  BY MR. BARR:

11     Q.   At contractor plants, did you ever
12  encounter military guards stationed to provide
13  physical plant security?

14     A.   I never encountered any military guards
15  at contractor facilities.

16     Q.   Now, with respect to the kinds of
17  classified information of which you became aware as
18  a government contracting officer, were you ever
19  aware of classified information that pertained to
20  chemical waste disposal by a contractor?

21     A.   I never was aware of any classified
22  information pertaining to any chemical waste.

Page 389

Pages 386 to 389

1    Q.   Now, in terms of the -- of government --
2    actions of the government personnel --
3        A.   Uh-huh.
4        Q.   -- with respect to physical plant
5    security and safeguarding classified information in
6    the hands of contractors, what role, if any, did
7    the government personnel have?
8            MR. WINE:  The question requests
9    generally or with respect to the Ryan site in
10   particular?
11           MR. BARR:  We'll get to Ryan in
12   particular.
13           MR. WINE:  Then objection on the
14   basis of relevance.
15       A.   So based -- based upon my experience as
16   a contracting officer, to every contract that
17   required access to any classified information,
18   there was a document entitled DD 254, which
19   specifically identified the material that was
20   considered to be classified and the level of
21   classification of that material.
22

Page 390

1    BY MR. BARR:
2        Q.   Did government personnel review
3    contractor procedures regarding -- to these
4    matters?
5        A.   There was a requirement for the
6    contractor to establish very strict, stringent
7    provisions for classified -- for safeguarding
8    classified information, and the government did
9    review those contractor procedures.
10       Q.   Now, what was necessary in terms of the
11   contractor's facility before classified information
12   could be released to a contractor?
13           MR. WINE:  And objection, relevance.
14       A.   The contractor facility had to have a
15   facility clearance for the level of classification.
16   So if there was top secret material provided to the
17   contractor, he had to have a top secret facility
18   clearance.
19           And then those individuals who had
20   access to the classified information not only had
21   to have an appropriate level of security clearance,
22   but they had to have a demonstrated need to know.

Page 391

1    BY MR. BARR:
2        Q.   And within your experience is -- "need
3    to know," is that a term of art in the area of
4    classified information?
5        A.   Yes, it is.  A need to know, they had to
6    have some purpose of having access to that
7    classified information other than just mere
8    curiosity.
9        Q.   Now, we've been talking in the context
10   of your experience as a government contracting
11   official in terms of physical plant security, in
12   terms of safeguarding classified information, in
13   terms of special clearances to a contractor's
14   facility, and for security clearances for
15   contractor personnel.
16           Have you encountered any evidence with
17   respect to Ryan or TRA that there were departures
18   from the practices and procedures with which you
19   were familiar during your career?
20           MR. WINE:  Objection, foundation.
21   To the extent the United States hasn't established
22   that this witness had a need to know any of that

Page 392

1    information, he would lack a sufficient basis on
2    which to testify in response to the United States'
3    question.  And it's also compound and also exceeds
4    his area of expertise and his expert report.
5        A.   I have seen no such evidence.
6    BY MR. BARR:
7        Q.   Now, whose responsibility was it within
8    the scope of your experience and knowledge to
9    obtain or to seek security clearances for
10   contractor personnel?
11           MR. WINE:  Objection, assumes facts
12   not in evidence, calls for a legal conclusion.
13       A.   It was the responsibility of the
14   contractor.
15   BY MR. BARR:
16       Q.   And again, have you encountered any
17   evidence in this case which indicates that the
18   practice at Ryan or TRA was any different?
19       A.   I have seen no such evidence.
20       Q.   Let's look at some additional exhibits.
21   The first one is a January 25, 1939 letter from
22   T. Claude Ryan to the Navy Department.

Page 393

Pages 390 to 393

1        (Exhibit No. 226 marked)
2        MR. BARR:  The second is a July 3,
3   1940 FBI report pertaining to the Ryan Aeronautical
4   Company.
5        (Exhibit No. 227 marked)
6        MR. BARR:  The next, after a cover
7   page, is a January 17, 1942 War Department
8   memorandum.
9        (Exhibit No. 228 marked)
10        MR. BARR:  The next document is a
11   one-page organization chart dated 10/24/1944 for
12   Ryan Aeronautical Company.
13        (Exhibit No. 229 marked)
14        MR. BARR:  Next is a May 4, 1953
15   Ryan Aeronautical Company letter.
16        (Exhibit No. 230 marked)
17        MR. BARR:  The next document is a
18   January 9, 1987, one-page weekly activity report.
19        (Exhibit No. 231 marked)
20        MR. BARR:  And for the record,
21   Mr. Jordan, I've placed a red tape flag next to the
22   first bulleted paragraph on that document.

Page 394

1        A.   Okay.
2   BY MR. BARR:
3        Q.   Mr. Jordan, now that you've had a chance
4   to review these documents, are these documents that
5   you considered in the course of your expert work in
6   this case to date?
7        A.   Yes, they were.
8        Q.   Without getting into the details, do
9   these, in your opinion, support your views as to
10   contractor responsibilities for plant security and
11   safeguarding of classified information?
12        MR. WINE:  Objection, assumes facts
13   not in evidence.  The documents are the best source
14   of information and, therefore, summaries or broad
15   testimony regarding general compliance with or
16   consistency with the witness' opinion is
17   inadmissible or inappropriate.
18        Also, to the extent that ASPR
19   provisions are included in the compilation, it
20   calls for a legal conclusion.
21        A.   Yes, they do.
22

Page 396

1        MR. WINE:  Which document?
2        MR. BARR:  Exhibit 231.
3        And the last document in this series
4   is a -- an excerpt from the 1963 ASPR, and I have
5   placed a tape flag pertaining to 7 --
6   Paragraph 7-104.12, Military Security Requirements.
7   I put a tape flag on the contract clause itself.
8        (Exhibit No. 232 marked)
9        MR. WINE:  While the witness is
10   reviewing the compilation of documents, TDY would
11   object on the basis of foundation for a number of
12   the documents, particularly those authored by TDY.
13        We would assert the same objections
14   with respect to the ASPR excerpt that the
15   government has inserted in this compilation, at
16   232, as it has asserted in other ASPR excerpts that
17   the government has sought to introduce in this
18   deposition.  To the extent that the documents
19   provided to the witness are not referenced in his
20   expert report and call for testimony related
21   thereto, they exceed his expert report and are,
22   therefore, inadmissible.

Page 395

1   BY MR. BARR:
2        Q.   Are the portions of these documents
3   which pertain to contractor responsibilities for
4   plant security and safeguarding of classified
5   information -- are these consistent with your
6   experience and knowledge gained during the course
7   of your career as a government contracting officer?
8        MR. WINE:  Objection, assumes facts
9   not in evidence.  Counsel has not shown that any of
10   these documents relate to the subject matter that
11   is contained within the question.
12        A.   Absolutely consistent.
13        MR. BARR:  It's 12:00 -- or I've got
14   11:59.  I think this would be a good time for us to
15   break for lunch.  I think we're doing pretty well
16   as far as time goes, but I can't make any promises
17   as far as when we're going to conclude for today.
18        MR. WINE:  Counsel, what is your
19   estimate?
20        MR. BARR:  I can't be held to an
21   estimate, but --
22        MR. WINE:  I'm not holding you to

Page 397

Pages 394 to 397

1  it. I'd just like it for informational purposes
2  since we're breaking a half an hour after we
3  started from the last break.
4       MR. BARR: It won't be any later
5  than when we adjourned on Wednesday.
6       MR. WINE: 3:00?
7       MR. BARR: That would be my guess.
8       MR. WINE: Okay.
9       MR. BARR: And that's all it is.
10      THE VIDEOGRAPHER: Going off record.
11  The time now is 11:59.
12       (Recess: 11:59 a.m. to 12:45 p.m.)
13       THE VIDEOGRAPHER: Going back on
14  record. The time now is 12:45.
15  BY MR. BARR:
16      Q.  Mr. Jordan, let me hand you again a
17  document that we marked -- I believe it was
18  yesterday -- Exhibit 103. This was Air Force
19  quality control instructions, a document dated
20  April 2, 1951. And I have put tape flags to direct
21  your attention to certain pages, 61024, 25, 32, and
22  35.

Page 398

1       If you would, please look at those, and
2  then I'll have a question for you.
3       MR. WINE: TDY asserts the same
4  objections as it did at the introduction of
5  Exhibit 103.
6       A.  Okay.
7  BY MR. BARR:
8       Q.  Mr. Jordan, are you familiar with this
9  document as a result of your expert work in this
10  case?
11      A.  Yes, I am.
12      Q.  Were you familiar with this document
13  during the course of your Air Force career as a
14  government contracting officer?
15      A.  Yes, I was.
16      Q.  The pages to which I have directed your
17  attention, these pertain to quality control, do
18  they not?
19       MR. WINE: Objection, the document
20  speaks for itself.
21      A.  Yes, they do.
22

Page 399

1  BY MR. BARR:
2       Q.  Do these portions of Exhibit 103
3  indicate who is responsible for quality control?
4       MR. WINE: Again, the document
5  speaks for itself.
6       A.  Yes, they do.
7  BY MR. BARR:
8       Q.  And what do they indicate to you?
9       MR. WINE: Objection, assumes facts
10  not in evidence, the document speaks for itself.
11      A.  It demonstrates that the responsibility
12  of quality control rests with the contractor.
13  BY MR. BARR:
14      Q.  And have you encountered any evidence in
15  this case which indicates that the responsibility
16  for quality control was not with Ryan or TRA?
17       MR. WINE: Objection, assumes fact
18  not in evidence, also mischaracterizes the
19  document.
20      A.  I have seen no such evidence.
21  BY MR. BARR:
22      Q.  Okay. Now, when we broke for lunch, we

Page 400

1  were talking about responsibilities for plant
2  security and protection of classified information.
3       Let me show you a document. We'll mark
4  this as an exhibit. These are minutes of the
5  annual meeting of the stockholders of the Ryan
6  Aeronautical Company, a meeting held on March 21st,
7  1944, and I put a tape flag on the page ending with
8  the Bates number 35028.
9       (Exhibit No. 233 marked)
10       MR. WINE: While the witness reviews
11  the document, TDY objects on the basis of
12  foundation and hearsay.
13  BY MR. BARR:
14      Q.  And I'll direct your attention
15  specifically to the last paragraph before the
16  "there being no further business" paragraph.
17      A.  Okay.
18      Q.  Is that discussion in the minutes
19  consistent or inconsistent with your understanding
20  of contractor responsibilities for protecting
21  classified information?
22       MR. WINE: Same objection,

Page 401

Pages 398 to 401

10/14/2011                    TDY Holdings v. United States of America                    Tommy Jordan

1    foundation, assumes facts not in evidence.  Also,
2    it -- to the extent it exceeds the opinions
3    articulated in the expert report and goes beyond
4    that report, is -- it is inadmissible as such.
5        A.   It is consistent.
6    BY MR. BARR:
7        Q.   And can you -- can you explain why you
8    believe it's consistent?
9            MR. WINE:  Same objections.
10       A.   It is my opinion that the portions of
11   the facility that Mr. Ryan wanted to show to the
12   stockholders, since it excluded the experimental
13   section, was that portion of the plant that was not
14   dealing with classified information.
15           MR. WINE:  Same objection, assumes
16   facts not in evidence, calls for -- based on
17   speculation.
18   BY MR. BARR:
19       Q.   For stockholders to have obtained access
20   to the experimental section, what would have been
21   necessary?
22           MR. WINE:  Objection, calls for

Page 402

1    speculation, assumes facts not in evidence.
2        A.   They would have had, No. 1, a security
3    clearance appropriate with the classification of
4    the work being conducted in that facility, and
5    then, No. 2, they'd have to have a demonstrated
6    need to know.
7    BY MR. BARR:
8        Q.   Now, just to be certain that I covered
9    this earlier, based on your experience as a
10   government contracting official, to what kinds of
11   matters has classified information used or
12   generated in connection with defense contracts
13   related?
14           MR. WINE:  Objection, compound,
15   vague and ambiguous, relevance.
16       A.   Based upon my personal experience, they
17   dealt primarily with technical issues relative to
18   capabilities, performance, and technical features
19   of the product being produced.
20   BY MR. BARR:
21       Q.   And when you say "primarily," do you
22   recall anything else within your personal

Page 403

1    experience to which classified information
2    pertained?
3            MR. WINE:  Same objections.
4        A.   During the portion of my career where I
5    was the director of contracting, I had
6    responsibility for the Air Intelligence Agency, and
7    I had access to some extremely high -- highly
8    classified procurement issues.  And without getting
9    into details of that kind of SEI clearance and the
10   documents pertaining to intelligence, all of the
11   other experiences I had with products and all of
12   those experiences dealt with technical issues.
13           MR. WINE:  Objection, the answer is
14   not responsive to the question.
15   BY MR. BARR:
16       Q.   Now, let's go back and let me show you
17   what was marked previously as government
18   Exhibit 125, and I've placed a red tape flag on the
19   page with the Bates number 2494.  I'll ask you to
20   take a look at that, and then I'll have a question
21   for you.
22           MR. WINE:  TDY asserts the same

Page 404

1    objections that it had propounded when Jordan
2    Exhibit 125 was previously introduced.
3            2494?
4            MR. BARR:  I believe that -- 494 --
5    2494, correct.
6        A.   Okay.
7    BY MR. BARR:
8        Q.   Are the -- is the discussion of company
9    responsibilities for plant security consistent with
10   your understanding of contractor responsibilities
11   in that regard during the time you were a
12   contracting officer?
13           MR. WINE:  Objection, assumes facts
14   not in evidence.
15       A.   Yes, it is.
16   BY MR. BARR:
17       Q.   Now, Mr. Jordan, during your career,
18   were you aware of the Big Safari Program?
19       A.   I was aware of the program, yes.
20       Q.   And what did you know about the Big
21   Safari Program?
22       A.   I knew it existed.  I knew basically

Page 405

Pages 402 to 405

10/14/2011                TDY Holdings v. United States of America                Tommy Jordan

1    what it was intended to do.  As I indicated earlier
2    in my deposition, I was the contracting officer on
3    the B58 program at General Dynamics.  They were one
4    of the four companies that had Big Safari
5    contracts.  They had a contract for modification of
6    the B57 for intelligence purposes; and while I was
7    at the contractor's facility, I saw the modified
8    RB57 sitting on the runway, and that was about the
9    extent of what I knew about the program.
10       Q.   Okay.  Let me mark in this case some
11   additional exhibits pertaining to the Big Safari
12   Program.
13           (Exhibit Nos. 234 through 237
14   marked)
15       A.   Okay.
16   BY MR. BARR:
17       Q.   Mr. Jordan, are these documents that you
18   reviewed in the course of your work in this case
19   either as a 30(b)(6) witness or in your expert
20   capacity regarding the Big Safari Program?
21           MR. WINE:  Objection to the extent
22   that testimony or material review in the witness'

Page 406

1    understanding of the nature and purpose of the Big
2    Safari projects?
3        A.   The purpose of the Big Safari projects,
4    as defined in Air Force Regulation 66-22, was for
5    intelligence purposes.
6        Q.   And you're referring to what we've
7    marked as Exhibit 234?
8        A.   Yes, I am.
9        Q.   And were -- were there some Big Safari
10   projects performed at the Ryan facility?
11       A.   Yes, there were.
12       Q.   And this occurred in the 1960s?
13           MR. WINE:  Objection, leading,
14   assumes facts not in evidence.
15       A.   Yes, it was.
16   BY MR. BARR:
17       Q.   Other than documents, did you have an
18   additional source of information as to the nature
19   and substance of Big Safari projects at Ryan during
20   the 1960s?
21       A.   There was a document entitled, "Big
22   Safari Book."  It was written by -- I think it was

Page 408

1    capacity as a 30(b)(6) is not related to his expert
2    report.  It does not contain any opinions
3    articulated in that report and goes beyond the
4    scope of that report, and is, therefore,
5    inadmissible.
6        A.   Yes, they were.
7    BY MR. BARR:
8        Q.   If you could, summarize, please, your
9    understanding of the nature and purpose of these
10   Big Safari projects.
11           MR. WINE:  Objection to the extent
12   that Counsel has referred to Big Safari projects.
13   The question is vague and ambiguous.
14           Also, based on the witness' prior
15   answer describing his familiarity or understanding
16   of the Big Safari, TDY objects that the witness is
17   not qualified to give an opinion.  He lacks
18   sufficient basis to offer an opinion, and,
19   therefore, it goes beyond his area of expertise.
20       A.   Could you repeat the question, please?
21   BY MR. BARR:
22       Q.   Could you summarize, please, the -- your

Page 407

1    two retired Air Force colonels, and then there was
2    the deposition testimony of Bobbi Swan.
3        Q.   And Bobbi Swan was previously known as
4    Robert Schwanhausser?
5        A.   That's correct.
6        Q.   Now, I'm not going to mark as an
7    exhibit, but we'll come -- we'll come to this in
8    just a moment.  You refer to a Big Safari Story
9    Book.  And are you aware that Mr. Zoch, who has
10   joined us here at this deposition, relied on that
11   book for some of his opinions?
12           MR. WINE:  Objection to the extent
13   it mischaracterizes the report of the expert
14   witness from TDY.
15       A.   Yes, I am.
16   BY MR. BARR:
17       Q.   Are you familiar with the term "zone of
18   interior"?
19       A.   Yes, I am.
20       Q.   Were you familiar with that term while
21   you were a government contracting officer?
22       A.   Yes, I was.

Page 409

Pages 406 to 409

1      Q.   And what is your understanding of what
2    the term "zone of interior" means?
3      A.   Zone of interior, during my employment
4    with the government, we primarily referred to it as
5    the continental -- within the continental limits of
6    the United States, the official definition was and
7    remains to be that area of the theater of
8    operations outside of the area of conflict or war
9    zone, if you will.
10      Q.   Now, do you ever recall that Mr. Zoch
11    stated his opinion that there was a zone of
12    interior within the Harbor Drive plant?
13      A.   Yes, I do.
14         MR. WINE:  Objection, assumes facts
15    not in evidence.
16    BY MR. BARR:
17      Q.   Have you formed an opinion regarding
18    that statement?
19      A.   Yes.
20      Q.   What is that opinion?
21         MR. WINE:  Same objections.
22      A.   Zone of interior has absolutely nothing
                                                Page 410

1    to do with anything within the Ryan facility or any
2    other contractor's facility.
3         MR. WINE:  Same objection as to the
4    answer to the extent that it purports a term of art
5    to a term used by an expert in a different fashion.
6    It's also outside the scope of the witness' expert
7    report and is, therefore, inadmissible.
8    BY MR. BARR:
9      Q.   Do you recall that Mr. Zoch cited to a
10    particular range of pages within the Big Safari
11    Story Book on which he believed that the term "zone
12    of interior" was included?
13         MR. WINE:  Objection, assumes facts
14    not in evidence.  The report is its best source of
15    information and speaks for itself.
16      A.   Yes, I do.
17    BY MR. BARR:
18      Q.   I'll take something out of order here.
19    Let me show you what we've marked previously as
20    Exhibit 94.
21         And my question is:  Did you encounter
22    evidence in the course of your work in this case --
                                                Page 411

1    your expert work -- that Ryan complied with its
2    obligations concerning the protection and
3    preservation of government property?
4         MR. WINE:  Objection, goes beyond
5    the scope of the witness' area of expertise.  To
6    the extent that it also exceeds the scope of his
7    expert report, it is also inadmissible, assumes
8    facts not in evidence.
9      A.   Yes, I did.
10    BY MR. BARR:
11      Q.   Let me show you what was previously
12    marked as Exhibit 94.  I have put red Post-it
13    notes.  If you could, please indicate for the
14    record the Bates numbers -- well, actually, I've
15    got that information.  The Bates numbers end in 290
16    and 300.
17         MR. WINE:  TDY offers the same
18    objections it offered when Jordan Exhibit 94 was
19    offered by the United States initially.
20      A.   Okay.
21    BY MR. BARR:
22      Q.   Is this one of the Air Force reports
                                                Page 412

1    that you had in mind when you testified regarding
2    Ryan's actions concerning government facilities
3    earlier?
4         MR. WINE:  Objection, leading,
5    ambiguous, mischaracterizes the witness' prior
6    testimony.
7      A.   Yes.
8    BY MR. BARR:
9      Q.   Now, based on the documents that you
10    have reviewed through the lens of your experience
11    as a government contracting officer, how would you
12    characterize the nature of the contractual
13    relationships between the military services and
14    Ryan during World War II?
15         MR. WINE:  Objection, exceeds the
16    witness' area of expertise in that the question
17    asks for a period before which the witness was
18    engaged as a federal official.  It also goes beyond
19    the scope of his expert witness -- expert report
20    and, therefore, is inadmissible.
21      A.   Based upon my years of experience, my
22    training as a contracting officer, and the
                                                Page 413

Pages 410 to 413

1   documents that I have reviewed in connection with
2   this case, I would characterize the relationship
3   between Ryan and the government essentially the
4   same as the relationship between the government and
5   all other contractors with whom I dealt with over
6   the years, and that is an arm's length relationship
7   between the government and those contractors,
8   including Ryan.
9          MR. WINE:  Object to the use of the
10  term "arm's length" in the witness' response to the
11  extent it has any legal meaning.
12  BY MR. BARR:
13     Q.   Did you determine in your review of the
14  documents pertaining to this case -- again, through
15  the lens of your experience as a government
16  contracting officer -- as to whether the
17  relationship between the military and the Ryan
18  Company was voluntary or involuntary?
19          MR. WINE:  Objection, calls for a
20  legal conclusion, assumes facts not in evidence,
21  goes beyond the witness' area of expertise.
22     A.   All the documents that I've reviewed

Page 414

1   BY MR. BARR:
2      Q.   Did you encounter any evidence in the
3   course of your work as an expert in this case as to
4   whether or not the government ever coerced or
5   forced Ryan or TRA to enter into any supply
6   contracts?
7          MR. WINE:  Objection, assumes facts
8   not in evidence.
9      A.   I saw no such evidence.
10  BY MR. BARR:
11     Q.   Now, excluding terminations for
12  convenience of the government, did you determine in
13  your review of documents and testimony in this case
14  whether or not the government ever required Ryan or
15  TRA to stop making what it had previously produced
16  and start producing something else?
17          MR. WINE:  Objection, vague and
18  ambiguous, assumes facts not in evidence, lack of
19  foundation, and outside the scope of the witness'
20  expert report.
21     A.   I saw no such evidence.
22

Page 416

1   indicate that the contracts into which Ryan entered
2   were not only voluntary, but that Ryan had
3   aggressively pursued those contracts with the
4   government.
5   BY MR. BARR:
6      Q.   Now, was your answer focused on World
7   War II, or are you including the post-war period?
8      A.   Both.
9      Q.   Now, the term "arm's length," how do you
10  understand that term as a former contracting
11  official?
12     A.   My understanding was and remains to be
13  that an arm's length relationship implies and means
14  that there is relationship between the respective
15  parties where both parties are sincerely, honestly,
16  and with integrity pursuing the interest of their
17  respective parties without fear of either collusion
18  or coercion between the parties.
19     Q.   Did you encounter any --
20          MR. WINE:  Bless you.
21          MR. BARR:  Bless you.
22          MR. MATEER:  Thank you.

Page 415

1   BY MR. BARR:
2      Q.   And did you determine in your review of
3   documents and testimony in this case, again through
4   the lens of your experience as a government
5   contracting officer, whether or not the military or
6   any other part of the federal government seized or
7   confiscated any Ryan property during World War II?
8          MR. WINE:  Same objection, assumes
9   facts not in evidence.
10     A.   There was no evidence whatsoever that
11  the government ever seized or threatened to seize
12  any of the Ryan property.
13          MR. WINE:  Object to the response as
14  nonconforming with the evidence, assumes facts not
15  in evidence.
16  BY MR. BARR:
17     Q.   We'll mark as the next exhibit a series
18  of telegrams, three of which appear to be Bureau of
19  Aeronautics telegrams, one of which appears to be a
20  telegram from Claude Ryan, president of Ryan
21  Aeronautical Company.
22          (Exhibit No. 238 marked)

Page 417

Pages 414 to 417

10/14/2011                 TDY Holdings v. United States of America                 Tommy Jordan

1   BY MR. BARR:
2       Q.   The date of the various telegrams are
3   all in June of 1942.
4           MR. WINE:  While the witness is
5   reviewing the document, TDY objects on the basis of
6   foundation and hearsay and to the extent the
7   document is not referenced in the witness' expert
8   report, the document and the -- and the witness'
9   associated testimony is inadmissible as such.
10      A.   I am aware of these documents.
11  BY MR. BARR:
12      Q.   Now, you were shown this document or
13  series of telegrams during one of your depositions
14  back in 2009.  Do you recall that?
15          MR. WINE:  TDY objects to the extent
16  that the document was used during the witness'
17  30(b)(6) testimony, which is not relevant to his
18  testimony as an expert witness.
19      A.   I believe I do recall that.
20  BY MR. BARR:
21      Q.   Okay.  In reading through the Bureau of
22  Aeronautics telegrams that are included in this

Page  418

1   exhibit, do you perceive -- again, through the lens
2   of your experience as a government contracting
3   officer -- any threat to seize by the government?
4           MR. WINE:  Objection to the extent
5   that the witness' perception is irrelevant to what
6   was being perceived by Ryan, also to the extent the
7   document or any opinion related to it exceeds the
8   opinions articulated by the witness in his expert
9   report, it is inadmissible.
10      A.   Absolutely not.
11  BY MR. BARR:
12      Q.   In order to summarize, was it apparent
13  to you from reading these telegrams of what the
14  position of the Army and the position of the Navy
15  were concerning the activities of the Consolidated
16  Aircraft Company?
17          MR. WINE:  Objection, the document
18  speaks for itself.  Any attempt to summarize or
19  mischaracterize the document is -- is impermissible
20  testimony.
21      A.   They were -- they were rejecting those
22  positions of the contractor to try to put pressure

Page  419

1   on the Army and the Navy to seize those properties
2   and turn them over to Consolidated.
3   BY MR. BARR:
4       Q.   Well, let me be sure I'm just absolutely
5   clear.  Were the Army and the Navy in favor of the
6   Consolidated Aircraft proposal or opposed to it?
7           MR. WINE:  Objection.  This witness
8   is not competent to testify as to the position of
9   the Army or Navy on the basis of reading a document
10  any more so than any other finder of fact is
11  capable of doing, and, therefore, any opinion
12  testimony is impermissible.
13      A.   They were aggressively opposed.
14  BY MR. BARR:
15      Q.   Now, with respect to the post-war
16  period, one of the Ryan and TRA lines of business
17  were unmanned aerial vehicles.  Do you recall that?
18          MR. WINE:  Objection, leading,
19  assumes facts not in evidence.
20      A.   Yes, I do.
21  BY MR. BARR:
22      Q.   Are you aware of any evidence of any

Page  420

1   kind that Ryan and TRA did not want to manufacture
2   UAVs for the military at any time in the post-war
3   period?
4           MR. WINE:  Objection, assumes facts
5   not in evidence.
6       A.   I'm aware of no such evidence that they
7   were opposed to accepting contracts from the
8   government for UAV production.
9   BY MR. BARR:
10      Q.   What kind of information did you gather
11  on the subject of whether their work was voluntary
12  or involuntary?
13      A.   Various reports, company correspondence,
14  and the deposition testimony of Bobbi Swan.
15      Q.   And collectively, what did these
16  documents and testimony indicate to you?
17          MR. WINE:  Objection, the documents
18  and testimony speaks for itself.  The question
19  calls for facts not in evidence and speculation on
20  the part of the witness.
21      A.   They voluntarily indicated -- or they
22  indicated that they voluntarily had entered into

Page  421

Pages  418 to 421

1 the contracts for production of UAVs, and then that
2 they had aggressively pursued new contracts for UAV
3 production and they very rigorously protected the
4 niche that they had carved -- carved out in that
5 industry.
6        MR. BARR:  Okay.  I'll mark a series
7 of documents and -- on this subject of unmanned
8 aerial vehicles.  For the record, Exhibit 240 was
9 Bates numbered in reverse order to the original
10 pagination of the document.  The Bates numbers are
11 U.S. 0010962 to 964, 964 being the first page of
12 the document, which is dated September 25, 1946.
13        (Exhibit Nos. 239 through 247
14 marked)
15        MR. WINE:  While the witness is
16 reviewing the document, TDY objects on the basis of
17 foundation and hearsay.  Also, to the extent
18 Counsel has marked a series of documents ranging
19 from 1946 through to the 19 -- early 1990s as
20 somehow characteristic -- characterizing the
21 entirety of Ryan's UAV activities, it assumes facts
22 not in evidence and constitutes hearsay.

Page 422

1 Also, to the extent that the
2 documents are not referenced in the witness' expert
3 report, it exceeds the scope of that report and,
4 therefore, are inadmissible -- testimony related
5 thereto is inadmissible.
6        MR. BARR:  We're off the record.
7        THE VIDEOGRAPHER:  Going off the
8 record.  The time now is 1:24.
9        (Recess 1:24 p.m. to 1:25 p.m.)
10        THE VIDEOGRAPHER:  Going back on
11 record.  The time now is 1:25.
12    A.  I'm familiar with these documents.
13 BY MR. BARR:
14    Q.  Are these documents that you reviewed in
15 connection with the Ryan and TRA efforts in the
16 field of UAVs?
17    A.  Yes.
18    Q.  And when we say "UAVs," we all
19 understand it means "unmanned aerial vehicles."
20 Correct?
21    A.  That is correct.
22    Q.  And are these some of the documents from

Page 423

1 which you drew the conclusion that Ryan and TRA's
2 efforts were voluntary?
3        MR. WINE:  Objection, leading,
4 assumes facts not in evidence.
5    A.  Yes, they were.
6 BY MR. BARR:
7    Q.  Let's turn to TRA's work as a
8 subcontractor on the Apache helicopter program.
9        Are you aware of any evidence that TRA
10 did not want to work as a subcontractor on that
11 program?
12        MR. WINE:  Objection, assumes facts
13 not in evidence, impermissible for the -- for the
14 witness to offer an opinion as to what TRA wanted
15 or thought regarding its involvement in that or any
16 other program.
17    A.  There is no such evidence.
18        MR. WINE:  Object to the answer to
19 the extent it assumes facts not in evidence.
20 BY MR. BARR:
21    Q.  Did you review documents which, through
22 the lens of your time as a government contracting

Page 424

1 officer, indicated to you whether or not TRA wanted
2 to participate in this program as a subcontractor?
3        MR. WINE:  Objection, calls for
4 speculation.  This witness is not qualified to
5 testify regarding what TRA wanted to do with
6 respect to participation in this program or any
7 other program.
8    A.  Based upon my experience and training as
9 a contracting officer and my review of documents
10 pertaining to the subcontract between Ryan or TDY
11 and Hughes and subsequently McDonnell Douglas for
12 helicopter production, they not only wanted it,
13 they aggressively defended the teaming agreement
14 that they had with the contract -- with the prime
15 contractor and their right to continue that
16 production of those components.
17 BY MR. BARR:
18    Q.  Let me show you some documents, and I'll
19 ask you to review them and ask if they pertain to
20 your opinions in this regard.
21        MR. WINE:  Are you stopping at 251?
22 Do you have other documents in this series or are

Page 425

Pages 422 to 425

1    you --
2            MR. BARR:  Not in this series, no.
3            (Exhibit Nos. 248 through 251
4    marked)
5            MR. WINE:  While the witness reviews
6    the document, TDY objects to the series of 248
7    through 251 as lacking foundation based on -- and
8    requiring testimony based on hearsay that is
9    inadmissible through this witness.
10           Also, to the extent that it is based
11   on -- that these exhibits and the witness'
12   testimony related thereto is not referenced in his
13   expert report, it exceeds the scope of that report
14   and, therefore, is inadmissible.
15       A.  Okay.
16   BY MR. BARR:
17       Q.  Mr. Jordan, again, through the lens of
18   your experience and career as a government --
19           MR. BARR:  Off the record.
20           THE VIDEOGRAPHER:  Going off record.
21   The time now is 1:32.
22           (Recess:  1:32 p.m. to 1:33 p.m.)

Page 426

1            THE VIDEOGRAPHER:  Going back on
2    record.  The time now is 1:33.
3    BY MR. BARR:
4        Q.  Mr. Jordan, are these some of the
5    documents that you reviewed in the course of your
6    work in this case in forming your opinions
7    concerning the voluntariness or involuntariness of
8    the TRA participation in the Apache program?
9            MR. WINE:  Is Counsel referring to
10   30(b)(6) testimony or expert testimony?
11           MR. BARR:  Both/either.
12           MR. WINE:  Then to the extent that
13   the question calls for testimony relating to the
14   witness' engagement as a 30(b)(6) expert, it goes
15   beyond the scope of the examination as an expert
16   for the government and, therefore, is inadmissible.
17       A.  Yes, they are.
18   BY MR. BARR:
19       Q.  Okay.  Let's talk about program review
20   meetings.  In the course of your career as a
21   government contracting official, did you
22   participate in what are known as program review

Page 427

1    meetings?
2        A.  I participated in many program review
3    meetings.
4        Q.  And essentially what are such meetings
5    all about?
6            MR. WINE:  Objection, vague and
7    ambiguous.
8        A.  The program review meetings were between
9    the government and its various representatives and
10   the contractor to review the program, its status,
11   the stage of development of the product, the
12   technical problems that had been encountered by the
13   contractor, the adequacy of the data that had been
14   provided by the government to the contractor for
15   performance of the contract, and then to resolve
16   those misunderstandings and any problems that were
17   being encountered by the contractor in the
18   performance of the contract.
19           MR. BARR:  Okay.  I'm told that we
20   need to change the tape in five minutes.  So let's
21   take a break now, and we'll go back on the record
22   when the tape has been changed by the videographer.

