IGNACIA S. MORENO
Assistant Attorney General

LEWIS M. BARR
MARK A. RIGAU (SBN 223610)
DUSTIN J. MAGHAMFAR (SBN 274414)
Trial Attorneys
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Defense Section
301 Howard Street, Suite 1050
San Francisco, California 94105
Telephone No:  (202) 514-9645
Facsimile No:   (202) 514-8865

Attorneys for Defendants and Counterclaimants

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

_____
                                                                )
TDY HOLDINGS, LLC and TDY                    )        Case No. 07cv787 CAB (BGS)
INDUSTRIES, LLC,                                        )
                                                                )
                                                                )        **DATE and TIME:**
            Plaintiffs-Counterclaim Defendants,       )
                                                                )        Monday, April 9, 2012 at 2:30 p.m.
                        v.                                     )
                                                                )        **PLACE:**   Courtroom 2
UNITED STATES OF AMERICA, UNITED       )
STATES DEPARTMENT OF DEFENSE and,      )
LEON E. PANETTA, in his official capacity as   )
SECRETARY OF DEFENSE,                          )
                                                                )        **Hon. JUDGE**
            Defendants and Counterclaimants.        )        **CATHY ANN BENCIVENGO**
_____)

**GOVERNMENT MEMORANDUM IN OPPOSITION
TO TDY'S MOTION IN LIMINE NO. 5 TO STRIKE
EXPERT TESTIMONY BY TOMMY B. JORDAN**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ........................................................................................1

II.     BACKGROUND ........................................................................................1

III.    MR. JORDAN'S EXPERT QUALIFICATIONS..................................2

IV.     ARGUMENT ..............................................................................................4

       A.     MR. JORDAN'S TESTIMONY REGARDING MILITARY PROGRESS
            PAYMENT CLAUSES WAS IN DIRECT RESPONSE TO TDY'S
            MARCH 2010 RELIANCE ON THEM AND SHOULD BE ADMITTED .......4

       B.     MR. JORDAN'S TESTIMONY AS TO THE LACK OF GOVERNMENT
            OFFICERS' AUTHORITY TO WAIVE TDY'S INDEMNIFICATION
            PROMISES AND TDY'S WAIVERS OF CLAIMS AGAINST THE
            GOVERNMENT WAS IN RESPONSE TO A CONTENTION BY TDY
            AFTER THE CLOSE OF DISCOVERY ....................................................6

       C.     MR. JORDAN'S TESTIMONY CORRECTING MR. ZOCH'S
            NOVEMBER 2009 TESTIMONY REGARDING THE MEANING OF
            THE MILITARY TERM "ZONE OF INTERIOR" IS PROPER ......................7

       D.     MR. JORDAN'S TESTIMONY REGARDING REIMBURSEMENT OF
            CONTRACTOR ENVIRONMENTAL CLEANUP COSTS UNDER
            GOVERNMENT COST ACOUNTING RULES AND PRINCIPLES DID
            NOT PERTAIN TO A NEW ISSUE OR OPINION ...............................................8

       E.     MR. JORDAN'S TESTIMONY THAT GOVERNMENT EQUIPMENT
            DID NOT CONTAIN HAZARDOUS SUBSTANCES AND THAT
            GOVERNMENT PERSONNEL DID NOT INSPECT TDY'S WASTE
            HANDLING ACTIVITIES RESPONDED TO CONTENTIONS MADE
            BY TDY AFTER DISCOVERY CLOSED ..............................................9

       F.     MR. JORDAN'S TESTIMONY REGARDING THE ABSENCE OF
            GOVERNMENT THREATS TO SEIZE TDY PROPERTY DURING
            WORLD WAR II DID NOT RAISE A NEW ISSUE .........................................11

       G.     MR. JORDAN'S TESTIMONY REGARDING THE USE OF
            DOCUMENTS BY OTHER CONTRACTORS SUCH AS THE
            MANUFACTURING PROCESS DATA DOCUMENTS USED
            BY TDY DID NOT PREJUDICE TDY ...................................................11

i

H.   MR. JORDAN'S TESTIMONY REGARDING CONSUMABLE CHEMICALS DID NOT RAISE A NEW ISSUE AND DID NOT PREJUDICE TDY ................................................................12

I.   TDY WAS NOT UNFAIRLY PREJUDICED BY MR. JORDAN'S TESTIMONY ................................................................13

J.   TDY OFFERS NO AUTHORITY IN THE FEDERAL RULES OR IN THE CASE LAW FOR THE SANCTIONS IT REQUESTS ........................14

V.   CONCLUSION................................................................15

ii

1

## **<u>TABLE OF AUTHORITIES</u>**

2

**CASES**

3

4

<u>American Int'l Specialty Lines Ins. Co. v. United States</u>,
   No. CV09-1734-AHM(RZx), 2010 U.S. Dist. LEXIS 65590 (C.D. Cal. June 30, 2010) ....... 10

5

6

<u>Cueto v. Overseas Shipholding Grp.</u>,
   No. 10cv1243 LAB (NLS), 2012 WL 28357 (S.D. Cal., Jan. 4, 2012) .................................. 15

7

<u>Estate of Bojcic v. City of San Jose</u>,
   358 Fed. Appx. 906 (9th Cir. 2009) ........................................................................ 15

8

9

<u>Gay v. Stonebridge Life Ins. Co.</u>,
   660 F.3d 58 (1st Cir. 2011) ...................................................................................... 14

10

11

<u>Miami-Dade County, Fla. v. United States</u>,
   345 F. Supp. 2d 1319 (S.D. Fla. 2004) ...................................................................... 3