Page 428

1            THE VIDEOGRAPHER:  Going off record.
2    The time now is 1:35.
3            (Recess:  1:35 p.m. to 1:39 p.m.)
4            THE VIDEOGRAPHER:  Going back on
5    record.  The time now is 1:39.
6    BY MR. BARR:
7        Q.  Mr. Jordan, just to clarify, what kinds
8    of issues were covered in these program review
9    meetings with respect to the products?
10           MR. WINE:  Objection, vague and
11   ambiguous.
12       A.  They were all technical issues.
13   BY MR. BARR:
14       Q.  When you say "technical," does that
15   include design?
16       A.  Design, performance, and all other
17   facets of the contractor's performance -- or
18   technical performance of the contract.
19       Q.  Now, in any of the program review
20   meetings in which you participated, were any
21   changes made to the contracts during such meetings?
22           MR. WINE:  Objection, relevance.

Page 429

Pages 426 to 429

1    A.   There were no changes to the contract
2  during the course of the program review.  There may
3  have been instances where subsequent to the program
4  review that there was a need for a contract change,
5  and then I subsequently issued a bilateral change
6  to the contract.  And by "bilateral," I mean it was
7  a change that it was mutually agreed to between the
8  contractor and the government.
9  BY MR. BARR:
10   Q.   Now, during any of the program review
11 meetings in which you participated, was it -- were
12 any chemical waste disposal issues ever discussed?
13       MR. WINE:  Objection, relevance.
14   A.   No discussion whatsoever on any chemical
15 issues.
16 BY MR. BARR:
17   Q.   Now, over the last several days of your
18 testimony, we've talked about the consistency over
19 time in the policies and practices in various
20 subjects.  And I believe you've testified to that
21 consistency.
22       In summary, did that consistency that

Page 430

1    A.   Absolute consistency.
2  BY MR. BARR:
3    Q.   The same question as to progress
4  payments and fixed price contracts?
5        MR. WINE:  Same objection.
6    A.   Absolute consistency.
7  BY MR. BARR:
8    Q.   Did you observe the same kind of
9  consistency in government property clauses in cost
10 reimbursement contracts?
11       MR. WINE:  Same objection.
12   A.   Absolute consistency.
13 BY MR. BARR:
14   Q.   Did you observe the same kind of
15 consistency in government inspection provisions?
16       MR. WINE:  Same objection.
17   A.   Absolute consistency.
18 BY MR. BARR:
19   Q.   Same question with respect to
20 contractor's rights regarding how to run their
21 plants?
22       MR. WINE:  Same objection.

Page 432

1  you've observed in the documentation extend to
2  releases by contractors under cost reimbursement
3  contracts?
4        MR. WINE:  Objection, assumes facts
5  not in evidence, calls for a legal conclusion,
6  vague and ambiguous, and leading.
7    A.   Absolutely consistent.
8  BY MR. BARR:
9    Q.   Did that consistency that you observed
10 include the indemnification provisions regarding
11 the contractor's possession and use of government
12 facilities?
13       MR. WINE:  Same objections.
14   A.   Absolutely consistent.
15 BY MR. BARR:
16   Q.   Did the consistency that you have
17 observed in the course of your work in this case
18 extend to provisions relating -- or policies and
19 practices relating to the contractor's duty for
20 proper maintenance and care of government
21 facilities?
22       MR. WINE:  Same objection.

Page 431

1    A.   Absolute consistency.
2  BY MR. BARR:
3    Q.   In the course of your work as an expert
4  in this case, and again through the lens of your
5  experience as a government contracting officer, did
6  you observe the same consistency over time with respect
7  to contractors' obligations regarding the quality
8  control over their products?
9        MR. WINE:  Same objections.
10   A.   Absolute consistency.
11 BY MR. BARR:
12   Q.   And again, did you observe this kind of
13 consistency in the contractors' handling of
14 government property upon completion of contractor
15 performance?
16       MR. WINE:  Same objection.
17   A.   Absolute consistency.
18       MR. BARR:  The government moves the
19 admission of all of the exhibits that have been
20 marked for identification in this case; and at the
21 time of trial, we will ask the Court to rule on the
22 plaintiff's objections.

Page 433

Pages 430 to 433

1      And we further state for the record
2  that the government will also be designating
3  various portions of Mr. Jordan's testimony in 2009
4  for admission into evidence to be considered along
5  with the testimony that he's given on the -- on
6  Monday, Wednesday, and today.
7      MR. WINE:  And for the record, to
8  the extent that Mr. Jordan has offered opinions
9  that are not contained in his expert report, TDY
10 will move to strike those -- that testimony that
11 exceeds the scope of his report.
12     The government has not presented or
13 entered into evidence documents or exhibits tied to
14 his expert report, but has vaguely referred to
15 documents considered by the expert witness,
16 notwithstanding the fact that the expert report
17 does not contain the Federal Rule of Civil
18 Procedure listing required that it list all
19 documents considered by the witness in the
20 formulation of its expert report.  And, therefore,
21 TDY has been put in the position of not knowing
22 prior to this testimony what -- what documents the

Page 434

1  witness specifically considered in the formulation
2  of his opinions and, therefore, was unable to
3  examine the witness effectively during discovery.
4      Moreover, TDY will voir dire the
5  witness next week per agreement of Counsel and lay
6  a foundation as to why the witness is not qualified
7  to offer all or some of the opinions articulated.
8      And to the extent that the witness
9  has not identified specific opinions for which the
10 government is seeking to qualify him as an expert
11 or for which he is offering in this matter, TDY
12 reserves its rights as such.
13     MR. BARR:  We'll have the Court deal
14 with all of your concerns at the appropriate time.
15     MR. WINE:  Understood.  So we
16 will --
17     THE VIDEOGRAPHER:  This marks --
18     MR. WINE:  Hold on.  No.  Just so we
19 have it on the record.  We plan to continue your
20 deposition -- your testimonial deposition,
21 Mr. Jordan, next Wednesday, which is October 19th,
22 and we'll start at 10:00 a.m.

Page 435

1      THE WITNESS:  Okay.
2      MR. WINE:  And we look forward to
3  seeing you then.  Thank you, sir.
4      THE VIDEOGRAPHER:  This marks the
5  end of the deposition.  The time off record now is
6  1:46.
7      (Deposition Recessed at 1:46 p.m.)

Page 436

1  CERTIFICATE OF SHORTHAND REPORTER
2      I, Steven Stogel, Certified Shorthand
3  Reporter, the officer before whom the foregoing
4  deposition was taken, do hereby certify that the
5  foregoing transcript is a true and correct record
6  of the testimony given; that said testimony was
7  taken by me stenographically and thereafter reduced
8  to typewriting under my supervision; and that I am
9  neither counsel for, related to, nor employed by
10 any of the parties to this case and have no
11 interest, financial or otherwise, in its outcome.
12     GIVEN UNDER MY HAND AND SEAL of office
13 on this _____ day of _____, 2011.
14
15
16
17 _____
18 STEVEN STOGEL, CSR, CLR
19 Texas Certified Shorthand Reporter
20 CSR No. 6174
21 Certified LiveNote Reporter
22 Expiration Date: 12/31/2012

Page 437

Pages 434 to 437

1   Tommy Jordan c/o
2   DICKSTEIN SHAPIRO, L.L.P.
    1825 Eye Street NW
3   Washington, D.C. 20006-5403
4
    Case: TDY Holdings v. United States of America
5   Date of deposition: 10/14/11
    Deponent: Tommy Jordan
6
7   Please be advised that the transcript in the above
8   referenced matter is now complete and ready for signature.
9   The deponent may come to this office to sign the transcript,
10  a copy may be purchased for the witness to review and sign,
11  or the deponent and/or counsel may waive the option of signing.
12  Please advise us of the option selected.
13  Please forward the errata sheet and the original signed
14  signature page to counsel noticing the deposition, noting the applicable
15  time period allowed for such by the governing Rules of Procedure.
16  If you have any questions, please do not hesitate to call our office at
17  (202)-232-0646.
18
19  Sincerely,
20
21  Digital Evidence Group
    Copyright 2011 Digital Evidence Group
22  Copying is forbidden, including electronically, absent express written consent

**Page  438**

---

1   Digital Evidence Group, L.L.C.
2   1299 Pennsylvania Ave NW, Suite 1130E
3   Washington, D.C. 20004
4   (202) 232-0646
5

    E R R A T A   S H E E T

6
7
8   Case Name: TDY Holdings v. United States of America
9   Witness Name: Tommy Jordan
10  Deposition Date: 10/14/11
11    Page No.   Line No.        Change
12
13
14
15
16
17
18
19
20
21   _____        _____
22     Signature                      Date

**Page  440**

---

1   Digital Evidence Group, L.L.C.
2   1299 Pennsylvania Ave NW, Suite 1130E
3   Washington, D.C. 20004
4   (202) 232-0646
5
    SIGNATURE PAGE
6
7
8   Case Name: TDY Holdings v. United States of America
9   Witness Name: Tommy Jordan
10  Deposition Date: 10/14/11
11  I do hereby acknowledge that I have read
    and examined the foregoing pages
12  of the transcript of my deposition and that:
13
14  (Check appropriate box):
15  ( ) The same is a true, correct and
    complete transcription of the answers given by
16  me to the questions therein recorded.
17  ( ) Except for the changes noted in the
    attached Errata Sheet, the same is a true,
18  correct and complete transcription of the
    answers given by me to the questions therein
19  recorded.
20
21  _____        _____
22   DATE                WITNESS SIGNATURE

**Page  439**

Page 441

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

_____

TDY HOLDINGS, LLC, and      §

TDY INDUSTRIES, INC.        §

                            §

        Plaintiffs,         §

                            §

VS.                         § Case No. 07cv0787 JAH

                            §

UNITED STATES OF AMERICA,   §

UNITED STATES DEPARTMENT    §

OF DEFENSE, and ROBERT M.   §

GATES, in his official      §

capacity as SECRETARY OF    §

DEFENSE                     §

                            §

        Defendants.         §

_____


Videotaped Deposition of

TOMMY B. JORDAN

San Antonio, Texas

Wednesday, October 19, 2011

9:43 a.m.


Volume 4

Reported by:  Marcy Clark, CSR, CLR

----------------------------------------------------

DIGITAL EVIDENCE GROUP

1299 Pennsylvania Avenue, NW Suite 1130E

Washington, DC 20004

(202) 232-0646

1    VOLUME 4
2    Videotaped Deposition of
3    TOMMY B. JORDAN
4
5    Held at the offices of:
6        Koole Court Reporters of Texas
7        711 Navarro Street, Suite 101
8        San Antonio, Texas 78205
9        (210) 558-9484
10
11
12
13       Taken pursuant to notice, before Marcy Clark,
14   Certified Shorthand Reporter and Certified LiveNote
15   Reporter in and for the State of Texas.
16
17
18
19
20
21
22
                                                    Page 442

1                         INDEX
2                    TOMMY B. JORDAN
3                    October 19, 2011
4
5    APPEARANCES                              443
6
7    PROCEEDINGS                              446
8
9
10   EXAMINATION OF TOMMY B. JORDAN:
11       BY MR. WINE                          446
12
13
14   CERTIFICATE                              631
15
16   ERRATA SHEET                             634
17
18
19
20
21
22
                                                    Page 444

1                    APPEARANCES
2    ON BEHALF OF THE PLAINTIFFS:
3        Bradley D. Wine
4        Michael C. Mateer
5        DICKSTEIN SHAPIRO, L.L.P.
6        1825 Eye Street NW
7        Washington, D.C. 20006-5403
8        (202) 420-3607
9
10   ON BEHALF OF THE DEFENDANTS:
11       Lewis M. Barr
12       U.S. DEPARTMENT OF JUSTICE
13       601 D Street NW, Suite 8000
14       Washington, D.C. 20004
15       (202) 514-9645
16
17   VIDEOGRAPHER:
18       Alex Segovia, Videographer
19
20   ALSO PRESENT:
21       Robert Zoch
22       John M. Tishok
                                                    Page 443

1                 DEPOSITION EXHIBITS
2                    TOMMY B. JORDAN
3                    October 19, 2011
4
5    NUMBER          DESCRIPTION          MARKED
6    Exhibit 252   Excerpt from FAR 52.232-16 -   610
7              Progress Payments; 8 pages
8
9    Exhibit 253   Subpart 32.5 - Progress       611
10             Payments Based on Costs;
11             7 pages
12
13
14
15
16
17
18
19
20
21
22
                                                    Page 445

Pages 442 to 445

10/19/2011                TDY Holdings v. United States of America                Tommy Jordan

1           PROCEEDINGS
2           THE VIDEOGRAPHER:  This is the start
3   of the deposition of Tommy B. Jordan, Volume 4.
4   Today is Wednesday, October 19th, 2011.  Time on
5   record now is 9:43.
6           TOMMY B. JORDAN,
7   having been previously sworn, continued to testify
8   as follows:
9           EXAMINATION
10  BY MR. WINE:
11      Q.  Good morning, Mr. Jordan.  We've met
12  several times before.  My name is Brad Wine for
13  Allegheny Technologies, actually TDY Holdings and
14  TDY Industries, plaintiffs in this matter.  With me
15  are my colleagues, Mike Mateer, expert witness for
16  TDY in this matter, Bob Zoch and counsel for
17  Allegheny Technologies, TDY Industries and TDY
18  Holdings, John Tishok.
19          We're here for purposes of your
20  cross-examination from -- from last week's
21  testimony; and before we begin, I just want to
22  remind you that your oath that you took last Monday

Page 446

1   its closure?
2       A.  That's correct.
3       Q.  Okay.  And from that time period,
4   obviously some of the opinions that you've offered
5   in this matter relate to the World War II period,
6   correct?
7       A.  That is correct.
8       Q.  Okay.  Now, your work for the United
9   States government began in 1962 if my notes are
10  correct; is that right?
11      A.  That's correct.
12      Q.  And your work experience with the Federal
13  Government, with government contracts -- you had no
14  prior experience with government contracting prior
15  to 1962; is that correct?
16      A.  That is correct.
17      Q.  Okay.  Can you describe for me in greater
18  detail the training courses that you took when you
19  began your federal service in 1962 as they related
20  to government contracting?
21      A.  The first formal course that I recall was
22  in 1963, and I believe it was March 1963.  It was a

Page 448

1   is still in effect.
2           Is that your understanding, sir?
3       A.  My understanding.
4       Q.  All right.  Now, I want to deal first with
5   some preliminary issues that Mr. Barr discussed with
6   you on Monday of last week.  You're being offered as
7   an expert in government contracts matters; is that
8   correct, sir?
9       A.  That is correct.
10      Q.  Okay.  And at various points in time
11  throughout your testimony, you referred to the
12  relevant time period for this litigation.
13          Can I get a sense from you as to what
14  you believe the relevant time period for this
15  litigation is?
16          MR. BARR:  Objection, vague and
17  ambiguous.
18      A.  Approximately 1939 until approximately
19  1999.
20  BY MR. WINE:
21      Q.  1939 being roughly the year in which the
22  site began its operations and then 1999 the year of

Page 447

1   four-week basic contracting course conducted by the
2   Army at Fort Lee, Virginia; but prior to that, I had
3   worked extensively under the tutelage of an
4   experienced contracting officer.
5           Then my first line supervisor was
6   also a very experienced contracting official,
7   contracting officer; and I worked under their
8   guidance from the day I started work at Hill Air
9   Force Base until -- well, until I was granted a
10  contracting officer warrant in December of 1964.
11      Q.  I take it that the two individuals you
12  just referred to, sir, were in federal employment
13  during the World War II period?
14      A.  To the best of my knowledge, they were.
15      Q.  And what specifically did they teach you
16  or offer to you in supervising you about government
17  contracting during the World War II period?
18      A.  That was 60 years ago, and I don't
19  specifically recall anything that they taught me
20  where they alluded to any differences in the period
21  of World War II than -- than the period that we were
22  talking about then.

Page 449

Pages 446 to 449

1    Q.   Okay.  And what specific coursework, if
2  any, did you take, sir, that related to government
3  contracting during the World War II period?
4    A.   To the best of my recollection, I took no
5  courses that were specifically related to
6  contracting during World War II.
7    Q.   Is it fair to say, sir, that your opinions
8  in this matter regarding pre-1962 issues are -- are
9  based entirely on your review of documents and
10 regulations from that time period and comparing them
11 to the regulations and contracts that you worked
12 with during your federal employment?
13           MR. BARR:  Objection, argumentative,
14 compound, vague and ambiguous.
15   A.   If you include in the definition of
16 documents correspondence on the record that was
17 generated during the World War II period and
18 regulations and contracts that were written during
19 that period of World War II, yes.
20 BY MR. WINE:
21   Q.   Okay.  In your decades-long career in
22 government contracting, sir, how much of your time

                                        Page 450

1  was spent in conjunction with research and
2  development efforts?
3    A.   I don't think I can give you a precise
4  percentage.  I did have experience writing a number
5  of contracts where the government solicitation had
6  consisted of a performance-type specification, and
7  the respondent contractors were expected to develop
8  a product and propose a product that was produced in
9  accordance with those performance parameters that
10 were included in the government specifications.
11   Q.   Did any of those contracts involve the
12 government working collaboratively with those
13 contractors to meet those specifications or to
14 develop an end item?
15   A.   Would you give me a definition of what you
16 mean, "collaboratively"?
17   Q.   That there would be exchanges between the
18 contractor and the government during the
19 manufacturing process, during the research and
20 development process, that would perhaps have an
21 impact on what the end item looked like or how it
22 performed.

                                        Page 451

1    A.   There were performance or program reviews
2  during the performance of the contract where the
3  government and the contractor would meet together
4  and the contractor would review the status of his
5  developmental effort so the government could
6  ascertain whether or not that development was
7  consistent with the govern -- government objectives.
8    Q.   What about a situation where a contractor,
9  during an R&D effort, was encountering some issues?
10 Did you ever experience the government working,
11 again collaboratively, with the contractor to
12 address and -- and seek to rectify those issues or
13 problems?
14           MR. BARR:  Objection, vague and
15 ambiguous.
16   A.   If the contractor felt there were
17 deficiencies in the data that the government had
18 provided to the contractor, we would review the
19 contractor's request for clarification; and to the
20 extent appropriate, we would amend the contract to
21 provide clarification to the contractor of the
22 government intent.

                                        Page 452

1  BY MR. WINE:
2    Q.   Would this be -- with respect to the
3  interactions that I've described for you, sir, would
4  that be more the function of an ACO or a PCO?
5    A.   Any changes to the contract that would be
6  issued to amend the data that had been provided to
7  the contract would be a function of the PCO and not
8  the ACO.
9    Q.   But what if the problems didn't require a
10 change in the contract?  For example, the
11 specifications of how the end item was to perform
12 didn't change, but because of the R&D nature of the
13 effort, the way you got about to those end product
14 specifications needed to change?
15           Would that be a function of the ACO
16 or the PCO's oversight?
17           MR. BARR:  Objection, vague and
18 ambiguous, speculative.
19   A.   I don't know what you're talking about
20 relative to a change in the specification that would
21 not precipitate a change in the contract.
22

                                        Page 453

                              Pages 450 to 453

BY MR. WINE:

Q.  What about a change in processes to get you to a specification?  Would that be a function --

MR. BARR:  Same objection.

BY MR. WINE:

Q.  -- of the ACO or the PCO?

MR. BARR:  Same objections.

A.  The processes that the contractor employed in order to comply with the process specifications -- if you recall, the prior deposition testimony by Mr. Ianucci, he said that those process specifications were submitted to the government for review and approval; and I think my deposition testimony in 2009 indicated that the result of that review and approval process was a mutually agreed to set of process specifications.

BY MR. WINE:

Q.  And -- and those were -- manifested themselves in the MPD, correct?

A.  In the case of this contractor, yes, it was an MPD.

Q.  Okay.  And in reviewing your 2009

Page 454

testimony, you're aware that research and development contracts and other experimental contracts were performed at the Ryan site, correct?

A.  I am aware that there were contracts that could be construed as research and development, yes.

Q.  All right.  But you're unable to quantify how many?

A.  Since we do not have a definitive record of all of the contracts that were performed at this site, I cannot quantify how many.

Q.  Okay.  Is there a different degree of interaction between the government and a contractor on an R&D contract than on a production contract, sir?

MR. BARR:  Objection, vague and ambiguous.

A.  I don't necessarily agree with the word "interaction," but there is more discussion between the government and the contractor on a developmental effort than on a production of an item that had been previously produced.

Page 455

BY MR. WINE:

Q.  You never served as an ACO, correct, sir?

A.  That is correct.

Q.  You don't -- you did not actually administer contracts during your -- your decades-long tenure with the Federal Government?

A.  I did not serve as an administrative contracting officer.

Q.  And you never served as a property administrator for the government?

A.  That is correct.

Q.  And you never -- you never witnessed operations at the Ryan plant directly through your federal employment?

A.  I think that during my earlier deposition, I testified that I had no recollection of any contracts with Teledyne Ryan at that location.

Q.  And sitting here today, has your recollection changed, sir?

A.  It has not.

Q.  Okay.  And again, I just want to do a couple of tie-ups from -- from our 2009 effort.

Page 456

You've never spoken with -- directly with anyone who was involved with operations at the Ryan plant, correct?

MR. BARR:  Objection, vague and ambiguous.

A.  What do you mean "operations"?

BY MR. WINE:

Q.  Anyone that -- that worked for Ryan.

A.  That is correct.

Q.  Okay.  You did have conversations with government officials that were either resident at Ryan or took cognizance of issues at Ryan, correct?

A.  That was my previous testimony, yes.

Q.  Since you gave me your testimony in 2009, have you had any other discussions with individuals with cognizance of Ryan activities?

A.  I have not.

Q.  Okay.  All right.  Now, aside from your expert witness testimony in the Miami-Dade matter, what other experience, if any, did you have, sir, in handling environmental matters for the United States government?

Page 457

Pages 454 to 457

1    A.  I think my prior deposition testimony
2  indicated that during the closure process at Kelly
3  Air Force Base, I was a senior executive at the
4  San Antonio air material area; and we had a number
5  of environmental issues that were associated with
6  the closure of Kelly and then the transfer of the
7  real property from the Air Force to the City of
8  San Antonio.
9    Q.  Uh-huh.
10    A.  And then I had been a participant in many
11  of the briefings conducted by our environmental
12  people relative to environmental issues at Kelly Air
13  Force Base.
14    Q.  Did any of those briefings relate to the
15  source of TCE contamination at Kelly Air Force Base?
16    A.  Yes, they did.
17    Q.  And what could you tell me about those
18  briefings, sir?
19       MR. BARR:  Objection, beyond the
20  scope of direct.
21    A.  During the early days of Kelly Air Force
22  Base, Kelly overhauled most, if not all, of the
                                      Page 458

1  radial reciprocating engines that we used within the
2  Air Force; and the overhaul of those radial
3  reciprocating engines employed a significant volume
4  of degreasers.  And, to my recollection, TCE was one
5  of the primary degreasers that was used in that
6  process.
7       And at that point in time, there was
8  a -- what they called an evaporation pit or several
9  evaporation pits --
10       THE REPORTER:  Or what?
11       THE WITNESS:  Evaporation pits.
12    A.  -- where the spent TCEs were dumped into
13  those evaporation pits and then that leeched into
14  the soil.
15  BY MR. WINE:
16    Q.  Do you --
17       MR. BARR:  Objection, relevance.
18  BY MR. WINE:
19    Q.  Do you know what time period that was,
20  sir, where that -- that evaporation pit was used?
21    A.  During the World War II period and
22  possibly prior to World War II because Kelly
                                      Page 459

1  operations began in 1917 or 1919.
2    Q.  Okay.  And were you briefed during these
3  conversations, sir, that that means of disposing of
4  TCE was common during that period of time?
5       MR. BARR:  Objection, beyond the
6  scope of the direct, relevance, beyond the scope of
7  the witness' expertise.
8    A.  To the best of my recollection, it was
9  common within the Air Force.  I don't know what was
10  common within industry.
11  BY MR. WINE:
12    Q.  Okay.  Aside from your work on the BRAC
13  effort at Kelly, did you have any other
14  responsibilities relating to environmental matters
15  during your federal tenure?
16    A.  Other than as we indicated in my
17  deposition on -- last week, there were a couple of
18  ASPR provisions relative to environmental issues in
19  the Seventies and then the inclusion of those
20  environmental clauses in contracts starting, I
21  believe, in 1975, no, sir.
22    Q.  Those are the ASPR provisions regarding
                                      Page 460

1  contractor requirements for compliance with state
2  and local and federal environmental laws?
3    A.  It was the Clean Air and Water Act, and
4  then there was a marking of hazardous material.
5  Then there was a subsequent requirement that if a
6  government official witnessed any violations of
7  environmental laws, they were to report it.
8    Q.  Okay.  Were you involved at all with the
9  Air Force in the discussions that the Department of
10  Defense had in the early 1990s regarding discussions
11  with industry about allowability of environmental
12  costs in overhead that ultimately made its way into
13  that 1992 DCAA guidance that you saw last week with
14  Mr. Barr?
15       MR. BARR:  Objection, vague and
16  ambiguous.
17    A.  What do you mean by involve --
18  "involvement"?
19  BY MR. WINE:
20    Q.  Were you part of any discussions or
21  working groups within the government talking about
22  what the government's position should be and how
                                      Page 461

Pages 458 to 461

1  regulation should be developed relating to the
2  recoverability of environmental costs by
3  contractors?
4     A.  Not to my recollection.
5     Q.  Okay.  Now, how -- you mentioned when --
6  during your testimony with Mr. Barr that you had
7  visited a number of -- of contractors' plan -- and
8  subcontractors' plants during your federal tenure.
9         Do you remember that deposition
10 testimony, sir?
11    A.  Yes, I do.
12    Q.  How many of those site visits for those
13 plants -- how many of those plants were undergoing
14 environmental remediation efforts, to your
15 knowledge?
16        MR. BARR:  Objection, relevance,
17 beyond the scope of the witness' expertise, his
18 reports and opinions.
19    A.  To the best of my recollection, that was
20 not one of the issues that we discussed when I was
21 visiting those contractors' facilities.
22

Page 462

1  BY MR. WINE:
2     Q.  Did it ever come to your attention that
3  any of those contractors that you visited were
4  having to undergo environmental remediation efforts,
5  sir?
6         MR. BARR:  Same objections.
7     A.  Not that I recall.
8  BY MR. WINE:
9     Q.  And you weren't involved in any
10 discussions regarding the government's share of
11 liability for those cleanups?
12    A.  Not that I recall.
13    Q.  Okay.  Now, last week during your -- your
14 direct testimony with Mr. Barr, you used the terms
15 "hazardous substances" and "hazardous material"
16 somewhat interchangeably.
17        Did you mean to distinguish between
18 the two terms, or is there a difference in your mind
19 between those two terms in your use of them?
20        MR. BARR:  Objection,
21 mischaracterizes the witness' testimony and my
22 questions, vague and ambiguous.

Page 463

1     A.  I think they're essentially
2  interchangeable.
3  BY MR. WINE:
4     Q.  Okay.  So, you're not using them, say, in
5  the -- in the same manner that -- that federal
6  statutes use those terms as a term of art?
7     A.  That is correct.
8     Q.  Likewise, the term "chemical waste," are
9  you -- is -- do you connote any specific
10 particularity to your usage of the term "chemical
11 waste," sir?
12    A.  The chemical wastes, in my mind, were
13 those chemicals that were used either in the plating
14 process and/or the anodizing process by this
15 specific contractor.
16    Q.  What about TCE?  Do you consider that to
17 be a chemical waste, sir?
18        MR. BARR:  Objection, vague and
19 ambiguous.
20    A.  It is included in the -- my definition of
21 chemical waste, yes.
22

Page 464

1  BY MR. WINE:
2     Q.  And what about PCBs?
3     A.  PCBs?
4     Q.  Correct.
5         MR. BARR:  Same objections.
6     A.  Not within the sense that it was used in
7  one of the cleaning and/or anodizing processes.
8  BY MR. WINE:
9     Q.  Do you know, if at all, sir, whether PCBs
10 were used at this site?
11    A.  Based upon prior deposition testimony by
12 other witnesses, I do recall that there were PCBs
13 used in several applications.
14    Q.  Okay.  And based on your understanding
15 through their testimony of the use of PCBs at this
16 site, do you consider PCBs to be a chemical waste
17 as use -- as you have used that term?
18    A.  I don't recall any application of PCBs in
19 either the cleaning process and/or the anodizing
20 processes.
21    Q.  Okay.  And why is it that -- that the
22 definition of an item as a chemical waste depends on

Page 465

Pages 462 to 465

10/19/2011                    TDY Holdings v. United States of America                    Tommy Jordan

1    its use in your mind in a cleaning process or in an
2    anodizing process?
3           MR. BARR:  Objection, vague and
4    ambiguous, confusing.
5       A.  Possibly because I have a degree in
6    chemistry.  Other than that, I don't know.
7    BY MR. WINE:
8       Q.  Okay.  And in your mind, sir, is there a
9    distinction between chemical wastes and hazardous
10   substances?
11          MR. BARR:  Objection, vague and
12   ambiguous, beyond the witness' expertise.
13   BY MR. WINE:
14      Q.  Just as you've used that term throughout
15   this matter?
16      A.  Chemical waste --
17          MR. BARR:  Objection to
18   mischaracterizing the witness' testimony.
19      A.  Chemical waste would be considered to be
20   hazardous substances.
21   BY MR. WINE:
22      Q.  Okay.  Now, you've never served as a DCAA
                                                    Page 466

1       Q.  Okay.  Is there anywhere in your expert
2    report that I can go to that spells out your
3    involvement with DCAA cost accounting regulations,
4    sir?
5           MR. BARR:  Objection, the report
6    speaks for itself.
7       A.  I'm sorry I didn't memorize every word in
8    my expert report so I can tell you specifically.
9    BY MR. WINE:
10      Q.  Do you recall whether you discussed at all
11   an application of DCAA auditing -- I mean, DCAA cost
12   accounting regulations in either of your expert
13   reports, sir?
14          MR. BARR:  Same objection.
15      A.  I'm sorry.  I don't recall.
16   BY MR. WINE:
17      Q.  Okay.  Have you, during your federal
18   employment, ever been called upon to determine
19   whether a contractor's costs are allocable to a
20   particular contract?
21      A.  I reviewed a number of determinations by
22   DCAA as to allocability of costs, but I never made
                                                    Page 468

1    auditor, correct, sir?
2       A.  That is correct.
3       Q.  And you testified, if I -- if I understand
4    correctly, that DCAA is a completely separate agency
5    from the DCMA or from the ACOs, that they report
6    through an entirely different chain of command up
7    through the Department of Defense.
8           Do I understand your testimony
9    correctly, sir?
10      A.  That is my understanding.
11      Q.  Okay.  Now, what experience, sir, do you
12   have in cost accounting regulations?
13      A.  Well, as I had testified earlier and in my
14   expert report, I believe I alluded to the fact that
15   I had negotiated a significant number of contracts
16   based upon cost and pricing data submitted by
17   contractors that had been audited by DCAA and
18   evaluated by the CMA officials.
19          And based upon my familiarity with
20   regulations and the negotiation of those contracts,
21   I think I understood and do still understand a lot
22   of the accounting regulations fairly well.
                                                    Page 467

1    the initial determination of allocability.
2       Q.  Did you ever, in your review of DCAA
3    determinations, take exception with the findings of
4    the DCAA?
5       A.  Not to my recollection.
6       Q.  Have you ever been involved during your
7    federal tenure in determining whether a contractor's
8    costs are allowable pursuant to applicable cost
9    accounting regulations?
10      A.  I reviewed a number of DCAA reports where
11   they had made a determination of allowability; but
12   to the best of my recollection, I didn't -- never
13   made the initial determination of allowability of
14   cost.
15      Q.  And did you ever take any exception to any
16   of those findings of allowability by the DCAA?
17      A.  Not to my recollection.
18      Q.  And what about a determination by DCAA
19   about -- regarding the reasonableness of a
20   contractor's costs?  Same answer?
21      A.  Not necessarily.
22      Q.  Have you ever reviewed any DCAA -- during
                                                    Page 469

                                          Pages 466 to 469

1  your federal tenure, conclusions by the DCAA of the
2  reasonableness of costs being claimed by a
3  contractor for cost accounting purposes?
4      A.  Would you repeat the question, please?
5      Q.  Sure.  During your federal tenure, have
6  you ever reviewed conclusions by the DCAA of the
7  reasonableness of costs being claimed by a
8  contractor for cost accounting purposes?
9      A.  Yes.
10     Q.  And describe for me when you did that,
11 sir.
12     A.  On basically every negotiated procurement
13 that was based upon cost and pricing data, there was
14 a determination, either by the DCAA or personnel
15 within the DCASR, as to reasonableness of the
16 contractor's proposed costs.  And then I also, as a
17 contracting officer, made determinations as to
18 reasonableness of costs based upon the adequacy of
19 the contractor's cost and pricing data that was
20 submitted.
21     Q.  During your federal tenure, sir, you were
22 never involved in determining the allocability of

1  environmental costs to a particular government
2  contractor, correct?
3          MR. BARR:  Objection, asked and
4  answered.
5      A.  Not to my recollection.
6  BY MR. WINE:
7      Q.  And you were never involved in the
8  decision-making process as to whether or not a
9  particular government contractor's environmental
10 costs were allowable, correct?
11     A.  Best of my recollection, no.
12     Q.  And you were never involved in the
13 decision-making process as to whether or not a
14 government contractor's environmental costs were
15 reasonable, correct?
16     A.  If you limit it to environmental costs,
17 no.
18     Q.  Okay.  And you're not offering an opinion,
19 sir, as to whether or not Ryan's environmental costs
20 in this matter were reasonable, are you?
21     A.  Based upon the DCAA audit reports that I
22 reviewed, there was at least one instance where the

1  DCAA had made a determination that the contractor's
2  environmental costs were unreasonable.
3      Q.  But that's not the question I asked you,
4  sir.
5          I asked you whether you were offering
6  an opinion in this matter as to the reasonableness
7  of the environmental costs that Ryan is seeking to
8  recover, TDY is seeking to recover in this
9  litigation?
10     A.  My opinion was predicated upon that DCAA
11 report that I just referenced.
12     Q.  So, what is your opinion, sir, in that
13 regard?
14     A.  My opinion is that the DCAA made a
15 determination that some of the costs were
16 unreasonable, and I have no reason to question that
17 determination.
18     Q.  Okay.  Insofar as there are costs that
19 Ryan is seeking recovery for, TDY is seeking
20 recovery for in this matter that were not the
21 subject of the 1995 audit process, have you
22 formulated an opinion, sir, in this matter regarding

1  the reasonableness of those costs?
2          MR. BARR:  Objection, calls for
3  speculation, incomplete hypothetical, vague and
4  ambiguous.
5      A.  Inasmuch as I have not seen all of the
6  details relative to all of those cost submissions
7  and the results of the government evaluation of that
8  cost submission or those cost submissions, I'm
9  afraid I cannot offer an opinion as to all of the
10 costs during that period.
11         MR. BARR:  Also, beyond the scope of
12 the direct.
13 BY MR. WINE:
14     Q.  And with respect to the DCAA audit report
15 that you referred to in the question -- in the
16 answer before the last question I offered you, sir,
17 your opinion simply is that you reviewed documents
18 wherein DCAA questioned the reasonableness of the
19 costs that Ryan had included in its overhead rates
20 from the early 1990s, correct?
21         MR. BARR:  Objection, misstates the
22 witness' prior testimony.