12

13

<u>Muldrow v. Re-Direct, Inc.</u>,
   493 F.3d 160 (D.C. Cir. 2007) ................................................................................. 14

14

15

<u>O'Connor v. Boeing N. Am., Inc.</u>,
   No. CV 97-1554 DT (RCx), 2005 WL 6035243 (C.D. Cal. 2005) ........................................ 14

16

17

<u>Sylla-Sawdon v. Uniroyal Goodrich Tire Co.</u>,
   47 F.3d 277, 284 (8th Cir. 1995) ............................................................................. 14

18

19

<u>Synbiotics Corp. v. Heska Corp.</u>,
   No. 98-CV-2076 W(NLS), 2000 WL 35632582 (S.D. Cal. Sept. 21, 2000).......................... 15

20

<u>Thompson v. Doane Pet Care Co.</u>,
   470 F.3d 1201 (6th Cir. 2006) ................................................................................. 14

21

22

23

24

25

26

27

28

iii

1

## **TABLE OF EXHIBITS**

2

3

Exhibit 1:    9/28/2009 Fed. R. Civ. P. 26(a)(2)(A) List of Experts Expected to be Called
4

to Testify at Trial by the United States ....................................................................1

5

Exhibit 2:    9/28/2009 Plaintiffs' Expert Witness Designations..............................................6

6

Exhibit 3:    10/9/2009 Plaintiffs' Supplemental Expert Witness Designations......................11

7

Exhibit 4:    10/7/2009 Rule 30(b)(6) Videotaped Deposition of Tommy B. Jordan ..............16

8

Exhibit 5:    10/9/2009 Rule 30(b)(6) Videotaped Deposition of Tommy B. Jordan ........... 115

9

Exhibit 6:    12/16/2009 Oral Deposition of Tommy Jordan ................................................. 182

10

Exhibit 7:    Table, Government Memorandum in Opposition to TDY's Motion
11

in Limine No. 5 to Strike Expert Testimony by Tommy B. Jordan.................. 219

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.  **INTRODUCTION**

The Government respectfully submits this memorandum in opposition to TDY's motion to exclude (Dkt. No. 201) large portions of the October 2011 expert testimony of Tommy B. Jordan.  TDY claims that Mr. Jordan offered opinions that were not contained in his October 26, 2009 or November 16, 2009 reports, and that those opinions should be excluded as a Rule 37 sanction.  As a further sanction, TDY argues that any testimony that Mr. Jordan gave regarding documents that he did not cite in his 2009 reports should be stricken.  TDY's motion has no merit, and no sanctions are warranted.

# II.  **BACKGROUND**

On September 28, 2009, the Government timely designated Mr. Jordan as a Government procurement practices and policies expert.  *See* US Ex. 1 hereto.  TDY was required to designate its rebuttal experts no later than October 9, 2009.  *See* Dkt. No. 94 at ¶ 2.  TDY chose not to designate any expert witness on Government procurement matters.  *See* US Exs. 2 and 3 hereto. The expert reports and depositions in this case, including Mr. Jordan's, began in late October 2009 and were completed in mid-December 2009, pursuant to the Court's scheduling orders. Due to the deterioration of Mr. Jordan's health over the following two years, and pursuant to Judge Skomal's September 12, 2011 Order (*see* Dkt. No. 180), the parties took the expert testimony of Tommy B. Jordan by deposition near his home in San Antonio, Texas over the course of five days in October 2011.[1]  On two of those days, TDY counsel conducted *voir dire* and cross-examination.  *See* TDY Ex. D.

Mr. Jordan testified regarding his knowledge and experience in: (1) the award, negotiation, use, and administration of military supply contracts, and military facilities contracts; (2) the nature and purposes of military specifications; and (3) the duties and responsibilities of Department of Defense inspectors, administrators, and auditors who interact

---

[1]     Based on Mr. Jordan's declining health, the Government advised TDY in August 2011 of its intent to designate a substitute expert, who would then prepare his own report and be deposed thereon.  TDY opposed the Government's subsequent motion, and the Court instead allowed the Government to proceed with Mr. Jordan's testimony by deposition.

with contractor personnel.  He testified regarding military procurement practices, policies, and terminology, and his specialized understanding regarding numerous military procurement issues at the heart of this case.

Mr. Jordan's testimony is intended to assist the Court in understanding the complex record in this matter.  The core of TDY's case is that the Government should be held responsible for most of the pollution cleanup costs based on 60 years of TDY's performance of hundreds of military prime contracts and subcontracts at the Harbor Drive plant (the "Site"), alleged military control of Site operations through contracts and specifications, and alleged Government reimbursement of TDY's costs of hazardous waste cleanup pursuant to Government cost accounting rules and policies.  *E.g.*, Amended Compl. ¶¶ 2-3, 16, 18-21, 27-28, 34-35, 39-41, 44, 46-48.  Moreover, three months after all discovery closed, TDY first asserted that the Government owned the chemicals and chemical wastes used or generated by TDY in performing those contracts by virtue of "progress payment" clauses in certain contracts with the military.  *See infra* at 4-5.  TDY also argued for the first time that the Government had waived TDY's indemnification promises, contract releases, and contract claim waivers.  *See infra* at 6-7.  Mr. Jordan's testimony is intended to assist the Court in resolving these and other Government procurement policy, practice and procedure issues.