1    A. There was a specific amount that they
2  referenced based upon contractor submissions, that
3  is correct.
4  BY MR. WINE:
5    Q. Okay. Do you know the ultimate outcome of
6  the decision-making process between DCAA and Ryan
7  regarding that dispute regarding the reasonableness
8  of costs being claimed by Ryan for those cleanup
9  matters?
10    A. That was one of the primary bases for the
11  settlement and advance agreement that had been
12  negotiated between the government and the contractor
13  and executed by the administrative contracting
14  officer and Ryan officials.
15    Q. And that's the Convair advance agreement,
16  correct?
17    A. I don't remember it being called the
18  Convair advance agreement. I think the title that I
19  recall was "Advance in Settlement Agreement," but it
20  was in regard to cleanup of the contamination that
21  had been introduced into the Convair lagoon through
22  the storm drains.

Page 474

1    Q. Okay. And the government didn't take a
2  firm position regarding the reasonableness of the
3  costs being claimed by Ryan in that advance
4  agreement, did it?
5        MR. BARR: Objection, vague and
6  ambiguous, the documents speak for themselves.
7  BY MR. WINE:
8    Q. You're offering an opinion about that.
9  So, I want to know what your understanding is, sir.
10        MR. BARR: Same --
11    A. Best of --
12        MR. BARR: -- objections.
13    A. Best of my recollection, there is no word
14  in that advance in settlement agreement that says
15  the costs are considered to be reasonable.
16  BY MR. WINE:
17    Q. But is there anything in that agreement
18  where the government says it concluded that the
19  costs were not reasonable?
20        MR. BARR: Same objections; documents
21  speak for themselves.
22    A. Best of my recollection, it does not say

Page 475

1  that the costs were reasonable or unreasonable.
2  BY MR. WINE:
3    Q. Okay. And you're not here to go beyond
4  what is stated in that document, are you, sir?
5    A. I am not.
6    Q. Okay. Now, you don't have any legal
7  training, correct, sir?
8    A. That is correct.
9    Q. And -- but some of the testimony that you
10  offered last week with Mr. Barr and some of the
11  opinions in your expert report seek to interpret
12  regulations, particularly ASPRs and FARs; is that
13  correct?
14        MR. BARR: Objection, vague and
15  ambiguous in the use of the word "interpret."
16    A. Let me clarify my last answer.
17        As I stated during my 2009
18  deposition, I did have one course in commercial
19  contract law; but other than that, I have no formal
20  training in -- in law.
21  BY MR. WINE:
22    Q. Okay. Are you offering opinions that are

Page 476

1  meant to interpret regulations in this matter, sir?
2        MR. BARR: Same objection as to
3  "interpret."
4    A. Since I spent the majority of my federal
5  career in contracting and as I had indicated
6  earlier, for most of that career, I had copies of
7  the regulations either on my desk or within a few
8  feet of my desk and I referred to those regulations
9  some days multiple times every day, I think that I
10  am qualified to read regulations as they pertain to
11  various contracting situations. And if you call
12  that interpretation, then, yes, I did interpret
13  regulations.
14  BY MR. WINE:
15    Q. So, I just want to make sure I understand
16  what you -- when you use the word "interpret," what
17  you mean that to be. It's reading regulations?
18    A. It is reading regulations and then
19  applying those regulations to various contracting
20  situations.
21    Q. Okay. And that's what you're doing in
22  this case?

Page 477

Pages 474 to 477

1          MR. BARR:  Objection, misstates the
2    witness' prior testimony, argumentative, vague and
3    ambiguous.
4          A.  I am reading regulations.  I am looking at
5    contracts.  I am looking at various pieces of
6    correspondence that were within that relevant time
7    frame and then basing my opinions upon that
8    collective body of evidence, yes.
9    BY MR. WINE:
10         Q.  And if I recall your testimony last week
11   correctly, you testified on numerous occasions that
12   the environmental regimes that you were testifying
13   about remained consistent for a period of decades;
14   is that correct?
15         MR. BARR:  Objection, misstates the
16   witness' testimony.  Object to the phrase
17   "environmental regimes."
18         MR. WINE:  I didn't use the term
19   "environmental regimes."
20         MR. BARR:  Yes, you did.  I'm reading
21   it.
22

                                            Page 478

1    BY MR. WINE:
2          Q.  Regulatory regimes.
3          A.  My deposition testimony last week stated
4    that in many of the instances, the regulations
5    covering various issues had remained remarkably
6    consistent throughout the relevant period of at
7    least 1948, which was the first edition of the ASPR
8    through the end of the relevant period.
9          Q.  Did you review any of the statutes that
10   underlie the ASPR, sir, in preparation for your
11   expert report?
12         A.  I don't recall reading any of the statutes
13   in preparation for my expert report.  I did review a
14   number of statutes during my career that were behind
15   those regulations and -- as well as various
16   testimony to committees of the -- the Congress that
17   had resulted in those statutes, yes.
18         Q.  Did you review any journal articles
19   regarding the various ASPR provisions and excerpts
20   that Mr. Barr showed you in preparation for your
21   expert report?
22         A.  Not to my recollection.

                                            Page 479

1          Q.  Did you review any board of contract
2    appeals opinions that applied any of the ASPR
3    excerpts that you testified about last week in
4    preparation for your expert report?
5          A.  I did review a number of decisions of the
6    Armed Services board of contract appeals pertaining
7    to some disputes between the government and this
8    specific contractor in preparation for my earlier
9    deposition and expert report.
10         Q.  But what about with respect to the ASPR
11   provisions that you testified about in your expert
12   report, sir?  Did you review any board of contract
13   appeals decisions relating to those, sir?
14         A.  The board of contract appeal decisions
15   that I reviewed may have alluded to various ASPR
16   provisions; but as I sit here today, I can't
17   specifically tell you which provision of ASPR they
18   alluded to.
19         Q.  What about court of federal claims
20   decisions?  Have you reviewed any court of federal
21   claims decisions analyzing or applying any of the
22   ASPR provisions that you included in your testimony

                                            Page 480

1    in preparation for your expert report?
2          A.  During my career, I did review a number of
3    court of claims decisions.  I can't specifically
4    relate any of those decisions to anything within my
5    expert report.
6          Q.  Same thing for federal circuit decisions,
7    sir?
8          A.  During my career, I do recall seeing
9    several federal circuit decisions; but I can't
10   specifically relate those decisions to anything
11   within my expert report.
12         Q.  Okay.  How about state court decisions?
13         A.  Since the contracts that I participated in
14   the award of during my career were federal cases,
15   federal regulations, I don't recall anything that
16   ever came up to a state court.
17         Q.  It's true in your experience, sir, that
18   courts sometimes interpret regulations in a manner
19   that's different from the Department of Defense,
20   correct?
21         MR. BARR:  Objection, vague and
22   ambiguous, overly broad.

                                            Page 481

                                   Pages 478 to 481

1       A.  Since I am not familiar with every
2   decision by every federal court, I cannot
3   specifically answer that question to your
4   satisfaction.
5   BY MR. WINE:
6       Q.  Are court decisions regarding the
7   interpretation of regulations, including ASPRs,
8   binding upon executive agencies or federal agencies
9   such as the Department of Defense, sir?
10          MR. BARR:  Objection, calls for a
11  legal opinion.
12      A.  Since I don't --
13          MR. BARR:  Vague and ambiguous,
14  beyond the scope of the direct.
15      A.  Since I don't have training in law, I
16  can't specifically answer that question.
17  BY MR. WINE:
18      Q.  It's true, isn't it, sir, that DOD's own
19  interpretation of regulations sometimes change over
20  a period of time?
21          MR. BARR:  Vague and ambiguous.
22      A.  There are instances where the government

1   government will offer in support of its case?
2           MR. BARR:  Objection, calls for an
3   evidentiary ruling, is a legal opinion.
4       A.  I think in my deposition testimony last
5   week, I indicated several ways in which I thought my
6   expert opinions could help the judge in arriving at
7   his -- his decisions.
8           As I indicated, I think in 2009, I am
9   not familiar with the judge.  I don't know him
10  personally.  I don't know his background.  I don't
11  know how much he is personally aware of the terms of
12  art that are used within government contracts; and
13  therefore, I am offering my opinions in an attempt
14  to assist him if he thinks he needs that assistance.
15  BY MR. WINE:
16      Q.  If the parties were to stipulate as to the
17  meaning of a term of art that is relevant in this
18  matter, would that require you to testify in this
19  case as an expert?
20          MR. BARR:  Objection, overly broad,
21  vague and speculative, ambiguous.
22      A.  If I understand your -- your question --

1   does, in fact, change its regulations because of
2   various situations that come up, either performance
3   by contractors indicates that there are ambiguities
4   in those regulations that require clarification
5   and/or there are laws promulgated that necessitate a
6   change in regulations, yes.
7   BY MR. WINE:
8       Q.  Now, the ASPR provisions that Mr. Barr
9   showed you last week in this matter, they aren't
10  ambiguous, are they, sir?
11          MR. BARR:  Question argumentative,
12  overly broad.
13      A.  I think we discussed that in 2009.  It
14  depends on your training in contract issues, how
15  many regulations you have read, your experience base
16  as to whether or not it would be considered to be
17  ambiguous or not.
18  BY MR. WINE:
19      Q.  Okay.  And it's your position, sir,
20  that -- that federal judge -- in this case, Judge
21  Houston -- needs expert testimony in order to read
22  and understand the regulations that perhaps the

1   your question, if you and Mr. Barr agree on a
2   definition of a term of art, whether or not Mr. Barr
3   would seek my opinion, I cannot answer that
4   question.
5   BY MR. WINE:
6       Q.  Okay.  In several instances last week, you
7   described the ASPR expert -- excerpts that Mr. Barr
8   showed you as remarkably consistent over time.
9           What does that mean, that
10  something -- that a series of regulations remain
11  remarkably consistent?
12      A.  If you go back to the earliest editions of
13  ASPR through the current Federal Acquisition
14  Regulations, either the words are the same or the
15  meanings within those words, in my opinion, are
16  remarkably consistent through time.
17      Q.  Would you agree with me, sir, that even
18  the change of one word within a regulation could
19  have a legally significant difference on how that
20  regulation's applied?
21          MR. BARR:  Objection, hypothetical,
22  speculative, vague and ambiguous.

10/19/2011                 TDY Holdings v. United States of America                 Tommy Jordan

1    A.  Depends on what word you're talking about.

2  BY MR. WINE:

3    Q.  Okay.  Now, you didn't read every document

4  that was produced in this litigation, did you, sir?

5    A.  I think my deposition testimony indicated

6  I had reviewed well in excess of a thousand.  I did

7  not keep a detailed inventory of the documents.  So,

8  I can't give you a precise number that I reviewed;

9  but based upon documentation that I have seen, there

10  are documents that I probably did not know exist or

11  either I thought that they were not relevant to the

12  issues that I was interested in.

13    So, to answer the question, I have

14  not reviewed every document that was generated

15  during this deposition or this litigation period.

16    Q.  Now, there's no section in your expert

17  report or rebuttal report that lays out or describes

18  the methodology that you employed to formulate your

19  opinions in this matter, is there?

20    MR. BARR:  Objection, the reports

21  speak for themselves.

22    A.  As I sit here today, I can't specifically

Page 486

1  tell you whether there is or isn't.

2  BY MR. WINE:

3    Q.  Okay.  Well, why don't I show you your

4  expert reports.  These, sir, were marked Jordan

5  Exhibits 3 and 4.  If you hold on a second, I'll get

6  it off the credenza so you can have the official

7  copy.

8    Just so the record adequately

9  reflects, I've handed the -- the witness what was

10  marked last week on Monday as Exhibits 3 and 4 for

11  purposes of Mr. Jordan's testimonial deposition,

12  which were described then as his rebuttal report and

13  his expert report in this matter.

14    If you'd like to look through that

15  and familiarize yourself, tell me whether or not

16  either of those documents lay out the methodology

17  that you used to formulate your opinions in this

18  matter.

19    A.  (Reviewing documents) There is no one

20  precise statement within my expert report that says,

21  "This is the methodology that I used"; but if you

22  read the sum and substance of my expert report, you

Page 487

1  will ascertain the processes that I used in order to

2  come up with my opinions.

3    Q.  Now, when we talked in 2009, you explained

4  that there was no list or collection of documents or

5  source that I could go to to describe what all the

6  documents were that you reviewed in the preparation

7  of the report.  Then you testified that the major

8  documents that you relied upon were found in the

9  footnotes of your report.

10    Do you remember that testimony from

11  2009?

12    A.  Yes, I do.

13    Q.  Now, of the 251 exhibits that were marked

14  in evidence last week during your expert deposition

15  or your testimonial deposition, 84 of them are

16  referenced in your expert reports.  167 aren't

17  referenced in either of those documents.

18    Why didn't you bother to cite to

19  those 167 documents in your reports, sir?

20    MR. BARR:  Objection, argumentative.

21    A.  As I indicated in my expert report, that I

22  reserve the right to supplement my opinions based

Page 488

1  upon evidence that I saw subsequent to the 26th of

2  October of 2009.  In my preparation for this

3  deposition, I have continued my review of documents

4  and evidence, either documents that I had but did

5  not include in my expert report or documents that

6  were provided to me either through my request or

7  upon discovery by DOJ.  And so, those, I assume, are

8  the documents that you're alluding to in your --

9  your question.

10  BY MR. WINE:

11    Q.  When did you conduct this supplemental

12  review, sir?

13    A.  I began preparation for my depositions

14  about two months ago, two and a half months ago.

15    Q.  Okay.  Now, you've added -- you've offered

16  additional opinions that are not contained in your

17  expert report of two years ago; is that correct,

18  sir?

19    A.  The only opinion that I can recall off the

20  top of my head that was not contained in my expert

21  report was relative to progress payments.

22    Q.  And why did you offer an opinion on

Page 489

Pages 486 to 489

10/19/2011                    TDY Holdings v. United States of America                    Tommy Jordan

1    progress payments, sir?
2        A.   In October of 2009, I was not aware that
3    the progress payments was an issue that had been
4    brought up; and I think you brought it up subsequent
5    to October of 2009.
6        Q.   Did you ever make any effort, sir, to
7    draft a supplemental expert report prior to your
8    testimonial deposition that commenced last week?
9        A.   I made no effort because I didn't know it
10   was required.
11       Q.   Okay.  Did you ask DOJ whether there was a
12   requirement in that regard?
13           MR. BARR:  Objection.
14       A.   I did not specifically ask if there was a
15   requirement, since I made the judgment decision that
16   if there was a requirement, DOJ would advise me.
17   BY MR. WINE:
18       Q.   And we'll get to progress payments in a
19   little while as to the substance; but specifically,
20   what opinions are you offering in this matter
21   regarding progress payments -- yes -- regarding
22   progress payments?
                                                    Page 490

1            MR. BARR:  Objection, witness'
2    testimony speaks for itself, overly broad, vague and
3    ambiguous.
4        A.   I think if you go back and read my
5    deposition testimony last week, you will find out
6    what my opinions were relative to progress payments.
7    BY MR. WINE:
8        Q.   Okay.  But sitting here today, if I ask
9    you, sir, as an expert for the government and
10   government contracting, what opinions in this matter
11   are you offering regarding progress payments, can
12   you answer that question?
13           MR. BARR:  Same objections.
14       A.   I think I can.
15   BY MR. WINE:
16       Q.   Okay.  And what opinions are you offering
17   in this matter regarding progress payments?
18       A.   That the progress payments were applicable
19   only to fixed-price contracts because there were no
20   provisions for progress payments in cost
21   reimbursable contracts, that in those contracts,
22   there were provisions for the government to assume
                                                    Page 491

1    title.
2            And I think that I expressed the
3    opinion last week that the material to which the
4    government assumed title through the process of
5    progress payments were those things of value that
6    the government could assume title to protect its
7    interest in the monies advanced to the contract
8    through -- contractor through progress payments,
9    that there were provisions in the regulations and
10   contracts that contain progress payments that
11   specifically stated that once the contractor had
12   completed all of his obligations to the government,
13   that the title to any residual property would revert
14   back to the contractor.
15           There were provisions in the contract
16   and the documentation that alluded to the
17   responsibilities of the contractor or the authority
18   for the contractor to sell property or scrap, if you
19   will, including that material for which he had
20   received progress payments without prior government
21   approval and that there were no documents -- no
22   documentation that I recall seeing that indicated
                                                    Page 492

1    that any of the hazardous materials were considered
2    to have any value.
3            There was a specific letter by the
4    contractor in the 1990s -- I don't recall the
5    specific date -- where the contractor had made a --
6    one of the vice presidents of the contractor had
7    specifically made a statement that notwithstanding
8    the fact that the government may have assumed either
9    title or a lien through progress payments, that the
10   contractor retained ownership to all of the property
11   until it had been disposed of or sold back to the
12   government.
13       Q.   Okay.  And what methodology did you
14   employ -- first of all, let me get to a preliminary
15   question.
16           When were you asked, if you were
17   asked at all, to formulate those opinions, sir?
18       A.   I can't specifically tell you when.
19       Q.   Was it this year?
20       A.   Yes.
21       Q.   Was it two months ago?
22       A.   It was within the last two, two and a half
                                                    Page 493

1  months.

2      Q.  Okay.  And one of your opinions deals with

3  the term, as used in the ASPRs if I remember your

4  testimony today and last week correctly, the term

5  "material," holding title to material.

6          Do you recall that testimony, sir?

7      A.  I don't recall specifically using the word

8  "material."

9      Q.  I think you had given a definition to the

10  term "material" as having value.  I'm sorry.  I'm

11  just trying to find an actual excerpt from your

12  testimony.  It might be up here.  Hold on one

13  second.

14          I apologize.  I found the testimony,

15  and it's consistent with my recollection of your

16  testimony last week.  "In certain contracts, there

17  were provisions for the government to assume title.

18  And I think that I expressed this opinion last week

19  that the material to which the government assumed

20  title through the process of progress payments were

21  those things of value that the government could

22  assume title to protect its interest in the monies

Page 494

1  the contractor under progress payments.

2      Q.  Do you recall Mr. Barr asking you

3  questions about this last Wednesday, sir?

4      A.  I cannot specifically recall exactly what

5  questions Mr. Barr asked me over those three days of

6  deposition testimony.

7      Q.  On Wednesday, Mr. Barr asked you, "Did any

8  of the contracts which used the word 'materials,'

9  define that word."

10          And you answered, "Based on my

11  recollection, they were basically defined as those

12  things that had value and those materials that were

13  entered into and made a part of the product being

14  produced by the government."

15          Do you recall that testimony, sir?

16      A.  Isn't that what I just said?

17      Q.  Do you recall that testimony, sir?

18      A.  Since you refreshed my memory, yes.

19      Q.  And do you recall defining the term

20  "material" in your expert report, sir?

21      A.  Not specifically, no.

22      Q.  Go ahead and turn to Page 16 of Exhibit 3.

Page 496

1  advanced to the contract -- through contractor --

2  through progress payments."

3          Is there a specific definition of the

4  word "material" in the ASPRs that you rely upon for

5  that aspect of your testimony or opinions, sir?

6      A.  I can't point you to a specific definition

7  within ASPR.  That definition of material is based

8  upon my experience and commonsense application of

9  regulations.

10          As I stated during my 2009

11  deposition, based upon my experience, material has

12  been those things that were entered into and made a

13  part of the item being produced and delivered to the

14  government.

15          The commonsense definition includes,

16  for the purposes of progress payments, those things

17  that do have value because if there is no value to

18  the item, whether it's a material or non-material

19  item, then there is no purpose of trying to obtain

20  title or a lien to that property because it would

21  not serve the purpose of protecting the government's

22  financial interest to the monies being advanced to

Page 495

1  And while you're finding it on Page 16, I'll read

2  from your report.

3          "Material means such property as may

4  be incorporated into or attached to the end products

5  to be delivered to the government or as may be

6  consumed or expended in the performance of a

7  contract.  It includes, but is not limited to, raw

8  and process material, parts, components, assemblies,

9  expendable small tools and consumable supplies.

10          Do you see that, sir?

11      A.  That's what the report says, yes.

12      Q.  Is TCE a consumable supply, sir?

13      A.  It is a consumable supply; but for

14  purposes of progress payments, it has no value.

15      Q.  Do contractors have to pay money in order

16  to get TCE to use in degreasers, for example?

17      A.  I saw no evidence that they charged the

18  cleaning materials, such as TCE, as a direct item of

19  cost; but it was probably included in the

20  contractor's overhead.

21      Q.  Why would it be included in overhead if it

22  had no value?

Page 497

Pages 494 to 497

10/19/2011                TDY Holdings v. United States of America                Tommy Jordan

1       A.  It -- it represents a cost that the
2   contractor would have to expend in order to perform
3   the contract.
4       Q.  Is chromium a consumable supply, sir, in
5   the context of this plant?
6       A.  To the extent that there were processes
7   employed by the contractor for chrome plating
8   certain products prior to delivery, it would be
9   considered to be a -- or the materials used by the
10  contractor to affect that plating process would be
11  consumable.
12      Q.  Would cutting oils be a consumable supply
13  at the site, sir?
14      A.  To the extent that they are purchased by
15  the contractor for application to government and
16  commercial contracts, they would be consumable.
17      Q.  And likewise, lubricants, aside from
18  cutting oils, used in machine tools and other
19  manufacturing processes at the site?
20      A.  Best of my knowledge, they would be
21  considered to be allowable and allocable costs.
22      Q.  Okay.  Besides your opinions regarding

                                        Page 498

1   progress payments, are you offering any other expert
2   opinions in this matter that were not contained in
3   Exhibits 3 or 4?
4       A.  Not that I can --
5           MR. BARR:  Objection, asked and
6   answered.
7       A.  Not that I can recall as I sit here.
8   BY MR. WINE:
9       Q.  Are there any opinions in Exhibit 3 or 4
10  that you're disclaiming at this point or are not
11  offering to the court as opinions in this matter?
12      A.  Not that I can specifically recall.
13      Q.  How much time did you spend, sir,
14  developing your opinions regarding progress payments
15  in this matter?
16      A.  I cannot specifically tell you how much
17  time I spent on that one specific issue because I
18  didn't break down the time that I spent in
19  preparation for my deposition into various topics
20  and issues.
21      Q.  What did you do -- what efforts did you
22  engage in to prepare your opinion regarding progress

                                        Page 499

1   payments?
2       A.  As I had indicated last week, I reviewed
3   regulations.  I reviewed contracts.  I reviewed
4   various pieces of correspondence.  I reviewed DCAA
5   audit reports.  I reviewed various reports.  I
6   reviewed contractor reports to their stockholders,
7   and that represented the collective body of evidence
8   that I reviewed in preparation for my deposition.
9       Q.  Sitting here today, sir, can you point me
10  to what documents you specifically reviewed in
11  formulating your expert opinions regarding progress
12  payments?
13      A.  I think those documents were included in
14  the 251 exhibits to my deposition last week.  I
15  can't specifically sit here, as I sit here today,
16  and tell you specifically which ones of those 251
17  documents pertain to the issue of progress reports.
18      Q.  Are there any documents that you reviewed
19  in formulating opinions regarding progress payments
20  that weren't marked as exhibits last week?
21      A.  Not that I can specifically recall.
22          MR. WINE:  Why don't we take a break?

                                        Page 500

1   We've been going for about an hour.  Off record.
2           THE VIDEOGRAPHER:  Going off record.
3   Time now is 10:47.
4           (Recess from 10:47 a.m. to 10:55
5   a.m.)
6           THE VIDEOGRAPHER:  Going back on
7   record.  Time now is 10:55.
8   BY MR. WINE:
9       Q.  In 2009, Mr. Jordan, I asked you if you
10  had an understanding as to how many contracts were
11  performed at the Ryan site from 1938 until 1999.
12          Do you recall me asking that
13  question?
14      A.  Yes.
15      Q.  And because of the -- the state of the
16  record, the absence of documents, I think it was
17  your response it was impossible to tell; is that
18  correct?
19      A.  As I recall in my deposition, that is my
20  answer, yes.
21      Q.  Can you provide, based on your experience,
22  sir, and your knowledge of the Ryan site that you've

                                        Page 501

                                    Pages 498 to 501

10/19/2011                TDY Holdings v. United States of America                Tommy Jordan

1  accumulated during the course of your engagement in
2  this matter an approximation as to the number of
3  contracts you believe were -- were performed at this
4  site during its decades-long, 60-year history?
5        MR. BARR:  Objection, asked and
6  answered.
7        A.  I have no information today that I didn't
8  have in 2009 relative to the numbers of documents or
9  number of contracts that were performed.
10 BY MR. WINE:
11       Q.  Could it have been in the thousands based
12 on your experience, sir?
13       MR. BARR:  Objection, speculative.
14       A.  I have no idea.  I think -- I could only
15 guess.
16 BY MR. WINE:
17       Q.  Okay.  Let's talk about the 1940s.  During
18 that operating period, the Ryan site, do you know
19 what percentage of the work Ryan was doing was of a
20 government nature?
21       MR. BARR:  Objection, vague and
22 ambiguous, "government nature."

Page 502

1  whether those were subcontracts under military
2  contracts; or were they commercial subcontracts?
3        A.  I saw no evidence that would differentiate
4  between those two.
5        Q.  Okay.  So, sitting here today for the
6  entire decade of the 1940s, are you able to
7  determine how much of Ryan's work during that decade
8  was for a government customer and how much of it was
9  for a commercial customer?
10       MR. BARR:  Same objections.
11       A.  Based upon the evidence that I saw and the
12 documents that I reviewed, there was no
13 differentiation between those con -- types of
14 contracts; and so I cannot answer that question.
15 BY MR. WINE:
16       Q.  How about for the 1950s?
17       MR. BARR:  Same objections.
18       A.  Other than some references in the reports
19 to their stockholders, I don't recall seeing any
20 documentation that alluded to that kind of
21 differentiation.
22

Page 504

1  BY MR. WINE:
2        Q.  Was for a government customer?
3        A.  During the period of the war?
4        Q.  1940s.
5        A.  During the war period or are you
6  talking -- including 1946 through 1949?
7        Q.  Let's go from 1940 to 1946.
8        MR. BARR:  Objection, calls for
9  speculation, beyond the scope of the direct.
10       A.  Based upon the documents that I reviewed,
11 I do not recall any commercial contracts that were
12 performed during that period.
13 BY MR. WINE:
14       Q.  What about from 1947 to 1949?
15       MR. BARR:  Same objections.
16       A.  I do recall that there were contracts that
17 the contractor performed for aircraft components
18 such as manifolds.  I don't recall any
19 differentiation between contracts for military
20 customers and commercial customers.
21 BY MR. WINE:
22       Q.  So, sitting here today, sir, do you know

Page 503

1  BY MR. WINE:
2        Q.  Is there any period of the facility's
3  operating history from 1938 until 1999 that you can
4  quantify the split between a government contracting
5  activity and other than government contracting
6  activity, commercial activity, anything of the sort?
7        MR. BARR:  Same objections.
8        A.  For that entire 60-year period, I made no
9  attempt to ascertain the exact split between
10 commercial contracts and government contracts.
11 BY MR. WINE:
12       Q.  Now, Mr. Barr asked you last week about
13 subcontracts that Ryan performed at the site.
14       Did you make any effort to determine
15 which of those subcontracts were for a government
16 end user or customer to the prime and which of them
17 were for a commercial customer to the prime?
18       A.  I think my deposition testimony was that I
19 saw no evidence relative to the exact nature of
20 those subcontracts.  So, I cannot answer that
21 question.
22       Q.  Based on your experience, sir, serving as

Page 505

Pages 502 to 505

10/19/2011      TDY Holdings v. United States of America      Tommy Jordan

1    a government contracting expert with the United
2    States for -- for over three decades, you are aware
3    in a subcontracting context that in many instances,
4    if not in all instances, rather consistently, primes
5    flow down their regulatory obligations to their
6    subs, are you not?
7          MR. BARR: Objection, overly broad,
8    vague and ambiguous.
9       A. You're talking about subcontracts for
10   government work?
11   BY MR. WINE:
12      Q. Yes.
13      A. Yes, there is a flow-down requirement.
14      Q. So, in many instances, the regulatory
15   obligations that a prime contractor has under a
16   government contract are flowed down and are the same
17   obligations for the sub; isn't that correct?
18         MR. BARR: Same objections.
19      A. Best of my knowledge, yes.
20   BY MR. WINE:
21      Q. Okay. Now, I just want to be clear, sir,
22   what you're not offering an opinion in this matter

Page 506

1    on. So, I'm going to ask you a series of questions
2    predicated on the premise that you are not offering
3    an opinion.
4          So, in the first instance, you are
5    not offering an opinion in this matter, sir, that
6    the ASPR indemnification provisions referenced in
7    your testimony last week with Mr. Barr preclude
8    recovery of damages by TDY in this matter, correct?
9          MR. BARR: Objection, calls for a
10   legal opinion, not been offered for that.
11      A. That is correct.
12   BY MR. WINE:
13      Q. Okay. And you're not expressing an
14   opinion in this matter as to whether the chemical
15   releases being remediated in this matter were the
16   result of discharges from machinery in the ordinary
17   course of their usage at the site, are you?
18      A. Since I am not an expert on the specific
19   uses of machinery, that is correct.
20      Q. Now, going back to the ASPR
21   indemnification provisions that was the subject of
22   my prior question, you're -- you're offering the

Page 507

1    opinion that the court should consider those ASPR
2    provisions, correct, if I read your report
3    correctly?
4       A. Would you repeat the question, please?
5       Q. It's your opinion in this matter that the
6    court should consider those ASPR provisions relating
7    to indemnification, correct, without opining on what
8    impact those provisions have on this particular
9    matter?
10      A. If the court feels that it should consider
11   those indemnification provisions, then it should
12   consider them.
13      Q. Are you aware of any instance, sir, in
14   which a court has applied ASPR provisions to
15   indemnify or hold the United States harmless from
16   environmental remediation costs at a government
17   contractor facility?
18         MR. BARR: Objection, relevance,
19   beyond the scope.
20      A. Since I am not conversant with every piece
21   of litigation between any segment of industry and
22   the Federal Government relative to environmental

Page 508

1    issues, I don't know how I could answer that
2    question.
3    BY MR. WINE:
4       Q. Have you ever seen a single case which
5    applied the ASPRs in a manner that precluded the
6    government from having to pay or contribute to the
7    environmental remediation of a site for a government
8    contractor?
9          MR. BARR: Same objections.
10      A. Since one of my hobbies is not reading
11   court decisions relative to environmental issues,
12   you're correct. I have not seen a decision by a
13   court relative to that issue.
14   BY MR. WINE:
15      Q. And you certainly didn't do it in
16   conjunction with your role as an expert in this
17   matter?
18      A. That is correct.
19      Q. And I take it -- and I just want to ask --
20   I believe you've answered it, but I want to ask the
21   question slightly differently.
22         You've also not seen published

Page 509

Pages 506 to 509

10/19/2011                     TDY Holdings v. United States of America                     Tommy Jordan

1   decisions by federal courts that expressly rejected
2   an interpretation of the ASPR indemnification
3   provisions where the government sought to be held
4   harmless or released from liability at a surplus
5   site?
6       A.  I don't recall any decision by a court
7   relative to those issues.
8       Q.  Now, in 1993, we looked with Mr. Barr last
9   week -- I believe it's Jordan Exhibit 71 and 72 --
10  DCAA guidance regarding the allowability of
11  environmental legacy costs at government contractor
12  facilities if a contractor can show that they were
13  reasonable, allowable and allocable.
14          Do you remember that testimony, sir,
15  last week?
16          MR. BARR:  Objection,
17  mischaracterizes the record, vague and ambiguous.
18      A.  You are referring to the 93 and 95
19  guidance documents from DCAA?
20  BY MR. WINE:
21      Q.  Actually, I'm referring to Jordan --
22  Jordan Exhibit 71 and 72, which are 92 and 94

Page 510

1   documents; but instead of talking about them in the
2   abstract, I'll show you a copy of them.
3          (Sotto voce discussion.)
4   BY MR. WINE:
5       Q.  I'm sorry.  I gave you one off.  I meant
6   to give you 71 and 73.  My apologies.
7          (Documents tendered.)
8   BY MR. WINE:
9       Q.  There you go.  For the record, I've
10  provided you, Mr. Jordan, with exhibits that were
11  marked by the government last week in your
12  deposition as Jordan Exhibits 71 and 73, and I'll
13  describe for the record what they are while you're
14  reviewing them.
15          Jordan Exhibit 71 is an October 14th,
16  1992 defense contract audit agency memorandum for
17  regional directors.
18          And Jordan Exhibit 73 is a May 12th,
19  1994 memorandum from the DCAA.
20          Do you recall your testimony last
21  week with regard to these two documents, sir?
22      A.  Yes, I do.