### III.     MR. JORDAN'S EXPERT QUALIFICATIONS[2]

Mr. Jordan's testimony was based on his more than 39 years of hands-on experience in Government procurement with the United States Air Force, beginning as an entry level contract trainee in 1962, and including his 26 years as a fully warranted Procuring Contracting Officer ("PCO"), and on his supervision of and working with other military procurement personnel.

---

[2]     TDY appears to claim a right to file a *Daubert* motion regarding Mr. Jordan during trial. TDY Mem. 2 n.1, 11 n.6.  TDY has no such right.  TDY questioned Mr. Jordan on *voir dire* and on cross examination in October 2011.  "All" *Daubert* and other pretrial motions had to be filed by March 9, 2012, in accordance with the Court's February 24, 2012 Order.  Dkt. No. 193. TDY filed five such motions pursuant to that Order, and may not file further motions that were due by March 9.  TDY has therefore waived its right to file any *Daubert* or other pretrial motions as to Mr. Jordan or any other Government expert.

- 2 -

TDY Ex. D at 18-21, 24-25, 28-36.  In order to perform his work negotiating, awarding, and administering contracts with military equipment suppliers such as TDY, he consulted on a daily basis the Armed Services Procurement Regulations ("ASPR") and their 1984 successor, the Federal Acquisition Regulations ("FAR").  TDY Ex. D at 51 -52.  He attended continuing education courses offered by the Air Force on price analysis, negotiations, source selection procedures and techniques, and the use of specifications. TDY Ex. D at 19, 21-23, 73.

Mr. Jordan's responsibilities as a PCO included translating the requirements of the engineers and program managers into contractual provisions and to negotiating the terms of contracts with industry.  TDY Ex. D at 39-42.  After contracts were awarded, he became the interface between the Air Force, the contactor and the Administrative Contracting Officer.  TDY Ex. D at 41-43.

Mr. Jordan handled procurements with hundreds of defense contractors, including some of the largest in this country, and reviewed and approved in excess of 1,000 contracts negotiated by subordinates. TDY Ex. D at 38.  He worked with an estimated 100 government inspectors from the Defense Contract Administrative Service during his time as a warranted contracting officer.  TDY Ex. D at 38-39.  From 1994 through 1996, he served as an Air Force Director of Contracting, a promotion that required the approval of the Secretary of the Air Force.  TDY Ex. D at 34-35.  In that position, he supervised more than 600 contracting professionals and oversaw contract obligations of more than $2 billion.  TDY Ex. A at 1.  At the time of his retirement in 2001, Mr. Jordan was one of the most senior civilian procurement officials in the Air Force.  He is eminently qualified to testify based on his specialized knowledge and vast practical experience regarding military procurement understandings and customs, usage of clauses, practices, and parlance.

In 2003, the court in *Miami-Dade County, Fla. v. United States*, 345 F. Supp. 2d 1319, 1328-29 (S.D. Fla. 2004), accepted Mr. Jordan as an expert in Government procurement practices, policies and procedures, including many of the specific subjects at issue here.  The court relied on Mr. Jordan's expert testimony in the context of solicitation of bids, competitive bidding, awarding of contracts, types of Government contracts, and the use of a series of

- 3 -

1   uniform contract clauses and standard contract forms.  *Id.* at 1352.  The court also accepted Mr.

2   Jordan's expert testimony regarding the duties of Air Force personnel who interacted with

3   private contractors:  Government contracting officers, quality inspection personnel, and property

4   accountants.  *Id.* at 1329.  The court also relied on Mr. Jordan's "uncontradicted expert

5   testimony" relating to "direct materials" and "indirect materials," as those terms were used in

6   military contracting, and a contractor's ownership of the chemicals it used in performing

7   military contracts.  *Id.* at 1348.

## IV.   ARGUMENT

9       TDY's motion to exclude large portions of Mr. Jordan's testimony has no merit.  First,

10   its claims of prejudice do not withstand scrutiny.  As noted above, the Government timely

11   designated Mr. Jordan as a Government procurement practices and policies expert in September

12   2009, and TDY chose not to designate any rebuttal witness on Government procurement matters

13   in October 2009.  TDY's complaint now that it "has been denied the opportunity to present a

14   rebuttal expert regarding [such] opinions" (TDY Mem. at 11) should therefore be dismissed.

15   Further, TDY makes no claim that Mr. Jordan's October 2011 testimony will cause any delay or

16   disruption of the trial schedule here.  Mr. Jordan's testimony addressed no issue of which TDY

17   was not already aware, and TDY was not prejudiced in any other way.

18       Accordingly, preclusion sanctions are entirely unwarranted and should be denied.  As

19   shown below, each of the eight challenged opinions was either not new or was in rebuttal to

20   TDY's late arguments.  All should be considered by the Court.

### A.   MR. JORDAN'S TESTIMONY REGARDING MILITARY PROGRESS PAYMENT CLAUSES WAS IN DIRECT RESPONSE TO TDY'S MARCH 2010 RELIANCE ON THEM AND SHOULD BE ADMITTED

23       TDY complains (alleged New Opinion #1) about Mr. Jordan's October 2011 testimony

24   regarding progress payment clauses in Government contracts.  TDY Mem. 5.  TDY fails to

25   disclose, however, that this testimony was made necessary by new arguments that TDY made

26   for the first time after discovery closed.