Page 511

1       Q.  Now, do you have any understanding as an
2   expert in this matter, sir, why the DCAA offered up
3   this guidance regarding the ability of government
4   contractors to recover for legacy environmental
5   costs at their site if the ASPRs and release
6   agreements that they had been executing for decades
7   released and held the government harmless for these
8   kinds of issues?
9          MR. BARR:  Objection, vague and
10  ambiguous, calls for speculation.
11      A.  (Reviewing documents) Without reading
12  every word of these documents, my recollection is
13  that the basic reasons behind these guidance
14  documents, that it was oftentimes difficult to make
15  a determination of reasonableness.  So, that's why
16  DCAA felt the -- need to issue this kind of
17  guidance.
18  BY MR. WINE:
19      Q.  Okay.  But my question is slightly
20  different.
21          If the ASPR indemnification
22  regulations, which had been in place for decades at

Page 512

1   the time that these two documents were published by
2   DCAA, operate in a manner that released and held the
3   United States harmless for damage to property, why
4   would DCAA in 1992 and 1994 offer guidance as to the
5   allowability of those costs?
6          MR. BARR:  Objection, vague and
7   ambiguous, calls for the witness to speculate.
8       A.  Since I did not participate in the
9   discussions with DCAA prior to the issuance of these
10  guidance documents, I can't specifically answer that
11  question.
12  BY MR. WINE:
13      Q.  Do you know whether the DCAA worked in
14  conjunction with other government agencies in
15  formulating that guidance document, sir?
16      A.  To repeat my answer to the last question,
17  since I did not work with DCAA in the formulation of
18  these guidance documents, I cannot answer that
19  question.
20      Q.  Well, let's look at the first line on
21  Paragraph 71 -- in Jordan Exhibit 71.  It says, "The
22  director of defense procurement," DDT -- "DDP,

Page 513

Pages 510 to 513

1   determined that environmental costs should be
2   treated as normal business expenses."
3          Is it your understanding, sir, based
4   on your federal experience that the director of
5   defense procurement is part of the DCAA?
6          MR. BARR:  Objection, vague and
7   ambiguous.
8   A.  I'm not familiar with that specific
9   organization and what its responsibilities were.
10  BY MR. WINE:
11  Q.  Then turn to Jordan Exhibit 73, which
12  indicates in the subject line that this was a joint
13  DCMC/DCAA guidance to environmental teams
14  addressing questions raised by the teams related to
15  the 9 -- 14 October, 1992 guidance paper on
16  environmental costs.
17         What entity is DCMC?
18  A.  Defense contract management command.
19  Q.  And that is not part of DCAA, is it?
20  A.  That's correct.
21  Q.  Were you part of the executives within the
22  Air Force in 1987 that were looking at proposing

Page 514

1   for environmental remediation costs in this matter,
2   are you?
3   A.  There was specific language in those two
4   novation agreements that you referenced -- and I
5   think one of them was amended at least once -- where
6   the contractor waived any claims that had existed
7   under any of the contracts that had been executed
8   either prior to the date of those novation
9   agreements or those contracts that were specifically
10  listed in the novation agreements.
11  Q.  Okay.  But you understand I'm talking
12  about release agreements as separate from or
13  different from novation agreements?
14         I believe you gave testimony with
15  Mr. Barr last week regarding release agreements that
16  were akin to close-out agreements at the end of a
17  contract, whereby the United States and TDY would
18  sign or execute a release.  And I'm asking you
19  whether you're offering an opinion in this matter
20  that any of those agreements, that those -- let me
21  state it differently.
22         You are not offering an opinion in

Page 516

1   environmental cost principles that would make
2   compliance costs allowable but cleanup costs
3   unallowable for government contractor operated
4   facilities?
5   A.  No.
6   Q.  Do you know any of the people from the Air
7   Force that were involved in that task force, sir?
8   A.  I do not.
9   Q.  Now, you're not offering -- you can put
10  those two exhibits to the side for now, sir.
11         You're not offering an opinion in
12  this matter that TDY and the United States executed
13  releases or novation agreements that preclude
14  recovery by TDY in this matter, are you?
15  A.  As I sit here today, I do not recall
16  anything within the body of those novation
17  agreements that specifically alluded to any waivers
18  of rights.
19  Q.  What about releases executed between TDY
20  and the United States?  You're not offering an
21  opinion, sir, that TDY and the United States
22  executed releases that preclude TDY from recovering

Page 515

1   this matter that any of those agreements preclude
2   recovery by TDY in this matter, correct?
3   A.  I'm not sure I understand your question.
4   Q.  Okay.  We'll come back to it in the
5   context of your testimony of release agreements
6   generally, later today.
7          You're not offering the opinion in
8   this matter, sir, that TRA, Teledyne Ryan
9   Aeronautical, and Ryan, as you've used those terms,
10  are in any way substantively different terms for
11  purposes of this litigation, are you?
12  A.  In my deposition, I probably have used
13  those two terms interchangeable but for all intents
14  and purposes, I think consider them the same.
15  Q.  Okay.  Now, you're not offering an opinion
16  in this matter, sir, that TDY -- let me ask it
17  slightly differently.
18         Are you aware of any statute or
19  regulation that would preclude TDY from using
20  progress payments to purchase supplies, such as
21  cutting oils, lubricants, TCE or chromium?
22         MR. BARR:  Objection, calls for a

Page 517

Pages 514 to 517

10/19/2011                    TDY Holdings v. United States of America                    Tommy Jordan

1    hypothetical, speculative.
2        A.  I saw no evidence in the documents that I
3    reviewed specifically identifying the types of items
4    or specifically identifying the items that were
5    procured with monies advanced to the contractor
6    through progress payments.
7    BY MR. WINE:
8        Q.  But I asked you a slightly different
9    question.
10            Regarding your experience as a
11   government contracts expert, are you aware of any
12   law or regulation that would preclude TDY from using
13   progress payments that it received from the
14   government to purchase feedstock chemicals such as
15   cutting oils, lubricants, TCE or chromium?
16       A.  There's nothing that I'm aware of in the
17   regulations that would specifically preclude the
18   contractor's use of monies advanced to it through
19   progress payments to procure those kinds of items.
20       Q.  And if I understand your testimony last
21   week and today correctly, you're not offering the
22   opinion that TDY didn't use its progress payments to

Page 518

1    cutting oils or lubricants, would that alter your
2    opinion, sir?
3            MR. BARR:  Objection, assumes facts
4    not in evidence, calls for speculation.
5        A.  Not necessarily.
6    BY MR. WINE:
7        Q.  Why not?
8        A.  It would depend on whether or not he
9    testified that as a result of progress payments,
10   that the government had assumed ownership of those
11   materials.
12       Q.  Well, it's your understanding, based on
13   your review of and work with the laws and
14   regulations pertaining to progress payments, that if
15   a progress payment is used to purchase equipment or
16   material, the government takes a title interest in
17   that purchase, correct?
18       A.  Best of my recollection, that is not what
19   I testified last week.
20       Q.  Well, how is that different from -- from
21   your understanding, sir?
22       A.  I think I testified last week that the

Page 520

1    purchase those chemicals, simply that you haven't
2    seen any documentation that indicates that TDY used
3    progress payments for those purposes, correct?
4        A.  That is correct.
5        Q.  Okay.  Now, you're not offering the
6    opinion in this matter that the United States did
7    not hold title to chemicals, such as TCE, chromium,
8    cutting oils or lubricants at this site, are you,
9    sir?
10       A.  As I recall my deposition last week, I
11   stated that I saw no evidence that the government at
12   any time owned any of the items that I generically
13   call hazardous materials.
14       Q.  You just don't know one way or the other?
15       A.  To repeat, I saw no evidence that at any
16   time the government or the contractor believed that
17   the government owned those kinds of materials.
18       Q.  Now, if Arden Honrud, the former CFO of
19   the company, were to testify at trial that the
20   company received progress payments on its contracts
21   and used, in part, those progress payments to
22   purchase feedstock chemicals, such as TCE, chromium,

Page 519

1    government assumed title or an interest in those
2    things of value that it would use to protect its
3    interest in those monies that were advanced to the
4    contractor through progress payments.
5        Q.  And so, let's say at a batch processing
6    facility, such as the Ryan plant, where chrome
7    plating operations are taking place in support of
8    government contracts, the chromic acid or other
9    chromium derivatives that are used for that process,
10   that has a value for the United States, doesn't it,
11   insofar as it's contracting with that company to
12   perform plating operations at its specification,
13   correct?
14           MR. BARR:  Objection, contrary to
15   the -- mischaracterizes the record.
16       A.  It has no value as a spent chemical.
17   BY MR. WINE:
18       Q.  What about the chemical that hasn't been
19   used that's sitting in that tank waiting to plate
20   metal that needs to be processed?
21       A.  As I recall my testimony last week, I saw
22   no evidence that the contractor had segregated its

Page 521

Pages 518 to 521

10/19/2011                TDY Holdings v. United States of America                Tommy Jordan

1  facilities relative to use for commercial products
2  or government contracts.
3          And to the best of my recollection, I
4  saw no evidence that the contractor had separate
5  plating facilities, if you will, used exclusively on
6  government contracts.
7      Q.  Can you point me to any DCAA guidance or
8  regulation that requires segregation of processes in
9  a batch processing facility in order for certain
10  materials to be recoverable under progress payments?
11  In other words, where was Ryan required to segregate
12  its operations in a manner consistent with the
13  testimony you just gave, sir?
14          MR. BARR:  Objection, vague and
15  ambiguous.
16      A.  I do recall seeing documentation that the
17  contractor was required to segregate material that
18  it had received progress payments on from other
19  material, and I specifically recall one DCAA audit
20  where the contractor was criticized because it had
21  not properly maintained that kind of segregation.
22

Page 522

1  BY MR. WINE:
2      Q.  Was that Ryan?
3      A.  At Ryan's, yes.
4      Q.  Okay.  And what if Ryan received progress
5  payments and used them for chemical feedstocks that
6  I've described during a period in which it was
7  exclusively performing government contracts?  Would
8  such segregation still be required, sir?
9          MR. BARR:  Objection, calls for
10  speculation, vague and ambiguous.
11      A.  If they wanted to claim that the
12  government had assumed title to that material, yes.
13  BY MR. WINE:
14      Q.  That ability to assume title or hold title
15  to items purchased using progress payments serves
16  the government's benefit as well, doesn't it, sir?
17          MR. BARR:  Objection, vague and
18  ambiguous.
19      A.  The -- the reason for taking a title or a
20  lien against those materials covered by progress
21  payments was intended solely for the purpose of
22  protecting the government's interest in the monies

Page 523

1  that it had advanced to the contractor.  If the
2  contractor were to subsequently default on
3  performance and the government had to somehow recoup
4  its -- its monies through the default procedures,
5  yes, it would have to segregate the material.
6  BY MR. WINE:
7      Q.  Is that the only benefit the government
8  derived from the title vesting clauses of the
9  applicable regulations and contract provisions, sir?
10      A.  Best of my knowledge, yes.
11      Q.  Isn't it also, true, sir, that if a
12  contractor is performing a critical need for the
13  government, say a DX-rated contract, and the
14  government's critical need for that end item
15  continues but the contractor becomes insolvent, the
16  government can use the title vesting provisions to
17  take whatever steps it needs to make sure that its
18  critical needs are met, including the use of any of
19  the materials that were acquired at that facility
20  via progress payments?
21          MR. BARR:  Objection, assumes facts
22  not in evidence, vague and ambiguous, calls for --

Page 524

1  it's a hypothetical, speculative, compound.
2      A.  Possibly in theory, but not in practical
3  application.
4  BY MR. WINE:
5      Q.  You never heard of that happening during
6  the World War II period, sir?
7      A.  That is correct.
8      Q.  Okay.  You're not offering the opinion in
9  this matter, sir, that TDY did not recover
10  environmental remediation costs in the 1980s and
11  '90s by burdening its overhead pursuant to
12  applicable cost accounting standards, correct?
13      A.  I am aware of deposition testimony by
14  prior contractor executives that they had included
15  those costs in their overhead submissions.  I think
16  I made a statement that I had seen no documentation,
17  no evidence as to the precise amount of those costs
18  that had been, in fact, paid by the government in --
19  to the contractor during the relevant period.
20      Q.  Are you aware that -- that Ryan was
21  burdening its overhead rates as early as the 1980s
22  for such costs, sir?

Page 525

Pages 522 to 525

10/19/2011                TDY Holdings v. United States of America                Tommy Jordan

1      A.  I also recall --
2      Q.  Were you aware of that, sir?
3          MR. BARR:  Objection, vague and
4   ambiguous.
5      A.  I am aware that they were burdening their
6   overhead with various aspects of costs, including
7   environmental costs.
8   BY MR. WINE:
9      Q.  Do you know the percentage breakdown
10  between cost-based contracts and fixed-price
11  contracts that Ryan was performing in the 1980s?
12     A.  I saw no documentation relative to that
13  kind of breakout.
14     Q.  Do you know what the breakdown between
15  cost-based and fixed-price contracts Ryan was
16  performing from 1990 until 1995?
17     A.  I saw no documentation relative to that
18  kind of breakout.
19     Q.  Okay.  You're not offering an opinion in
20  this matter, sir, that the United States has never
21  been found to have hold -- held title to chemicals
22  at a site, the release of which gave rise to

Page 526

1   cost accounting standards, correct?
2      A.  Specifically speaking to CERCLA?
3      Q.  To CERCLA.
4          MR. BARR:  Same objections.
5      A.  I have seen no evidence that CERCLA costs
6   were considered to be either allowable or
7   unallowable by DCAA.
8   BY MR. WINE:
9      Q.  Okay.  And you're not offering an opinion,
10  sir, that the costs that TDY has -- has -- is
11  seeking contribution from the United States from --
12  for in this litigation post-dating the Convair
13  lagoon cleanup are unreasonable applying cost
14  accounting standards, are you?
15         MR. BARR:  Objection.  Same
16  objections.
17     A.  I do not recall seeing any documentation,
18  any evidence that speaks to that issue.
19  BY MR. WINE:
20     Q.  Okay.  You're not offering an opinion in
21  this matter, sir, whether the government should or
22  should not be considered an operator or a ranger

Page 528

1   environmental remediation costs for which the United
2   States was held liable, correct?
3          MR. BARR:  Objection, beyond the
4   scope of the direct, calls for a legal opinion.
5      A.  I'm not personally aware of any situation
6   in which the government assumed ownership to those
7   kinds of chemicals at any contractor's facility.
8   BY MR. WINE:
9      Q.  And likewise, I take it, sir, that you're
10  not familiar with any case law that has found that
11  the title vesting clauses of contracts or
12  regulations gave rise to government liability
13  pursuant to CERCLA -- CERCLA for the release of
14  chemicals at a site and resultant environmental
15  remediation costs?
16         MR. BARR:  Same objections.
17     A.  I never claim that I am an expert on
18  CERCLA.
19  BY MR. WINE:
20     Q.  Okay.  You're not offering any opinion in
21  this matter, sir, that the costs incurred by TDY in
22  this case are unallowable pursuant to applicable

Page 527

1   pursuant to CERCLA, correct?
2          MR. BARR:  Same objections.
3      A.  To repeat, I am not an expert on CERCLA.
4   BY MR. WINE:
5      Q.  Are you familiar with or have an
6   understanding of what -- how CERCLA defines operator
7   as a potentially responsible party pursuant to that
8   statute?
9          MR. BARR:  Same objections; beyond
10  the scope of the direct.
11     A.  I am not an expert on CERCLA.  So, I can't
12  answer that question.
13  BY MR. WINE:
14     Q.  I'm just asking if you have familiarity
15  with how CERCLA uses the term "operator."
16         MR. BARR:  Same objections.
17     A.  I am not familiar with CERCLA or how they
18  use terms.
19  BY MR. WINE:
20     Q.  Okay.  Have -- have you ever reviewed the
21  CERCLA statute, sir?
22     A.  To the best of my knowledge, no.

Page 529

Pages 526 to 529

10/19/2011                     TDY Holdings v. United States of America                     Tommy Jordan

1    Q.  And the two matters in which the
2  government has sought or has -- has actually
3  qualified you as an expert to offer expert opinion
4  testimony have been CERCLA matters, correct?
5    A.  I can't answer that question since I
6  don't -- I don't know CERCLA.
7    Q.  Now, during the course of your testimony
8  last week, sir, Mr. Barr asked you for a number of
9  topics, whether you had found any evidence to
10 support certain propositions that he specified.
11        Do you recall generally that series
12 of questions he asked you?
13   A.  Generally, yes.
14   Q.  Okay.  And I believe you stated at the
15 beginning of today's testimony that you've not
16 reviewed all of the evidence in this matter,
17 correct?
18   A.  I stated that I had not reviewed all the
19 documents related to this particular contractor
20 operating at this -- this location, that's correct.
21   Q.  Well, let me drill down a little more
22 specifically.

                                        Page 530

1        You also haven't reviewed all of the
2  documents exchanged in this litigation between these
3  two parties, correct?
4    A.  That is correct.
5    Q.  You've not reviewed all the expert reports
6  authored by either TDY's witnesses or the
7  government's witnesses, correct?
8        MR. BARR:  Objection, assumes facts
9  not in evidence, relevance.
10   A.  I reviewed those expert reports that I was
11 aware of.
12 BY MR. WINE:
13   Q.  Okay.  How many expert reports have you
14 reviewed, sir?
15   A.  I don't recall precisely.  Three or four.
16   Q.  Did you ever ask the government to provide
17 you with copies of every expert report authored in
18 this matter?
19   A.  I did not specifically ask for every
20 expert report, no, sir.
21   Q.  Have you reviewed every deposition that
22 was given in this case, sir?

                                        Page 531

1    A.  Since I don't know every deposition that
2  was given in this case, I can't tell you whether I
3  reviewed every one of them or not.  I reviewed a
4  number of them.
5    Q.  Okay.  And so, for the series of questions
6  that Mr. Barr asked you for which you answered you
7  saw no evidence or you found no facts, it's
8  possible, sir, that there's evidence for those
9  propositions; but you just haven't seen it, correct?
10        MR. BARR:  Objection, calls for
11 speculation by the witness.
12   A.  If you could show me specific documents
13 that speak to these issues that I have not reviewed,
14 I'd be happy to look at them.
15 BY MR. WINE:
16   Q.  Okay.  And if -- if TDY presents evidence
17 on -- on any of these topics at trial, provides
18 evidence to Judge Houston, that would invalidate
19 your opinions to the extent that you say you saw no
20 evidence or you had found no facts, correct?
21        MR. BARR:  Objection, calls for a
22 legal opinion, calls for speculation, vague and

                                        Page 532

1  ambiguous, argumentative.
2    A.  I have seen nothing to date that would
3  cause me to change my opinion.  If there is evidence
4  or testimony at trial that is contrary to the
5  opinions that I have expressed, then I'm sure the
6  judge will take that into consideration.
7  BY MR. WINE:
8    Q.  Okay.  Now, I want to return to a subject
9  that we talked about briefly and that you spoke with
10 Mr. Barr on Monday about; and those were releases of
11 claims, contract clauses that were contained -- that
12 were contained in a number of the contracts you were
13 familiar with that related to the close-out of a
14 contract.
15        Do you remember that subject matter,
16 sir?
17   A.  Yes, I do.
18   Q.  Now, you were showed one of those
19 releases; and I believe it was Exhibit 19 of your
20 testimony last Monday.  Let me go ahead and get you
21 a copy of that so you can take a look at it.
22        MR. BARR:  I will object to this

                                        Page 533

                              Pages 530 to 533

10/19/2011                TDY Holdings v. United States of America                Tommy Jordan

1  question as mischaracterizing the record.
2  BY MR. WINE:
3      Q.  Mr. Jordan, I've handed you what's been
4  marked last week by the government as Government
5  Exhibit 19 for purposes of your testimonial
6  deposition; and we'll describe it briefly for the
7  record.
8          It is a Navy department Bureau of
9  Aeronautics settlement agreement produced by Ryan in
10 this matter Bates labeled TDY Ryan 20034015 through
11 4024.
12         Do you recall testifying about this
13 document last week, sir?
14     A.  I believe I did.
15     Q.  Okay.  Now, if you'd turn to -- hold on
16 one second.
17         MR. WINE:  Off the record.
18         THE VIDEOGRAPHER:  Going off record.
19 Time now is 11:35.
20         (Recess from 11:35 a.m. to 11:40
21 a.m.)
22         THE VIDEOGRAPHER:  Going back on

Page 534

1  record.  Time now is 11:40.
2  BY MR. WINE:
3      Q.  All right.  Mr. Jordan, there's a little
4  bit of a mix-up as to specific documentation on
5  facilities release agreements.  So, I'm going to
6  come back to that.
7          What I'd like to ask you about is the
8  series of contracts that Mr. Barr showed you last
9  week relating to prime contracts between the United
10 States and other government contractors.  Do you
11 remember him asking questions to that regard?
12     A.  Yes, I do.
13     Q.  I'm going to show you exhibits that he
14 marked as Exhibit 34, 35, 36 and 37.  Just ask you
15 to look at those briefly.
16     A.  (Reviewing documents)
17         MR. BARR:  Object to the question as
18 mischaracterizing the contracts.
19     A.  (Reviewing documents)
20 BY MR. WINE:
21     Q.  You're more than welcome, Mr. Jordan, to
22 review each of those.  I'm not going to ask you

Page 535

1  anything other than generally why you reviewed those
2  four documents in the preparation of your expert
3  report.
4      A.  Because these -- to the best of my
5  recollection, these were all facilities contracts.
6  We know that there were other facilities contracts
7  awarded by the government to Ryan other than the --
8  the one I think that we could -- could locate.
9          And by reviewing contracts for
10 facilities awarded to other contracts, it
11 demonstrated that the consistency of the application
12 of regulations throughout facilities contracts to
13 the government was the same.
14     Q.  Can I see that stack of exhibits, sir?
15         Now, you reviewed one of these
16 contracts.  I'll tell you specifically which one.
17 It's actually No. 34 at the top, the North American
18 Aviation Rocketdyne Division contract, correct?
19     A.  That is correct.
20     Q.  Do you have any familiarity, sir, with the
21 ongoing environmental cleanup at the Rocketdyne site
22 for which the Department of Energy and NASA are

Page 536

1  taking exclusive responsibility?
2          MR. BARR:  Objection, beyond the
3  scope, relevance.
4      A.  I do not know.
5  BY MR. WINE:
6      Q.  Do you know if any of the other
7  contractors identified in those exhibits are
8  currently engaged in cleanup for which the United
9  States is contributing?
10         MR. BARR:  Same objections.
11     A.  I do not know.
12 BY MR. WINE:
13     Q.  Do you know if the United States, either
14 through advance agreement or through the payment of
15 overhead costs, has contributed to the cleanup of
16 the General Dynamics site adjacent to the Ryan site
17 in San Diego?
18         MR. BARR:  Same objections.
19     A.  I do not know.
20 BY MR. WINE:
21     Q.  Now, when Mr. Barr was asking you about
22 the advance agreement, you stated in your testimony

Page 537

Pages 534 to 537

10/19/2011          TDY Holdings v. United States of America          Tommy Jordan

1    that you know of nothing in regulation that gives
2    any government employee, such as administrative
3    contracting officers, DCAA auditors, the authority
4    to waive provisions in prior contracts, such as --
5    such as that existed earlier in the period prior to
6    the -- this period that you were talking about in
7    the 1980s and '90s. There's simply no authority for
8    them to waive those privileges.
9         My question to you, sir, is: If the
10   government wasn't contractually -- was contractually
11   released from paying for environmental costs
12   associated with Ryan's activities, why did they
13   enter into the advance agreement?
14        MR. BARR: Objection, calls for
15   speculation, vague and ambiguous, argumentative,
16   calls for a legal opinion.
17        A. Would you repeat the question, please?
18   BY MR. WINE:
19        Q. My question is: Why did the United States
20   enter into the advance agreement with TDY if it was
21   released and held harmless from paying such claims
22   pursuant to contract and regulation?

Page 538

1    senior government procurement official, permit the
2    recovery of environmental costs by a government
3    contractor?
4         MR. BARR: Objection, vague and
5    ambiguous, incomplete hypothetical, calls for
6    speculation.
7         A. To the best of my recollection, the issue
8    of recovery of environmental costs did not come up
9    on any of the contracts which I was an -- a
10   contracting executive.
11   BY MR. WINE:
12        Q. So, when it comes to supplying government
13   contract principles to the recovery of environmental
14   costs, you have no work experience in that area,
15   correct?
16        A. That is correct.
17        Q. And you understand that TDY is not
18   asserting a breach of contract cause of action in
19   this matter, are you not, sir?
20        MR. BARR: Objection, calls for a
21   legal opinion, vague and ambiguous.
22        A. The only breach of contract issue that I'm

Page 540

1         MR. BARR: Same objections; also
2    assumes facts not in evidence.
3         A. The settlement and advance agreement was
4    predicated upon the guidance that had been issued by
5    DCAA; and as you indicated a while ago, it was a
6    joint DCMA/DCAA decision relative to the guidance.
7         I don't know all of the thought
8    processes that went into the preparation of that
9    guidance document or whether or not the people who
10   promulgated this guidance was aware of the prior
11   releases that had been executed by this contractor
12   on -- at this site.
13   BY MR. WINE:
14        Q. Now, sir, during your tenure as a federal
15   employee and as a contracting officer, did you ever
16   apply the ASPR or contractual indemnification
17   provisions to preclude the recovery of environmental
18   cleanup costs by a government contractor?
19        A. To preclude the recovery?
20        Q. Yes.
21        A. Not to my recollection.
22        Q. Did you ever, as a contracting officer or

Page 539

1    aware of is between TDY and the prime contractor on
2    Apache helicopter.
3    BY MR. WINE:
4         Q. Nothing between the United States and TDY?
5         A. That is correct.
6         Q. Now, when the government and government
7    contractors entered into these release agreements or
8    indemnification clauses going back prior to World
9    War II but certainly up through the 1940s, '50s,
10   '60s and '70s, they weren't aware of CERCLA at that
11   time, were they, sir?
12        MR. BARR: Objection, assumes facts
13   not in evidence, vague and ambiguous, argumentative,
14   relevance.
15        A. As I indicated a while ago, I am not an
16   expert on CERCLA. So, I can't tell you precisely
17   when CERCLA became the law.
18   BY MR. WINE:
19        Q. I believe it was your testimony last week,
20   though, that environmental compliance wasn't even in
21   the national conscience until the late 1970s.
22        MR. BARR: Objection, misstates the

Page 541

Pages 538 to 541

1    record.
2        A.  I don't recall the exact language.  I
3    testified a while ago that prior to -- I believe it
4    was 1990 -- or 1975, there was no requirement in
5    ASPR to include any provisions related to
6    environmental issues.
7    BY MR. WINE:
8        Q.  Okay.  Now, sir, one of the documents that
9    Mr. Barr showed you last week was a release
10   agreement that was produced by TDY in this matter.
11   I'm going to hand it to you.  It was marked as
12   Exhibit 20 in this litigation.  And while you're
13   reviewing it, I'll describe it for the record.
14           It says, "Contractor's Release Under
15   Contract No." -- or "Nos. 314."  It is signed by a
16   C.A. Stillwagen -- I believe that's the name --
17   secretary for The Ryan Aeronautical Company, and it
18   bears the Bates label TDYRYAN20034628.
19           Do you recall testifying about this
20   last week, sir?
21       A.  Yes, I do.
22       Q.  And what was the purpose of your testimony

Page 542

1        Q.  I'd like you to read with me toward the
2    bottom of that paragraph.  One, two, three, four,
3    five -- six lines from the bottom of the
4    paragraph after the word "contract" with a
5    semicolon; and I'll read it for the record while
6    you're reviewing it.
7            "Provided that this agreement
8    expressly excepts from this release without
9    prejudice to the rights of either party under the
10   above-mentioned contract all claims not known to the
11   Contractor and hereafter presented or made against
12   the Contractor on any subcontract claim or claim of
13   any third person, of whatsoever kind or nature and
14   for which the Contractor's liable under the
15   aforesaid contract."
16           Now, sir, this was dated
17   February 21st, 1946.  Do you see that?
18       A.  Yes, I do.
19       Q.  Do you have any reason sitting here today
20   to believe that Ryan was aware in February of 1946
21   of the possibility of CERCLA liability that would be
22   assessed against it in the 1990s, 2000s and still to

Page 544

1    or your consideration of this document in
2    formulating your expert opinions, sir?
3            MR. BARR:  Objection, vague and
4    ambiguous.
5        A.  This was one of the -- as you indicated a
6    while ago, a close-out release that had been
7    executed at the time of contract completion.
8    BY MR. WINE:
9        Q.  And I think it was your testimony -- but I
10   don't want to misstate it.  So, I'll give you the
11   opportunity to correct me if I'm wrong, but I think
12   it was your -- it was your testimony that close-out
13   agreements like this were pretty standard, that you
14   can extrapolate that there were other agreements
15   like this one by virtue of the fact that they were
16   pretty consistent over time for an extended period;
17   is that correct?
18       A.  That was my deposition -- deposition
19   testimony, yes.
20       Q.  And that's still your testimony today,
21   sir?
22       A.  Yes, it is.

Page 543

1    this date?
2        A.  The release says what it says, since I
3    testified a few minutes ago that I wasn't aware of
4    the CERCLA and I don't know what Ryan was aware of
5    or should have been aware of in 1946 relative to
6    future liabilities.
7        Q.  When did you first become aware of
8    environmental issues and the need to remediate
9    environmental hazards at manufacturing sites, sir?
10       A.  I think my testimony a few minutes ago was
11   that prior to, I believe it was, 1975, we had no
12   requirement in our regulations relative to any
13   environmental issues.  So, prior to that date, I had
14   no cognizance of environmental issues.
15       Q.  So, then, sir, it's -- it's fair to
16   extrapolate, based on how you used Jordan Exhibit 20
17   in the consideration and formulation of your expert
18   opinions, that close-out agreements or releases like
19   this one contain the same provision that I just read
20   to you?
21           MR. BARR:  Objection,
22   mischaracterizes the witness' testimony.  He

Page 545

Pages 542 to 545

10/19/2011                     TDY Holdings v. United States of America                     Tommy Jordan

1  referred to many other documents and ASPR
2  provisions.
3      A.  I didn't say it was exactly the same.  I
4  said it was consistent.
5  BY MR. WINE:
6      Q.  And if the government or Ryan removed that
7  clause, it would be substantially inconsistent,
8  correct?
9          MR. BARR:  Objection, argumentative,
10 confusing.
11     A.  If it was changed substantially, then it
12 would be inconsistent.  So, if you will show me
13 releases that are substantially different from this,
14 then I will review those releases.
15 BY MR. WINE:
16     Q.  But your testimony last week was that it
17 was fair to extrapolate that this Exhibit 20 fairly
18 represented and would have consistently been applied
19 to every close-out of every contract performed by
20 Ryan at this site, correct?
21         MR. BARR:  Objection, misstates the
22 witness' testimony.
                                              Page 546

1  TCE for degreasing operations, cutting oils or
2  lubricants that are on the site but that haven't
3  been used yet, whether those chemicals have value
4  from a government perspective with respect to
5  progress payments or title vesting clauses.
6          MR. BARR:  Objection, vague and
7  ambiguous, compound, confusing, hypothetical.
8      A.  If I recall Mr. Ianucci's deposition, he
9  said when they needed to recharge the vats, they
10 went to their chemical stores and withdrew
11 chemicals.
12         And so, I interpreted that statement
13 to mean that they retained ownership of those
14 chemicals prior to their introduction into the --
15 the plating vats or cleaning vats.
16 BY MR. WINE:
17     Q.  And if Ryan used progress payments from
18 the government to either purchase chemicals to put
19 in their stores, their inventory, or to put directly
20 into the machines themselves, would the government
21 own title to the chemicals when they were placed in
22 the machine and used for purposes of performing a
                                              Page 548

1      A.  In form and substance, yes, it was
2  consistent.
3  BY MR. WINE:
4      Q.  Okay.  Now, you stated the opinion last
5  Monday that any evidence that -- that you had not
6  seen any evidence that any of -- hold on.  Let me
7  see how I can formulate this more clearly.
8          MR. WINE:  Why don't we -- why don't
9  we take a brief break.
10         THE VIDEOGRAPHER:  Going off record.
11 Time now is 11:55.
12         (Recess from 11:55 a.m. to 12:55
13 p.m.)
14         THE VIDEOGRAPHER:  Going back on
15 record.  Time now is 12:55.
16 BY MR. WINE:
17     Q.  Mr. Jordan, I want to revisit a question I
18 asked you before our last break.  Make sure I get a
19 clear answer for the record.
20         The question was whether or not
21 chemicals being used at the facility for batch
22 processing, chromium for chrome-plating operations,
                                              Page 547

1  government contract?
2          MR. BARR:  Objection, assumes facts
3  not in evidence, hypothetical, vague and ambiguous.
4      A.  I saw no evidence in the record, the
5  documents that I reviewed, that indicated they had
6  used progress payment monies to procure those kinds
7  of items.
8  BY MR. WINE:
9      Q.  And if Ryan did -- regardless of what you
10 concluded from your review of the documentary
11 evidence, if a Ryan witness responsible for
12 accounting issues with the government for requesting
13 progress payments from the government states that
14 the -- that they requested progress payments and
15 utilized those payments to purchase feedstock
16 chemicals, what would your answer be, sir?
17         MR. BARR:  Objection -- same
18 objections.
19     A.  I think I'd have to review the specific
20 documents before I made a judgment decision.  I
21 would prefer not to respond to a hypothetical issue.
22
                                              Page 549

                                   Pages 546 to 549

10/19/2011                    TDY Holdings v. United States of America                    Tommy Jordan

BY MR. WINE:

Q.  You understand as an expert witness you're
capable of giving hypotheticals and that, in fact,
the Federal Rules of Evidence permit me to ask you
hypothetical questions?