27       TDY argued in its March 22, 2010 opposition to the Government's February 22, 2010

28   motion for partial summary judgment on liability issues that the "Government held title to the

- 4 -

1    'chemicals or wastes' that contaminated the Site because the Government paid TDY progress

2    payments pursuant to various contracts . . . ."  Dkt. No. 153 at 12; Dkt. 153-1 at ¶¶ 42-45.[3]

3    TDY made this assertion three months after the close of expert discovery in December 2009.

4    TDY had never before referenced progress payments clauses in the Complaint, in the Amended

5    Complaint, or in its interrogatory responses.

6           It is true that in late November 2009, near the end of expert discovery, one of TDY's

7    experts, Robert M. Zoch, Jr., stated in deposition that Government ownership of discarded

8    chemical wastes generated at the plant was "possible" under government contract progress

9    payment provisions.  *See* Dkt. No. 202 – Gov't Zoch Motion Ex. 4 at 424-27.[4]  However, he

10   also testified that he did not know whether title to any raw material chemicals purchased by the

11   company actually vested in the Government by virtue of progress payment clauses, had not seen

12   any direct documentary evidence of such ownership, that it was only a "possibility," and that he

13   did not know which contracts had such provisions.  *Id.*  These uncertain and unsupported

14   comments were insufficient to raise this issue and give the Government a meaningful

15   opportunity to develop it with further discovery and independent research at that time.

16          Basic fairness demands that the Government be allowed to defend itself against TDY's

17   March 2010 progress payment assertion with both the relevant exhibits and Mr. Jordan's

18   testimony.

19

20   ───────────────────

21   [3]     TDY's March 2010 Statement of Disputed Facts relied on a 2008 deposition in which a

22   witness did not mention progress payments at all, on a 2009 deposition in which another witness
     said nothing to indicate that the payment of progress payments operated to vest title in the
     Government, and on Mr. Jordan's 2009 testimony relating to Government title to "material in

23   process."  In that Statement, for the first time in this case, TDY referenced an ASPR provision
     pertaining to progress payments. Dkt. 153-1 at ¶¶ 42-45.  Mr. Jordan explained at his trial

24   deposition (TDY Ex. D at 492-97) that material  in process refers to the unfinished deliverable

25   end product and items of value, not to chemicals which are not incorporated into the product
     such as those used to clean or process metal.

26

27   [4]     The Government has moved under *Daubert* for an order finding Mr. Zoch unqualified to

28   offer expert opinions regarding this and other Government procurement matters.  Dkt. No. 202.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**B.     MR. JORDAN'S TESTIMONY AS TO THE LACK OF GOVERNMENT OFFICERS' AUTHORITY TO WAIVE TDY'S INDEMNIFICATION PROMISES AND TDY'S WAIVERS OF CLAIMS AGAINST THE GOVERNMENT WAS IN RESPONSE TO A CONTENTION BY TDY AFTER THE CLOSE OF DISCOVERY**

TDY also seeks to exclude (alleged New Opinion #2) Mr. Jordan's testimony regarding the lack of authority of Government contracting personnel to waive the Government's contract rights.  TDY Mem. 5.  However, this testimony was also made necessary by a new argument that TDY raised for the first time after the close of discovery.

As it had regarding progress payments, TDY argued for the first time in its March 22, 2010 opposition brief that the Government, by allegedly reimbursing TDY pursuant to 1980s and 1990s production contracts for environmental cleanup overhead costs at the Harbor Drive plant, waived the indemnification promises that TDY had made to the Government in the 1950s through 1970s facilities contracts.[5]  *See* Dkt. 153 at 31-32.  TDY argued that such 1980s and 1990s reimbursements were a "course of dealing" by which the Government contracting personnel waived rights held by the United States under the 1950s through 1970s contracts.  *Id.* Mr. Jordan was asked to testify about this new waiver argument based on his experience and training.  *See* TDY Ex. D at 103-06.

In his October 2009 report, Mr. Jordan in fact addressed TDY's indemnification promises, contract releases, and novation waivers at length (TDY Ex. A at 3, 26-30), contrary to TDY's suggestions otherwise.  TDY Mem. 5.  Mr. Jordan's testimony in October 2011 addressed them as well (TDY Ex. D at 97-102).  He then addressed TDY's related new argument concerning the alleged Government course of dealing that allegedly waived these and

---

[5]     At trial, the evidence will show that such promises were mandatory provisions under the policies set out in all of the Armed Services Procurement Regulations of that era and would have been contained in all four known TDY facilities contracts that governed TDY's possession and use of Government-owned machine tools and other equipment.  For example, such a promise was included in TDY's surviving 1967 facilities contract in which TDY agreed to "indemnify and hold the Government harmless against claims for injury to persons or damage to property of the Contractor or others arising from the Contractor's possession or use of" the Government-owned machine tools and equipment.  Trial Ex. 5714 - US0061563-608 at 575.

- 6 -

1    other Government contract rights, by testifying that the personnel who authorized such

2    reimbursements had no authority to waive such rights.  TDY Ex. D at 103-06.[6]

3           At his trial deposition in October 2011, TDY counsel cross-examined Mr. Jordan at

4    length on whether Government procurement officers had the authority to waive such

5    Government rights, as TDY had first contended in March 2010.  TDY Ex. D at 537-42.

6    Because Mr. Jordan had in fact addressed the TDY indemnification promises, contract releases,

7    and novation waivers in his October 2009 report, TDY counsel could also have cross-examined

8    him on the waiver authority issue during his December 2009 expert deposition.  TDY Ex. C.

9           TDY therefore offers no viable basis for striking Mr. Jordan's testimony on the

10   "authority" issue, and provides no basis to exclude any of the deposition testimony relating to

11   the indemnification promises, contract releases, and novation waivers themselves.