MR. BARR:  Proper hypotheticals.
Objection.

A.  I am not familiar with the Rules of
Evidence of which you speak; but again, if you show
me the specific document that indicates that they
used those kinds of progress payment monies to
procure those kinds of items, then I will give you
an opinion.

BY MR. WINE:

Q.  And let's assume -- and we've all sat
around this table and have recognized that because
of the time frames involved and document retention
policies and things like that, that the documentary
record in this case is necessary -- necessarily
incomplete.

Judge Houston's commented on it as
well; but let's suppose in open court, giving sworn

Page 550

testimony, Arden Honrud, for example, states that he
was specifically responsible for requesting progress
payments and designating those progress payments'
use throughout the facility and that one of the uses
was to purchase feedstock chemicals.

What would be your view as to the
government's ownership of those chemicals when used
to fulfill a government contract.

MR. BARR:  Same objections.

A.  I don't know -- know if I will be given an
opportunity to express my opinion subsequent to
sworn testimony in court.

If I do have that kind of opinion,
I'd have to listen to the testimony and then give
you an appropriate opinion at the time.

BY MR. WINE:

Q.  And I'm asking for the hypothetical now.
If that testimony is offered, would that testimony
alter your opinions in any way?

MR. BARR:  Objection, calls for
speculation, improper hypothetical, vague and
ambiguous.

Page 551

A.  I prefer not to speculate.  Again, I'd
have to listen to the -- the complete testimony in
the context from which it was given.

BY MR. WINE:

Q.  Other than the -- the premise, the
hypothetical that I've given you, sir, what other
information do you need --

MR. BARR:  Same objection.

BY MR. WINE:

Q.  -- to answer my question?

MR. BARR:  Impossible to answer.
Objection.

A.  I don't know how to answer that question,
sir.

BY MR. WINE:

Q.  Okay.  Let's step back to the first
element of the question that I asked you before and
I'm still not sure I've gotten an answer to and that
is whether the chemicals before they're used in a
machine -- let's take TCE in a degreaser -- whether
the chemicals have value.

MR. BARR:  Objection, vague and

Page 552

ambiguous.  Value to whom?

A.  If you can demonstrate that progress
payment monies were used to procure those kinds of
items and the government was trying to protect its
interest in that -- monies that they advanced to the
contractor through progress payments, then they may
theoretically have value if you can be -- it can be
demonstrated that the government had title to that
kind of material.

BY MR. WINE:

Q.  And you're aware, I believe if I
understand your prior testimony, sir, that
particularly in the World War II period, TCE was a
critical -- that TCE was in critical demand in
the -- in the United States, correct?

A.  I did not testify to that.

Q.  Okay.  Do you have an understanding that
during the World War II period, TCE was in critical
demand, sir?

MR. BARR:  Objection, beyond the
scope of the witness' direct and his opinions.

A.  I recall the deposition testimony by other

Page 553

Pages 550 to 553

1 witnesses or expert opinions by other witnesses that
2 it was in critical command -- demand; but other than
3 that deposition, I saw no other document --
4 documentary evidence --
5 BY MR. WINE:
6    Q.  Do you have -- I'm sorry.
7    A.  -- that it was in critical demand.
8    Q.  Do you have any firsthand knowledge to
9 agree or disagree with that opinion, sir?
10       MR. BARR:  Objection.  Same
11 objections; beyond the scope of the direct, beyond
12 his opinion, scope of his opinions.
13    A.  I have no firsthand knowledge --
14 knowledge, one way or the other.
15 BY MR. WINE:
16    Q.  Okay.
17       (Sotto voce discussion.)
18 BY MR. WINE:
19    Q.  And if the -- the material has value in a
20 batch processing manufacturing facility such as Ryan
21 and that it is being used to fulfill government
22 contracts pursuant to mil spec and MPDs developed at

Page 554

1 whether the item in question was entered into and
2 made a part of the item delivered to and paid for by
3 the government.
4    Q.  Is that consistent with the various
5 clauses in the ASPRs that you've reviewed and
6 testified about last week, sir?
7    A.  I believe it is.
8    Q.  Okay.  How is -- is the definition, as
9 you've used it in your report, sir, of material
10 different from your definition that you just gave of
11 an item of value?
12       MR. BARR:  Objection, assumes facts
13 not in evidence, matter taken out of context.
14    A.  In my opinion, the two are comparable and
15 consistent.
16 BY MR. WINE:
17    Q.  Okay.  And -- and your -- your definition
18 of material that you include in your expert report
19 at Page 16 was taken from the 1948 edition of the
20 Armed Services Procurement Regulations, correct,
21 sir?
22    A.  I can't quote you the footnotes of every

Page 556

1 the site, the costs associated with that would be
2 allocable to those contracts, correct, sir?
3       MR. BARR:  Objection, vague and
4 ambiguous, calls for speculation.
5    A.  It would be allocable in the proportionate
6 value of government contracts to commercial
7 contracts and then the relationship between
8 fixed-price contracts and cost contracts.
9 BY MR. WINE:
10    Q.  Sir, for purposes of -- of these title
11 vesting provisions and the area of inquiry that
12 we've been going into, how do we determine whether
13 something has value?
14       MR. BARR:  Objection, vague and
15 ambiguous.
16 BY MR. WINE:
17    Q.  Or how do you -- let me -- how do you
18 determine, given your government contracting
19 experience, whether an item has value and is,
20 therefore, subject to these -- these title vesting
21 principles?
22    A.  In my opinion, it would be dependent upon

Page 555

1 document I referenced, but if -- I take your word
2 for it if you say it is.
3    Q.  Right.  So, your definition of "material,"
4 though, in your expert report is broader than the
5 definition of item of value that just -- you just
6 gave me insofar as it also includes the following --
7 I'll read the entire definition as quoted here.
8       "Such property as may be incorporated
9 into or attached to the end product to be delivered
10 to the government" -- and that's consistent with
11 what you just defined, sir -- "or as may be consumed
12 or expended in the performance of a contract.  It
13 includes, but is not limited to, raw and processed
14 material, parts, components, assemblies, expendable
15 small tools and consumable goods."
16       Sir, would that include chemical
17 feedstocks then?
18    A.  It --
19       MR. BARR:  Same objections.
20    A.  It says what it says.
21 BY MR. WINE:
22    Q.  Let's talk about scrap.  Scrap metal, for

Page 557

Pages 554 to 557

10/19/2011                 TDY Holdings v. United States of America                 Tommy Jordan

1  example, isn't included in the ultimate end item
2  delivered to the government; but the government
3  recognizes it as having value and accounted for it
4  in the progress payment title vesting procedures
5  that it engaged in with the contractor, did it not,
6  sir?
7      A.  I'm not sure what you mean by "accounted
8  for it."
9      Q.  The government charged the contractor for
10 the scrap value of any scrap that the government --
11 that the contractor sold for that purpose, correct?
12     A.  My recollection is that the applicable
13 ASPR provisions specify that when scrap was sold,
14 the proceeds of those sales would be credited back
15 to the government.
16     Q.  Because the government owned title to the
17 scrap, correct?
18     A.  I saw no provision where it said the
19 government had title to it.
20     Q.  So, then, why was the government being
21 given credit for the value of the scrap if it didn't
22 own title to the scrap?

Page 558

1      A.  If the -- well, let me go back to my
2  experience.
3          And based on my personal experience,
4  those situations where the contractor gave credit
5  back to the government is where the contractor had
6  segregated the scrap generated from government
7  contracts to commercial contracts.
8          I saw no documentation in the
9  documents that I reviewed that indicate that the
10 contractor had, in fact, segregated the scrap
11 material and had, in fact, credited the proceeds
12 from those sales back to the government.
13     Q.  Are you aware of testimony by witnesses --
14 by Ryan witnesses in this matter that scrap metals,
15 stainless steel and otherwise, were collected at
16 this site and were sold as scrap and that that money
17 was credited back to the government?
18         MR. BARR:  Objection, compound.
19     A.  I do not specifically recall that part of
20 the deposition testimony.
21 BY MR. WINE:
22     Q.  And do you remember seeing any testimony

Page 559

1  regarding that scrap metal containing cutting oil or
2  lubricant residues or TCE residues on it before it
3  was collected and placed into bins and placed in
4  segregable areas at the site?
5          MR. BARR:  Same objections; vague and
6  confusing, assumes facts not in evidence.
7      A.  I do recall at least one deposition where
8  they had indicated that some of the scrap did have
9  such residue on it.
10 BY MR. WINE:
11     Q.  Do you recall, based on your familiarity
12 with the site and information that you've reviewed
13 in this matter, whether there were specific areas of
14 the site designated for storage of scrap?
15         MR. BARR:  Beyond the scope of the
16 direct.  Also same objections.
17     A.  I do not recall.
18 BY MR. WINE:
19     Q.  And do you have any recollection of
20 information that those specific areas designated for
21 storage of scrap before sent off-site for recycling
22 are areas of concern for PCB contamination?

Page 560

1          MR. BARR:  Same objections.
2      A.  I do not know what areas are of concern
3  relative to PCB contamination.
4  BY MR. WINE:
5      Q.  Now, during Day 1 of your testimony with
6  Mr. Barr, he asked you if you had found any evidence
7  in this case that Ryan or TRA provided any written
8  notice to a government contracting officer regarding
9  the kinds of claims that TDY makes in this case.
10         And you responded, "I have not seen
11 any such evidence."
12         Do you recall that testimony, sir?
13     A.  I believe I do.
14     Q.  Now, that kind of notice would be
15 necessary if TDY was presenting a claim for
16 adjudication by the contracting officer, correct?
17     A.  My recollection is that in most of the
18 release forms that were executed by the contract,
19 especially subsequent to 1948, contain a provision
20 that the waiver applied to those situations unless
21 the contractor had provided written notice to the
22 contracting officer within six years of the date of

Page 561

Pages 558 to 561

1    execution of that claim.

2        Q.  Okay.  And what --

3        A.  Or execution of that form.

4        Q.  And what happens in the case of a latent

5    defect or condition that the contractor doesn't know

6    about for six or more years?

7            MR. BARR:  Objection, assumes facts

8    not in evidence, vague, calls for speculation,

9    incomplete hypothetical.

10       A.  In -- in my mind, a latent defect is

11   different from the issue of releases that we've been

12   talking about.

13           A latent defect is one in the end

14   product that cannot be disclosed through reasonable

15   inspection.

16   BY MR. WINE:

17       Q.  Do you know when Ryan first became aware

18   of the need to remediate PCBs or TCE at the site?

19           MR. BARR:  Objection, beyond the

20   scope of direct and the witness' opinions.

21       A.  I do not know.

22

Page 562

1    contract claims?

2            MR. BARR:  Same objections.

3        A.  I do not know.

4    BY MR. WINE:

5        Q.  Now, on Monday, Mr. Barr asked you did you

6    determine in your review of the documents and

7    testimony in this case whether or not the government

8    contracted to deliver any government-owned military

9    hardware --

10           MR. WINE:  Bless you.

11   BY MR. WINE:

12       Q.  -- containing any hazardous substances to

13   the Harbor Drive Plant in order for Ryan or TRA to

14   refurbish or repair that hardware.

15           And you said, "I saw no such evidence

16   in any of the contracts that I reviewed."

17           Do you remember that testimony, sir?

18       A.  That's correct.

19       Q.  What about the delivery of military

20   hardware containing substances for purposes other

21   than refurbishment or repair?

22       A.  I saw no such evidence.

Page 564

1    BY MR. WINE:

2        Q.  If I told you, sir, it was a period of

3    decades from when the -- the site -- first began

4    performing manufacturing operations at the site,

5    would you have any reason to disagree with me?

6            MR. BARR:  Same objections.

7        A.  I have no reason to agree or disagree.

8    BY MR. WINE:

9        Q.  Okay.  Now, other than the release

10   provision that you cited to, are you aware of any

11   statute or regulation that requires Ryan to provide

12   a government contracting officer with a written

13   notice before it can seek contribution from the

14   United States as a PRP under CERCLA?

15           MR. BARR:  Objection, calls for legal

16   opinions, beyond the scope of the witness' direct

17   and his opinions.

18       A.  As I told you this morning, I am not an

19   expert in CERCLA.

20   BY MR. WINE:

21       Q.  Okay.  So, you have no way of knowing

22   whether CERCLA claims are somehow different from

Page 563

1        Q.  You're aware, are you not, sir, that the

2    government located degreasers at the site that were

3    specified to use TCE in their operations, were you

4    not?

5            MR. BARR:  Objection, misstates the

6    witness' testimony, beyond the scope of the witness'

7    direct and his opinions.

8    BY MR. WINE:

9        Q.  Were you aware of that, sir?

10       A.  Yes, I was.

11       Q.  Okay.  So, that was a piece of equipment

12   sourced by the government to TDY --

13           MR. BARR:  Also assumes facts not in

14   evidence.

15   BY MR. WINE:

16       Q.  -- to TDY to use with a hazardous

17   substance, correct?

18       A.  That was not --

19           MR. BARR:  Assumes facts not in

20   evidence, vague and ambiguous, argumentative and

21   beyond the scope of the witness' direct and his

22   opinions.

Page 565

Pages 562 to 565

10/19/2011                 TDY Holdings v. United States of America                 Tommy Jordan

1      A.   That was not your question.
2    BY MR. WINE:
3      Q.   Okay.
4      A.   Your question was delivered items to the
5    contractor with TCE or hazardous material and not
6    for use in connection with.
7      Q.   You're right.  It's a different question.
8           So, now, the next question, which I'm
9    asking you, is:  You're aware, are you not, sir,
10   that the government sourced equipment to the Ryan
11   site to be used with hazardous materials?  Correct?
12         MR. BARR:  Objection.  Same
13   objections.
14     A.   That is the information which I have, yes.
15   BY MR. WINE:
16     Q.   And you're familiar, in part through your
17   experience at Kelly Air Force Base, that the use of
18   degreasers often involves, through drag out or other
19   operations, releases of TCE in the surrounding
20   areas, are you not, sir?
21         MR. BARR:  Same objections; beyond
22   the scope of this witness.
                                          Page 566

1      A.   Based upon my personal observation, it is
2    not necessarily associated with it.  It can be, but
3    it's not necessary.
4    BY MR. WINE:
5      Q.   Got it.
6           Now, you're also aware that the
7    government leased, through facilities agreements,
8    large pieces of manufacturing equipment, like
9    cutting equipment, that required the use of cutting
10   oils and lubricants, are you not, sir?
11         MR. BARR:  Same objections.
12     A.   Yes, I am.
13   BY MR. WINE:
14     Q.   And you're aware -- you understand, sir,
15   that that equipment that the government leased to
16   Ryan for use on government contracts could not be
17   used without those lubricants and cutting oils,
18   correct?
19         MR. BARR:  Same objections.
20     A.   I am aware they could not be used without
21   the use of those kinds of cutting oils.
22
                                          Page 567

1    BY MR. WINE:
2      Q.   And, in fact, the condition of the
3    facilities agreement was that if Ryan was not
4    productively using that equipment, the government
5    retained the right to take the equipment back and
6    put it at a site where it would be productively
7    used, correct?
8      A.   That is my understanding.
9      Q.   Okay.  And you're aware, are you not,
10   sir -- well, let's -- let's go to a different
11   question Mr. Barr asked you.
12         He asked you whether or not any
13   government contracts with Ryan or TRA during this
14   period called for the company to test any
15   government-owned military hardware that contained
16   hazardous substances at the Harbor Drive Plant.
17         And you responded, "I saw no such
18   evidence."
19         Do you recall that testimony during
20   Monday's --
21     A.   That is correct.
22     Q.   -- exam?
                                          Page 568

1           Did you see any evidence in the
2    record, sir, regarding Ryan's testing of rocket
3    engines at this site?
4      A.   Not that I recall.
5      Q.   Do you recall seeing any evidence of -- of
6    Ryan performing tests of jet engines at this site?
7      A.   I saw some documents that alluded to
8    testing jet engines, but it doesn't -- did not
9    necessarily say it was used jet engines that had
10   been returned to the contractor for testing.
11     Q.   Were you able to determine who owned those
12   jet engines?
13     A.   I was not.
14     Q.   Did you see any evidence in the record
15   regarding the use of guns or the -- the -- an armory
16   area of the site where guns were used at the site?
17     A.   I do not.
18     Q.   Okay.  And I take it since you didn't see
19   any evidence regarding gun -- guns being used at the
20   site or rockets being tested at the site, that you
21   don't know whether these rockets or guns were
22   government-owned equipment?
                                          Page 569

                                    Pages 566 to 569

10/19/2011                 TDY Holdings v. United States of America                 Tommy Jordan

1    A. That is correct.

2    Q. Now, again, aside from the Convair, the

3  advance agreement that you testified about last

4  week, you're not offering an opinion in this matter

5  regarding Ryan's prior recovery of environmental

6  costs via overhead allocations, are you, sir?

7    A. That is correct.

8        MR. BARR: Objection, vague and

9  ambiguous.

10  BY MR. WINE:

11    Q. Okay. I'm sorry. Your answer again?

12    A. That is correct.

13    Q. Now, Mr. Barr asked you last Monday, "With

14  respect to TDY's argumentative that the government

15  would now pay for the environmental site cleanup

16  costs as part of overhead cost pools, in your

17  opinion, is that a reasonable assumption?"

18        And you responded, "In my opinion, it

19  is not a reasonable assumption -- assumption."

20        Sir, I reviewed your expert report

21  and rebuttal report and did not find that opinion in

22  your reports.

1        Can you tell me why it was not

2  located in your expert reports?

3    A. I don't know.

4    Q. Do you know when you formulated that

5  opinion, sir?

6    A. I do not recall.

7    Q. Do you know -- can you tell me what

8  methodology you utilized to derive that opinion,

9  sir?

10    A. It was through, as I had indicated, review

11  of the ASPR, review of documents in the record,

12  review of correspondence, review of contractor

13  documentation, review of audit reports; but I can't

14  specifically point to one document and tell you that

15  was the basis of my opinion.

16    Q. And if I recall correctly, your testimony

17  before the lunch break was you had no

18  responsibilities during your government employment

19  as a contracting officer or contracting official as

20  they related to environmental matters with

21  contractors, correct?

22        MR. BARR: Objection, misstates the

1  witness' prior testimony.

2    A. I think you asked me if I had any

3  responsibility in determining allowability of

4  environmental issues or allocability of

5  environmental issues. I don't think you've asked me

6  if I had no involvement with any environmental

7  issues.

8  BY MR. WINE:

9    Q. Okay. As to allowability and

10  allocability -- and let's throw reasonableness in

11  there as well -- you had no experience with that

12  during your government employment, correct?

13    A. That is correct.

14    Q. And yet, when Mr. Barr asked you, "With

15  respect to TDY's argument that the government would

16  now pay for the environmental site cleanup costs as

17  part of overhead cost pools, in your opinion, is

18  that a reasonable assumption," that's exactly what

19  he's asking you about, the allowability,

20  allocability and reasonableness of those costs,

21  correct?

22        MR. BARR: Objection, argumentative,

1  misstates the question and answer, also vague and

2  ambiguous.

3    A. I think my answer was it would depend upon

4  the timing and the facts and circumstances

5  surrounding that particular issue.

6  BY MR. WINE:

7    Q. Now, during Wednesday's testimony last

8  week, you talked about the presence at the site of

9  government inspectors, auditors, property

10  administrators and -- and other personnel.

11        Do you recall that, sir.

12        MR. BARR: Objection, the testimony

13  speaks for itself. Object to the summary.

14    A. I recall saying that there were auditors,

15  inspectors and property administrators who had the

16  responsibility of administering government

17  contracts.

18  BY MR. WINE:

19    Q. Were military personnel located at the

20  site, uniformed military personnel in the 1940s?

21    A. I saw no documentation that I can recall

22  that indicated there were on-site military

1 personnel.

2    Q.  Do you recall seeing any testimony in

3 expert reports, documents or -- or deposition

4 testimony that there were military guards guarding

5 the site during specific times of its operation?

6    A.  I do not recall such.

7    Q.  Do you recall there being a military

8 detachment located at the site associated with the

9 Big Safari program?

10   A.  There was a group of uniformed military

11 personnel that were designated as a detachment

12 during Big Safari.

13   Q.  Were there any military -- uniformed

14 military personnel located at the site in the 1950s?

15   A.  Not that I recall.

16   Q.  Have you seen any evidence, or you just

17 don't recall?

18   A.  I saw no evidence that indicated there

19 were.

20   Q.  How about during the 1960s?

21   A.  I saw --

22      MR. BARR:  Objection.

Page 574

1      A.  I saw no evidence that there were

2 uniformed military at that site during the 1960s.

3 BY MR. WINE:

4    Q.  With the exception of Big Safari?

5    A.  With the exception of Big Safari.

6    Q.  How about in the 1970s?

7    A.  Same answer.

8    Q.  How about the 1980s?

9    A.  Same answer.

10   Q.  And the same answer for the 1990s?

11   A.  That's correct.

12   Q.  Okay.  So, if Ryan witnesses who worked at

13 the site testify that there were uniformed military

14 personnel resident at the site, you wouldn't be able

15 to tell me, sitting here today, what those personnel

16 were doing there?

17      MR. BARR:  Objection, calls for --

18 assumes facts not in evidence.  It's a hypothetical,

19 vague and ambiguous.

20      A.  Since I -- I don't know that they were

21 there and I don't know what they would have been

22 doing there, I can't answer that question.

Page 575

1 BY MR. WINE:

2    Q.  Now, Mr. Barr asked you last Wednesday,

3 "Government contracting or inspection personnel

4 during World War II supervise or direct Ryan

5 employees or executives concerning the" -- oh, I'm

6 sorry.

7      "Did government contracting or

8 inspection personnel during World War II supervise

9 or direct Ryan employees or executives concerning

10 the actual day-to-day manufacturing operations or

11 processes at the plant?"

12      MR. BARR:  Objection, misstates my

13 question.

14 BY MR. WINE:

15   Q.  And you answered, "None whatsoever,

16 indication that government employees, either

17 inspectors or contracting officers, directed the

18 contractor to do anything outside the scope or

19 breadth of contracts that existed between the

20 government and the contractor."

21      Do you recall giving that testimony,

22 sir?

Page 576

1    A.  Yes, I do.

2    Q.  Now, I couldn't find that opinion in your

3 expert report in either Exhibit 3 or Exhibit 4.

4      Can you direct me to that opinion in

5 either of those documents, sir?

6      MR. BARR:  Objection, assumes facts

7 not in evidence, misstates the reports which speak

8 for themselves.

9    A.  Since I didn't memorize my expert report,

10 I cannot direct you to a specific statement to that

11 effect.

12 BY MR. WINE:

13   Q.  Do you know when you formulated that

14 opinion, sir?

15      MR. BARR:  Same objections.

16   A.  Same answer that I gave you a while ago on

17 other opinions.  I can't specifically tell you when

18 I formulated that opinion.

19 BY MR. WINE:

20   Q.  Aside from your experience as a government

21 contracting official that began in the 1960s, is it

22 fair to say, sir, that the only way you know what

Page 577

Pages 574 to 577

10/19/2011                     TDY Holdings v. United States of America                     Tommy Jordan

1    government officials, whether they were inspectors
2    or auditors, property administrators, were doing at
3    the Ryan site was through your review of documents
4    in this matter?
5        A.  That is correct.
6        Q.  Okay.  And you've stated a number of
7    times, I believe, that the documentary record in
8    this case, because of document retention policies
9    and for other reasons, just the passage of time, is
10   necessarily incomplete; is that correct?
11       A.  That is correct.
12       Q.  Now, you stated during Day 2 that "There
13   was no documentation that I saw during the World War
14   II period that indicates the government supervised
15   any action relative to the handling and/or disposal
16   of hazardous wastes."
17           Do you see that?  Do you recall
18   saying that, sir?
19       A.  Yes, I do.
20       Q.  Now, what about the handling of hazardous
21   substances such as chemicals used in batch
22   processing?

                                      Page 578

1        Did you see any documents regarding
2    the government's supervision of any action relative
3    to the handling of those materials, sir?
4        A.  During what period?
5        Q.  World War II.
6        A.  I saw no such documentation.
7        Q.  Did you see any MPDs from the World War II
8    period?
9        A.  I reviewed a number of MPDs.  I don't
10   recall the dates of those documents.
11       Q.  Now, you stated as well, "I saw no
12   documentation in the volumes of documents that I
13   reviewed that indicated that the government in any
14   way, shape, form or fashion had issued an
15   instruction to the contractor relative to the
16   handling of PCB waste."
17           Do you recall giving that testimony,
18   sir?
19       A.  Yes.
20       Q.  Yet you've also given testimony today,
21   sir, that you are aware that the government gave to
22   Ryan certain machinery that required as an inherent

                                      Page 579

1    purpose of its use lubricants and cutting oils.
2        Do you recall that testimony, sir?
3            MR. BARR:  Objection, confusing,
4    assumes facts not in evidence.
5        A.  That is correct.
6    BY MR. WINE:
7        Q.  And when you made these various site
8    visits to other contracting facilities that you were
9    personally involved with, did any of those
10   contractors that you visited their site use
11   equipment like lathes or cutting machines or other
12   big machinery that was used to cut or bend or mold
13   metals?
14       A.  Yes.
15       Q.  And did any of those machines use cutting
16   oils and lubricants?
17       A.  Yes.
18       Q.  And do you know whether any of those
19   lubricants, by virtue of their applications, contain
20   PCBs?
21       A.  I do not know.
22       Q.  And when you personally observed this

                                      Page 580

1    equipment, did you see any residues on the material
2    in process or around the equipment that was being
3    used?
4        A.  I do not recall seeing any of those
5    cutting oils or other similar items around the
6    equipment being used.
7        Q.  Did you ever see those residues on any
8    material other than in a contained manner in the
9    equipment itself?
10           MR. BARR:  Objection, vague and
11   ambiguous.
12       A.  Not that I recall.
13   BY MR. WINE:
14       Q.  Do you know when the government started
15   issuing guidance to government contractors regarding
16   the handling of PCBs?
17           MR. BARR:  Objection, assumes facts
18   not in evidence.
19       A.  I have seen no --
20           MR. BARR:  Vague and ambiguous.
21       A.  I have seen no evidence that the
22   government ever issued guidance to contractors

                                      Page 581

                                            Pages 578 to 581

1    relative to handling of PCBs.
2    BY MR. WINE:
3        Q.   What about the handling of chromium?
4            MR. BARR:  Same objections.
5        A.   Same answer.
6    BY MR. WINE:
7        Q.   Were you aware that the government issued
8    guidance regarding the use or handling of chromium
9    within the last five years?
10           MR. BARR:  Same objections.
11       A.   Within the last five years?
12   BY MR. WINE:
13       Q.   Correct.
14       A.   Are you talking about 2006 through today?
15       Q.   Correct.
16       A.   Since that was not part of the relevant
17   period and not included in the volume of documents I
18   reviewed, no.
19       Q.   Okay.  Sir, Mr. Barr asked you whether or
20   not any DOD personnel supervised or directed Ryan or
21   TRA personnel in the actual day-to-day manufacturing
22   operations or processes in the plant.

1            And you said, "I saw no such
2    evidence."
3            Do you recall that testimony, sir?
4        A.   That is correct.
5        Q.   When did you form that opinion?
6        A.   Same answer I gave you a while ago.  I
7    cannot specifically tell you when I formed specific
8    opinions.
9        Q.   And if I can't find that opinion in your
10   expert report, can you explain why it doesn't appear
11   there?
12           MR. BARR:  Objection, assumes facts
13   not in evidence, the reports speak for themselves.
14       A.   I do not know.
15   BY MR. WINE:
16       Q.   Okay.  Likewise, Mr. Barr asked you
17   whether or not any DOD personnel supervised or
18   directed Ryan or TR -- TRA personnel in the usage of
19   chemicals in manufacturing operations or processes.
20           And you said you saw no such
21   evidence.
22           Do you recall that, sir?

1        A.   That's correct.
2        Q.   And likewise, can you explain why that
3    opinion does not appear in your expert report, sir?
4            MR. BARR:  Objection, assumes that
5    it's not -- the reports speak for themselves,
6    assumes facts not in evidence.
7        A.   Same answer I gave you a while ago.
8    BY MR. WINE:
9        Q.   And I take it that your answer is the same
10   regarding Mr. Barr's question regarding
11   PCB-containing fluids that came out of any plant
12   machinery or equipment -- or equipment?
13           MR. BARR:  Same objections.
14       A.   That is correct.
15   BY MR. WINE:
16       Q.   And the same about the question that there
17   was no evidence the government had in any way
18   supervised or directed contractors in how to handle
19   and/or dispose of hazardous chemicals?
20           MR. BARR:  Same objections.
21       A.   That's correct.
22

1    BY MR. WINE:
2        Q.   Now, let's talk about MPDs and military
3    specifications.
4            I believe Mr. Barr showed you a
5    series of documents that he represented to be MPDs
6    that were used at other sites.
7            Do you recall those documents, sir?
8            MR. BARR:  Objection, misstates
9    the -- mischaracterizes the documents.
10       A.   I recall seeing some MPDs that were used
11   by prime contractors on work that was subcontracted
12   to Ryan or TDY, but I don't recall process documents
13   at other sites.  There may have been, but I don't
14   recall.
15   BY MR. WINE:
16       Q.   Okay.  He asked you on -- on Wednesday of
17   last week, "Are you aware of contractors other than
18   Ryan or TRA who used manufacturing process data
19   documents?"
20           And your answer was, "I have seen
21   contractors use similar type documents.  They had
22   the same purpose and intent as the MPD that were

10/19/2011          TDY Holdings v. United States of America          Tommy Jordan

1  prepared by Ryan."
2          Do you recall that testimony, sir?
3      A.  Yes, I do.
4      Q.  Now, are you aware of whether or not those
5  other contractors engaged in discussions or had any
6  interactions with their government customer in
7  developing those MPDs?
8      A.  To the best of my recollection, those
9  documents -- they weren't called, necessarily,
10  MPDs -- were, in fact, reviewed by government
11  representatives to assure that they were in
12  compliance with the applicable specifications.
13      Q.  Okay.  Mr. Barr went on and asked, "And in
14  any of the TRA MPD documents that you reviewed, did
15  any of them speak about chemical waste disposal
16  methods or practices?"
17          And you responded, "I saw no evidence
18  whatsoever in any of the documents that spoke to
19  disposal and/or handling of chemical waste."
20          Do you recall that?
21      A.  That is correct.
22      Q.  What about the handling of chemicals in

Page 586

1  the processing -- in the process itself?
2          MR. BARR:  Objection, asked and
3  answered.
4      A.  To the best of my recollection, there was
5  nothing that I recall seeing in any of the MPDs that
6  spoke to the issue of the handling of those kinds of
7  chemicals.
8  BY MR. WINE:
9      Q.  That includes no MPDs regarding the
10  handling of TCE?
11      A.  Not that I recall.
12          MR. BARR:  Objection, vague and
13  ambiguous.
14  BY MR. WINE:
15      Q.  Do you recall any MPDs that dealt with
16  chrome plating or -- or chrome anodizing?
17      A.  There were MPDs that spoke to both the
18  chemical cleaning and -- and anodizing, but I don't
19  recall anything in those MPDs that spoke to the
20  issue of handling.
21      Q.  When you use that term "handling," what do
22  you mean, sir?

Page 587

1      A.  Touching, introducing into the -- the
2  vats, the disposal of those chemicals once they are
3  considered to be spent.  They do speak to the issue
4  of the usage of -- usage of cleaning and anodizing,
5  but I don't recall anything relative to specifically
6  the handling of -- what I consider to be handling of
7  the chemicals.
8      Q.  How about how often a chemical needs to be
9  replaced in a piece of equipment?
10          MR. BARR:  Objection, vague and
11  ambiguous, overly broad.
12      A.  The only thing I recall relative to the
13  replacement of, quote, unquote, spent chemicals was
14  in Mr. Ianucci's deposition; and he said that when
15  they determined that the chemicals needed to be
16  replaced, they -- he issued what he called a dump
17  and recharge order.
18  BY MR. WINE:
19      Q.  What about how long a material in process,
20  a piece of cut metal or whatnot, is either placed in
21  a certain process or dangled over the process so
22  that chemicals can drip off of it?