12          **C.    MR. JORDAN'S TESTIMONY CORRECTING MR. ZOCH'S
               NOVEMBER 2009 TESTIMONY REGARDING THE MEANING OF
13             THE MILITARY TERM "ZONE OF INTERIOR" IS PROPER**

14          TDY seeks to strike (alleged New Opinion #6) Mr. Jordan's testimony regarding the

15   meaning of a military term of art:  "zone of interior."  TDY Mem. 6.  This was in response to

16   TDY expert testimony about that term of art, and caused no prejudice to TDY.  In his November

17   23 and 24, 2009 deposition, Mr. Zoch claimed that the term "Zone of Interior" referred to a

18   portion of TDY's plant.  *E.g.*, Dkt. No. 202 - Govt. Zoch Motion Ex. 4 at 40-47.  TDY had not

19   previously made this assertion.  TDY chose not to ask Mr. Jordan about this term at either of his

20   December 16, 2009 depositions.  *See* US Ex. 6 hereto; TDY Ex. C.

21          Mr. Jordan testified in October 2011 about this military term based on his experience

22   and training.  Mr. Jordan testified that the term "Zone of Interior" referred to the continental

23

24   _____

25   [6]      In his October 2009 expert report, Mr. Jordan addressed the limited authority of
     Government procurement personnel with regard to a specific Navy contract.  Mr. Jordan stated
26   that a "Technical Engineering representative does not have the authority to alter any contractual
     obligations or to change the statement of work and that any alterations or changes to the contract
27   or the contract work statement which are desired by the government will be issued in writing
     and signed by the Contracting Officer."  TDY Ex. A at 74.
28

Government Memorandum in Opposition to TDY's Motion
in Limine No. 5 to Strike Expert Testimony by Tommy B. Jordan

1    United States, as distinguished from military theaters of operation, and that it had nothing at all

2    to do with any contractor's factory.  TDY Ex. D - Jordan Dep. 409-11.  TDY counsel had every

3    opportunity to cross-examine Mr. Jordan on this point in October 2011, and could also have

4    referenced any contrary evidence on its November 2011 trial exhibit or witness lists.  TDY

5    offers no basis to strike Mr. Jordan's testimony refuting the erroneous testimony of TDY's

6    expert.

7           **D.    MR. JORDAN'S TESTIMONY REGARDING REIMBURSEMENT OF
                  CONTRACTOR ENVIRONMENTAL CLEANUP COSTS UNDER**
8           **GOVERNMENT COST ACOUNTING RULES AND PRINCIPLES DID**
                  **NOT PERTAIN TO A NEW ISSUE OR OPINION**
9

10          TDY argues (alleged New Opinion #3) that Mr. Jordan's testimony in October 2011

11    regarding the allowability and Government reimbursement of contractors' environmental

12    cleanup costs is a new opinion, even though TDY admits that two years ago, Mr. Jordan

13    provided "a one paragraph opinion dealing exclusively with the language of an October 14,

14    2009 DCAA Audit Guidance on the Allowability of Environmental Costs."  TDY Mem. 5-6.

15    TDY quibbles that the November 2009 discussion did not specifically mention TDY or what are

16    known as "advance agreements."  *Id.* at 6.[7]

17          TDY can make no credible claim of prejudice from Mr. Jordan's October 2011

18    testimony regarding Government cost accounting rules principles because the issue is not new.

19    TDY alleged in its 2007 Complaint that the bases for Government liability included its payment

20    of TDY overhead cost pools in which the company included environmental cleanup costs.  *See*

21    Dkt. No. 1 at ¶ 48.  TDY then argued in Mr. Zoch's October 26, 2009 report that the

22    Government's alleged reimbursement of TDY's cleanup costs should be an equitable factor to

23    be considered by the Court.  *See* Dkt. No. 202 – Gov't Zoch Motion Ex. 1 at 37.  Moreover, Mr.

24    Jordan more than adequately addressed the subject in his November 2009 rebuttal report.  TDY

25

26    [7]      Advance agreements are used in order to reach agreement on the allowability and
        reasonableness of certain kinds of costs before they are submitted for Government
27    reimbursement by the contractor, thereby avoiding disputes and difficulties regarding
        reimbursements.  TDY Ex. D at 154-155.
28

1    Ex. B at 9-10.  TDY cannot legitimately argue that this was a new issue in the case, or that it

2    was prejudiced or surprised that Mr. Jordan again addressed reimbursement of contractor costs

3    in his October 2011 trial deposition.

4         More importantly, in December 2009, TDY counsel cross-examined Mr. Jordan at

5    length on this subject, including advance agreements.  *See, e.g.,* US Ex. 6 at 17-18, 21-25, 28-

6    29, 31-33, 44, 46, 68-70, 76-80, 86, 119-20.[8]  In October 2011, TDY counsel again cross-

7    examined Mr. Jordan at length on this subject and the relevant deposition exhibits, all of which

8    had been produced by the parties years ago.  TDY Ex. D at 510-15, 525-27, 537-40, 570-73.

9    Here as well, TDY could also have included contrary evidence on its November 2011 trial

10   exhibit or witness lists regarding this subject.

11        It is therefore only fair that the Government be allowed to address fully TDY's

12   contentions regarding reimbursement of contractors' environmental costs.  TDY offers no basis

13   for striking any of Mr. Jordan's testimony regarding Government reimbursement of contractors'

14   environmental cleanup costs or regarding the pertinent Government guidance and other policy

15   documents.