Page 588

1          MR. BARR:  What about it?  Vague and
2  ambiguous objection.
3          MR. WINE:  I'm not asking you the
4  questions.
5      A.  There were --
6          MR. BARR:  Objection.
7      A.  There were some statements relative to
8  what was called loiter time and there were also some
9  statements that when an item was removed from the
10  vapor degreasing, that it had to be rotated in order
11  for the chemicals to drip off of the component.
12          I don't recall the amount of time
13  that the item remained in the -- the vapor above
14  the -- the tank.  I think they called it loiter
15  time, if I recall; but I don't remember how much
16  time that was.
17  BY MR. WINE:
18      Q.  Do you recall under the facilities
19  contracts, or in any of the documents associated
20  with any of the facilities documents -- facilities
21  contracts, discussion of cleaning of tooling and --
22  and specifically removal of cutting oils and

Page 589

Pages 586 to 589

10/19/2011          TDY Holdings v. United States of America          Tommy Jordan

1  lubricants from tooling used in larger cutting
2  machines?
3           MR. BARR:  Objection, overly broad,
4  vague and ambiguous.
5       A.  I do not recall seeing that in any
6  facilities contract.
7  BY MR. WINE:
8       Q.  Do you know how Ryan went about cleaning
9  tooling that was government-owned?
10       A.  The only thing I recall was that on small
11  items, they had some small tanks that they dipped
12  those items in.  I don't recall if it was limited
13  to, quote, unquote, special tools or not.
14       Q.  Do you know what -- where those tools were
15  placed once they had been cleaned?
16           MR. BARR:  Objection, beyond the
17  scope of the witness' direct or his -- and his
18  reports.
19       A.  I do -- do not recall seeing anything
20  relative to where they stored special tools.
21  BY MR. WINE:
22       Q.  Now, the documents that you discussed with
                                           Page 590

1  Mr. Barr that were like the MPDs at Ryan -- they
2  weren't called MPDs but they were documents that
3  were similar types of documents that we talked about
4  just a moment ago -- those documents aren't
5  referenced in your expert report, are they, sir?
6       A.  That is correct.
7       Q.  Why aren't they?
8       A.  I saw no need to reference those kinds of
9  documents.
10       Q.  And -- but you did see a need to testify
11  about them last week?
12       A.  I was not aware that I had to limit my
13  deposition testimony only to those specific points
14  that were in my expert report.
15       Q.  And you didn't express any opinions in
16  your expert report regarding those MPD-like
17  documents, correct?
18       A.  Not that I recall.
19       Q.  The MPDs at issue in this case developed
20  by Ryan with oversight by the United States, those
21  are specific to this site, are they not?
22           MR. BARR:  Objection,
                                           Page 591

1  mischaracterizes the record, vague and ambiguous,
2  argumentative.
3       A.  I don't necessarily agree with the term
4  "oversight."  I will agree that they were apparently
5  submitted to the government for review and approval,
6  but I don't necessarily agree with the term that the
7  government exercised oversight in their preparation.
8  BY MR. WINE:
9       Q.  You recall Mr. Ianucci's testimony that
10  you reviewed in the formulation of your expert
11  opinions, correct?
12       A.  Yes, I do.
13       Q.  Now, the MPDs at issue here are specific
14  to this site, correct?
15       A.  That is correct.
16       Q.  They couldn't be used at another
17  manufacturing facility, correct?
18       A.  It is an internal Ryan or TDY document.
19       Q.  And when I deposed you in 2009, it was
20  your testimony that you had no basis to disagree
21  with Mr. Ianucci's description of how the MPD
22  development process worked with the government,
                                           Page 592

1  correct?
2           MR. BARR:  Objection, testimony
3  speaks for itself, asked and answered.
4       A.  I don't specifically recall what I said in
5  2009 on that issue.
6  BY MR. WINE:
7       Q.  Sitting here today, sir, do you have any
8  basis to disagree with Mr. Ianucci's testimony about
9  how MPDs were developed between Ryan and the United
10  States?
11       A.  Relative --
12           MR. BARR:  Same objections.
13       A.  Relative to his statement that they were
14  submitted to the -- I think you said DCASR for
15  review and approval.  Other than that, no.
16  BY MR. WINE:
17       Q.  And you recall his testimony that there
18  were multiple instances of the government going back
19  and forth and disapproving certain MPDs provided by
20  Ryan and negotiations between the parties back and
21  forth until a final MPD could be agreed upon?
22       A.  And I think that I testified that after
                                           Page 593

Pages 590 to 593

1 that process was complete, they represented a mutual

2 agreement between the parties relative to that MPD.

3     Q.  But let's get to the process itself.  You

4 recall the -- the description of that process

5 between the United States and TDY, correct?

6          MR. BARR:  Objection, vague and

7 ambiguous.

8     A.  Yes, I do.

9 BY MR. WINE:

10     Q.  And sitting here today, you have no reason

11 to disagree with the process Mr. Ianucci described

12 and that I just summarized, correct?

13     A.  I have no reason to disagree with what

14 Mr. Ianucci said.

15     Q.  Okay.  And it's also your understanding

16 that TDY could not field an MPD to the floor of the

17 production facility to begin manufacturing processes

18 unless and until the United States had said that

19 that MPD met its approval, correct?

20          MR. BARR:  Same objections; asked and

21 answered.

22     A.  I am not aware of anything in writing that

Page 594

1 BY MR. WINE:

2     Q.  Couldn't -- it couldn't necessarily find

3 the -- the contractor in default?

4     A.  Whether or not the government would

5 exercise its rights to terminate the contract in

6 default is a hypothetical issue.

7     Q.  It could use that right afforded to it if

8 the contractor did not comply with the government's

9 disagreement with a particular manufacturing

10 process, correct?

11          MR. BARR:  Same objections;

12 incomplete, improper hypothetical.

13     A.  In theory but not in -- probably not in

14 practice.

15 BY MR. WINE:

16     Q.  Are you aware of whether military

17 specifications or government-approved manufacturing

18 production documents have ever use -- been used by a

19 court as an allocation factor in determining

20 equitable allocation between the United States and a

21 government contractor?

22          MR. BARR:  Objection, calls for a

Page 596

1 says that they were prohibited from deploying an MPD

2 until it had been approved by the government other

3 than Mr. Ianucci's testimony.

4 BY MR. WINE:

5     Q.  Well, sir, let me ask you:  In your

6 experience, if a contractor in the United States had

7 a disagreement about an MPD, how to meet a mil spec

8 via a document like an MPD and during that

9 disagreement, the contractor fielded to the floor an

10 MPD that the government did not agree with, what

11 would be the government's reaction to that?

12          MR. BARR:  Objection, calls for a

13 hypothetical, incomplete information, improper,

14 vague and ambiguous.

15     A.  The government could refuse to accept the

16 products that were produced at that document.

17 BY MR. WINE:

18     Q.  The government could also find the

19 contractor in default, couldn't it?

20          MR. BARR:  Object -- same objections.

21     A.  Not necessarily.

22

Page 595

1 legal analysis, beyond the scope of the witness'

2 testimony and his expert reports.

3     A.  Since I'm not familiar with every case

4 ever brought by anybody in industry against the

5 Federal Government, I can't answer that question.

6 BY MR. WINE:

7     Q.  Are you aware of any such case in which

8 that happened?  I'm not asking about all of them,

9 just any of them.

10          MR. BARR:  Same objections.

11     A.  First question you asked was any of them,

12 but I am not aware of any one specific case in which

13 the -- the Court used that kind of argument.

14 BY MR. WINE:

15     Q.  Okay.  Now, Mr. Barr asked you a number of

16 questions as they related to Appendix B of the Armed

17 Services Procurement Regulations last Wednesday.

18          Do you recall that, sir?

19     A.  Yes, I do.

20     Q.  Okay.  What opinions in this matter are

21 you offering with respect to Appendix B to the Armed

22 Services Procurement Regulations?

Page 597

Pages 594 to 597

1          MR. BARR:  Objection, overly broad,
2    vague and ambiguous, testimony speaks for itself and
3    his reports.
4          A.  Appendix B provided to the government
5    property administrator the basic guidance relative
6    to the administration of government property
7    provided to a contractor in performance of a
8    contract.
9    BY MR. WINE:
10         Q.  Okay.  Did it implicate or -- or identify
11   other documents that were relevant to that purpose,
12   sir?
13         MR. BARR:  Objection, vague.
14         A.  Did what identify the documents?
15   BY MR. WINE:
16         Q.  Did Appendix B reference any other
17   documents that formed that process, sir?
18         THE REPORTER:  I'm sorry.  Can you
19   repeat that question?
20   BY MR. WINE:
21         Q.  Did Appendix B identify any other
22   documents --

1          MR. BARR:  Objection, vague and
2    ambiguous.
3    BY MR. WINE:
4          Q.  -- that were relevant to that purpose?
5          A.  Appendix B is a many-paged document.  I
6    cannot sit here today and tell you precisely what
7    every one of those pages says.
8          Q.  Now, do you recall your testimony
9    regarding the role of property inspectors at the
10   site?
11         MR. BARR:  Objection, misstates the
12   record.
13         A.  There is no term that I recall using that
14   said, "property inspector."
15             There are inspectors who inspected
16   the products being produced; but they didn't
17   necessarily inspect, quote, unquote, "property."
18   BY MR. WINE:
19         Q.  I'm sorry.  I was -- I was using two
20   terms.  There's -- there are inspectors, and then
21   there are property administrators.
22             Do you recall that term, sir?

1          A.  That is correct.
2          Q.  Now, do you recall last Wednesday you
3    stated the following testimony, "The documents that
4    I have reviewed do not indicate that the government
5    did, in fact, inspect government-furnished
6    equipment.  They have the right to inspect it, but I
7    found no documents on the record that they had, in
8    fact, conducted those kinds of inspections"?
9              Do you recall that, sir?
10         A.  That is correct.
11         Q.  What documentation are you referring to
12   that gave the government the right to inspect
13   government-furnished equipment?
14         A.  The facilities contracts and then the
15   language in the ASPR relative to facilities.
16         Q.  And what -- let's see here.  Let's start
17   with Exhibit 80.  I'm going to show you a couple of
18   documents, sir, the government marked last week.
19             Sir, I've handed you what's been
20   marked as Government Exhibit -- or Jordan Exhibit 80
21   marked by the government last week for purposes of
22   your testimonial deposition.

1              While you're reviewing it, I'll state
2    for the record that this is one of the excerpts of
3    the Armed Services Procurement Regulations that the
4    government introduced, this one from July of 1976.
5    It's Bates-labeled US0250555 through 564.
6              Do you recall testifying about this
7    document, sir?
8          A.  I believe so, yes.
9          Q.  And what was the purpose of your testimony
10   with respect to this document, sir?
11         A.  It established the foundation for advance
12   agreements.
13         Q.  Okay.  Now, 15-105 relates to facilities
14   contracts, does it not, sir?
15         A.  (Reviewing document) That is correct.
16         Q.  It references Part 5 of this section.
17             Do you see that?
18         A.  Yes.
19         Q.  Part 5 is not part of this excerpt, was
20   it, sir?
21         A.  No.
22         Q.  And do you know if you reviewed Part 5

10/19/2011                TDY Holdings v. United States of America                Tommy Jordan

1  referenced herein in formulating your opinions as an
2  expert in this matter?
3      A.  I don't specifically recall reviewing
4  Part 5.
5      Q.  Do you know what Part 5 states based on
6  your experience as a government contracting
7  official?
8      A.  Not off the top of my head, no.
9      Q.  Did you make any effort to -- to find or
10 review Part 5 in the formulation of your opinions in
11 this matter, sir?
12     A.  Not that I recall.
13     Q.  You can put Exhibit 80 away.  Let's go to
14 103.  I'll show you another document that the
15 government marked last week for your testimonial
16 deposition.
17         While my colleague is retrieving it,
18 it is Jordan Exhibit 103, a document produced by the
19 United States with the Bates label US0061019 through
20 1097.  While the witness is reviewing the document,
21 I'll describe it.
22         It is a document that states at the

Page 602

1  top, "Headquarters Air Material Command,
2  Wright-Patterson Air Force Base, Dayton, Ohio" dated
3  April -- 2 April, 1951.  I'll ask the witness if
4  he's familiar with that document.
5      A.  Yes, I am.
6      Q.  And you reviewed this document in your
7  preparation -- in the preparation of your expert
8  opinions in this matter, sir?
9      A.  I believe I did.
10     Q.  Okay.  And what was the purpose of you
11 referencing this document in the formulation of your
12 expert opinions, sir?
13     A.  It spoke to the issue of quality control
14 and inspection.
15     Q.  Okay.  And the document states -- well,
16 hold on one second.
17         To the extent that the document
18 references other documentation that an inspector is
19 to review in performing his or her duties, did you
20 endeavor to review those documents, sir?
21     A.  Can you point me to a specific document?
22     Q.  Yeah.  Hold on one second.  Yeah.

Page 603

1          If you go to Page 1026, the bottom
2  right-hand corner, under "Responsibilities of the
3  Air Force Quality Control Inspector," 1,
4  general, "b" --
5      A.  What's the -- what's the Bates number?
6      Q.  1026, sir.  I'll read the excerpt for you
7  once you get to that page.
8          If you look at (1)(b), "He is
9  responsible for familiarizing himself with the
10 applicable directives pertaining to quality control
11 such as DOIs, HOIs, AMC regulations," Air -- "AF
12 regulations, TOs and local operating instructions.
13 These directives must be complied with by the AF
14 quality control inspector and by contractors when
15 referenced in contracts or specifications."
16         Do you see that, sir?
17     A.  Yes, I do.
18     Q.  Did you review any DOIs in formulating
19 your expert report, sir, relevant to the Ryan site?
20     A.  Not that I recall.
21     Q.  What does "DOI" stand for?
22     A.  Departmental office instructions, I think.

Page 604

1      Q.  What about -- what about HOIs?
2      A.  Did not review any HOIs.
3      Q.  What about AMC regulations?
4      A.  I believe I did review some AMC
5  regulations.  I don't recall specifically which
6  ones.
7      Q.  Were any of them introduced last week in
8  your testimony, sir?
9      A.  Not that I recall.
10     Q.  Are any of them cited in your expert
11 report, sir?
12     A.  Not that I recall.
13     Q.  Okay.  I assume "AF" means Air Force
14 regulations.
15         Which Air Force regulations did you
16 review in formulating your opinions in this matter,
17 sir?
18     A.  During the course of my experience, there
19 were a number of documents called AFPI, Air Force
20 Procurement Instructions, that implemented the ASPR;
21 and I reviewed those regularly.
22     Q.  Were those entered into evidence -- or

Page 605

Pages 602 to 605

1  were those marked by the government last week in
2  your -- in your direct testimony, sir?
3      A.  Not that I recall.
4      Q.  Are they referenced in your expert report,
5  sir?
6      A.  Not that I recall.
7      Q.  What about TOs?
8      A.  Tech orders.
9      Q.  Did you review any tech orders related to
10 the Ryan site, sir?
11     A.  Specifically for Ryan, no, sir.
12     Q.  What about local operating instructions?
13     A.  I would consider MPDs to be local
14 operating instructions.
15     Q.  Is local operating instructions broader
16 than just MPDs?  Would they include other documents
17 or would it be limited to MPDs?
18     A.  Depends.
19     Q.  Okay.  What does it depend on, sir?
20     A.  It depends on the specific locality, I --
21 that's my supposition.
22     Q.  Okay.

Page 606

1  answered.
2      A.  I think my deposition stated that I saw no
3  evidence that they had, in fact, inspected
4  government facilities.
5          MR. WINE:  Why don't we take a break
6  here.  Off the record.
7          THE WITNESS:  Yes.
8          THE VIDEOGRAPHER:  Going off record.
9  Time now is 1:57.
10         (Recess from 1:57 p.m. to 2:09 p.m.)
11         THE VIDEOGRAPHER:  Going back on
12 record.  Time now is 2:09.
13 BY MR. WINE:
14     Q.  Okay.  Returning now, sir, to the title
15 vesting provisions and progress payment clauses that
16 you testified about last week.
17         On Wednesday, you testified that
18 "Progress payments are made on fixed-price contracts
19 because there is no provision for progress payments
20 under cost contracts because under a cost-type"
21 contractor -- "contract, the contractor receives
22 payments as he incurs those costs in support of a

Page 608

1          (Sotto voce discussion.)
2  BY MR. WINE:
3      Q.  Now, you can put that document aside, sir.
4          Did you read any affidavits offered
5  by Mr. Richards or Sakamoto in this matter?
6      A.  I believe I recall seeing a Richards
7  affidavit, deposition or declaration.  I don't
8  recall seeing one by Mr. Sakamoto.
9      Q.  Okay.  Are you aware of -- of testimony by
10 Ryan witnesses, including Mr. Sakamoto and Richards,
11 that the government inspected every aspect of
12 government programs at the site?
13         MR. BARR:  Objection,
14 mischaracterizes the testimony.  The witness'
15 testimony speak for themselves.
16     A.  I don't recall them saying specifically
17 that, no.
18 BY MR. WINE:
19     Q.  Sir, what's the basis for your opinion
20 that the government did not expect -- inspect
21 government equipment at the Ryan site?
22         MR. BARR:  Objection, asked and

Page 607

1  specific contract."
2          Do you know of any law or regulation
3  that precludes a contractor from receiving progress
4  payments for cost-based contracts, sir?
5      A.  I know of nothing in the regulations that
6  speaks to the issue of progress payments in
7  cost-type contracts.
8      Q.  Okay.  Now -- so, you're unfamiliar with
9  any regulations that permit the receipt of progress
10 payments for cost contracts if I -- if I understand
11 your last answer correct?
12     A.  Not that I'm aware of.
13     Q.  Okay.  Have you reviewed -- are you
14 familiar with FAR 52.232-16, sir?
15     A.  If you show me that provision, I'll tell
16 you whether or not I'm familiar with it.
17     Q.  Now, before I show you that document, all
18 of your testimony regarding progress payments under
19 fixed contracts -- fixed-price contracts is new
20 opinion that you formulated within the last two
21 months, correct, sir?
22         MR. BARR:  Objection, asked and

Page 609

Pages 606 to 609

1   answered.
2      A.  Best of my knowledge, yes.
3         (Sotto voce discussion.)
4         MR. WINE:  Let's go ahead and mark
5   it.  Let's go ahead and mark, as Jordan Exhibit 252,
6   a document.
7         (Deposition Exhibit 252 marked.)
8         MR. WINE:  I'll hand it to the
9   witness, to Mr. Barr.
10        And while the witness reviews it, I
11  will describe it for the -- for the record.  I've
12  provided the witness a copy of FAR 52.232-16, the
13  progress payments clause as it currently exists as
14  of August, 2010, taken off of DOD's FAR site and
15  produced -- I mean, excuse me -- and -- and copied
16  here.  The copy was made on October 17th, 2011; and
17  it is an eight-page document.
18  BY MR. WINE:
19     Q.  I'll ask you to review that, Mr. Jordan.
20     A.  (Reviewing document)
21        MR. BARR:  While he's doing that,
22  I'll object to the relevance.

Page 610

1      A.  (Reviewing document) Okay.  I've reviewed
2   this document.
3   BY MR. WINE:
4      Q.  Have you reviewed -- you are familiar
5   with -- with this regulation as a result of your --
6   or -- or the predecessors to this regulation as a
7   result of your decades-long federal contracting
8   experience, sir?
9      A.  Before I can offer an opinion on it, I'd
10  have to review 32.502-4A.  It says, "As prescribed
11  in 32.502-4A, insert the following clause."
12        And before I can offer an opinion or
13  use this clause, I'd have to refer back to that
14  opinion --
15     Q.  Are you --
16     A.  -- or that provision.
17     Q.  Are you familiar, sitting here today, with
18  what that provision is, sir?
19     A.  I am not.
20        (Sotto voce discussion.)
21        (Deposition Exhibit 253 marked.)
22

Page 611

1   BY MR. WINE:
2      Q.  Mr. Jordan, at your request, I'm handing
3   you what is marked as Jordan Exhibit 253 for
4   purposes of your testimony.  It is -- I will
5   represent to you it is Subpart 32.5 of the FAR,
6   progress payments based on costs, in which you can
7   find 32.502-4.  This document was taken from an
8   acquisition.gov website, and it is seven pages
9   produced for your review in this matter.
10     A.  (Reviewing document) Okay.
11     Q.  Were you familiar with 32.502-4 from your
12  federal service, sir?
13     A.  Generally, yes.
14     Q.  Okay.  And turning to 32.502-4 (a)(1),
15  small i and small ii -- you see that, sir?  The
16  small Roman numeral i and Roman numeral ii?  I can
17  point it to you if it would help you find it.
18     A.  Okay.
19     Q.  These two right here, one -- and let the
20  record reflect that I've highlighted small Roman
21  numeral i and small Roman numeral ii in 32.502-4.
22        Do you see that, sir?

Page 612

1      A.  Yes.
2      Q.  And in fact, this regulation, 32.502-4,
3   (a)(1) -- I'm not sure I have an answer to my prior
4   question -- were you familiar with this regulation
5   during your federal service, sir?
6      A.  Generally, yes.
7      Q.  And is it generally consistent with its
8   predecessor versions of this regulation?
9      A.  Best of my recollection, yes.
10     Q.  Okay.  And this regulation instructs the
11  inclusion of the contract clause 52.232-16 in
12  certain instances, correct so far?
13     A.  It specifically says, "Solicitations that
14  may result in contracts providing for progress
15  payments based on costs."
16     Q.  Okay.  And -- and what is that type of a
17  contract, sir?
18     A.  There are two different methods for
19  progress payments.  One is a percentage based on
20  cost.  The other is based on a percentage of
21  completion of the product.
22        But again, it does not specifically

Page 613

Pages 610 to 613

1  state that the use for -- are applicable to
2  cost-type contracts.
3      Q.  Okay.  It does say -- it does delineate
4  fixed-price contracts in small Roman numeral ii,
5  correct?
6          MR. BARR:  Objection, the document
7  speaks for itself, vague and ambiguous.
8      A.  Yes.
9  BY MR. WINE:
10     Q.  Okay.  And is it your testimony, sir, that
11 small Roman numeral i does not encompass cost
12 contracts -- cost-based contracts?
13         MR. BARR:  Objection, asked and
14 answered.
15     A.  That is my opinion, yes.
16 BY MR. WINE:
17     Q.  Okay.  So, are you expressing an opinion
18 in this matter, sir, that Ryan would have needed to
19 maintain separate chemical processing tanks or
20 degreasing equipment for different customers in
21 order to bill the government for progress payments
22 on -- in order to assess against progress payments

Page 614

1  was that you'd have to review the facts and
2  circumstances pertaining to such claims for progress
3  payments to determine whether segregation was
4  necessary.
5          MR. BARR:  Objection.
6  BY MR. WINE:
7      Q.  And I'm asking you now whether you
8  performed that analysis in this matter based on what
9  you know about this case?
10         MR. BARR:  Objection, misstates the
11 witness' prior testimony.
12     A.  I did not perform that kind of analysis.
13 BY MR. WINE:
14     Q.  Are you capable of performing it now?
15     A.  Since I don't have all of the facts and
16 circumstances relative to how they segregated
17 their -- their tanks, no.
18     Q.  I take it from your answer, sir, that
19 there may be facts and circumstances that would not
20 require the physical segregation of chemicals, tanks
21 and other processes; is that correct?
22         MR. BARR:  Objection, hypothetical,

Page 616

1  chemicals used in those processes on government
2  contracts?
3          MR. BARR:  Objection, vague and
4  ambiguous, confusing.
5      A.  I think I'd have to review the facts
6  and -- and circumstances pertaining to such claims
7  for progress payments for those kinds of chemicals;
8  but in my opinion, they would, in all likelihood,
9  have to maintain separate processing tanks.
10 BY MR. WINE:
11     Q.  Did you formulate an opinion in this
12 matter given the facts and circumstances as you know
13 it for this case?
14     A.  I saw --
15         MR. BARR:  Objection, vague and
16 ambiguous, overly broad.
17     A.  I think I testified last week that I saw
18 no documentation that they had, in fact, maintained
19 separate processing tanks.
20 BY MR. WINE:
21     Q.  But a different question, sir.
22         My question is:  Your prior answer

Page 615

1  calls for speculation.
2      A.  In theory, but not in practice.
3  BY MR. WINE:
4      Q.  Now, in reviewing your expert report, I
5  didn't see any mention to the lack of documentation
6  regarding requests for progress payments by Ryan in
7  your -- your expert report.
8          That's because it's a new opinion,
9  correct, sir?
10         MR. BARR:  Objection, asked and
11 answered.  We've been over this.
12     A.  The best of my recollection, my -- my
13 expert report does not speak to the issue of
14 progress payments.
15 BY MR. WINE:
16     Q.  And it's -- it's your view that without
17 supporting documentation, you cannot offer an
18 opinion whether the government received title to or
19 lien to any material, including chemicals used in
20 the processes at the facility?
21         MR. BARR:  Objection, misstates the
22 witness' prior testimony.

Page 617

Pages 614 to 617

10/19/2011                    TDY Holdings v. United States of America                    Tommy Jordan

1      A.  I saw no documentation that stated
2   specifically that the government had, in fact,
3   assumed title and/or a lien against those kinds of
4   chemicals.
5   BY MR. WINE:
6      Q.  Now, you've testified that given the
7   passage of time in this case, the record in the
8   matter is incomplete; and yet, in formulating your
9   expert report and in testifying in response to
10  questions from Mr. Barr, you were willing to make
11  certain inferences even in the absence of
12  documentation.
13         Is that a correct assessment on my
14  part, sir?
15         MR. BARR:  Objection, overly broad,
16  vague and ambiguous, argumentative.
17     A.  I have made certain instances in some
18  situations that, based upon my review of regulations
19  and contracts that were available, that it was a
20  logical conclusion that similar provisions had been
21  included in those contracts that were no longer
22  available for review.

                                          Page 618

1   BY MR. WINE:
2      Q.  Why is it fair or possible to draw
3   inferences in the absent -- absence of documentation
4   in certain instances but not in others?
5         MR. BARR:  Same objections.
6      A.  I don't understand the question.
7   BY MR. WINE:
8      Q.  Well, there are certain instances,
9   questions specifically propounded by me and in
10  certain other areas in your expert report where you
11  offer an opinion that you can't conclude a matter
12  because you've not seen any documentation.
13         And my question, sir, is:  Why are
14  you willing or able to form an opinion on behalf of
15  the United States in the admitted absence of
16  documentation there, but unwilling to formulate an
17  opinion on other matters because there's an absence
18  of documentation?
19         MR. BARR:  Same objections.
20     A.  Because of the compendium of regulations
21  and the consistency between one iteration of those
22  regulations and subsequent iterations of the

                                          Page 619

1   regulations, I was able to make those kinds of
2   inferences.
3         In the situation that you just
4   alluded to, there is no compendium of documentation
5   that speaks to that specific issue from which I can
6   make an inference.
7   BY MR. WINE:
8      Q.  So, instead of offering the opinion that
9   you've seen no evidence on something, why offer any
10  opinion at all?  Why not just remain silent on a
11  topic because you haven't seen documentation one way
12  or the other?
13         MR. BARR:  Same objections.
14     A.  I think I had the right to express an
15  opinion based upon the evidence that I saw and which
16  I did.
17  BY MR. WINE:
18     Q.  Or evidence that you didn't see?
19     A.  I -- I saw no evidence on some situations;
20  and based upon that lack of evidence, I think I am
21  entitled to draw an opinion.
22     Q.  Now, you recall on Wednesday testifying

                                          Page 620

1   about a collection of Ryan annual reports, correct,
2   sir?
3      A.  Stockholder reports, yes, sir.
4      Q.  Okay.  And you stated that on some of the
5   annual reports, they included inventory less
6   progress payments; and for those years that they had
7   received progress payments and for years they had
8   not received progress payments, they did not -- back
9   up.  I think I missed a word.
10         On some of the annual reports, they
11  included inventory less progress payments; and for
12  those years, they had received progress payments.
13  And for the years they had not received progress
14  payments, they did not make that deduction from the
15  value of the inventory.
16         Do you recall that testimony, sir?
17     A.  Yes, I do.
18     Q.  Are you aware of any requirement, SEC
19  regulation or other rule obligating Ryan for the
20  period of time that you reviewed and summarized its
21  stockholder reports that required Ryan to report out
22  to its stockholders specificity of its financials,

                                          Page 621

                                          Pages 618 to 621

10/19/2011                    TDY Holdings v. United States of America                    Tommy Jordan

1   including progress payments?
2          MR. BARR:  Same -- objection, calls
3   for a legal analysis, beyond the scope of the
4   witness' opinions, reports and testimony.
5       A.  I know of no SEC regulation that speaks to
6   that issue.
7   BY MR. WINE:
8       Q.  Now, none of these stockholder reports
9   were included in your expert report, correct?
10         MR. BARR:  Objection, those reports
11  speak for themselves.
12      A.  Not that I recall.
13  BY MR. WINE:
14      Q.  Okay.  And it's fair, based on your review
15  of those stockholder reports, that they did not
16  include or contain a full accounting of Ryan's
17  payments and costs for the given year for which
18  they're reported, correct?
19         MR. BARR:  Objection, vague and
20  confusing, ambiguous.
21      A.  I think the reports speak for themselves
22  as to what they included and what they didn't

Page 622

1   stockholder report, that means that Ryan did not
2   receive progress payments in that given year?
3       A.  I think that is a logical conclusion, yes.
4       Q.  Okay.  Is it -- what qualifies you to draw
5   an opinion regarding the financials of the company?
6          MR. BARR:  Objection.
7       A.  As I have testified before, I spent a
8   large part of my career reviewing cost-type data and
9   financial-type data in the evaluation of
10  contractors' proposals and the evaluation of
11  contractor responsibility.
12         So, I think that qualifies me to make
13  those kinds of conclusions.
14  BY MR. WINE:
15      Q.  And in how many of those instances where
16  you were performing those as a federal official did
17  you rely on the stockholder report of a company to
18  draw those conclusions?
19      A.  I can't tell you a specific number.
20      Q.  Any of them?
21      A.  Yes, there were some; but I can't tell you
22  a number.

Page 624

1   include.
2   BY MR. WINE:
3       Q.  They contain a summary of the financials
4   of the company for that year, correct?
5          MR. BARR:  Objection, documents speak
6   for themselves.
7       A.  That's my opinion, yes.
8   BY MR. WINE:
9       Q.  Okay.  And -- and so, do you know, sir,
10  whether Ryan uniformly reported in all of its
11  stockholder reports receipt of progress payments on
12  an annualized basis?
13         MR. BARR:  Objection, the documents
14  speak for themselves.
15      A.  I did not see a detailed year-by-year
16  summary of those financials.
17         My opinion is based upon those annual
18  reports that I did review.
19  BY MR. WINE:
20      Q.  Okay.  So, are you concluding in your
21  opinion, sir, that in a year where there is not
22  reference to progress payments in the Ryan

Page 623

1       Q.  In point of fact, the government requires
2   more detailed financial data to draw those
3   conclusions, don't they?
4       A.  We had significantly more data.  I didn't
5   make that -- conclusions based solely upon a
6   stockholder report, you're right.
7       Q.  Okay.  So, in this instance, you're
8   drawing conclusions based -- regarding the company's
9   receipt of progress payments in a given year solely
10  on a stockholder report, correct?
11         MR. BARR:  Objection, misstates the
12  witness' prior testimony.
13      A.  My conclusion relative to those years was
14  based upon my review and analysis of those
15  stockholder reports.
16  BY MR. WINE:
17      Q.  And that review and analysis is
18  inconsistent with the way you performed your
19  analysis when you were a federal official charged
20  with conducting that kind of analysis, correct?
21         MR. BARR:  Objection, argumentative,
22  contrary to witness' prior testimony.

Page 625

Pages 622 to 625

10/19/2011                TDY Holdings v. United States of America                Tommy Jordan

---

**Page 626**

1    A.  I wouldn't say it's inconsistent.  It is a
2  piece of the data that was reviewed during my tenure
3  as a government executive, but I would not
4  necessarily call it inconsistent.
5  BY MR. WINE:
6    Q.  So, instead of drawing the opinion that
7  Ryan didn't receive progress payments in years for
8  which the stockholder report doesn't make mention of
9  them, why didn't you testify last week that you had
10  insufficient data to draw a conclusion one way or
11  another as you have on a variety of other matters?
12      MR. BARR:  Objection, argumentative,
13  vague and ambiguous, overly broad.
14    A.  I think if you go back and read all of the
15  stockholder reports, you will also see some
16  statements by Mr. Ryan that they financed their
17  operation through private loans.
18      So, you know, other than just the
19  financial summary, I think there's information that
20  helped me make those conclusions.
21  BY MR. WINE:
22    Q.  Does the receipt of financing via a

---

**Page 627**

1  private vehicle preclude a contractor from receiving
2  progress payments in support of their government
3  contracting activity?
4    A.  Not necessarily.
5    Q.  Okay.  In point of fact, a government
6  contractor can receive and apply progress payments
7  to government contracts at the same time it's
8  receiving financing from a third-party private
9  lender, correct?
10    A.  In theory, yes.
11    Q.  Well, in application as well, correct?
12    A.  Yes.
13    Q.  You had direct experience with that as a
14  federal official, didn't you?
15    A.  Yes.
16    Q.  So, is it possible, sitting here today,
17  sir, that Ryan received progress payments in those
18  years in which the stock -- stockholder report was
19  silent as to progress payments?
20      MR. BARR:  Objection, calls for
21  speculation.
22    A.  Probably not.