16   **E.   MR. JORDAN'S TESTIMONY THAT GOVERNMENT
          EQUIPMENT DID NOT CONTAIN HAZARDOUS SUBSTANCES**

17   **AND THAT GOVERNMENT PERSONNEL DID NOT INSPECT TDY'S
     WASTE HANDLING ACTIVITIES RESPONDED TO**

18   **CONTENTIONS MADE BY TDY AFTER DISCOVERY CLOSED**

19        TDY further contends (alleged New Opinion #4) that Mr. Jordan offered new opinions

20   on two subjects: what TDY misleadingly characterizes as testimony regarding "Government

21   Equipment Containing Hazardous Substances," and "Government Inspection of Chemical

22   Waste."  TDY Mem. 6.  To the contrary, Mr. Jordan testified that the Government did not

23

24   _____

     [8]     Contrary to TDY's assertions (TDY Mem. 6), the fact that some or all of Mr. Jordan's
25   October and December 2009 testimony on this subject occurred during questioning by TDY's
     counsel in Mr. Jordan's Rule 30(b)(6) deposition is immaterial.  Whether the subject was
26   explored by TDY's counsel during Mr. Jordan's 2009 expert testimony or during his Rule
     30(b)(6) deposition, TDY clearly knew of the subject and cross-examined the witness on it some
27   2.5 years ago.

28

Government Memorandum in Opposition to TDY's Motion
in Limine No. 5 to Strike Expert Testimony by Tommy B. Jordan

1    deliver equipment containing hazardous substances to the TDY plant, and that the Government

2    was not responsible for or involved in inspecting TDY's chemical waste handling activities.

3         On July 2, 2010, TDY advised the Court of the decision in *American Int'l Specialty*

4    *Lines Ins. Co. v. United States*, No. CV09-1734-AHM (RZx), 2010 U.S. Dist. LEXIS 65590

5    (C.D. Cal. June 30, 2010) ("*AISLIC*").  Dkt. No. 165.  TDY contended that the decision was

6    relevant to TDY's argument that Government liability here arises from releases of hazardous

7    substances from Government-owned equipment used by TDY at the plant.  *Id.*  Mr. Jordan's

8    October 2011 testimony bore directly on this TDY assertion regarding *AISLIC*, and his

9    testimony drew distinctions between the facts found in *AISLIC* and those here.[9]

10        Second, in Mr. Jordan's October 2009 report, and in his October and December 2009

11   deposition testimony, Mr. Jordan repeatedly stated that Government personnel had no duties or

12   responsibilities pertaining to, and were not involved in, TDY's waste disposal decisions,

13   facilities or actions.  *E.g.,* TDY Ex. A at 3, 25, 36, 38, and 44; TDY Ex. C at 96-97.  It therefore

14   cannot credibly be said that the October 2011 testimony and exhibits on the subject were new.

15        In any event, TDY's counsel had a full and fair opportunity to cross-examine Mr. Jordan

16   on both of these subjects in October 2011.  Moreover, TDY could have referenced contrary

17   evidence in its November 2011 trial exhibit list and designated witnesses to testify to the

18   contrary.

19   / / /

20   / / /

21

22   [9]    Specifically, Mr. Jordan testified that he had found no evidence that: (1) the government
23   contracted with TDY to deliver any Government-owned equipment containing hazardous
     substances to the plant in order for TDY to refurbish or repair that hardware; (2) any contracts
24   with TDY called for testing of government equipment that contained such substances; (3) any
     such contracts called for the provision of quantities of hazardous substance raw materials in
25   excess of those needed for contract performance; (4) the Government provided any such
     substances to TDY as Government-furnished material; (5) that by its contracts with TDY the
26   Government intended to dispose of such substances; and (6) during what is known as "process
27   inspection," the Government inspected or otherwise got involved in contractor disposal of
     chemical wastes. TDY Ex. D at 126-130, 247-48.

28

Government Memorandum in Opposition to TDY's Motion
in Limine No. 5 to Strike Expert Testimony by Tommy B. Jordan

**F.   MR. JORDAN'S TESTIMONY REGARDING THE ABSENCE OF GOVERNMENT THREATS TO SEIZE TDY PROPERTY DURING WORLD WAR II DID NOT RAISE A NEW ISSUE**

TDY claims (alleged New Opinion #7) that Mr. Jordan offered new opinions regarding what TDY misleadingly characterizes as the "Military's Threats to Seize [TDY] Property During World War II."  TDY Mem. 7.  In fact, evidence at trial will establish that the military never made any such threats to TDY.  TDY claims that Mr. Jordan's testimony regarding a few wartime telegrams is new, but TDY's counsel asked him about those same telegrams in 2009 (TDY Ex. C at 63-64).  Mr. Jordan further testified in 2009 that he knew of nothing in military "contracting regulations that [gave] the government the right to confiscate property" and that he had seen no documents that any such authority "existed or was exercised" during World War II. *Id*. at 62-63.  Thus, Mr. Jordan's testimony on this subject in October 2011 did not provide new opinions.

TDY also misquotes Mr. Jordan's 2009 testimony.  TDY Mem. 7.  TDY claims that Mr. Jordan said in 2009 that he did not "have enough information to offer an opinion on" the telegrams, because the telegrams were "outside my scope of expertise in contracts." *Id.* However, what Mr. Jordan actually said was that he did not have enough information to dispute Dr. Carlisle's opinion as TDY's historian that if a company did not cooperate with Government in entering into wartime contracts, the Government could as a last resort take over the company entirely. *See* TDY Ex. C - Jordan Dep. 64-65.

On this subject as well, TDY could have cross-examined Mr. Jordan in October 2011 and included any available contrary evidence in its November 2011 trial exhibit or witness lists. There is therefore no basis for sanctions on this subject.