---

**Page 628**

1  BY MR. WINE:
2    Q.  It's true, sitting here today, sir, that
3  you don't know one way or the other in the absence
4  of more -- more thorough documentation?
5      MR. BARR:  Objection, argumentative,
6  misstates the witness' prior testimony.
7    A.  Since they saw a necessity to deduct the
8  value of progress payments from some years and not
9  other years, there is no other logical reason that I
10  can think of that would make them do that kind of
11  differentiation between years.
12  BY MR. WINE:
13    Q.  Did you review any of the company's
14  financials regarding what it did and did not deduct
15  for for those years in which a stockholder report
16  was silent on progress payments?
17      MR. BARR:  Objection, vague and
18  ambiguous, confusing.
19    A.  Other than that which is in the annual
20  reports to stockholders, no.
21  BY MR. WINE:
22    Q.  It's not possible to do an audited

---

**Page 629**

1  accounting of a company based on the summaries of
2  financials contained in a stockholder report, is it?
3      MR. BARR:  Objection, argumentative,
4  vague and ambiguous, relevance.
5    A.  I don't know of any DCAA audits of the
6  annual reports to stockholders.  That's between the
7  stockholders and the company.
8  BY MR. WINE:
9    Q.  Okay.  So, if you're going to opine on a
10  company's receipt of progress payments in a given
11  year, which would be a preferable source, the actual
12  books and records of the company or a summary of
13  financials contained in a stockholder report?
14      MR. BARR:  Objection, calls for
15  speculation, improper hypothetical.
16    A.  If I had access to the detailed records, I
17  would prefer to see the detailed records.
18  BY MR. WINE:
19    Q.  Did you ask the government for those
20  detailed records?
21    A.  I did not specifically ask the government
22  for those kinds of records, but I did not see them

---

Pages 626 to 629

1    in the volume of documents that I reviewed.
2        Q.  Did you ask that specific searches be
3    conducted for those types of detailed records for
4    the years in which the stockholder agreement was
5    silent?
6        A.  Not that I recall.
7        Q.  Did you run any queries in the DOJ
8    database in the course of the last two months?
9        A.  In the last two months?  I ran several,
10   yes.
11       Q.  Okay.  And what queries specifically
12   related to your new opinions on progress payments
13   did you run?
14       A.  None.
15           MR. WINE:  Why don't we stop there
16   for the day.
17           THE VIDEOGRAPHER:  This marks the end
18   of the deposition.  Time off record now is 2:36.
19           (Deposition adjourned at 2:36 p.m.)
20
21
22

Page 630

1    Tommy Jordan c/o
2    DICKSTEIN SHAPIRO, L.L.P.
     1825 Eye Street NW
3    Washington, D.C. 20006-5403
4
     Case: TDY Holdings v. United States of America
5    Date of deposition: 10/19/11
     Deponent: Tommy Jordan
6
7    Please be advised that the transcript in the above
8    referenced matter is now complete and ready for signature.
9    The deponent may come to this office to sign the transcript,
10   a copy may be purchased for the witness to review and sign,
11   or the deponent and/or counsel may waive the option of signing.
12   Please advise us of the option selected.
13   Please forward the errata sheet and the original signed
14   signature page to counsel noticing the deposition, noting the applicable
15   time period allowed for such by the governing Rules of Procedure.
16   If you have any questions, please do not hesitate to call our office at
17   (202)-232-0646.
18
19   Sincerely,
20
21   Digital Evidence Group
     Copyright 2011 Digital Evidence Group
22   Copying is forbidden, including electronically, absent express written consent

Page 632

1    CERTIFICATE OF SHORTHAND REPORTER
2        I, Marcy Clark, Certified Shorthand
3    Reporter, the officer before whom the foregoing
4    deposition was taken, do hereby certify that the
5    foregoing transcript is a true and correct record of
6    the testimony given; that said testimony was taken
7    by me stenographically and thereafter reduced to
8    typewriting under my supervision; and that I am
9    neither counsel for, related to, nor employed by any
10   of the parties to this case and have no interest,
11   financial or otherwise, in its outcome.
12       Certified to by me on this _____ day
13   of _____, 2011.
14
15
16
17
18       _____
         MARCY CLARK, CSR, CLR
19       Texas Certified Shorthand Reporter
20       CSR No. 4935
21       Certified LiveNote Reporter
22       Expiration Date:  12/31/2012

Page 631

1    Digital Evidence Group, L.L.C.
2    1299 Pennsylvania Ave NW, Suite 1130E
3    Washington, D.C. 20004
4    (202) 232-0646
5
     SIGNATURE PAGE
6
7
8    Case Name: TDY Holdings v. United States of America
9    Witness Name: Tommy Jordan
     Deposition Date: 10/19/11
10
11   I do hereby acknowledge that I have read
     and examined the foregoing pages
12   of the transcript of my deposition and that:
13
14   (Check appropriate box):
15   (  ) The same is a true, correct and
     complete transcription of the answers given by
16   me to the questions therein recorded.
17   (  ) Except for the changes noted in the
     attached Errata Sheet, the same is a true,
18   correct and complete transcription of the
     answers given by me to the questions therein
19   recorded.
20
21   _____    _____
22   DATE                    WITNESS SIGNATURE

Page 633

Pages 630 to 633

```
1    Digital Evidence Group, L.L.C.
2    1299 Pennsylvania Ave NW, Suite 1130E
3    Washington, D.C. 20004
4    (202) 232-0646
5

          E R R A T A   S H E E T
6

7

8    Case Name: TDY Holdings v. United States of America
9    Witness Name: Tommy Jordan
10   Deposition Date: 10/19/11
11      Page No.  Line No.      Change
12
13
14
15
16
17
18
19
20
21      _____    _____
22          Signature              Date
```

Page  634

Page 635

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

_____

TDY HOLDINGS, LLC, and          §

TDY INDUSTRIES, INC.            §

                                §

          Plaintiffs,           §

                                §

VS.                             § Case No. 07cv0787 JAH

                                §

UNITED STATES OF AMERICA,       §

UNITED STATES DEPARTMENT        §

OF DEFENSE, and ROBERT M.       §

GATES, in his official          §

capacity as SECRETARY OF        §

DEFENSE                         §

                                §

          Defendants.           §

_____


Videotaped Deposition of

TOMMY B. JORDAN

San Antonio, Texas

Friday, October 21, 2011

9:22 a.m.


Volume 5

Reported by:  Marcy Clark, CSR, CLR

---------------------------------------------------

DIGITAL EVIDENCE GROUP

1299 Pennsylvania Avenue, NW Suite 1130E

Washington, DC 20004

(202) 232-0646

```
 1            VOLUME 5
 2     Videotaped Deposition of
 3         TOMMY B. JORDAN
 4
 5  Held at the offices of:
 6      Koole Court Reporters of Texas
 7      711 Navarro Street, Suite 101
 8      San Antonio, Texas 78205
 9      (210) 558-9484
10
11
12
13      Taken pursuant to notice, before Marcy Clark,
14  Certified Shorthand Reporter and Certified LiveNote
15  Reporter in and for the State of Texas.
16
17
18
19
20
21
22
                                    Page 636
```

```
 1               INDEX
 2         TOMMY B. JORDAN
 3          October 21, 2011
 4
 5  APPEARANCES                        637
 6
 7  PROCEEDINGS                        639
 8
 9  EXAMINATION OF TOMMY B. JORDAN:
10
11      BY MR. WINE            639
12      BY MR. BARR           681
13      BY MR. WINE            698
14
15  CERTIFICATE                        708
16
17  ERRATA SHEET                       711
18
19
20
21
22
                                    Page 638
```

```
 1            APPEARANCES
 2  ON BEHALF OF THE PLAINTIFFS:
 3      Bradley D. Wine
 4      Michael C. Mateer
 5      DICKSTEIN SHAPIRO, L.L.P.
 6      1825 Eye Street NW
 7      Washington, D.C. 20006-5403
 8      (202) 420-3607
 9
10  ON BEHALF OF THE DEFENDANTS:
11      Lewis M. Barr
12      U.S. DEPARTMENT OF JUSTICE
13      601 D Street NW, Suite 8000
14      Washington, D.C. 20004
15      (202) 514-9645
16
17  VIDEOGRAPHER:
18      Alex Segovia, Videographer
19
20  ALSO PRESENT:
21      Robert Zoch
22      John M. Tishok
                                    Page 637
```

```
 1            PROCEEDINGS
 2          THE VIDEOGRAPHER:  This is the start
 3  of the deposition of Tommy B. Jordan, Volume 5.
 4  Today is Friday, October 21st, 2011.  Time on record
 5  now is 9:22.
 6          TOMMY B. JORDAN,
 7  having been previously sworn, continued to testify
 8  as follows:
 9          EXAMINATION (Cont.)
10  BY MR. WINE:
11      Q.  Good morning, Mr. Jordan.
12      A.  Good morning.
13      Q.  Remind you:  You are still under oath for
14  this continuation, I believe, of the last day of
15  your testimonial deposition.
16          I want to begin with an exhibit that
17  Mr. Barr showed you last Monday.
18          MR. WINE:  I'm handing the -- the
19  witness an exhibit that was marked Jordan Exhibit 21
20  during the first day of his testimonial deposition.
21  BY MR. WINE:
22      Q.  Ask you just briefly to review the
                                    Page 639
```

1    document, sir, to confirm that you reviewed this in
2    the preparation of your expert opinions and
3    testified about it during your testimonial
4    deposition last week.
5        A.   (Reviewing document) Yes, I did.
6        Q.   And is this one of the releases that you
7    considered in the portion of your expert report
8    where you say that the Court should consider
9    indemnifications, releases and similar clauses in
10   reviewing this matter?
11       A.   One of many, yes.
12       Q.   Now, if you'll turn to Page 3677 in the
13   bottom right-hand corner, you'll see Paragraph C
14   about the middle of the page, sir.
15       A.   Yes.
16       Q.   I'll read it for you.
17            It says, "Upon the payment of said
18   sum of $852,432.43 as aforesaid, all rights and
19   liabilities of the parties under the contracts and
20   under the act insofar as it pertains to the
21   contracts shall cease forthwith and be forever
22   released."  And then there's an exceptions -- there

Page 640

1        A.   Yes, I do.
2        Q.   And did you consider that clause in the
3    formulation of your expert opinions in this matter,
4    sir?
5        A.   Yes, I did.
6        Q.   Okay.  You can put that document to the
7    side.
8            I'm going to show you another
9    exhibit.  This one was marked Exhibit 234 for
10   purposes of your testimony last week, I believe last
11   Friday.
12            As the witness is reviewing the
13   document, the document was previously marked as
14   Jordan Exhibit 234 by the government in this matter.
15       A.   Okay.
16       Q.   Now, Mr. Jordan, did you review this
17   document in the formulation of your opinions in this
18   case?
19       A.   Yes, I did.
20       Q.   And you reviewed this in conjunction with
21   your opinions regarding the Big Safari matter,
22   correct?

Page 642

1    are -- there are exception clauses underneath that.
2            Do you see that clause, sir?
3        A.   Yes, I do.
4        Q.   Now, do you understand the claim -- did
5    you consider that language in the formulation of
6    your opinions, sir?
7        A.   I believe I did, yes.
8        Q.   Do you consider the claims that TDY is
9    bringing in this matter to be claims under the
10   contracts and/or under the act that is referenced in
11   Paragraph C?
12       A.   Not necessarily.
13       Q.   And if you'll turn to Page 3678, one of
14   the exceptions, Clause No. 3, it says, certain of
15   the claims excepted per the prior paragraph that we
16   just read under paragraph -- Subparagraph 3 reads,
17   "Claims by the contractor against the government
18   which were based upon responsibility of the
19   contractor to third parties and which involve costs
20   reimbursable under the contracts, but which are not
21   known to the contractor."
22            Do you see that, sir?

Page 641

1        A.   That is correct.
2        Q.   And what opinions regarding the Big Safari
3    matter are you offering in this case?
4            MR. BARR:  Objection, asked and
5    answered.
6        A.   As I sit here today, I can't specifically
7    recall which opinion is -- is limited to Big Safari.
8    BY MR. WINE:
9        Q.   Okay.  Turn to Page 5368 in the bottom
10   right-hand corner.
11       A.   Okay.
12       Q.   And at that page -- let me just make sure
13   you're on the right page because I think that might
14   be 5366.
15       A.   It's 68.
16       Q.   Turn to the third page in the compilation.
17       A.   70?
18       Q.   You have a different Bates-labeled version
19   but we'll -- we'll go with -- actually, let me use
20   yours.
21            (Sotto voce discussion.)
22

Page 643

BY MR. WINE:

Q. There you go, Mr. Jordan. I'll represent for the record that the document, as it was produced, contain two pages, two three -- 5366 and 5367, as it was produced to the government. Those two pages are missing from the version that was marked by the government as an exhibit last week, but we'll begin with 368. And I apologize for the confusion.

If you look at Paragraph No. 2 in the left-hand column, 2(C), "What Constitutes a Big Safari Project," and you go to the middle of that paragraph, it reads, "Projects designated for Big Safari management will be directed only by the Office of the Secretary of Defense, Secretary or Under Secretary of the Air Force, Chief of Staff or Vice Chief of Staff" of the Deputy Chief of Staff, Systems and -- "or the Deputy Chief of Staff" -- excuse me -- "Systems and Logistics, through the Director of Maintenance-Engineering to the Air Force Logistics Command." And then it says, "Each project so directed must," and there's a list of items.

Page 644

Before we go on to the list of items, were you familiar with that language, sir?

A. I reviewed this document, yes.

Q. Okay. Was that consistent with your understanding of one of the preconditions to -- to designate a program under the Big Safari program?

A. Basically --

MR. BARR: Objection, vague and ambiguous.

A. Based upon this document, that is a precondition, yes.

BY MR. WINE:

Q. Did you review any other materials that suggested otherwise, sir?

A. Not that I recall.

Q. Do you have any other reason beyond documents to believe otherwise, sir?

A. I think I testified the other day that I have no personal knowledge of Big Safari with the exception of the fact that one of the Big Safari programs was performed by General Dynamics in their Fort Worth facility, and when I was visiting that

Page 645

facility in conjunction with the B-58, that I did see the RB-57 aircraft sitting on the runway.

Q. And through your engagement as an expert witness in this matter, sir, you're also familiar that there was a Big Safari -- there was Big Safari activity at the Ryan site, correct?

A. That is correct.

Q. Okay. Now, if you look at the project descriptions or project identifiers under the clause that I just read to you, sir, (A) says, "Be of sufficient importance and priority to warrant preferential treatment, quick reaction and extraordinary procurement action."

Do you see that?

A. Yes, I do.

Q. Did you consider that language, sir, in the formulation of your opinions regarding this matter?

A. I considered this regulation.

Q. Okay. And did you consider that language in particular?

A. I can't specifically point to my opinions

Page 646

and which one is -- is -- hinges upon this particular paragraph; but, yes, I did consider this regulation in its entirety.

Q. Okay. Let's look at (D). I just want to make sure I exhaust this, sir.

(D) says, "Require continuing unique logistics support by AFLC and/or the modification contractor because of the peculiar or non-standard equipment utilized."

Do you see that, sir?

A. Yes, I do.

Q. Do you know what peculiar or non-standard equipment, if any, was utilized at the Ryan site?

A. Specifically, I do not know.

Q. Would that information be classified under the Big Safari program, sir?

MR. BARR: Objection, calls for speculation.

A. May or may not.

BY MR. WINE:

Q. Okay. And then (E) states, "Require the security safeguards which apply to all" covert --

Page 647

Case 3:07-cv-00787-CAB-BGS   Document 201-5   Filed 03/09/12   PageID.13475   Page 169 of
184
10/21/2011                    TDY Holdings v. United States of America                    Tommy Jordan

1    "covert intelligence collectors."
2            Do you see that?
3        A.  Yes, I do.
4        Q.  And did you consider that in the
5    formulation of your opinions as well?
6        A.  I considered this regulation in its
7    entirety.
8        Q.  Okay.  Let's go to 3(C) just below that in
9    the middle of the paragraph.  It says, "In addition,
10   the complexity of most equipment involved in the
11   various projects requires the selection and
12   retention of the best qualified officer, airman and
13   civilian personnel available."
14           And then it says, "AFRs 205-1 and
15   205-4 will be followed explicitly and a separate
16   Security Guide will be distributed by the Director
17   of Operations, Headquarters USAF."
18           Do you see that?
19       A.  Yes, I do.
20       Q.  Did you review in your materials, sir, the
21   separate security guard -- security guide that was
22   distributed by the director of operations in the

1    formulation of your opinions in this matter, sir?
2            MR. BARR:  Objection, relevance.
3        A.  I didn't specifically review them in
4    connection with my work on this case; but I believe
5    that during my tenure as an Air Force executive, I
6    had reviewed those documents.
7    BY MR. WINE:
8        Q.  Now, you've offered opinions regarding
9    roles and responsibilities of the government and of
10   Ryan for providing security at the site, correct?
11       A.  That's correct.
12       Q.  Okay.  And -- did you consider this
13   material in the formulation of those opinions, sir?
14       A.  I considered --
15           MR. BARR:  Objection, vague and
16   ambiguous.
17       A.  I considered this regulation or this
18   document in its entirety, but I didn't specifically
19   go back and review those two Air Force regulations.
20   BY MR. WINE:
21       Q.  If you'll turn to the next page, sir,
22   5369, in the right-hand column, 5, "Air Force

1    Systems Command Responsibilities."  (B) "Provide
2    engineering assistance as required in matters beyond
3    the responsibility or capability of AFLC."
4            Do you see that, sir?
5        A.  Yes, I do.
6        Q.  Do you know what engineering assistance
7    was provided at the Ryan site in support -- if any,
8    in support of Big Safari operations?
9            MR. BARR:  Objection, assumes facts
10   not in evidence.
11       A.  I do not specifically, no.
12   BY MR. WINE:
13       Q.  Was it customary for the United States Air
14   Force to provide engineering assistance to
15   contractors on non-Big Safari programs?
16           MR. BARR:  Objection, vague and
17   ambiguous, overly broad.
18       A.  I do not know.
19   BY MR. WINE:
20       Q.  Look at 5(D), "Provide command
21   requirements for peculiar logistics support
22   according to operational plans and deployments."

1            Is it customary for the government to
2    include a clause or support as described in 5(d) at
3    government contractors not performing Big Safari
4    operations in your experience, sir?
5            MR. BARR:  Same objections.
6        A.  5(D)?
7    BY MR. WINE:
8        Q.  I'm sorry.  7(D).  7(D), "Provide command
9    requirements."
10       A.  (Reviewing document) I see it.
11       Q.  And was this type of support customarily
12   provided to government contractors not involved in
13   Big Safari program in your experience, sir?
14           MR. BARR:  Same objections.
15       A.  Based upon my experience, I do recall some
16   programs where that kind of support was provided.
17   BY MR. WINE:
18       Q.  Okay.  And what -- what type of peculiar
19   logistics support was required at the Ryan site,
20   sir?
21           MR. BARR:  Objection, assumes facts
22   not in evidence, vague and ambiguous.

1     A.  I don't recall seeing anything that
2  provided details relative to logistic support.
3  BY MR. WINE:
4     Q.  And if it was peculiar logistics support
5  required under Big Safari, would that material have
6  been classified, sir?
7         MR. BARR:  Objection, calls for
8  speculation, vague and ambiguous, assumes --
9     A.  It may or may not.
10        MR. BARR:  -- facts not in evidence.
11  BY MR. WINE:
12     Q.  Excuse me.  Your answer?
13     A.  May or may not.
14     Q.  Did you consider either of these clauses
15  or any of the clauses reviewed so far in the exhibit
16  in formulating your opinions regarding government
17  involvement at the Ryan site?
18        MR. BARR:  Objection, asked and
19  answered.
20     A.  I considered this regulation in its
21  entirety, yes.
22

Page 652

1  BY MR. WINE:
2     Q.  Okay.  Turn to Page 5371.  In the
3  right-hand corner -- in the right-hand column --
4  excuse me -- under 4(a)(3), it says, "Special
5  Projects AFLC" Liaison Offices -- or "AFLC LO will,
6  (a), provide direct management and supervision of
7  Big Safari programs at the contractors' facilities."
8        Do you see that, sir?
9     A.  (Reviewing document) Yes, I do.
10     Q.  Did you include that clause in the
11  formulation of your opinions regarding the
12  government's involvement at the Ryan site?
13     A.  To repeat, I considered this regulation in
14  my formulation of my opinions.
15     Q.  Now, I reviewed your expert reports last
16  night.  This clause was not cited in your expert
17  reports.
18        Can you explain why it was not?
19     A.  No, I cannot.
20     Q.  Okay.  If you'll review further down the
21  column in (e), it says that "The AFLC LO will
22  supervise the day-to-day security operations of the

Page 653

1  contractor in accordance with applicable security
2  guides, except those functions which by agreement
3  will be performed by the DCASR personnel."
4        Do you see that, sir?
5     A.  Yes, I do.
6     Q.  And did you include that clause in your
7  consideration in offering your opinions regarding
8  responsibilities for providing physical security at
9  the Ryan site in your expert report?
10     A.  I considered this regulation in its
11  entirety, yes.
12     Q.  And I'll represent to you again, sir, with
13  respect to the -- as I did with the prior, that I
14  reviewed both of your expert reports last night; and
15  this clause was not cited in the portion of your
16  opinions relating to the provisioning of physical
17  security.
18        Why did you not include this?
19        MR. BARR:  Objection, misstates the
20  reports as well as the witness' prior testimony.
21     A.  I do not know.
22

Page 654

1  BY MR. WINE:
2     Q.  If you'd turn to Page 373.  If you look at
3  Clause 14 in the bottom right-hand corner, it says,
4  "Program funds (through MCVX) for replacing items
5  supplied from operating stocks and for one year's
6  spares when necessary."
7        Do you recall this clause, sir?
8     A.  I don't recall that specific clause; but I
9  did review this document, yes.
10     Q.  You did.  Okay.  And do you know what
11  replacing items supplied from operating stocks --
12  what, specifically, operating stocks referred to
13  there in this clause, sir?
14     A.  The Air Force Logistics Command maintained
15  spares in stock at the applicable air material area
16  or logistics center, as it was known in those days;
17  and to the extent that those spares were available,
18  they would be requisitioned from Air Force logistics
19  command and provided to the -- the program.  And to
20  the extent that they were not available, MCMX --
21  MCVX would provide funds to procure those spares.
22     Q.  Does -- does this clause relate to spares,

Page 655

1  sir, or supplies?

2        MR. BARR:  Objection, the document

3  speaks for itself.

4        A.  It says spares.

5  BY MR. WINE:

6        Q.  Where are you seeing "spares," sir?

7        A.  The last part of that.  And one year

8  spares when necessary.

9        Q.  Okay.  And you'll see -- if you look at

10  the left-hand side, sir, under 6(a), "Assure the

11  procedure for support of the Big Safari programs are

12  accomplished as follows," and 14 -- I apologize.

13  Strike that, sir.

14        Just to make sure we have a complete

15  record on 14, if you'll turn the page to 372, 4(b)

16  says, "AMAs and the Aerospace Guidance and Metrology

17  Center will assign a specific Big Safari program

18  manager to:" and then that is the precursor to -- to

19  14.

20        Am I reading that document correctly,

21  sir?

22        A.  I have not found it yet.

Page 656

1        Q.  If you look on Page 5372 in the right-hand

2  column --

3        A.  72?

4        Q.  Yes, sir.

5        A.  I'm sorry.  I was on the wrong page.

6        Q.  Right-hand column, 4(b).

7        A.  Okay.

8        Q.  And it says, "AMAs and the Aerospace

9  Guidance and Metrology Center will assign a specific

10  Big Safari manager to..."

11        A.  Okay.

12        Q.  And then that is what qualifies

13  Paragraph 14 that we were -- that you testified to.

14        Am I reading that correctly, sir?

15        MR. BARR:  Objection, the record's

16  confusing -- the question's confusing, vague and

17  ambiguous.

18  BY MR. WINE:

19        Q.  Is that the precursor to 14, sir?

20        A.  (Reviewing document) Not necessarily.

21        Q.  Okay.  What do you view as the precursor

22  to 14?

Page 657

1        A.  4 -- 14 is under 4(c) maintenance.

2        Q.  I -- I see where you're reading, sir.

3  So -- well, the way this is written is that 4(b) and

4  then there's an (a) supply, a (b) transportation,

5  and a (c) maintenance as the lead-in for those

6  items.

7        A.  That's what it says, yes.

8        Q.  Okay.  So, 4(b)(c), maintenance.

9        Am I -- am I reading it correctly?

10        A.  That's the way I would read it.

11        Q.  Okay.  And what sorts of spares are

12  maintained, sir, in operating stocks?

13        A.  It is spares to provide support to the

14  item that is in operational status.

15        Q.  Would that include feedstocks?

16        MR. BARR:  Objection.

17        A.  No.

18  BY MR. WINE:

19        Q.  What would it include?

20        A.  Spare components of the end item would

21  include those things that are stocks stored and

22  issued to operational commands to provide support to

Page 658

1  that unit and were applicable and called for in the

2  contract.  They would be provided to the contractor

3  as government-furnished property.

4        Q.  If you'd turn the page, sir, I have one

5  last clause.  I'd like to ask you about this

6  document.  If you look at Paragraph 16 in the

7  left-hand column --

8        MR. BARR:  What page?

9        MR. WINE:  5374.

10  BY MR. WINE:

11        Q.  Are you with me?  It says, "Assure that

12  security of the Big Safari program is maintained at

13  the AMA level.  Accomplish program security

14  requirements, assignment of level clearances, and

15  processing of classified information using the

16  guidance specified in the Big Safari Security

17  Guide."

18        Do you see that language, sir?

19        A.  Yes, I do.

20        Q.  Did you include that language in the

21  formulation of your opinions regarding government

22  involvement at the site and, in particular, the

Page 659

Pages 656 to 659

1  provisioning of security as it --
2       MR. BARR:  Objection --
3  BY MR. WINE:
4     Q.  -- relates to the Ryan site?
5          MR. BARR:  Objection, asked and
6  answered, compound, vague and ambiguous.
7     A.  That is not what this paragraph says.  It
8  has nothing to do with the site.  It is -- assure
9  that security of the Big Safari program is
10 maintained at the AMA level.
11 BY MR. WINE:
12    Q.  Okay.
13    A.  Air material area.  And it is not at Ryan.
14    Q.  And you're certain there was not an AMA
15 area at the Ryan site?
16    A.  We covered that --
17         MR. BARR:  Objection.
18    A.  -- that item discussion significantly at
19 the 2009 deposition.  And based upon my personal
20 knowledge of working at an air material area for
21 most of my adult life, they had some of the
22 functions of a logistics operation at Ryan; but it

Page 660

1  was not an AMA.
2  BY MR. WINE:
3     Q.  And do you know whether the functions that
4  Ryan was performing required the government to
5  include the types of security requirements described
6  in Paragraph 16 that you just read -- or that I just
7  read to you?
8          MR. BARR:  Objection, assumes facts
9  not in evidence.
10    A.  At the air material area?
11 BY MR. WINE:
12    Q.  No.  At Ryan.
13         MR. BARR:  Same objection.
14    A.  This paragraph has nothing to do with
15 Ryan.
16 BY MR. WINE:
17    Q.  But I didn't ask you that, sir.
18         I said:  Do you know whether the
19 logistics support requirements that Ryan was
20 providing through Big Safari on the site required
21 the employ -- the use of the program security
22 requirements described in this paragraph?

Page 661

1          MR. BARR:  Assumes facts not in
2  evidence.
3     A.  To repeat, in my opinion, Paragraph 16 has
4  nothing to do with the Ryan site.
5  BY MR. WINE:
6     Q.  Do you have sufficient facts to know what
7  was being performed -- what work was being performed
8  at the Ryan site for Big Safari to testify about
9  what security the government did provide?
10         MR. BARR:  Objection, vague and
11 ambiguous.
12    A.  Other than --
13         MR. BARR:  Assumes facts not in
14 evidence.
15    A.  Other than what is included in the
16 deposition by Bobbi Swann and in this regulation and
17 the other documents that I referred to during my
18 review of this case, no.
19 BY MR. WINE:
20    Q.  Can you describe for -- for the Court the
21 nature of -- of control, if any, the government
22 utilized over that area of the site that was

Page 662

1  designated for Big Safari during its operational
2  period at the Ryan site?
3          MR. BARR:  Objection, assumes facts
4  not in evidence, vague and ambiguous.
5     A.  Based upon my recollection, they had the
6  responsibility of review and approval of the
7  individuals who had access to that area.
8          Based upon the documents that I
9  reviewed, Ryan had responsibility for physical
10 control of the area.  There were no, if you will,
11 armed military guards in the area that I saw any
12 evidence of; and as far as I know, the military had
13 the responsibility of reviewing Ryan's procedures
14 and processes for safeguarding classified
15 information.  But the responsibility was that of the
16 contractor.
17 BY MR. WINE:
18    Q.  Where would you have expected to see
19 documentation of armed security guards -- armed
20 guards securing that portion of the site used for
21 Big Safari that you testified you have not seen?
22         MR. BARR:  Objection, calls for

Page 663

Pages 660 to 663

1   speculation, vague and ambiguous.

2        A.   The only thing that I saw relative to a

3   guard was in Bobbi Swann's deposition where she said

4   that when she moved the Big Safari program office

5   to -- from Frontier Street -- I think they called it

6   the warehouse -- to Kearny Mesa if I pronounced it

7   correctly, he took a secretary and a guard.

8   BY MR. WINE:

9        Q.   Now, sir, if the government has a security

10  protocol for a site, has specific guards in an area,

11  things like that, the government typically tends to

12  keep that information as classified so as to not

13  provide that type of information to the general

14  public or to individuals that might wish to

15  improperly or illegally access a site, correct?

16       MR. BARR:   Objection, calls for

17  speculation, vague and ambiguous.

18  BY MR. WINE:

19       Q.   In your experience --

20       MR. BARR:   Excuse me.  I'm not

21  finished with my objection.

22       MR. WINE:   I thought you were.

Page 664

1        MR. BARR:   Calls for speculation.

2   It's vague and ambiguous.  It's argumentative and a

3   question of relevance.

4   BY MR. WINE:

5        Q.   Okay.  You spent 30 years in federal

6   employment, sir.  You're familiar with -- you worked

7   at Kelly Air Force Base, correct?

8        A.   That's correct.

9        Q.   There were armed guards at Kelly Air Force

10  Base?

11       A.   That is correct.

12       Q.   In your 30 years' experience in federal

13  service, does the government publish or make

14  available to the general public its security

15  protocols for a site?

16       MR. BARR:   Objection, vague and

17  ambiguous.

18       A.   Anybody who drove onto or by Kelly Air

19  Force Base was fully aware of the armed guards that

20  we maintained at the gates.

21  BY MR. WINE:

22       Q.   Okay.  That's -- but that's not the

Page 665

1   question I asked you.

2        Does the government, when it

3   documents its security protocols for a site, make

4   that available to the general public; or does it

5   classify those materials?

6        A.   I do not recall ever seeing a protocol for

7   security at Kelly Air Force Base that was

8   classified.

9        Q.   So, they were all unclassified?

10       A.   I never recall seeing a written protocol

11  for security.

12       Q.   Okay.  Let's go back to some of the

13  testimony you gave to me on Wednesday.

14       A.   Are we through with 234?

15       Q.   You're through with 234.

16       Now, I asked you some questions about

17  the documents you did not cite in your expert

18  report, but you referenced as having considered in

19  formulating your expert opinions when Mr. Barr

20  questioned you on direction.  There were roughly 167

21  of those documents that were not referenced in your

22  expert reports but which the government marked as an

Page 666

1   exhibit in this matter.

2        Do you recall that, sir?

3        MR. BARR:   Object to misstating the

4   record.

5        A.   I am aware that there were more documents

6   as exhibits to my deposition than were cited in my

7   report, yes.

8   BY MR. WINE:

9        Q.   Why -- what happened in the intervening

10  two years that required you to reference those

11  documents that weren't referenced in your report?

12  Why didn't you reference them in your report to

13  begin with?

14       A.   Many of the documents were made available

15  to me subsequent to the preparation of my expert

16  report.

17       Q.   So, those 167 documents were not provided

18  to you in your -- in the author -- prior to the

19  authorship or in support of the authorship of your

20  report, sir?

21       MR. BARR:   Objection, misstates the

22  witness' testimony.

Page 667

Pages 664 to 667

1    A.  As I sit here today, I cannot specifically
2  tell you which ones of those documents were provided
3  to me at what point in time.
4  BY MR. WINE:
5    Q.  Okay.
6    A.  But many documents were provided to me
7  subsequent to the preparation of my expert report.
8    Q.  Now, I believe you also testified that you
9  ran queries in the DOJ database over the course of
10  the last two, two and a half months; is that
11  correct?
12    A.  Yes, I did.
13    Q.  And what queries did you run in the DOJ
14  database, sir?
15      MR. BARR:  Objection, asked and
16  answered.
17    A.  As I sit here today, I cannot tell you
18  specifically what I recall.
19  BY MR. WINE:
20    Q.  What subject matter were you querying the
21  J -- DOJ database on?
22    A.  As I sit here today, I cannot remember

Page 668

1  exactly what subjects I was looking at.
2    Q.  What -- what was the purpose of you
3  engaging in that effort, sir?
4    A.  To try to obtain additional documentation
5  that reflected upon the issue that I was concerned
6  with.
7    Q.  Did you make any notes regarding the
8  searches you were performing, sir?
9    A.  I did not.
10    Q.  You didn't -- didn't retain any
11  information about the searches you performed?
12    A.  I did not.
13    Q.  So, sitting here today, there's no way of
14  finding out what information you looked for and
15  found or didn't find in the last two months?
16    A.  Not that I know of.
17    Q.  Okay.  You understand the reason I'd like
18  to know that, sir, is because much of your testimony
19  is related to information that you haven't seen in
20  this matter.
21      MR. BARR:  Object --
22

Page 669

1  BY MR. WINE:
2    Q.  You understand that?
3      MR. BARR:  Objection, argumentative.
4  BY MR. WINE:
5    Q.  So, if there's no way for me to know what
6  you have or haven't looked for, how am I able to
7  verify what is or is not material you've seen in the
8  formulation of your expert opinions?
9      MR. BARR:  Objection, argumentative,
10  misstates the witness' testimony, relevance.
11    A.  I do not know.
12  BY MR. WINE:
13    Q.  Okay.  Now, we talked about consumable
14  supplies on Wednesday; and there were -- I had
15  questions for you as to whether or not materials
16  used in batch processing had value.  In particular,
17  let's take first TCE.
18      Is TCE that is used in a
19  manufacturing facility an item of value to the
20  contractor?
21      MR. BARR:  Objection, asked and
22  answered.