**G.   MR. JORDAN'S TESTIMONY REGARDING THE USE OF DOCUMENTS BY OTHER CONTRACTORS SUCH AS THE MANUFACTURING PROCESS DATA DOCUMENTS USED BY TDY DID NOT PREJUDICE TDY**

TDY seeks (alleged New Opinion #5) to strike Mr. Jordan's October 2011 testimony based on his experience that defense contractors other than TDY used documents similar in content and purpose to TDY's Manufacturing Process Data ("MPD") documents, and that it was

- 11 -

1    standard practice for Government personnel to review the similar documents of other

2    contractors to ensure that the resulting end product would comply with the specifications

3    referenced in the supply contracts.

4            To the minor extent that this testimony went beyond his 2009 reports and extensive

5    testimony regarding TDY's MPDs, in that Mr. Jordan testified about the use of similar

6    documents by other defense contractors, TDY's counsel cross-examined Mr. Jordan on this

7    closely-related matter five months ago.  *See* TDY Ex. D at 590-96.  TDY therefore provides no

8    basis for its request to exclude this testimony.

9    **H.    MR. JORDAN'S TESTIMONY REGARDING CONSUMABLE**

10   **CHEMICALS DID NOT RAISE A NEW ISSUE AND DID NOT**
     **PREJUDICE TDY**

11           As to alleged New Opinion #8, TDY asks the Court to strike Mr. Jordan's testimony that

12   the chromic acid used in processing, the cutting oils or lubricants used in machine tools, and the

13   chlorinated solvents used in degreasing equipment were not incorporated into or made a part of

14   the products that TDY manufactured for the Government.  TDY Mem. 7.  As will become clear

15   at trial, this relates directly to the Government's refutation of TDY's 2010 progress payments

16   argument.  In fact, what TDY seeks to exclude is testimony on re-direct as to which TDY

17   opened the door on cross-examination. *E.g.,* TDY Ex. D at 518-24, 675-78.

18           Moreover, on October 7, 2009, TDY counsel questioned Mr. Jordan about "material in

19   process," and in response, Mr. Jordan stated that in his experience, progress payments

20   provisions passed title to subassemblies or components that are produced or procured by the

21   contractor "for inclusion in the end product" or that were identified to the end product being

22   produced under the contract (US Ex. 4 at 87-90), but TDY counsel did not ask him at that time

23   about the related issue of whether processing chemicals or associated wastes were also "material

24   in process" or were property to which the Government took title.

25           Therefore, to the minor extent that this testimony went beyond Mr. Jordan's 2009

26   reports, TDY's counsel questioned him on closely related issues in 2009, cross-examined him

27

28

Government Memorandum in Opposition to TDY's Motion
in Limine No. 5 to Strike Expert Testimony by Tommy B. Jordan

on this topic in October 2011, and could also have referenced contrary evidence through its

November 2011 trial exhibit and trial witness lists.

## I.   TDY WAS NOT UNFAIRLY PREJUDICED BY MR. JORDAN'S TESTIMONY

TDY has not been unfairly prejudiced by any of Mr. Jordan's October 2011 testimony.

To the extent there was anything in Mr. Jordan's October 2011 trial testimony that was not in

his 2009 reports, it was provided in response to TDY's contentions near the end or after

discovery in late 2009 and early 2010. Five months ago, TDY had ample opportunity to and in

fact conducted extensive *voir dire* and cross-examination of Mr. Jordan. TDY had a full and

fair chance to cross-examine Mr. Jordan on all eight of his allegedly new opinions, especially

because of the spacing of deposition days (October 10, 12, 14, 19, and 21, 2011) to

accommodate the dialysis schedule of the witness. TDY in fact cross-examined Mr. Jordan

regarding most of those opinions. If TDY had truly felt "blindsided" (TDY Mem. at 10), it

could have requested more deposition time with Mr. Jordan. TDY made no effort five months

ago to address with the Court the alleged prejudice about which it only now complains.

In addition, TDY concedes that "in many instances" the 135 "new" documents were

produced by or to TDY over three years ago. TDY Mem. 4. In fact, 77 percent – 104 of the

135 exhibits that TDY claims were "previously undisclosed documents" (TDY Mem. 7) – were

produced before the end of 2009. *See* Ex. 7 hereto.[10] The remaining 31 exhibits were ASPR or

FAR provisions directly responsive to TDY's 2010 contentions. *Id.* Moreover, almost one third

of the 135 allegedly undisclosed documents were also cited by the Government in its 2010

partial summary judgment motion papers. *See* Dkt. Nos. 141 and 158.[11]

---

[10]    TDY's long discussion (TDY Mem. 3-4), regarding Mr. Jordan's generalized testimony, as to what *kinds* of documents may or may not have been available to or reviewed by him in 2009, references no specific documents and provides no basis for sanctions. None of the 135 deposition exhibits to which TDY objects is described in these deposition excerpts. TDY Mem. 4.