Page 670

1    A.  To the contractor?
2  BY MR. WINE:
3    Q.  Yes.
4    A.  Since a contractor procures those kinds of
5  items, I would assume that he considers it to be of
6  value.
7    Q.  And will a contractor -- since it is an
8  item of value to the contractor, is the contractor
9  able to burden its cost-based contracts for the
10  expenses associated with procuring an item such as
11  TCE?
12    A.  It is able to burden its overhead with any
13  cost that is considered to be allowable, allocable
14  and reasonable.
15    Q.  And would TCE qualify in that regard, sir?
16      MR. BARR:  Objection, hypothetical.
17    A.  I don't recall seeing any documentation
18  relative to what they included in their overhead
19  that specifically included TCE; but based upon my
20  knowledge -- personal knowledge of the processes
21  that contractors use to burden their overhead, if
22  you will, it would be considered to be a cost -- a

Page 671

Pages 668 to 671

10/21/2011                     TDY Holdings v. United States of America                     Tommy Jordan

1   type of cost that they would include in their
2   overhead.
3   BY MR. WINE:
4       Q.   And what about chromium?  Same -- same
5   scenario.  If a -- a government contractor requires
6   the use of chromium to, say, do anodizing or
7   chrome-plating activities at a site for a cost-based
8   contract, would those costs to purchase chromium be
9   allowable and allocable under that contract?
10          MR. BARR:  Objection, compound.
11      A.   The contractor was able to include in its
12  overhead submissions to the government any cost that
13  would be considered to be allowable, allocable and
14  reasonable.
15  BY MR. WINE:
16      Q.   And in your experience for anodizing
17  operations, would chromium be one of those items?
18      A.   In my experience, I do not specifically
19  recall any instance where the overhead submissions
20  that I reviewed contain chromium, quote, unquote.
21      Q.   Not the question I asked you, sir.
22      A.   That is the question that I understood you

                                              Page 672

1   to ask.
2       Q.   Okay.  Not whether you saw requests for
3   chromium -- for accounting treatment for chromium;
4   but would chromium, by your experience, be an item,
5   if used in a process at a manufacturing plant for a
6   government contract, be an item that could be
7   allocable, allowable and reasonable under a contract
8   that was being used to support that contract?
9       A.   If the DCAA considered those costs to be
10  allowable, allocable and reasonable, yes.
11      Q.   Okay.  And what about lubricants?
12      A.   Same answer.  If DCAA considered those
13  costs to be allowable, allocable and reasonable, the
14  contractor would be able to include those costs in
15  its overhead and recover those costs through either
16  government or commercial contracts.
17      Q.   What about cutting oils?
18      A.   Same answer.
19      Q.   Other than the documentation that you've
20  testified about regarding Convair, are you aware of
21  any DCAA findings that costs submitted by Ryan were
22  deemed to be unallowable, unallocable or

                                              Page 673

1   unreasonable?
2       A.   Since I didn't review every DCAA audit
3   that was conducted in the history of this facility,
4   I didn't see all the documents; but I do not recall
5   any specific DCAA audit that I reviewed where they
6   considered those kinds of overhead costs to be
7   unallowable.
8       Q.   Now, if a contractor stops performing on a
9   cost-based contract in the middle of performance,
10  middle of -- of contract performance -- let's say it
11  goes bankrupt or -- or for other reasons is unable
12  to complete the performance, because the government
13  has made partial payment under that cost contract,
14  does the government own title to any of the material
15  in process?
16          MR. BARR:  Objection, vague and
17  ambiguous, calls for -- it's an improper
18  hypothetical.
19      A.   It would depend upon the circumstances,
20  but each individual case would have to be reviewed
21  on its own merits.
22

                                              Page 674

1   BY MR. WINE:
2       Q.   And can you give an answer at all based on
3   the question that I asked you, sir?
4           MR. BARR:  Same objections;
5   argumentative.
6       A.   A determination would have to be made
7   based upon the circumstances of each individual
8   case, and I don't know if you can give a generic
9   answer to that question.
10  BY MR. WINE:
11      Q.   If -- if a contract calls for anodizing of
12  parts and chromium is used in that anodizing
13  process, is the -- is chromium part of the end
14  product?
15      A.   I am not that familiar with the anodizing
16  process.  I have looked at the specifications
17  relative to anodizing.  I don't recall a situation
18  where chrome is deposited directly on the -- the end
19  product being produced.
20          Based upon what I have seen and
21  contrary to operations, chrome is deposited during
22  chrome-plating operations, but not necessarily in

                                              Page 675

                                              Pages 672 to 675

1  anodizing processes.
2      Q.  So, let's take your clarification then.
3  In chrome-plating operations -- you're aware that
4  chrome-plating operations were performed at this
5  site, correct?
6          MR. BARR:  Objection, assumes facts
7  not in evidence.
8      A.  I do not recall seeing anything
9  specifically speaking to chrome plating.
10  BY MR. WINE:
11      Q.  So, you have no information about that one
12  way or the other?
13      A.  I have no information.
14      Q.  Okay.  Let's assume a chrome-plating
15  operation at the site.
16          Would chromium then be part of the
17  end product?
18          MR. BARR:  Objection, calls for
19  speculation.
20      A.  If --
21          MR. BARR:  Incomplete hypothetical.
22      A.  If chrome plating was performed, then the

Page 676

1  for anodizing operations where chromium continues or
2  chromic acids continue to have use -- useful future
3  life as it sits in a -- a -- a processing batch?
4          MR. BARR:  Same objections; assumes
5  facts not in evidence.
6      A.  Possibly in theory, but not in practice.
7  BY MR. WINE:
8      Q.  What about cutting oils or lubricants that
9  reside in a machine before it's being used?  Do
10  those have value?
11          MR. BARR:  Objection, vague and
12  ambiguous, hypothetical, calls for speculation.
13      A.  In my judgment, no.
14  BY MR. WINE:
15      Q.  Why not?
16      A.  I don't know how you would go about
17  removing those kinds of items from a piece of
18  contractor-owned equipment and then using those in
19  some other operation.
20      Q.  Do you have sufficient background to know
21  how manufacturers do that as part of routine
22  maintenance of equipment?

Page 678

1  chrome that would be deposited -- pardon me -- on
2  the end product would be incorporated into and made
3  a part of the product being delivered to the
4  government.
5  BY MR. WINE:
6      Q.  Okay.  Based on your answer, sir, would
7  that make the chromium solution used for
8  chrome-plating operations an item of value to the
9  government?
10          MR. BARR:  Objection, hypothetical,
11  calls for speculation, vague and ambiguous.
12      A.  Not necessarily.  If it were a used
13  solution, then I don't see where it would have
14  value.
15  BY MR. WINE:
16      Q.  If it was a solution that continued to
17  have productive life, would it be an item of value
18  to the government?
19          MR. BARR:  Same objections.
20      A.  May or may not.
21  BY MR. WINE:
22      Q.  Is that -- is your answer any different

Page 677

1      A.  Specifically, no.
2      Q.  And what about for -- does your answer
3  change if it's government-furnished equipment?
4          MR. BARR:  Same objections.
5      A.  If it were government-furnished equipment
6  and the government reacquired that particular piece
7  of equipment and moved it to another location and if
8  it contained at that time those kinds of fluids,
9  then it could possibly have value.
10  BY MR. WINE:
11      Q.  Now, sir, I asked you a question the other
12  day about testimony from -- or expected testimony
13  from a Ryan witness, Arden Honrud; and in answering
14  my question, you said, "I don't know if I'll be
15  given an opportunity to express my opinion
16  subsequent to sworn testimony in court.  If I do
17  have that kind of opinion, I will have to listen to
18  the testimony and then give you an appropriate
19  opinion at the time."
20          Sir, if the condition of your health
21  continues unchanged as it is today, would you be
22  able to testify at trial next year in San Diego in

Page 679

Pages 676 to 679

1  this matter.

2          MR. BARR:  Objection, hypothetical,

3  calls for speculation.

4      A.  I refer you back to the declaration that I

5  filed several months ago.  Unfortunately, I am not

6  prophetic.  I cannot tell you what my health

7  condition will be a year from now.  I don't think

8  that I will be able to testify at trial; but that

9  will depend upon my health a year from now or two

10 years, whenever the trial is -- is held.

11 BY MR. WINE:

12     Q.  Okay.  One moment.

13         MR. WINE:  Nothing else for you at

14 this time, Mr. Jordan.  Thank you.

15         THE WITNESS:  Okay.

16         MR. BARR:  Okay.  We'll take a --

17 let's take a ten-minute break, and then we'll have

18 some redirect.

19         THE VIDEOGRAPHER:  Going off record.

20 Time now is 10:04.

21         (Recess from 10:04 a.m. to 10:18

22 a.m.)

Page 680

1          THE VIDEOGRAPHER:  Going back on

2  record.  Time now is 10:18.

3          FURTHER EXAMINATION

4  BY MR. BARR:

5      Q.  All right, Mr. Jordan.  Let's pick up

6  where -- essentially where Mr. Wine left off,

7  Government Exhibit 234.

8          At the top, the title just before the

9  words "Big Safari program" is a (U).

10 What does that mean?

11     A.  It -- I think it means that this -- the

12 title Big Safari program is unclassified.

13     Q.  Okay.  And then underneath that, there's a

14 similar parenthetical for that introductory

15 paragraph.

16         Do you see that?

17     A.  Yes, I do.

18     Q.  And it says, "This regulation outlines the

19 policies and procedures governing the management of

20 certain projects involving the initial modification,

21 cyclic maintenance, and follow-on support of

22 selected airborne recognizance systems."

Page 681

1          And where it refers to management,

2  management of what and where?

3          MR. WINE:  Objection, leading.

4      A.  My interpretation is referring to the

5  management of those projects throughout the -- the

6  Air Force.

7  BY MR. BARR:

8      Q.  Is this essentially management of

9  Air Force -- Air Force personnel and programs?

10         MR. WINE:  Objection, leading.

11     A.  That would be my interpretation, yes.

12 BY MR. BARR:

13     Q.  Similar question with respect to the

14 language that Mr. Wine read to you in Paragraph 2(C)

15 on the first page, 234, where it said -- referred to

16 "Projects designated for Big Safari management will

17 be directed only by the Air Force or the Secretary

18 of Defense," et cetera.

19         Where it says, "Projects designated

20 for Big Safari management," was that management

21 within the Air Force or at contractors.

22         MR. WINE:  Objection, leading.

Page 682

1      A.  That would be management by the Air Force

2  and incorporation of a project under the umbrella of

3  Big Safari.

4  BY MR. BARR:

5      Q.  Now, this Air Force regulation, I take it

6  that in the course of your career, you became

7  familiar with a number of Air Force regulations?

8      A.  Yes, I did.

9      Q.  Were these for internal management

10 purposes?

11         MR. WINE:  Objection, leading.

12     A.  They were for internal management purposes

13 unless they were specifically included in a

14 contract.

15 BY MR. BARR:

16     Q.  Okay.  Let's turn to the page with the

17 Bates number ending in 5371.

18     A.  Okay.

19     Q.  And I believe your attention was directed

20 to Paragraph 4(A)(3), which says, "Special Projects

21 AFLC Liaison Offices (AFLC LO) will, A, provide

22 direct management and supervision of Big Safari

Page 683

Pages 680 to 683

10/21/2011                TDY Holdings v. United States of America                Tommy Jordan

1  programs at the contractor's facilities."
2         Based on your understanding as a
3  government contracting officer, direct management
4  and supervision of whom?
5         MR. WINE:  Objection, document speaks
6  for itself.
7     A.  (Reviewing document) My interpretation
8  would be management of the detachment located at the
9  various contractor facilities.
10        MR. WINE:  Object to the answer
11 insofar as the clause is clear and unambiguous, not
12 requiring an interpretation.
13 BY MR. BARR:
14    Q.  And farther down below referring to that
15 Subparagraph 4(A)(3)(E), it refers to "Supervise the
16 day-to-day security operations of the" secure -- "of
17 the contractor in accordance with applicable
18 security guides, except those functions which, by
19 agreement, will be performed by DCASR personnel."
20        Do you interpret this provision to be
21 in any way inconsistent with the opinions you've
22 expressed as to who was responsible for security at
                                              Page 684

1         MR. BARR:  The whole thing?  Is "C"
2  all on 19?
3     A.  Okay.
4  BY MR. BARR:
5     Q.  And also Exhibit 21, if you would,
6  Pages 33676 to 78 and, in particular,
7  Article 4(C)(3).
8     A.  Okay.
9     Q.  Now, as far as the exceptions that are
10 stated in the provisions that I have just referred
11 you to in Exhibits 19 and 21, what is your essential
12 understanding of the scope of those exceptions?
13        MR. WINE:  Objection, document speaks
14 for itself, calls for a legal conclusion.
15    A.  Well, the key provision in both of these
16 citations is claims by the contractor against the
17 government, which are based upon responsibilities of
18 the -- of the contractor to third parties and which
19 involve costs reimbursable under the contract, but
20 which are not known to the contractor.
21 BY MR. BARR:
22    Q.  Okay.  Now let's go back to Exhibit 20.
                                              Page 686

1  contractor facilities?
2         MR. WINE:  Objection, the document
3  speaks for itself as does any inconsistency to the
4  client's opinion or the witness' opinion in prior
5  testimony.
6     A.  I do not.
7  BY MR. BARR:
8     Q.  Let's go back to the subject of releases.
9  You were shown Exhibit 20, and you were asked some
10 questions about that the other day.
11        I'd like to show you Exhibit 20 as
12 well as 19 and 21.  And for the record, I'm going to
13 direct your attention to certain pages on each of
14 these; and I'll indicate those pages for the record.
15        Just let us know when you've finished
16 reviewing those.
17    A.  (Reviewing documents) Okay.
18    Q.  With respect to Exhibit 19, let me direct
19 your attention to Pages 34018 and 34019,
20 Article 4(C)(2).
21        MR. WINE:  Is there anything on 18
22 that you -- C(2) is on 1-9.
                                              Page 685

1         Now, the other day, you were asked to
2  focus on one portion of the last six lines, that
3  one-paragraph release form under Contract No.
4  a(s)-314.  Let me read to you that provision.
5         It says, "Provided that this
6  agreement expressly excepts from this release
7  without prejudice to the rights of either party
8  under the above-mentioned contract, all claims not
9  known to the contractor and hereafter presented or
10 made against the contractor on any subcontract claim
11 or claim of any third person of whatsoever kind or
12 nature and for which the contractor is liable under
13 the aforesaid contract."
14    A.  Okay.
15    Q.  Now, I'd like you to focus on the last
16 line.  Mr. Wine did not focus your attention on that
17 last line.
18        I'd like you to do that.  And could
19 you, based on your experience as a former
20 contracting officer, explain what the focus of that
21 last line is?
22        MR. WINE:  Objection, document speaks
                                              Page 687

                                              Pages 684 to 687

10/21/2011                    TDY Holdings v. United States of America                    Tommy Jordan

1   for itself, calls for a legal conclusion.
2       A.  It speaks to -- in my opinion based upon
3   my experience and -- and training, it speaks to
4   those costs that the contractor incurred
5   specifically related to a specific contract and his
6   responsibility to pay for those supplies or whatever
7   that he incurred an obligation to under this
8   contract.
9   BY MR. BARR:
10      Q.  Did you discern a change in the format and
11  contents of releases between the World War II period
12  and the post-war period?
13          MR. WINE:  Objection, goes beyond the
14  scope of the -- of the cross-examination.
15      A.  The Department of Defense was created in
16  1947.
17          (Whereupon, Mr. Tishok left the
18  room.)
19      A.  The first edition of the Armed Services
20  Procurement Regulation was published in 1948.  And
21  those releases that were executed subsequent to the
22  publication of -- of ASPR did have a more focused
                                            Page 688

1   and somewhat broader application than those that
2   were executed during World War II.
3   BY MR. BARR:
4       Q.  Now, did you mean to suggest that -- in
5   your testimony the other day that what was marked as
6   Exhibit 20 was the same as the releases that were
7   executed throughout the period of 1939 to 1999?
8           MR. WINE:  Objection, leading.
9       A.  That was not my intent.
10  BY MR. BARR:
11      Q.  What -- based on your knowledge and
12  training over the decades as a government
13  contracting officer, have been the essential
14  purposes of releases in government contracting?
15          MR. WINE:  Objection, calls for a
16  legal conclusion and analysis.  It goes beyond the
17  scope of the witness' expert report and opinions
18  articulated therein and is, therefore, inadmissible.
19  BY MR. BARR:
20      Q.  I'm just asking for your understanding of
21  the policies.
22      A.  It brings to closure and finality those
                                            Page 689

1   contracts under which a release was executed and
2   eliminates the possibility of an open-ended
3   liability on the part of the government.
4       Q.  On the part of whom?  I'm sorry.
5       A.  Of the government.
6       Q.  I see.  Now, the other day, Mr. Wine used
7   the term "legacy environmental costs" a number of
8   times.
9           What was your understanding of
10  Mr. Wine's use of that term?
11          MR. WINE:  Objection to the extent it
12  mischaracterizes prior testimony and/or the record.
13      A.  My interpretation of legacy refers to
14  those costs that were incurred prior to or inherited
15  by a contractor from previous operations.
16  BY MR. BARR:
17      Q.  Now, let me direct your attention to -- I
18  believe he showed you two of these, but I don't
19  think he showed you all of them -- Exhibits 71, 72
20  and 73.
21          I'll ask you -- I've tabbed a couple
22  of pages.  I'll ask you to review those documents.
                                            Page 690

1           While you're doing that, I've tabbed
2   on Exhibit 71 Page 2504; and on Exhibit 72, I've
3   tabbed Page 616.
4       A.  (Reviewing documents) Okay.
5       Q.  Now, based on your familiarity with these
6   documents, both during your time as an Air Force
7   contracting official and your work on this case, do
8   any of these DCAA guidance documents use the word
9   "legacy"?
10          MR. WINE:  Objection to the extent it
11  mischaracterizes the witness' prior testimony in
12  which he stated he did not have direct knowledge or
13  familiarity with the documents based on his work
14  within the Air Force.
15      A.  Based upon my reading of the documents,
16  you won't find specifically the word "legacy" in
17  these documents, to my -- best of my knowledge.
18  BY MR. BARR:
19      Q.  Now, referring you to the -- Exhibit 71
20  and 72, do these DCAA guidance documents address, in
21  substance, the question of environmental costs with
22  respect to prior operations?
                                            Page 691

                                    Pages 688 to 691

1          MR. WINE:  Objection, the documents
2   speak for themselves.  The witness is not -- lacks
3   the requisite knowledge on which to opine regarding
4   the meaning or content of the documents.
5       A.  In substance, yes, they do.
6   BY MR. BARR:
7       Q.  Could you identify the paragraph or
8   provisions on those tabbed pages for us --
9          MR. WINE:  Objection --
10  BY MR. BARR:
11      Q.  -- which do that?
12         MR. WINE:  Objection as leading.
13  Counsel has tabbed the pages for the witness.
14      A.  Under Exhibit 72, it would be
15  Paragraph 7-1920.7(a).
16  BY MR. BARR:
17      Q.  And on 71?
18      A.  It would be under 2504 -- Page 2504, and
19  the title of that paragraph is "Costs from a
20  Contractor's Previous Site."
21      Q.  Okay.  Thank you.
22         Now let's return to the subject of

Page 692

1   progress payments.  For both direct and cross,
2   you've mentioned that the government protects its
3   interests when making progress payments.
4          Do you recall that subject?
5       A.  Yes, I do.
6       Q.  What interests are those?
7       A.  It would be much like security on a
8   commercial loan.  It protects the monies -- the
9   right of the -- the government to recoup monies
10  advanced to a contractor through progress payments.
11      Q.  And as far as the interests go, what are
12  the essential interests of the government when it
13  enters into a contract pursuant to which progress
14  payments are made?
15         MR. WINE:  Objection, calls for a
16  legal analysis.
17      A.  The primary interest of the government is
18  to obtain delivery of the product for which it
19  contracted.
20  BY MR. BARR:
21      Q.  And how does the government go about
22  protecting the interests in getting the product when

Page 693

1   it makes progress payments?
2          MR. WINE:  Objection, calls for a
3   legal analysis.
4       A.  Through either title or a lien on
5   property, I think I -- as I identified it earlier as
6   items of value.
7   BY MR. BARR:
8       Q.  Now, we -- I think we touched on but I
9   don't think we finished with our conversation
10  regarding the liquidation of progress payments.
11         Can you explain for the Court what
12  liquidation of progress payments means?
13         MR. WINE:  Objection, goes beyond the
14  scope of cross-examination and is, therefore,
15  inadmissible.
16      A.  Liquidation is a process through which the
17  government recoups the monies advanced to the
18  contractor.  For lack of a better term, you could
19  almost consider it a loan, even though it is not a
20  loan.
21         Through deducting from the payment
22  for completed end products the progress payments

Page 694

1   that were advanced to the -- the contractor so that
2   at the completion of the contract, the government
3   has recouped all of its monies advanced to the
4   contractor, the contractor has been able to produce
5   the item with none or minimal expense to commercial
6   loans; and then the government receives delivery of
7   the product for which it contracted.
8   BY MR. BARR:
9       Q.  All right.  Let's talk again about
10  consumable chemicals; and you were asked some
11  questions, both the other day and today, about
12  chromium.  I want to be sure that we're -- we're
13  clear as far as the chromic acid that may have been
14  used in the chromic acid anodizing process.
15         Based on your experience, what is
16  your understanding as to whether or not the chromic
17  acid is actually deposited on the metal that is
18  anodized?
19         MR. WINE:  Objection, goes beyond the
20  scope of the witness' area of expertise for which
21  he's been qualified and is, therefore, inadmissible.
22      A.  Based upon the specifications that I

Page 695

Pages 692 to 695

10/21/2011                TDY Holdings v. United States of America                Tommy Jordan

1 reviewed in preparation for my deposition, I do not
2 believe that the chromic acid was depose --
3 deposited upon the product being produced for the
4 government.
5 BY MR. BARR:
6     Q.   And were any of the cutting oils used in
7 machine tools at the Harbor Drive Plant, to the best
8 of your knowledge in your work on this case,
9 incorporated into or made a part of the end item
10 deliverable products made by Ryan or TRA?
11        MR. WINE:  Objection, beyond the
12 scope of the witness' knowledge and his expert
13 report and is therefore inadmissible.
14    A.   Based upon my opinions and knowledge that
15 I have obtained through the years, it would not be
16 incorporated into and made a part of the product
17 being produced for the government.
18 BY MR. BARR:
19    Q.   And Mr. Wine asked you questions --
20 similar questions relating to lubricants used with
21 the machine tools.
22        Would any of the lubricants used in

Page 696

1 BY MR. BARR:
2     Q.   Thank you, Mr. Jordan.
3        MR. BARR:  That's all I have.
4        MR. WINE:  If you'd just give us two
5 minutes to make sure we don't have any cleanup.
6        THE WITNESS:  Okay.
7        THE VIDEOGRAPHER:  Going off record.
8 Time now is 10:43.
9        (Recess from 10:43 a.m. to 10:49
10 a.m.)
11        THE VIDEOGRAPHER:  Going back on
12 record.  Time now is 10:49.
13            FURTHER EXAMINATION
14 BY MR. WINE:
15    Q.   Mr. Jordan, just a couple of cleanup
16 questions.  Did you work with any of the Big Safari
17 regulations during your federal employment?
18    A.   I did not.
19    Q.   So, your testimony regarding the Big
20 Safari regulations is based solely on your review of
21 those documents in the context of this litigation?
22    A.   That is correct.

Page 698

1 the machine tools at the Harbor Drive Plant have
2 been incorporated into or made a part of the end
3 item deliverable products made by the company for
4 the government?
5     A.   Based upon --
6        MR. WINE:  Objection.  Objection,
7 goes beyond the scope of the witness' area of
8 expertise and his expert opinions and is, therefore,
9 inadmissible.
10    A.   Based upon my judgment, no.
11 BY MR. BARR:
12    Q.   And as far as -- the same question with
13 respect to the chlorinated solvents.
14        Were -- based on your knowledge of
15 what Ryan and TRA made for the military or prime
16 contractors, were any of the chlorinated solvents
17 used in degreasing equipment incorporated into or
18 made a part of the end item deliverable products
19 made by the company?
20        MR. WINE:  Same objections.
21    A.   Based upon my judgment, no.
22

Page 697

1     Q.   Okay.  Now, with respect to Jordan
2 Exhibits 19, 20 and 21 that both Mr. Barr and I
3 asked you questions about, do those release -- those
4 releases relate exclusively to releases of contract
5 claims, don't they?
6     A.   That is my interpretation of those
7 clauses, yes.
8     Q.   Now, with respect to the work that was
9 performed at the Ryan site, could Ryan perform the
10 work that it was being contracted to do by the
11 government without the use of TCE during the 1940s?
12        MR. BARR:  Objection, beyond the
13 scope of the witness' expertise, reports and
14 testimony.
15    A.   I don't know.
16 BY MR. WINE:
17    Q.   How about the 1950s?
18        MR. BARR:  Same objections.
19    A.   Specifically, I do not know.
20 BY MR. WINE:
21    Q.   Do you have any knowledge as to whether or
22 not Ryan could have performed the work that the

Page 699

Pages 696 to 699

10/21/2011                TDY Holdings v. United States of America                Tommy Jordan

1  government contracted with it to perform without
2  using TCE at any point in time during its
3  operations?
4         MR. BARR:  Same objections.
5    A.  Based upon my experience, in the contracts
6  that I am personally familiar with, most of the
7  programs where contractors used large volumes of TCE
8  were prepare and overhaul of engines, specifically
9  reciprocating engines.
10  BY MR. WINE:
11    Q.  Okay.  And with respect to manufacturing
12  operations where metals and specialty steels and
13  other materials were being milled, used on lathes,
14  used in high pressure hydraulic presses and things
15  like that, do you know if that work could be
16  performed without the use of TCE at a site?
17         MR. BARR:  Same objections.
18    A.  I don't know.
19  BY MR. WINE:
20    Q.  Do you know what TCE is used for at a site
21  like that?
22         MR. BARR:  Same objections.

                                                    Page 700

1    A.  It is used to remove oils, greases and
2  carbon products from the -- the item being
3  degreased.
4  BY MR. WINE:
5    Q.  Would that item being degreased include
6  material in process?
7         MR. BARR:  Same objections.
8    A.  It depends on the item.
9  BY MR. WINE:
10    Q.  Would it depend on -- would it also
11  include tooling?
12         MR. BARR:  Same objections; also
13  vague and ambiguous.
14    A.  I think I testified the other day that
15  based upon my personal experience, most of the tools
16  that I saw being degreased were -- I think the
17  terminology is -- hand dipped in small vats of -- of
18  solvents.
19  BY MR. WINE:
20    Q.  Including TCE?
21         MR. BARR:  Objection, beyond --
22  that's not what the witness testified.

                                                    Page 701

1    A.  I don't know specifically whether the
2  dipping operations that I personally involved -- saw
3  were TCE or PCE.
4  BY MR. WINE:
5    Q.  Do you know of any reason why a vapor
6  degreaser cannot be used for cleaning of tooling?
7         MR. BARR:  Same objections; calls for
8  speculation.
9    A.  I guess, in theory, it could be.
10  BY MR. WINE:
11    Q.  Do you know if any of the work performed
12  at the Ryan site for which the government contracted
13  could have been performed without the use of
14  chromium?
15         MR. BARR:  Same objections.
16    A.  I think I testified earlier that I don't
17  recall specifically any items that were, quote,
18  unquote, chrome plated.
19  BY MR. WINE:
20    Q.  Did you run searches in the DOJ database
21  to see if there were chrome-plating operations at
22  the site?

                                                    Page 702

1    A.  Not that I recall.
2    Q.  Do you recall reviewing any testimony by
3  any Ryan witnesses regarding chrome-plating
4  operations at the site?
5    A.  As I sit here today, not that I can
6  recall.
7    Q.  What about witness -- expert reports
8  referencing chrome-plating operations?
9    A.  As I sit here today, I can't specifically
10  recall any.
11    Q.  But you are aware that the -- of anodizing
12  operations, correct?
13    A.  That is correct.
14    Q.  And those anodizing operations used
15  chromic acid, correct?
16         MR. BARR:  Objection, misstates the
17  witness' prior testimony, assumes facts not in
18  evidence.
19    A.  Based upon the specifications that I
20  reviewed, one of the processes for anodizing was the
21  use of chromic acid.
22

                                                    Page 703

Pages 700 to 703

BY MR. WINE:

Q.   And to -- to the extent that a specification required the use of chromic acid, could Ryan perform operations at the site without using chromic acid?

MR. BARR:  Objection, calls for speculation, beyond the scope of the witness' reports, expertise and testimony.

A.   Based upon my recollection of documents which I reviewed, anodizing was performed on some of the products produced by -- by Ryan.

BY MR. WINE:

Q.   Okay.  And so, my question is:  Could Ryan have performed those operations without using chromic acid insofar as the military specification required it?

MR. BARR:  Objection -- same objections.

A.   I recall that there were two processes for anodizing, one of which was chromic acid.

BY MR. WINE:

Q.   Could -- well, let me just make sure I

Page 704

have an answer to the last series of questions.

Do you know one way or another whether Ryan could have performed its anodizing operations at the site without using chromic acid?

MR. BARR:  Same objections.

A.   If there were two acceptable processes for anodizing, I don't know specifically which ones of those two was used by Ryan; and I don't recall any of the MPDs which specifically spoke to use of chromic acid.

BY MR. WINE:

Q.   Do you know whether chromic acid was used at the site?

A.   I don't know.

Q.   Would it require someone with expertise different than yours, sir, to determine whether or not chromic acid was needed in operations at the Ryan facility?

A.   In my judgment, yes.

Q.   And finally, with respect to cutting oils and lubricants, could Ryan have performed the work that the government was contracting with it to do

Page 705

without employing cutting oils or lubricants at the site?

MR. BARR:  Same objections.

A.   Probably not.

BY MR. WINE:

Q.   And do you know whether or not the applications requiring those cutting oils and lubricants were under certain conditions that required PCB additives as well?

MR. BARR:  Same objections; assumes facts not in evidence.

A.   I do not recall seeing anything that spoke specifically to the cutting oils and lubricants containing PCBs.

BY MR. WINE:

Q.   And I believe you -- you testified that you had recollection of reviewing witness testimony, about the use of PCBs at the site.

Am I remembering correctly, sir?

A.   The only thing that I specifically recall in prior depositions was the PCBs in transformers.

Q.   Okay.

Page 706

MR. WINE:  No further questions. Thank you, Mr. Jordan.

MR. BARR:  That's all.  Thank you, Mr. Jordan.

THE VIDEOGRAPHER:  This marks the end of deposition.  Time off record now is 10:58.

(Deposition concluded at 10:58 a.m.)

Page 707

Pages 704 to 707

1  CERTIFICATE OF SHORTHAND REPORTER
2       I, Marcy Clark, Certified Shorthand
3  Reporter, the officer before whom the foregoing
4  deposition was taken, do hereby certify that the
5  foregoing transcript is a true and correct record of
6  the testimony given; that said testimony was taken
7  by me stenographically and thereafter reduced to
8  typewriting under my supervision; and that I am
9  neither counsel for, related to, nor employed by any
10  of the parties to this case and have no interest,
11  financial or otherwise, in its outcome.
12       Certified to by me on this _____ day
13  of _____, 2011.
14
15
16
17
18       _____
        MARCY CLARK, CSR, CLR
19      Texas Certified Shorthand Reporter
20      CSR No. 4935
21      Certified LiveNote Reporter
22      Expiration Date:  12/31/2012

Page  708

---

1  Digital Evidence Group, L.L.C.
2  1299 Pennsylvania Ave NW, Suite 1130E
3  Washington, D.C. 20004
4  (202) 232-0646
5
   SIGNATURE PAGE
6
7
8  Case Name: TDY Holdings v. United States of America
9  Witness Name: Tommy Jordan
   Deposition Date: 10/21/11
10
11  I do hereby acknowledge that I have read
    and examined the foregoing pages
12  of the transcript of my deposition and that:
13
14  (Check appropriate box):
15  ( ) The same is a true, correct and
    complete transcription of the answers given by
16  me to the questions therein recorded.
17  ( ) Except for the changes noted in the
    attached Errata Sheet, the same is a true,
18  correct and complete transcription of the
    answers given by me to the questions therein
19  recorded.
20
21  _____      _____
22   DATE            WITNESS SIGNATURE

Page  710

---

1  Tommy Jordan c/o
2  DICKSTEIN SHAPIRO, L.L.P.
   1825 Eye Street NW
3  Washington, D.C. 20006-5403
4
   Case: TDY Holdings v. United States of America
5  Date of deposition: 10/21/11
   Deponent: Tommy Jordan
6
7  Please be advised that the transcript in the above
8  referenced matter is now complete and ready for signature.
9  The deponent may come to this office to sign the transcript,
10  a copy may be purchased for the witness to review and sign,
11  or the deponent and/or counsel may waive the option of signing.
12  Please advise us of the option selected.
13  Please forward the errata sheet and the original signed
14  signature page to counsel noticing the deposition, noting the applicable
15  time period allowed for such by the governing Rules of Procedure.
16  If you have any questions, please do not hesitate to call our office at
17  (202)-232-0646.
18
19  Sincerely,
20
21  Digital Evidence Group
   Copyright 2011 Digital Evidence Group
22  Copying is forbidden, including electronically, absent express written consent.

Page  709

---

1  Digital Evidence Group, L.L.C.
2  1299 Pennsylvania Ave NW, Suite 1130E
3  Washington, D.C. 20004
4  (202) 232-0646
5
   E R R A T A   S H E E T
6
7
8  Case Name: TDY Holdings v. United States of America
9  Witness Name: Tommy Jordan
10  Deposition Date: 10/21/11
11   Page No.   Line No.       Change
12
13
14
15
16
17
18
19
20
21  _____      _____
22   Signature                 Date

Page  711

Pages  708 to 711