[11]    If the Court were to give any credence to TDY's claims regarding the so-called "previously undisclosed documents," the Government's attached Exhibit 7 shows when each of

Government Memorandum in Opposition to TDY's Motion
in Limine No. 5 to Strike Expert Testimony by Tommy B. Jordan

## J.     TDY OFFERS NO AUTHORITY IN THE FEDERAL RULES OR IN THE CASE LAW FOR THE SANCTIONS IT REQUESTS

Just as there is no factual basis for TDY's motion, there is no legal basis either.  The purpose of Rule 26(a)(2)(B) and Rule 37(c)(1) is to prevent "unfair surprise to the opposing party." *Muldrow v. Re-Direct, Inc.*, 493 F.3d 160, 167 (D.C. Cir. 2007), quoting *Sylla-Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d 277, 284 (8th Cir. 1995).  *Accord*, *Gay v. Stonebridge Life Ins. Co.*, 660 F.3d 58, 64 (1st Cir. 2011); *Thompson v. Doane Pet Care Co.*, 470 F.3d 1201, 1203 (6th Cir. 2006).  Under these cases, where by virtue of prior disclosures the moving party reasonably could have anticipated the challenged elaboration in trial testimony, there is no unfair surprise and no basis for exclusion.  Based on the facts set out above, these cases require denial of TDY's motion concerning Mr. Jordan's testimony.  Everything about which he testified was known to TDY and it could reasonably have anticipated his testimony.

TDY's reliance on *O'Connor v. Boeing N. Am., Inc.*, No. CV 97-1554 DT (RCx), 2005 WL 6035243 (C.D. Cal. 2005) is misplaced, in part because the plaintiffs' three experts' reports there disclosed new opinions that "would [have] improperly widen[ed] the trial issues at the eleventh hour," and thereby unduly prejudiced the defendant only weeks before trial.  *Id.* at *7.  In *O'Connor*, the court detailed the pretrial hearings and orders starting two years earlier in which the court had required and cautioned plaintiffs to present the kind of exposure and causation theories that were only disclosed on the eve of trial.  *Id.* at *8 and *10.  Finally, the court added in passing and without explanation that the "new opinions *appear* based on information that was available to these experts at the time of their" first expert reports.  *Id.* at *7 (emphasis added).  Unlike *O'Connor*, Mr. Jordan's testimony five months ago responded to TDY's contentions made after or just prior to the end of discovery more than two years ago, and was not the subject of judicial efforts to obtain disclosure.  Unlike *O'Connor*, Mr. Jordan's

---

the 135 documents was produced, and the extent to which TDY's claims in Exhibit E as to "related" testimony are excessive and overbroad.  As Exhibit 7 shows, TDY attempts to have the Court exclude much more of Mr. Jordan's testimony than can be fairly said to relate to the documents, and TDY's Exhibit E should be rejected.

Government Memorandum in Opposition to TDY's Motion in Limine No. 5 to Strike Expert Testimony by Tommy B. Jordan

1   testimony on the matters covered by TDY's motion responded to TDY's 2010 contentions,

2   raised no new issues, and to the minor extent that it expanded upon his prior opinions, did not

3   prejudice TDY.

4         The facts in TDY's other cases are also wholly different from those relating to Mr.

5   Jordan and provide no guidance for the Court here.  In *Cueto v. Overseas Shipholding Grp*., No.

6   10cv1243 LAB (NLS), 2012 WL 28357 at *2 (S.D. Cal., Jan. 4, 2012), the court denied

7   defendants' motion to submit a supplemental expert report adding at least one wholly new

8   theory five court days before the final pretrial conference and five months after the deadline to

9   submit supplemental expert reports, where defendants neither identified previously unavailable

10  information nor explained why they could not have met the supplemental expert report deadline

11  or have sought to extend it.  In *Synbiotics Corp. v. Heska Corp*., No. 98-CV-2076 W(NLS),

12  2000 WL 35632582 (S.D. Cal. Sept. 21, 2000), the court granted a motion to strike the

13  substantially different report of a substitute expert designated by the plaintiff without court

14  permission two months after discovery closed, where the withdrawal of the prior expert was due

15  to health problems the severity of which were already known when the prior expert was

16  designated.  TDY's other case, *Estate of Bojcic v. City of San Jose*, 358 Fed. Appx. 906, 907

17  (9th Cir. 2009), simply held that the district court did not abuse discretion in preventing entirely

18  new expert opinion testimony from being offered for the first time during a jury trial.  As

19  discussed in detail above, Mr. Jordan offers no new opinions and no new theories, and these

20  cases are therefore inapposite.

21        Thus, none of TDY's cases is applicable here, and none supports any of the exclusions

22  that TDY requests.

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

Government Memorandum in Opposition to TDY's Motion
in Limine No. 5 to Strike Expert Testimony by Tommy B. Jordan

## V.   CONCLUSION

For all of these reasons, the Court should deny TDY's motion as to Mr. Jordan's October 2011 trial deposition.

Respectfully submitted,

IGNACIA S. MORENO
Assistant Attorney General


_/s/ Lewis M. Barr_
LEWIS M. BARR
MARK A. RIGAU (SBN 223610)
DUSTIN J. MAGHAMFAR (SBN 274414)
Trial Attorneys
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Defense Section
301 Howard Street, Suite 1050
San Francisco, California 94105
Telephone No:  (202) 514-9645
Facsimile No:   (202) 514-8865

Attorneys for Defendants and Counterclaimants

Dated:   March 26, 2012

- 16 -
Government Memorandum in Opposition to TDY's Motion
in Limine No. 5 to Strike Expert Testimony by Tommy B. Jordan

1

## CERTIFICATE OF SERVICE

2

3        I HEREBY CERTIFY that on this 26th day of March, 2012, I caused a true and correct

4   copy of the "Government Memorandum In Opposition To TDY's Motion in Limine No. 5 to

5   Strike Expert Testimony by Tommy B. Jordan" with accompanying exhibits thereto to be served

6   electronically via the Court's e-filing system upon Counsel of Record.

7

8                                                    _/s/ Lewis M. Barr_____

9                                                    LEWIS M. BARR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 17 -