# EXHIBIT 6

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

TDY HOLDINGS, LLC, and     )

TDY INDUSTRIES, INC.       )

                           )

        Plaintiff,         )

                           )

vs.                        )   CASE NO. 07CVC787 JAH(POR)

                           )

UNITED STATES OF AMERICA,  )

UNITED STATES DEPARTMENT   )

OF DEFENSE, and ROBERT M.  )

GATES, in his official     )

capacity as Secretary of   )

Defense,                   )

                           )

        Defendants.        )

        *********************************

ORAL DEPOSITION

TOMMY JORDAN

December 16, 2009

        *********************************


Reported by:      Rebecca J. Callow, CSR, RPR, CRR

-----------------------------------------------------

DIGITAL EVIDENCE GROUP

1111 16th Street, NW Suite 410

Washington, DC  20036

(202) 232-0646

1    ORAL DEPOSITION OF TOMMY JORDAN, produced as a

2    witness at the instance of the Plaintiff and duly sworn,

3    was taken in the above-styled and numbered cause on the

4    16th day of December, 2009, from 1:54 p.m. to 5:20 p.m.,

5    before Rebecca J. Callow, Registered Professional

6    Reporter, Certified Realtime Reporter, and Certified

7    Shorthand Reporter in and for the State of Texas,

8    reported by computerized stenotype machine at 300

9    Convent Street, Suite 1500, San Antonio, Texas ,

10   pursuant to the Federal Rules of Civil Procedure and the

11   provisions stated on the record or attached hereto.

Page 2

---

INDEX

PAGE

TOMMY JORDAN

Examination by Mr. Wine ..........................5
Examination by Mr. Barr .........................122
Further Examination by Mr. Wine ................125
Instructions to answer ...........................58

EXHIBITS

EXHIBIT          DESCRIPTION          PAGE

1        Order granting in part and          5
         denying in part Plaintiff's
         Motion for Sanctions

2        Plaintiffs' and Counterclaim          5
         Defendants' Fourth Amended Rule
         30(b)(6) Deposition Notice and
         Related Document Request
         Directed to all Defendants

3        December 15, 2009, letter from          8
         Michelle Lambert to Harvey G.
         Sherzer - with attachments

4        July 17, 1996, letter from          32
         Peter Woodworth to Arden Honrud
         - with attachments

5        May 21st, 1986 Authorization          52
         for Expenditure

6        Memorandum re: Transformer          55
         Replacement Plan

7        Letter re: Storm Drain Removal      58

8        March 9, 1998, letter from G.E.      61
         McGill to Ladin H. Delaney

9        Defense Contract Audit Agency          65
         Audit Report - 9 February 1996

10       Defense Contract Audit Agency          118
         Audit Report - 3 July 1995

Page 4

---

1                    APPEARANCES

2

3    FOR PLAINTIFF:

4        BRADLEY D. WINE

5        Dickstein Shapiro, L.L.P.

6        1825 Eye Street, NW

7        Washington, D.C. 20006

8        (202) 420-3607

9

10   FOR DEFENDANTS:

11       LEWIS M. BARR

12       U.S. Department of Justice

13       Environmental Defense Section

14       601 D. Street, N.W.

15       Suite 8000

16       Washington, D.C. 20004

17       (202) 514-9645

18

19   ALSO PRESENT:

20       Michael C. Mateer - Dickstein Shapiro, L.L.P.

21

22

Page 3

---

1           MR. WINE:  We're on the record, we've just

2    concluded Mr. Jordan's deposition as an expert witness

3    and we are now going to begin his deposition as a

4    30(b)(6) witness.

5           TOMMY JORDAN,

6    having been previously duly sworn, continued

7    to testify as follows:

8               EXAMINATION

9    BY MR. WINE

10       Q.  Mr. Jordan, you were previously sworn.  That

11   oath that you took earlier this morning is still in

12   effect.  Is that your understanding, sir?

13       A.  I understand.

14           (Exhibits 1 and 2 marked)

15       Q.  (BY MR. WINE)  I'd like to hand you two

16   documents.  We have started renumbering, so this is

17   Jordan 30(b)(6) Exhibit 1, Jordan 30(b)(6) Exhibit 2.

18   And while you read those two documents, I will describe

19   them for the record.

20           The first document is a captioned

21   document taken from the court's electronic case filing

22   system, document 118, filed on November 19th, 2009.  It

Page 5

Pages 2 to 5

184
Exhibit 6

1 is a three-page document entitled Order Granting in Part
2 and Denying in Part Plaintiff's Motion for Sanctions,
3 signed by Magistrate Judge Louisa S. Porter.
4       And Exhibit Number 2 to the Jordan
5 30(b)(6) deposition is Plaintiffs', Counterclaim
6 Defendants' Fourth Amended Rule 30(b)(6) Deposition
7 Notice and Related Document Request directed to all
8 defendants. It is a six-page document bearing my
9 signature signed by my colleague Shannon Forchheimer on
10 August 19th, 2009, with an associated certificate of
11 service.
12       Mr. Jordan, have you seen these two
13 documents prior to today?
14    A. I just looking at Exhibit Number 1 and I have
15 seen it, and I'm looking at number 2 right now. I have
16 seen number 2.
17    Q. Okay. Now, if you turn your attention to page
18 5 of Exhibit 2, in the middle of the page at line 10, it
19 refers to matter number 5. Is your understanding
20 that you're here today to testify to matter number 5?
21    A. That is correct.
22    Q. And if you will turn back to Exhibit 1 to page

Page 6

1 2 at line 18, I'll read for the record paragraph 3. It
2 states, "With regard to Matter No. 5, Plaintiff's
3 request that the Court prohibit Defendants from entering
4 into evidence or rebutting any evidence related to
5 Defendant's consideration or payment of the costs of
6 environmental remediation at the site that Mr. Jordan
7 did not provide in response to Plaintiff's questions is
8 hereby denied. However, Mr. Jordan shall fully prepare
9 himself for questions in the identified areas for which
10 Defendants designated him as a 30(b)(6) designee to
11 testify on behalf of Defendants. A further deposition
12 of Mr. Jordan for purposes of Matter No. 5 shall be held
13 on or before December 4, 2009. Defendants shall bear
14 Plaintiff's travel and deposition costs including (1)
15 airfare for one round trip coach class ticket limited to
16 one attorney; (2) one night's stay in a hotel limited to
17 one attorney, and (3) the cost of a court reporter and
18 room rental for one day for the deposition."
19       I will represent to you, Mr. Jordan, that
20 that order was subsequently amended with respect to the
21 date, allowing us to be here today on December 16th to
22 take this deposition for you after December 4th.

Page 7

1       Have you prepared with respect to the
2 subject matter, Matter No. 5, for today's deposition?
3    A. Yes, I have.
4    Q. Please could you describe for me how you have
5 gone about preparing for today's deposition?
6    A. I rereviewed those documents that were included
7 in my inventory of documents reviewed for my initial
8 30(b)(6) deposition and then I reviewed those documents
9 that were provided to you a day or two ago by Department
10 of Justice, which is the inventory of documents which I
11 reviewed specifically in preparation for this deposition
12 today.
13       (Exhibit 3 marked)
14    Q. (BY MR. WINE) Let me hand you a document
15 that's been marked as Exhibit 3 for purposes of today's
16 deposition.
17       Mr. Jordan, I've handed you what's been
18 marked as Exhibit Jordan 30(b)(6) Exhibit 3 for purposes
19 of today's deposition. As you review it, I'll identify
20 it for the record.
21       It is a December 15th, 2009, letter on
22 Department of Justice letterhead from Michelle R.

Page 8

1 Lambert to Harvey Sherzer, Bradley Wine and Bernard F.
2 Sheehan transmitting to us a six-page table of
3 documents and stating in the cover, "Please find
4 attached a list of additional documents reviewed or
5 considered by Mr. Jordan in preparation for his upcoming
6 deposition as the government's designee under Federal
7 Rule Civil Procedure 30(b)(6). If you have any
8 questions, please do not hesitate to contact me."
9       Mr. Jordan, we received this list at noon
10 yesterday. Are you familiar with this list of
11 documents?
12    A. Yes.
13    Q. And this is the list you were just referring to
14 in your prior testimony?
15    A. Yes.
16    Q. Describe for me how this list was compiled.
17    A. It was documents that -- most of which had been
18 identified by Department of Justice, Mr. Barr's
19 colleagues, and provided to me for review. Part of the
20 list was prepared by Ms. Lambert; I added -- in that
21 body of documents that I received from DOJ for review, I
22 added other documents to the inventory. Ms. Michelle --

Page 9

185
Exhibit 6

12/16/2009          TDY Holdings LLC v. The United States of America          Tommy Jordan

1  or Ms. Lambert actually prepared the listing and
2  provided it to me for review and validation that, yes, I
3  did look at these documents.
4      Q.  Does this list include or supplement the list
5  of materials that you previously provided for us that
6  you referred to in your first deposition on Matter No.
7  5?
8      A.  There may be some duplications, but basically
9  it supplements.
10     Q.  Okay.  When did you review these documents,
11 sir?
12     A.  Since the day that I was advised that I needed
13 to give a second 30(b)(6) deposition, and I don't
14 remember the date; but it was within the last six weeks.
15     Q.  Late November?
16     A.  I think it was more like early November to --
17 yeah.  I think it was early November.
18     Q.  Okay.  Judge Porter issued her order on
19 November 19th, 2009.  Do you know if the government
20 asked you to supplement your efforts before the court
21 issued that order, sir?
22     A.  I don't recall.

Page 10

1      A.  I received one box of documents last Saturday
2  morning.  I don't know -- they came from DOJ, but I
3  don't know where those documents came from initially.
4      Q.  When you say last Saturday morning, do you mean
5  five days ago?
6      A.  Yes.
7      Q.  Can you describe for me the box of documents
8  that you received from the Department of Justice five
9  days ago?
10     A.  It was essentially some audit reports relative
11 to --
12         MR. BARR:  I'm sorry to interrupt.  That's
13 four days, but go ahead.
14     Q.  (BY MR. WINE)  Four days ago.
15     A.  There were some audit reports and related
16 correspondence relative to audits that were performed
17 during the 1990s relative to noncompliance with certain
18 cost accounting standards.
19     Q.  Any of those deal with environmental matters,
20 sir?
21     A.  They had an indirect impact upon environmental
22 matters, but they specifically did not reference

Page 12

1      Q.  Is it possible, sitting here today, sir, to
2  identify which documents Ms. Lambert pulled for you and
3  which documents you found on your own?
4      A.  No.
5      Q.  Is there any explanation as to why these
6  documents were not reviewed for your first 30(b)(6)
7  deposition, sir?
8      A.  Some of them I didn't know existed until they
9  were dug out for the second deposition.  Other than
10 that, I have no specific explanation.
11     Q.  Now, on Monday, December 14th, the government
12 produced several hundred pages of documents from the
13 DCMA; did you review any of those documents in
14 preparation for today's 30(b)(6) testimony?
15         MR. BARR:  I'll just object to the
16 characterization of the description of the number of
17 pages.
18         THE WITNESS:  Are they on this inventory?
19     Q.  (BY MR. WINE)  I'm not sure.
20     A.  I don't know.
21     Q.  Were you made aware that documents were
22 recently produced by the DCMA in this matter?

Page 11

1  environmental.
2      Q.  Describe what you mean by indirect impact on
3  environmental matters.
4      A.  The cost accounting standards affected the
5  allocation of costs, and when there is a noncompliance
6  issue they could have, and probably did have, an impact
7  upon the allocation of costs to various contracts; and
8  that is a relationship between audit reports and the
9  environmental matters.
10     Q.  Were the documents in this box you received
11 four days ago Bates labeled?
12     A.  Yes.
13     Q.  Roughly how many pages of documents were in
14 that box, sir?
15     A.  I didn't count them, but it was three or four
16 hundred probably, I'm guessing.
17     Q.  Were those documents then incorporated in the
18 list that's been marked as Exhibit 3 for your
19 deposition?
20     A.  Yes.
21     Q.  Were there any documents that you reviewed that
22 you did not include on the list in Exhibit 3?

Page 13

Pages 10 to 13

12/16/2009          TDY Holdings LLC v. The United States of America          Tommy Jordan

| | |
|---|---|
| 1   A. Not that I can recall. | 1   identifying documents at DCMA that were responsive to |
| 2   Q. Were you made aware by anyone, sir, within the | 2   Ryan document requests? |
| 3   last two or three weeks that the government had recently | 3     A. Do not know. |
| 4   discovered a compilation of DCMA documents in response | 4     Q. As I recall, you had identified an individual |
| 5   to a request made by Ryan in this matter? | 5   from DOJ as participating in that call when we discussed |
| 6     A. No. | 6   it this morning. Is that individual Michelle Lambert? |
| 7     Q. This is the first you're hearing of it? | 7     A. Yes. |
| 8     A. Yes. | 8     Q. I believe you also testified that there was a |
| 9     Q. So it's fair to say that you don't know which | 9   DCAA attorney on the phone. Is that correct? |
| 10   requests by TDY those documents were produced pursuant | 10     A. I don't recall whether the DCAA or DCMA |
| 11   to? | 11   attorney. |
| 12     A. I do not know. | 12     Q. Do you remember that individual's name? |
| 13     Q. Okay. When we spoke earlier this morning you | 13     A. I do not. |
| 14   mentioned that you had a 30- to 45-minute conversation | 14     Q. Anyone else on the call? |
| 15   by telephone within the last two weeks with a Peter | 15     A. There was somebody else on the call that did |
| 16   Woodworth. Do you remember that? | 16   not actively participate, but I don't recall who she |
| 17     A. That's correct. | 17   was. It was a woman that Michelle had arranged to have |
| 18     Q. Mr. Woodworth had been previously identified by | 18   on the conversation, but I don't recall who she was or |
| 19   the government in its interrogatory responses propounded | 19   where she worked. |
| 20   to Ryan several months ago. Why was your conversation | 20     Q. Does the name Paige Turney sound familiar? |
| 21   with Mr. Woodworth only -- why did your conversation | 21     A. I don't know. |
| 22   with Mr. Woodworth only take place within the last two | 22     Q. Did you prepare questions in preparation for |
|                                  Page 14 |                                  Page 16 |
| 1   weeks? | 1   this call? |
| 2     A. Well, I did not feel it was necessary on my | 2     A. I had a list of things I wanted to ask |
| 3   initial 30(b)(6) deposition, however, subsequently it | 3   Mr. Woodworth, yes. |
| 4   was determined that a conversation with him would be | 4     Q. Is that a written list? |
| 5   beneficial, and that conversation was arranged by | 5     A. I had some notes. |
| 6   Ms. Lambert. | 6     Q. Did you maintain those notes, sir? |
| 7     Q. Can you remind me, sir, where is Mr. Woodworth | 7     A. No. |
| 8   employed today? | 8     Q. Would you describe for me the conversation that |
| 9     A. He is still with Defense Contract Management | 9   you had with Mr. Woodworth? |
| 10   Agency, but he was the principal administrative | 10     A. It was basically to inquire as to his |
| 11   contracting officer for Teledyne Ryan for some period | 11   recollection of environmental matters leading up to and |
| 12   during '90s. | 12   including the Advance Agreement that was executed |
| 13     Q. Did you take notes of your conversation with | 13   between Mr. Woodworth and Teledyne in 1996. |
| 14   Mr. Woodworth? | 14     Q. That's the Convair settlement agreement? |
| 15     A. Formal notes, no. | 15     A. The Convair Lagoon settlement agreement. |
| 16     Q. Any informal notes? | 16     Q. What did Mr. Woodworth tell you? |
| 17     A. No. I jotted down a few things, but I no | 17     A. Basically that the agreement was |
| 18   longer have them. | 18   precipitated by audits that had been performed by DCAA |
| 19     Q. What's Mr. Woodworth's role at DCMA today? | 19   in the 1995-1996 time frame relative to the allowability |
| 20     A. I believe he is still a contracting officer, | 20   of environmental costs, and that a determination had |
| 21   but I don't know for sure. | 21   been made between Teledyne and the government that it |
| 22     Q. Do you know if Mr. Woodworth had any role in | 22   would be extremely difficult to determine the |
|                                  Page 15 |                                  Page 17 |

Pages 14 to 17

12/16/2009          TDY Holdings LLC v. The United States of America          Tommy Jordan

1  reasonableness of those costs; and then that led up to
2  the establishment and negotiation of an Advance
3  Agreement relative to the cost of cleanup of the Convair
4  Lagoon.
5      Q.  Do you know whether Mr. Woodworth had been
6  given any documents to review in preparation for that
7  phone call?
8      A.  Not that I can recall.
9      Q.  Okay.  Did you discuss any payments made by the
10 United States to TDY pursuant to that advance agreement?
11     A.  Not with Mr. Woodworth.  That was one of the
12 issues that we discussed with the DCAA auditor.
13     Q.  What else did you discuss with Mr. Woodworth?
14     A.  Whether or not he was the principal contracting
15 officer for Teledyne, if he was responsible for
16 administration of contracts with any other company in
17 the San Diego area, whether or not he was resident at
18 Teledyne or whether he officed at some other location,
19 and what period of time was he the principal contracting
20 officer for Teledyne.
21     Q.  Any other questions you asked him?
22     A.  If he had any recollection of any other

Page 18

1  environmental issues during his tenure as the
2  contracting officer for Teledyne.
3      Q.  Anything else?
4      A.  That's basically all I can recall.
5      Q.  All right.  With respect to your question as to
6  whether or not he was the principal contracting officer
7  for Teledyne, what did he tell you?
8      A.  That he was.
9      Q.  Was he responsible for administering any other
10 contracts with other companies in San Diego?
11     A.  Yes.
12     Q.  Which ones?
13     A.  He didn't say.
14     Q.  Did you ask him?
15     A.  No.
16     Q.  Why
17     A.  I didn't think it was pertinent.
18     Q.  Did he office at Teledyne or elsewhere?
19     A.  Elsewhere.
20     Q.  Where?
21     A.  At the main office of the Defense Contract
22 Management Agency in San Diego, but what -- he may have

Page 19

1  mentioned the address, but I don't recall it.
2      Q.  What was he -- what period of time was he the
3  principal contracting officer at the site?
4      A.  1996 through '98 I believe, or '99.
5      Q.  Do you know whether it was till the plant
6  closed in '99?
7      A.  I don't recall.
8      Q.  So roughly a period of two to three years?
9      A.  Two to three years, yes, sir.
10     Q.  Did you ask him who preceded him in that
11 capacity?
12     A.  No.
13     Q.  Why not?
14     A.  I didn't think it was necessary.
15     Q.  I believe you said you asked him if there were
16 any other environmental issues that he addressed during
17 his tenure.  Is that correct?
18     A.  I said I asked him if he recalled any other
19 environmental issues, and he did not.
20     Q.  Did you describe for him what you meant by
21 "other environmental issues"?
22     A.  Not specifically, no.

Page 20

1      Q.  Did he ask for any additional specificity on
2  your part for that?
3      A.  He did not.
4      Q.  How did you leave the conversation with
5  Mr. Woodworth?
6      A.  Basically he had answered the questions that I
7  had and there was no longer a requirement to continue
8  the discussion.
9      Q.  Did you ask Mr. Woodworth any questions
10 regarding the overhead rates presented or proposed by
11 Ryan to the government that may have related to
12 environmental cleanups at the site?
13     A.  I did not discuss that with Mr. Woodworth, but
14 discussed it with DCAA auditor.
15     Q.  Did you discuss indirect costs other than the
16 Convair Lagoon settlement with Mr. Woodworth?
17     A.  No.
18     Q.  Did you discuss general administrative costs
19 with Mr. Woodworth?
20     A.  No.
21     Q.  I believe you said that the conversation
22 regarding payment of the one-million-dollar amount

Page 21

Pages 18 to 21

12/16/2009              TDY Holdings LLC v. The United States of America              Tommy Jordan

**Page 22**

1   specified in the Advance Agreement was discussed with
2   Ms. Lawson.  Was that your testimony?
3       A.  Yes.
4       Q.  Mr. Woodworth had no knowledge of that payment?
5       A.  He had executed the agreement but he -- we
6   didn't discuss the overhead rates and how that affected
7   the overhead rates.
8       Q.  Did you ask Mr. Woodworth whether or not he
9   considered indemnification clauses or novation
10  agreements when he executed the Advance Agreement?
11      A.  I did not.
12      Q.  Why not?
13      A.  The document agreements spoke for themself, and
14  he said he wasn't familiar with any other issues.  The
15  indemnification provisions were prior to that short
16  period of time that he was the administrative
17  contracting officer, and I did not discuss it.
18      Q.  You didn't have occasion on your phone call
19  with him to tell him that that should have been
20  considered or ask him why it wasn't considered?
21      A.  I did not.
22      Q.  Did Mr. Woodworth refer to anyone else during

**Page 23**

1   your conversation as individuals with knowledge that
2   might be able to assist you in your capacity as
3   providing testimony on behalf of the United States on
4   this matter?
5       A.  Specifically, no.
6       Q.  Did he in any general sense?
7       A.  Other than alluding to the fact that DCAA had
8   been resident at the plant and had participated in the
9   audits that -- DCAA audit of environment -- of their
10  overhead rates, which included a certain amount for
11  environmental issues, was the event that precipitated
12  the Advance Agreement.
13      Q.  Describe for me what you mean by that:  DCAA
14  had been resident at the plant and had participated in
15  audits --
16      A.  There were two -- pardon me.
17      Q.  No, go ahead.  I'm sorry.  I wanted to get a
18  better appreciation of what exactly precipitated the
19  Advance Agreement.
20      A.  There were two specific audits that are
21  included in the inventory of documents reviewed:  One in
22  1996 and one in 1995, where DCAA had made a

**Page 24**

1   determination that the costs of cleanup of the Convair
2   Lagoon and the costs associated with the storm drains
3   were unreasonable and therefore unallowable.  And the
4   problems that had been attendant to that issue, which
5   was raised by DCAA, precipitated the discussions between
6   Teledyne and DCAA and the administrative contracting
7   officer relative to how to deal with those costs,
8   specifically with the cleanup of the Convair Lagoon, and
9   that resulted in the negotiation of the Advance
10  Agreement.
11      Q.  At any time, sir, did you ask Mr. Woodworth who
12  from DCAA was resident at the Ryan site?
13      A.  I did not specifically ask Mr. Woodworth, but
14  the DCAA -- there were several DCAA auditors that were
15  resident at the plant.  They are identified in the audit
16  reports that I reviewed, and then also I misspoke this
17  morning about Ms. Lawson.  Her first name is Theresa,
18  not Patricia, and that at one time during that 1990
19  period, she was resident at the plant.
20      Q.  Just so that I understand it, was your
21  information from your conversation with Mr. Woodworth
22  that DCAA had made a determination that costs associated

**Page 25**

1   with the cleanup of Convair Lagoon and with the cleanup
2   of storm drains at the site was deemed to be
3   unreasonable?
4       A.  That is the language specifically in the audit
5   reports.  They're unreasonable and therefore
6   unallowable.
7       Q.  Do you know whether a final decision was ever
8   made on those costs, sir?
9       A.  The Advance Agreement relative to cleanup of
10  the Convair Lagoon settled that issue relative to the
11  costs associated with that specific environmental issue.
12  I could find no reference in any documents that I
13  reviewed relative to the final disposition of the
14  cleanup cost for the storm drains.
15      Q.  So sitting here today, sir, does the government
16  know whether it compensated Ryan for costs incurred with
17  respect to the remediation of storm drains at the site?
18      A.  The government does not know.
19      Q.  Does the government know whether it compensated
20  Ryan for the costs associated with the removal of storm
21  drains at the site?
22      A.  The government does not know.

Pages 22 to 25

1    Q.  What about for other environmental related
2  activities taken at the site, like the removal of PCB --
3  transformers or capacitors containing PCBs?  Do you know
4  how the -- if the government compensated Ryan for those
5  costs?
6    A.  The government does not know.
7    Q.  Why don't you tell me about your conversations
8  with Theresa Lawson?  You had two conversations with
9  her?
10    A.  Yes.
11    Q.  When did those take place?
12    A.  The last one took place -- as I said earlier, I
13  think it was Monday of this week.
14    Q.  Two days ago?
15    A.  Yes.
16    Q.  Okay.
17    A.  The other conversation was either the first
18  part of the prior week or the latter part of the week
19  before, and I don't recall specifically.
20    Q.  Let's take the first conversation first.  Who
21  was on the first conversation with you and Ms. Lawson?
22    A.  Yes.  And Ms. Lambert.

Page 26

1    Q.  Anyone else?
2    A.  Yes, but I don't recall who.  They were not an
3  active participant, they were listening to the
4  conversation.  I believe it was another attorney, but I
5  don't know for sure.
6    Q.  How was Ms. Lawson identified to you?
7    A.  Well, her name appeared in the -- there was a
8  memorandum for the record prepared by Mr. Woodworth
9  relative to a meeting that was held between himself,
10  Teledyne, and DCAA specifically to discuss the Advance
11  Agreement, and her name was identified as a participant
12  in that meeting along with Mr. Honrud and Mr. Wands from
13  Teledyne, and two Teledyne counsels, Mr. Woodworth,
14  Ms. Lawson, and there may have been somebody else
15  identified in that document.
16    Q.  And the purpose of that meeting was to discuss
17  the Advance Agreement, sir?
18    A.  That is correct.
19    Q.  Whose idea was it to contact Ms. Lawson?
20    A.  That was arranged by Ms. Lambert.  I don't know
21  whether I had suggested that or she did.  And I know I
22  had several conversations with Ms. Lawson, but I don't

Page 27

1  recall whose idea that was.
2    Q.  Okay.  Going back briefly to the substance of
3  your conversation briefly with Ms. Lawson.  The two
4  audit reports that you referenced, sir?
5    A.  Yes.
6    Q.  What years were those performed in?
7    A.  1995 and 1996.
8    Q.  Has the government obtained information
9  regarding the earliest time by which Ryan sought
10  reimbursement from the government for environmental
11  related costs at the site?
12        MR. BARR:  Objection.  Vague.
13        THE WITNESS:  I don't understand the
14  question.
15    Q.  (BY MR. WINE)  Did the government have
16  information, sitting here today, as to the earliest date
17  upon which Ryan sought compensation or reimbursement
18  from the government fro environmental-related costs
19  associated with the site?
20        MR. BARR:  Same objection.
21        THE WITNESS:  The government does not know
22  anything specifically prior to the proposals for

Page 28

1  overhead rates that were the basis of the audit reports
2  in 1995 and 1996.
3    Q.  (BY MR. WINE)  Which leads to my next question:
4  What years did those two audits cover?
5    A.  I don't specifically recall.
6    Q.  Do you have a general recollection of what
7  years those audits covered, sir?
8    A.  It was the early 1990s.
9        I would like to slightly amend my
10  discussion there.  There were other audit reports and
11  other issues relative to Teledyne's claiming
12  reimbursement for costs associated with a criminal
13  investigation that had been initiated in the early 1990s
14  that had -- those costs, which were approximately half a
15  million dollars, had been included in some overhead cost
16  proposals by Teledyne and then subsequently
17  self-disallowed by Teledyne once a consent decree was
18  negotiated between the Department of Justice and
19  Teledyne somewhere in the '93-'94 timeframe.
20    Q.  It's true, is it not, sir, that the majority of
21  that $500,000 in costs was associated with legal fees
22  that the company incurred in defending itself in the

Page 29

Pages 26 to 29

1  associated criminal and civil matters. Correct?
2     A.  That's correct.
3     Q.  And when you said "self-disallowed," it's
4  correct, is it not, sir, that in approximately 1994
5  Teledyne informed the government that the prior criminal
6  matter resulted in a civil consent decree whereby Ryan
7  agreed to pay a penalty, and as a result it was removing
8  or changing its position regarding allowability of those
9  costs incurred. Is that correct, sir?
10    A.  That is correct.
11    Q.  Okay.  If you looked at the document that's
12  been marked as Exhibit 3, could you identify in this
13  document the specific audit reports to which you've been
14  referring, sir?
15    A.  I believe one of them was Bates numbers
16  beginning with --
17    Q.  Let me just ask you which page you're on first.
18    A.  Page number 3 of 6.
19    Q.  Okay.
20    A.  6 -- from the bottom?
21    Q.  Yes.
22    A.  Audit report number 4151-96H210000001.  I

Page 30

1  believe that is one of them.
2     Q.  Dated 2 February '96?
3     A.  Yes.
4     Q.  Okay.  Okay.  Were the others in May, July, and
5  August of '96?
6     A.  The other one was in '95.  I can't identify the
7  specific number.
8     Q.  If you look at page 5, do you see reference to
9  the July and April '95 audit reports, bottom -- the top
10  third of the chart?  Do those refresh your recollection,
11  sir?
12    A.  I don't recall.  I know it was in '95, but I
13  don't recall the number.
14    Q.  In the Advance Agreement, is it the
15  government's position, sir, that the government and TDY
16  ultimately concluded that the costs associated with the
17  environmental contamination at Convair Lagoon consisted
18  of normal business expenses that are generally
19  allowable?
20         MR. BARR:  Objection.  The document speaks
21  for itself.
22         THE WITNESS:  I'd like to refer back to

Page 31

1  that document.  The document is fairly explicit.
2         (Exhibit 4 marked)
3     Q.  (BY MR. WINE)  I hand you a document that's
4  been marked as Exhibit 4.
5         MR. WINE:  I'm sorry.  We were pressed for
6  time and only had time to make one copy.
7         MR. BARR:  That's fine.
8     Q.  (BY MR. WINE)  The document that's been marked
9  as Jordan Exhibit 4, which has a Bates label 20028215
10  through 28217.  It is -- the first page is a July 17th,
11  1996, letter from the Defense Logistics Agency, Defense
12  Contract Management Command in San Diego from a Peter W.
13  Woodworth to Mr. Arden Honrud and it contains a two-page
14  Settlement and Advance Agreement between Mr. Woodworth
15  and TRA dated July 10th, 1996, by Mr. Honrud and
16  July 16th, 1999, by Mr. Woodworth.
17         Mr. Jordan, I direct your attention to
18  paragraph 4 of the agreement, but by all means you
19  should feel free to review the whole document to satisfy
20  yourself.
21    A.  It says, and I quote:  The parties agree that
22  the costs incurred to clean up environmental

Page 32

1  contamination are considered to be normal business
2  expenses and are generally allowable costs if reasonable
3  and allocable.  However, the reasonableness of
4  environmental cleanup costs can be difficult to assess,
5  and the parties desire to avoid possible subsequent
6  disallowance or dispute over the reasonableness of
7  cleanup costs related to remediation of Convair Lagoon.
8     Q.  So via this document, did the government take a
9  position one way or the other as to whether or not the
10  cost associated with Convair Lagoon were reasonable?
11         MR. BARR:  Objection.  The document speaks
12  for itself.  Vague and ambiguous.
13         THE WITNESS:  I do not know of any such
14  determination.  The government is not aware of any such
15  determination.
16    Q.  (BY MR. WINE)  Okay.  Now, why don't you tell
17  me about the substance of your conversation -- the first
18  conversation that you had with Ms. Lawson.  With respect
19  to that conversation, did you prepare any questions?
20    A.  Not specifically, no.
21    Q.  Did you ask Mr.-- did you ask Ms. Lawson to
22  review any documents in preparation for that

Page 33

Pages 30 to 33

191
Exhibit 6

1  conversation?
2    A.  I did not ask her to review any documents,
3  however, I believe that she did review some documents
4  that Ms. Lambert had provided to her.
5    Q.  What did you ask Ms. Lambert on this
6  conversation?
7    A.  What her recollection was of any environmental
8  issues at Teledyne while she was an auditor at Teledyne.
9  She had no specific recollection of anything other than
10  this one issue of the Advance Agreement.
11    Q.  How long had Ms. Lawson been an auditor
12  resident at Teledyne?
13    A.  I don't know, and I did not ask her.
14    Q.  Why not?
15    A.  I simply did not.  I don't know why.
16    Q.  Do you know when she left the Ryan site?
17    A.  I think it was approximately when Teledyne sold
18  to Northrop.
19    Q.  Okay.  What else did you ask Ms. Lawson?
20    A.  If she could add anything else to the issue of
21  environmental contamination, and at that particular
22  time, she couldn't recall anything; however, that

Page 34

1  she had no way of determining -- the government had no
2  way of determining really how much of the costs would,
3  in fact, have been passed on to the government through
4  invoices.  She also indicated that because of the
5  noncompliance with cost accounting standards, those
6  would have had an impact on how costs were allocated to
7  various contracts.
8    Q.  And, again, sir, what period of time are you
9  talking about or was Ms. Lawson talking about?
10    A.  Basically the middle 1990s through the end of
11  1990 -- '95 through '99 approximately.
12    Q.  The last four years of the site operating
13  history?
14    A.  Yes, sir.
15    Q.  Do you know what contracts company was
16  performing during that period of time?
17    A.  Other than her recollection that they were 90
18  to 95 firm fixed price, I do not know.
19    Q.  Did you ask Ms. Lawson who preceded her as one
20  of the principal auditors resident at the site?
21    A.  All of the audit reports that were prepared
22  contains the identification of the auditors, so I didn't

Page 36

1  conversation was continued Monday this week.
2    Q.  Okay.  What was the purpose of continuing the
3  conversation to this week?
4    A.  She had familiarized herself with the issue of
5  the noncompliance with certain cost accounting
6  standards, and we discussed what impact that would have
7  upon the allocation of costs.  It was her recollection
8  that during 1990s, at least the time she was familiar
9  with, between 90 and 95 percent of all the contracts
10  held by Teledyne Ryan were firm fixed price and there
11  were very few what she referred to as incurred cost
12  audits, such as would be performed on a cost
13  reimbursable type contract; that they were audits of
14  projected overhead rates used for bidding purposes.  And
15  those audits would be established -- would be used to
16  establish the basis of negotiation between the
17  administrative contracting officer and the contractor
18  relative to the overhead rates that would be used in
19  proposals prepared by Teledyne in firm fixed price
20  contracts.
21        Since they were firm fixed price contracts
22  and those rates were used only for proposal purposes,

Page 35

1  see a need to ask her who preceded her.
2    Q.  Did you make any effort to identify or speak
3  with any resident auditors with cognizance of facts
4  related to the accounting treatment at the site prior to
5  the mid-1990s?
6        MR. BARR:  Objection.  Vague.
7        THE WITNESS:  Specifically no.
8    Q.  (BY MR. WINE)  Did you ask Ms. Lambert to
9  identify any individuals with knowledge of auditing
10  activities at the site prior to the mid-1990s?
11    A.  They would have been identified in the audit
12  reports.
13    Q.  Okay.  So did you take the audit reports and
14  ask Ms. Lambert to find those auditors who were
15  responsible?
16    A.  I did not.
17    Q.  Why not?
18    A.  I reviewed the audit reports, and there was no
19  reference in the audit reports to environmental issues.
20  I reviewed a number of proposals that are identified in
21  the inventory of documents, and there was no specific
22  identification of environmental costs outside of one or

Page 37

Pages 34 to 37

12/16/2009          TDY Holdings LLC v. The United States of America          Tommy Jordan

**Page 38**

1  two of the proposals identified a category of costs
2  called "Environmental Matters," but there was no details
3  to specify what was included in that cost book.
4     Q.  Did you get any assistance -- do you have any
5  familiarity, sir, in reviewing overhead rate proposals
6  by contractors from an auditing perspective?
7     A.  During --
8          MR. BARR: Objection. Vague.
9          THE WITNESS: -- my tenure as a
10  contracting officer, I reviewed a number of proposals
11  and audit reports including audits of overhead. Yes.
12     Q.  (BY MR. WINE) I'm talking specifically of
13  overhead rate proposals from contractors, not audits.
14     A.  I answered yes, both proposals and audits of
15  those proposals.
16     Q.  And so having performed those previous reviews,
17  looking at the proposals from the Teledyne Ryan
18  Aeronautical Company, are you able to determine, sir,
19  which costs -- which specific costs are covered in those
20  proposals?
21     A.  Within certain parameters; yes; however, there
22  are a lot of details relative to the costs that could

**Page 39**

1  only be obtained through a -- an audit of the actual
2  books of the contractor.
3     Q.  What does the Factory Cleanup Labor category
4  relate to, sir?
5     A.  From what I could ascertain from the documents,
6  those costs are other than environmental. The cost
7  category for environmental matters is under a different
8  cost pool.
9     Q.  Environmental Hazard Labor?
10     A.  To the best of my recollection, that would deal
11  with actual employees who worked in hazardous
12  conditions.
13     Q.  What about the Plant Engineering and
14  Maintenance category, what does that cover?
15     A.  I think that is pretty well descriptive. It's
16  Plant Engineering and Maintenance of the facilities and
17  things like painting or repair of physical plant
18  facilities.
19     Q.  How about Removal of Storm Drains?
20     A.  I don't -- the government does not know whether
21  that could be covered under that category or not.
22     Q.  What about Quality Assurance Environmental

**Page 40**

1     Affairs?  What was covered in that?
2     A.  I do not know.
3     Q.  How about Industrial Engineering?
4     A.  Industrial Engineering, by definition, is
5  things like improving the efficiency of operations.
6     Q.  Okay.  Would the removal of underground tanks
7  pursuant to California regulation be covered by the
8  factory cleanup category, sir?
9          MR. BARR: Objection. Calls for
10  speculation.
11          THE WITNESS: The government does not
12  know.
13     Q.  (BY MR. WINE) I believe you had previously
14  testified, sir, that you discussed with Ms. Lawson the
15  payment of the one-million-dollar amount pursuant to the
16  Convair Advance Agreement. Is that correct?
17     A.  Yes.
18     Q.  What did Ms. Lawson have to say on the subject?
19     A.  That is when she made reference to the fact
20  that her recollection was that during this relevant
21  period of the 1990s, that 90 to 95 percent of the
22  contracts performed were firm fixed price, and that the

**Page 41**

1  audits performed by DCAA were on projected overhead
2  rates and not incurred costs and that there was no way
3  the government could determine how much of that
4  $1 million in the settlement agreement had actually been
5  included in invoices, submitted to the government paid
6  by the government.
7     Q.  So sitting here today, does the government know
8  whether its paid $1 million to TDY pursuant to this,
9  1996 agreement?
10     A.  The government's position is that that million
11  dollars was authorized to be included in costs allocated
12  to contracts based upon the mix of commercial contracts
13  and government contracts. The government does not know
14  today during that period when the $1 million was, in
15  fact, approved for allocation, how many dollars worth or
16  what the relative percentage was of government contracts
17  versus commercial contracts. And so there was never an
18  agreement to -- for the government to pay $1 million,
19  the agreement was that Teledyne was authorized to
20  include those one-million-dollar costs and costs
21  allocated to all contracts.
22     Q.  Does the government believe that Ryan was

Pages 38 to 41

193
Exhibit 6

1  performing commercial contracts from the 1996 period
2  until the plant closed in 1999?
3      A.   I cannot specifically identify the document,
4  but the government does believe that during that period
5  that there was some commercial contracts performed.
6      Q.   Any sense of what those contracts entailed?
7      A.   I do not know.
8      Q.   Did you discuss anything else with Ms. Lawson?
9      A.   Other than those issues that I discussed and
10  the discussion of the audit reports that alluded to
11  noncompliance issues, no.
12      Q.   Okay.   Did you obtain any documents from
13  Ms. Lawson?
14      A.   From her, no, not directly.   I obtained
15  documents from DOJ, but I don't know whether they
16  obtained those documents from Ms. Lawson.
17      Q.   Did Ms. Lawson identify any other individuals
18  that you should speak with in your preparation to speak
19  to Matter No. 5 for the government?
20      A.   No.
21      Q.   Did you ask for such names?
22      A.   No.

Page 42

1      Q.   Were you under the understanding, sir, that
2  your preparation for Matter No. 5 was limited to the
3  mid-1990s until the plant's closure in 1999?
4      A.   My understanding was that Matter 5 covers the
5  allocation of the environmental costs irrespective of
6  time frame.
7      Q.   And so what specific efforts did you undertake
8  to determine the allocation of environmental costs from,
9  say, the -- from 1995 and before that period of time?
10      A.   The documents that I reviewed, the audit
11  reports and proposals into the 1980's, and I reviewed
12  all those documents identified in the inventory.   The
13  government could not identify any other documents that
14  were germane to the issues.
15      Q.   Is the government aware that Ryan incurred
16  environmental costs associated with the removal of
17  underground storage tanks pursuant to California
18  Regulation Title 23 in the mid-1980s?
19      A.   I recall seeing documents that referenced that
20  removal, but I do not recall seeing any documents, and
21  the government is not aware of anything that
22  specifically speaks to the cost of removal of those

Page 43

1  underground storage tanks or how that was treated.
2      Q.   Does the government have a position one way or
3  the other regarding its treatment, if any, of those
4  costs?
5      A.   The government's position is that prior to the
6  policy statement that came out of DCAA in 1992 relative
7  to the treatment of environmental costs, that there was
8  very little, if any, guidance relative to environmental
9  costs and they were frequently contentious between the
10  government and contractors, and that basically was what
11  precipitated the policy letter in 1992.
12      Q.   What specifically -- what specific information
13  does the government have regarding the treatment of
14  Ryan-specific costs as related to the storage tank
15  removal operations in the mid 1980s?
16          MR. BARR:   Objection.   Asked and answered.
17          THE WITNESS:   The government has no
18  specific information of the cost related to that event.
19      Q.   (BY MR. WINE)  So does the government have a
20  position regarding what treatment it gave those costs,
21  if any?
22          MR. BARR:   Asked and answered.

Page 44

1          THE WITNESS:   The government does not
2  know.
3      Q.   (BY MR. WINE)  Okay.   What about -- is the
4  government aware that Ryan undertook a PCB transformer
5  replacement plan in the mid 1980s?
6      A.   The government is aware of that.
7      Q.   Does the government have a position regarding
8  what accounting treatment, if any, the government
9  utilized for that transformer replacement plan?
10          MR. BARR:   Objection.   Vague.
11          THE WITNESS:   The government does not have
12  a position specifically related to those costs.   I have
13  seen no documentation relative to how those costs were
14  treated.
15      Q.   (BY MR. WINE)  If you were to be shown a cost
16  proposal submission by Ryan for the relevant time
17  period, would you be able to identify what accounting
18  categories PCB transformer replacement costs could be
19  accounted for?
20          MR. BARR:   Objection.   Hypothetical.
21  Calls for speculation.
22          THE WITNESS:   I do not know.   I'd have to

Page 45

Pages 42 to 45

12/16/2009          TDY Holdings LLC v. The United States of America          Tommy Jordan

1  look at the document.
2     Q.  (BY MR. WINE)  Do you know if any of the
3  overhead cost proposals that you have reviewed included
4  costs amortized over time for the PCB transformer
5  replacement plan?
6     A.  The documents the government reviewed, no.
7     Q.  Is the government aware of the date on which
8  Ryan undertook -- well, is the government aware that in
9  the mid-1980s, Ryan undertook a storm drain removal
10  program?
11        MR. BARR:  Objection.  Outside the scope
12  of Matter No. 5.
13        THE WITNESS:  The only documentation that
14  I recall seeing was the audit report that I referenced a
15  while ago where approximately $300,000 associated with
16  storm drains had been determined by DCAA to be
17  unreasonable and therefore unallowable.
18     Q.  (BY MR. WINE)  That was the audit report from
19  either 1995 or 1996?
20     A.  That is correct.
21     Q.  Did that cover the period of December 1985?
22     A.  I don't think it went back to that -- that far,

                                                Page 46

1     Q.  Does the government have any knowledge
2  regarding the amounts expended by the company for
3  environmental consultants related to PCB investigations
4  at the site?
5        MR. BARR:  Objection.  Outside the scope
6  of Matter No. 5.
7     Q.  (BY MR. WINE)  Directly relating to
8  environmental costs or remediation of the site.
9     A.  The government's recollection is that there
10  were consultant costs included in the $1 million for --
11  or the backup for the $1 million relative to cleanup of
12  the Convair Lagoon.
13     Q.  With respect to PCB investigations that were
14  conducted on site -- the site proper, not in Convair
15  Lagoon -- do you know how much the Ryan company expended
16  in the mid-1980s for environmental consultation
17  regarding PCB investigations?
18        MR. BARR:  Same objection.
19        THE WITNESS:  The government does not
20  know.
21     Q.  (BY MR. WINE)  The government does not know?
22     A.  No.

                                                Page 48

1  no.
2     Q.  Did you see any determinations by DCAA that
3  costs expended with the IT Corporation for the removal
4  of approximately 700 linear feet of PCB contaminated
5  storm drains were deemed to be unreasonable or
6  unallowable?
7     A.  The government saw no documentation relative to
8  that.
9     Q.  With respect to the approximately -- I believe
10  you said $300,000 in costs associated with subsequent
11  storm drain removal efforts from the 1990s, do you know
12  what the ultimate decision by DCAA of that cost was?
13        MR. BARR:  Objection.  Misstates the
14  witness' prior testimony.
15        THE WITNESS:  I think I testified earlier
16  I found no evidence the government does not know what
17  happened to those costs.
18     Q.  (BY MR. WINE)  Does the government have a
19  position or an understanding as to the amounts expended
20  by Teledyne Ryan in the mid-1980s with respect to the
21  transformer replacement program?
22     A.  The government does not know.

                                                Page 47

1     Q.  Does the government have a position or an
2  understanding as to how much money Teledyne expended in
3  the 1980s for the cleaning of the 15, 30-inch storm
4  drain lines?
5        MR. BARR:  Same objection.
6        THE WITNESS:  During what period of time?
7     Q.  (BY MR. WINE)  The mid-1980s.  Actually in
8  October of 1986.
9     A.  The government does not know.
10     Q.  Does the government have an understanding as to
11  amounts expended by Ryan in the mid-1980s for
12  environmental costs associated with the metal
13  reclamation yard program?
14        MR. BARR:  Same objection.
15        THE WITNESS:  The government has seen no
16  documentation specifically in relation to that
17  reclamation yard.
18     Q.  (BY MR. WINE)  Is it your understanding, sir,
19  on behalf of the government that the Advance Agreement
20  related to Convair included costs associated with
21  sampling?
22        MR. BARR:  Objection.  The document speaks

                                                Page 49

                                    Pages 46 to 49

                                195
                            Exhibit 6

1  for itself.
2       THE WITNESS: Sampling in the Convair
3  Lagoon?
4     Q.  (BY MR. WINE)  Correct.
5     A.  My understanding is that those costs were
6  intended both by the government and by Teledyne to cover
7  all of the costs associated with cleanup of the Convair
8  Lagoon, whatever those costs may have been.
9     Q.  Okay.  Does the government have an
10  understanding as to the environmental costs incurred by
11  Ryan associated with the Underground Tank Removal
12  Program?
13       MR. BARR:  Objection -- same objection.
14  Also asked and answered.
15       THE WITNESS:  I believe I answered that
16  question a while ago.  The government does not know.
17     Q.  (BY MR. WINE)  Does the government have an
18  understanding as to the amounts expended by Teledyne in
19  the mid-1980's for the Hazardous Waste Disposal Program?
20       MR. BARR:  Same objection.
21       THE WITNESS:  The government does not
22  know.

Page 50

1       (Back on the record at 3:12 p.m.)
2       (Exhibit 5 marked)
3     Q.  (BY MR. WINE)  Mr. Jordan, I'm handing you
4  what's been marked as Exhibit 5 for purposes of today's
5  deposition.  While you're reviewing it, I'll read it for
6  the record but I will also tell you, Mr. Jordan, that
7  the document should be familiar as it was marked as
8  Exhibit 12 to your last 30(b)(6) deposition on this
9  topic.
10       The document that's been marked Exhibit 5
11  for purposes of this 30(b)(6) deposition bears the Bates
12  label US30027477.  It is a one-page document entitled
13  Authorization for Expenditure, dated May 21st, 1986, in
14  the upper right-hand corner, requested by the
15  Environmental Affairs Department and requested by John
16  C. Palmer.  In the description of work to be performed
17  it says, "Remove and dispose of underground external
18  acid sump located north of Building No. 130, includes
19  the installation of two new double-wall sump tanks with
20  flow monitors."
21       Mr. Jordan, are you familiar with this
22  document?

Page 52

1     Q.  (BY MR. WINE)  Is your answer the same with
2  respect to Teledyne's administration of environmental
3  programs for the facility?
4       MR. BARR:  Same objection.
5       THE WITNESS:  I -- the government does not
6  know.
7     Q.  (BY MR. WINE)  Does the government have an
8  understanding as to the percentage of cost-plus
9  contracts that were being performed at the site in the
10  mid-1980s?
11       MR. BARR:  Same objection.
12       THE WITNESS:  The government does not
13  know.
14     Q.  (BY MR. WINE)  Have you read Dr. Brigham's
15  report in this matter that speaks to that?
16       MR. BARR:  Same objection.
17       THE WITNESS:  Specifically I do not
18  recall.
19       MR. WINE:  Would you like to take a break?
20       MR. BARR:  Yes.  I think this is a good
21  time to take a break.
22       (Off the record at 2:59 p.m.)

Page 51

1     A.  I believe I have seen it.
2     Q.  Mr. Jordan, since your last 30(b)(6)
3  deposition, what specific steps did you take to
4  determine whether or not the government considered in
5  treating the overhead costs associated with the site the
6  costs specifically referenced in Exhibit Number 5?
7     A.  I believe that in my initial 30(b)(6)
8  deposition when you showed me this document I said that
9  on the face of this document you could not determine
10  what had happened to this cost, it is an external
11  Teledyne document, Authorization for Expenditure, but
12  whether or not it was included in the overhead account
13  and passed to the government based upon this document,
14  you cannot make a determination.
15     Q.  Did you undertake any efforts to determine,
16  apart from this document, whether the government
17  reimbursed Ryan for any costs associated with this
18  activity?
19     A.  The government saw no documentation that
20  referenced the disposal -- disposition of these costs.
21     Q.  Did the government make any efforts to speak to
22  any individual with knowledge from the mid-1980s who

Page 53

Pages 50 to 53

1 would have cognizance as to whether or not the
2 government paid all or a portion of these costs pursuant
3 to Ryan's overhead cost claims?
4          MR. BARR: Objection. Assumes facts not
5 in evidence. Also misstates the government's prior
6 testimony in this 30(b)(6) deposition.
7          THE WITNESS: The government made no
8 specific effort to identify a government employee who
9 had recollection of what happened 20 years ago.
10     Q. (BY MR. WINE) Why did the government make no
11 such effort?
12     A. The government did not consider that this
13 dollar value of $26,000 would be sufficient to bring
14 into recollection what happened more than 20 years ago.
15     Q. In reviewing the cost proposal -- the Teledyne
16 Ryan proposed overhead rate submissions that the company
17 did make and that you did review, to what dollar amount
18 did those proposed overhead rates drill down to? What
19 increments of dollars? How low of a dollar amount did
20 those proposed overhead rates --
21          MR. BARR: Objection. Vague and
22 confusion.

Page 54

1          MR. WINE: Let me finish the question.
2     Q. (BY MR. WINE) To what dollar amount did those
3 proposals go down to?
4          MR. BARR: Same objection.
5          THE WITNESS: It depends. I saw some
6 dollar amounts that were relatively insignificant dollar
7 amounts, less than a thousand dollars. There were other
8 figures that were tens of thousands or hundreds of
9 thousands of dollars, so it varied.
10     Q. (BY MR. WINE) In fact, some of these proposals
11 went down to the tens of dollars, didn't they? Less
12 than a hundred dollars.
13     A. Relatively insignificant dollar values.
14     Q. And some of them were for costs in the millions
15 of dollars.
16     A. That's correct.
17          (Exhibit 6 marked)
18     Q. (BY MR. WINE) Now, I show you another document
19 that's been marked Exhibit 6 for purposes of today's
20 30(b)(6) deposition. For purposes of your prior
21 30(b)(6) this was marked as Exhibit 13. While you
22 review the document, I'll describe it for the record.

Page 55

1          It is a Bates labeled document bearing the
2 Bates label US30072024 through 72030. It is a
3 memorandum from John Palmer to Mr. Bob Nelson dated
4 March 20th, 1985, regarding PCB transformer replacement
5 plan.
6          I ask you, sir, if you could please review
7 the document and tell me if you're familiar with it.
8     A. Let me read it, please.
9     Q. Sure.
10     A. I've looked at the document.
11     Q. Do you recall seeing this as Exhibit Number 13
12 to your last deposition, sir?
13     A. I believe so, yes.
14     Q. What specific steps did the government
15 undertake, if any, to determine whether or not the costs
16 described in Exhibit Number 6 were presented to the
17 government as part of Ryan's overhead costs for the
18 relevant time period?
19          MR. BARR: Objection. Asked and answered.
20          THE WITNESS: We could find no specific
21 evidence that this has been included in proposals and/or
22 reviewed by DCAA. The government has no position on

Page 56

1 that one way or another.
2     Q. (BY MR. WINE) Did you speak with any specific
3 individuals at DCAA or other agencies to determine if
4 they had any information regarding the costs associated
5 with the replacement of PCB transformers at Ryan?
6     A. The government did not.
7     Q. And why not?
8     A. We attempted to find contemporaneous
9 documentation; however, there were no documents that
10 alluded to these, and we simply did not try to identify
11 anybody that was resident at the plant at the DCAA in
12 the 1980s.
13     Q. Did the government have a view as to whether or
14 not Judge Porter's order went beyond looking for
15 documents to prepare for today's deposition?
16          MR. BARR: Objection. That calls for a
17 legal conclusion.
18          THE WITNESS: The government does not
19 believe that Judge Porter's order required that the
20 government interview or speak to any individuals.
21     Q. (BY MR. WINE) Is that your view, sir?
22          MR. BARR: Objection. Instruct the

Page 57

Pages 54 to 57

197
Exhibit 6

1 witness not to answer. That calls for a legal opinion.
2    Q. (BY MR. WINE) If Judge Porter's order didn't
3 require you to do that, why did you interview two
4 witnesses?
5       MR. BARR: Same objection. That's work
6 product and attorney-client privilege. I instruct the
7 witness not to answer.
8    Q. (BY MR. WINE) Is it fair to say, sir, sitting
9 here today, the government is better prepared to talk
10 about the last four years of the site's operating
11 history and the account treatment related thereto than
12 the preceding 56 years of the site's history?
13       MR. BARR: Objection. Argumentative. Vague
14 and ambiguous.
15       THE WITNESS: There is significantly more
16 documentation related to environmental issues starting
17 with the issuance of the 1992 policy guidance from DCAA
18 than existed prior to that time.
19       (Exhibit 7 marked)
20    Q. (BY MR. WINE) I hand you another document.
21 This document has been marked as Exhibit 7 for purposes
22 of your deposition today, sir. Again, this document was

Page 58

1 prepared for budgetary purposes, and there is no
2 evidence on the face of this document that the contract
3 was ever consummated between Teledyne and IT
4 Corporation.
5    Q. Sitting here today, is the government aware of
6 whether or not Teledyne retained the IT Corporation to
7 perform a series of storm drain cleanouts throughout the
8 mid- to late 1980s and into the 1990s?
9    A. The government does not know.
10    Q. And would subject budget documents and actual
11 contracts be used in formulating the proposed overhead
12 costs that are then transferred or submitted to the
13 government for its consideration for accounting
14 purposes?
15       MR. BARR: Objection. Vague and
16 confusing. Calls for speculation.
17       THE WITNESS: Based upon this document, I
18 do not know. It's speculative.
19    Q. (BY MR. WINE) And like the preceding
20 documents, the government undertook no effort to speak
21 with percipient fact witnesses regarding that storm
22 drain cleanout from the mid-1980s?

Page 60

1 marked as Exhibit 14 for your last deposition. As you
2 review it, I'll describe it for the record.
3       It's a two-page document from the
4 International Technology Corporation, Bates labeled
5 US30040540 through 541 from a Don H. Palmer to John
6 Palmer, dated December 16th, 1995, relating to the Storm
7 Drain Removal Project. Are you with me? An estimated
8 budgetary cost of $98,000.
9       Sir, are you familiar with this document?
10    A. Let me review it, please.
11    Q. Sure.
12    A. I've reviewed the document.
13    Q. Is it fair to say, sir, that the government's
14 effort to investigate the treatment of costs reflected
15 in this document is similar to the two preceding
16 documents that have been marked as exhibits in this
17 matter?
18       MR. BARR: Objection. Vague and
19 ambiguous.
20    Q. (BY MR. WINE) We can go through the specific
21 questions again if it would help you.
22    A. This appears to be an internal document

Page 59

1    A. That's correct.
2       (Exhibit 8 marked)
3    Q. (BY MR. WINE) I show you another document,
4 Exhibit 8. What I've handed you is Exhibit 8 to your
5 deposition today which was marked as Exhibit 15 to your
6 last deposition. Sir, as you review it, I'll describe
7 it for the record.
8       It is a March 1988 letter from Chuck
9 McGill to a Mr. Ladin H. Delaney, executive officer of
10 the California Regional Water Quality Control Board,
11 Bates labeled TDYRYAN20019644 through 9649 transmitting
12 a list of TRA Environmental Expenses totaling in excess
13 of $3.5 million, as well as a shipping and packing sheet
14 showing the transmittal of the document to Mr. Delaney
15 and a transmission report or a fax report and associated
16 fax cover sheet dated March 9th 1988.
17       Mr. Jordan, do you recall seeing this
18 document which was labeled Exhibit 15 to your last
19 deposition?
20    A. I believe so, yes.
21    Q. And what steps, if any, did the government take
22 in determining whether this three and a half million

Page 61

1  dollars in environmental expenses claimed by Ryan that
2  were incurred by Ryan in connection with environmental
3  matters as represented on the cover letter were, in
4  fact, accounted for in overhead rates for the associated
5  time period with the United States Government?
6      MR. BARR: Objection. Asked and answered.
7      THE WITNESS: The government believes that
8  part of these costs associated with PCBs were, in fact,
9  included in the estimates for cleanup of the Convair
10  Lagoon. The government believes that at least part of
11  the costs associated with storm drain issues were
12  included in those costs that were audited by DCAA in the
13  1995-1996 audit reports, and are determined to be
14  unallowable and unreasonable.
15      Q.  (BY MR. WINE) Let's start with PCBs. Which
16  costs represented on the attached list of environmental
17  expenses is it the United States' position are covered
18  by the Advance Agreement?
19      MR. BARR: Objection. The Advance
20  Agreement speaks for itself. Object to speculation.
21      THE WITNESS: I believe that the
22  government believes that Issue No. 2, in part, was

Page 62

1      Does the --
2      A.  Item No. 2 does appear to be residues at the
3  facility.
4      Q.  And does the Advance Agreement cover PCB
5  remediation at the facility or at Convair Lagoon?
6      A.  In Convair Lagoon.
7      Q.  Okay. What other costs is the government -- so
8  is it the government's position that the costs covered
9  by Item No. 2 were covered by the Advance Agreement or
10  not?
11      A.  Not covered by the agreement.
12      Q.  What other costs, if any, does the government
13  contend are covered by the Advance Agreement?
14      A.  Item No. 5.
15      Q.  Okay. Okay. What else?
16      A.  Possibly part of number 8, but I'm not sure.
17      Q.  You don't know one way or the other?
18      A.  I do not know one way or the other.
19      Q.  And I believe it was your prior testimony as
20  related to storm drain, sir, I'm assuming that you're
21  referring to Item No. 3 on the list that you are unaware
22  of the ultimate disposition of those costs.

Page 64

1  included in the Convair Lagoon cleanup estimate.
2      Q.  (BY MR. WINE) Let's stop right there. What's
3  your understanding of the $686,500 represented in Item
4  No. 2. What cost is that related to, sir?
5      A.  The document speaks for itself. It says,
6  "Environmental consultation for PCB investigation."
7      Q.  And it actually says "PCB residue at the
8  facility."
9      Is it the government's position that the
10  Convair Lagoon is at the facility?
11      A.  That's what the document says.
12      Q.  Well, is it -- the government -- that entry
13  doesn't say anything about Convair Lagoon. The
14  government doesn't speak to Convair Lagoon at all, it
15  speaks to residues at the facility. Is it the
16  government's position that $686,500 relates to something
17  other than PCB residues at the facility?
18      A.  That's what the document appears to be, Item
19  No. 5 --
20      Q.  Wait. I want to make sure I've got a very
21  clear understanding of what your testimony is here
22  today, sir.

Page 63

1      A.  The audit report that I referenced earlier
2  determined that approximately $300,000 worth of storm
3  drain costs that had been included in the Ryan proposal
4  had been determined to be unallowable -- or unreasonable
5  and therefore unallowable.
6      Q.  Sitting here today does the government know
7  whether the $70,000 figure referenced on the attachment
8  to Exhibit 7 -- I'm sorry -- Exhibit 8, thank you -- was
9  covered in that 300,000-dollar figure from the mid-1990s
10  audit report?
11      A.  Based on the face of this document, I cannot
12  make that determination one way or another.
13      MR. WINE: Let's go ahead and mark this as
14  Exhibit 9.
15      (Exhibit 9 marked)
16      Q.  (BY MR. WINE) Before I hand this to you,
17  Mr. Jordan, I want to describe it for the record, since
18  I only have one copy, what has been marked as Jordan
19  30(b)(6) Exhibit 9. It is a Defense Contract Audit
20  Agency Audit Report dated February 2nd, 1996, Bates
21  labeled US0097808 through 9783 -- I believe it's 7, but
22  it's been cut off on the copy that's been produced to

Page 65

Pages 62 to 65

199
Exhibit 6

12/16/2009                    TDY Holdings LLC v. The United States of America                    Tommy Jordan

1  us. I ask you to review and tell me if you're
2  familiar with it.
3       A.  This is not the audit report that I thought it
4  was when I gave you that audit report number. Obviously
5  I was mistaken on the identification of the audit
6  report. This is not the audit report that made the
7  determination that environmental costs are --
8       MR. BARR: There's no question pending.
9       Q.  (BY MR. WINE) Turn to page 818, sir, page 11
10 of the document. Several times throughout this
11 afternoon's deposition you referred to a 300,000-dollar
12 amount associated with storm drain cleanout that you had
13 testified was deemed to be unreasonable and therefore
14 unallowable. You'll see reference to a 300,000-dollar
15 figure in the bulleted portion of the upper part of that
16 document. Do you see that, sir?
17      A.  Yes.
18      Q.  Does that associate that 300,000-dollar amount
19 with storm drain cleanout?
20      MR. BARR: Objection. The document speaks
21 for itself.
22      Q.  (BY MR. WINE) It does not, does it?

Page 66

1       MR. BARR: Same objection. Argumentative.
2       THE WITNESS: Cleanup costs of the Convair
3  Lagoon; but their specific language in the audit reports
4  that I reviewed that made reference to 300,000 for the
5  storm drain.
6       Q.  (BY MR. WINE) Okay. So that 300,000-dollar
7  reference to Convair Lagoon is somewhat different than
8  the 300,000-dollar reference that you're referring to
9  for storm drains.
10      A.  That is the government's recollection, yes.
11      Q.  Do you know how early in the site's operating
12 history it began incurring costs associated with Convair
13 Lagoon?
14      A.  The government does not recall.
15      Q.  If the government turns its attention to
16 Exhibit 8, point of fact, we can determine from this
17 document, can we not, sir, that as early as 1988, the
18 Ryan site was incurring at least in excess of six
19 figures associated with Convair Lagoon. Correct?
20      MR. BARR: Objection. The document speaks
21 for itself.
22      THE WITNESS: Specifically talking to Item

Page 67

1  No. 5 on Exhibit Number. 8?
2       Q.  (BY MR. WINE) Correct.
3       A.  That figure is $122,000.
4       Q.  Do you know whether Convair associated costs
5  were burdened against the company as overhead rates
6  prior to the mid-1990s?
7       A.  Based upon review of the documents that were
8  available for review, there were no -- the government's
9  position is, there were no environmental costs
10 associated with Convair Lagoon included in the overhead
11 rates prior to the mid-1990s.
12      Q.  What specific documents from the 1980s did the
13 government review in order to determine that no overhead
14 costs were paid to Ryan from that period for Convair
15 associated costs?
16      MR. BARR: Objection. Asked and answered.
17 The document previously marked I believe as Exhibit 3
18 speaks for itself.
19      THE WITNESS: Just the review of
20 documentation including letters from Teledyne Ryan
21 executives that were precedent to and contemporary with
22 the 1992 policy agreement led the government to the

Page 68

1  conclusion that those costs had not been passed to the
2  government.
3       Q.  (BY MR. WINE) Which 1992 policy agreement?
4       A.  This is a 1992 policy statement from DCAA that
5  basically provided the guidance to the administrative
6  contracting officer for the Advance Agreement in 1996.
7       Q.  And so what specific documents or any
8  information can you point me to in the 1992 time frame
9  or before specific to the Ryan site that indicate to
10 you, sir, that those environmental costs were not passed
11 through and paid by the government in the overhead
12 treatment of the site?
13      A.  It was -- there are several pieces of
14 correspondence signed by various executives within
15 Teledyne Ryan that were contemporary to that general
16 time frame, and then the specific language that was
17 included in the audit reports that I referenced earlier
18 led the government to the conclusion that those costs
19 had not been dealt with previously.
20      Q.  So the audit reports from '95 and '96 that
21 you're referring to this afternoon speak to all prior
22 Convair associated costs going back into the 1980s?

Page 69

Pages 66 to 69

200
Exhibit 6

12/16/2009          TDY Holdings LLC v. The United States of America          Tommy Jordan

1  MR. BARR: Objection. Misstates the
2  witness' prior testimony. Argumentative.
3  THE WITNESS: As I sit here today, the
4  government cannot specifically recall the dates that
5  were inclusive in that audit report. But it did make
6  reference to the efforts by TRA to clean up the storm
7  drain and those costs had been considered to be
8  unreasonable and unallowable.
9  Q. (BY MR. WINE) Do you recall earlier you said
10 that after the last 30(b)(6) deposition I raised -- or
11 asked you about the deposition of several other
12 percipient fact witnesses who spoke about or testified
13 about environmental cleanup costs and whether those
14 costs were considered to be indirect costs to the
15 government. Do you remember that?
16 A. Yes.
17 Q. Do you remember Charles Wands being one of
18 those witnesses who so testified?
19 A. Yes.
20 Q. Did you go back and review Mr. Wands' testimony
21 in that regard?
22 A. Yes.

Page 70

1  those costs to the government for payment as part of its
2  overhead and that those costs were paid, does the
3  government have a basis to refute that testimony, sir?
4  MR. BARR: Objection. Asked and answered.
5  Calls for speculation. Hypothetical, and...
6  Q. (BY MR. WINE) You can answer my question, sir.
7  A. The documents on the record speak for
8  themselves relative to the determination by DCAA that
9  certain environmental costs were unreasonable and
10 unallowable, and the documentation speaks for itself
11 that the contractor and the government made an agreement
12 in that Advance Agreement that it would be extremely
13 difficult to make a determination of the reasonableness,
14 and that was the basis of the Advance Agreement.
15 Q. Can you show me in the Advance Agreement where
16 it speaks to cleanout of storm drains?
17 MR. BARR: Objection. The document speaks
18 for itself.
19 THE WITNESS: The Advance Agreement is
20 limited specifically to cleanup of the Convair Lagoon.
21 Q. (BY MR. WINE) So subsequent to the Advance
22 Agreement, how did the government treat the cleanout of

Page 72

1  Q. Are you aware based on your review -- is the
2  government aware based on its review that Mr. Wands
3  testified that during the time period he worked for
4  Teledyne, environmental cleanup costs were considered to
5  be indirect costs and therefore passed on to the
6  government?
7  MR. BARR: Objection. The testimony
8  speaks for itself. Object to characterizing the
9  transcript.
10 THE WITNESS: I recall in his deposition
11 that he had testified that, to the best of his
12 recollection, that the costs of cleanup of the storm
13 drains was a hundred thousand dollars. Contemporary
14 documents indicate that that was closer to 300,000. He
15 indicated that -- to the best of his recollection,
16 that those costs that are environmental issues and never
17 been determined to be unreasonable and unacceptable by
18 the government. There are two audit reports that refute
19 his recollection but, yes, I did review his deposition
20 in detail.
21 Q. (BY MR. WINE) If Mr. Wands testifies under
22 oath in court in this matter that Ryan did so submit

Page 71

1  storm drains on the site?
2  A. I testified earlier that the government has
3  seen no documentation as to the disposition of those
4  costs.
5  Q. So the government does not know one way or the
6  other?
7  A. The government does not know one way or the
8  other.
9  Q. So if Mr. Wands testifies in open court under
10 oath that the government paid those costs, and if he has
11 knowledge of those payments as a former executive of
12 the company, the government would have no position to refute
13 his testimony, would it?
14 MR. BARR: Objection. Misstates the
15 witness' prior testimony, and calls for speculation.
16 THE WITNESS: Absent any contemporary
17 documentation to the contrary, the government assumes
18 that his testimony is correct.
19 Q. (BY MR. WINE) Okay. And you're familiar with
20 Mr. Wands' testimony in that deposition regarding the
21 cost of repair and maintenance of electrical
22 distribution at the site? Pages 22 through 24 of his

Page 73

Pages 70 to 73

201
Exhibit 6

1  deposition.
2   A.  I reviewed the deposition, but I cannot
3  specifically recall that.
4   Q.  And he testified that those costs were burdened
5  in the repairs and maintenance accounting category of
6  the company's overhead rates. Do you recall that?
7       MR. BARR: Objection. Testimony speaks
8  for itself. Vague and ambiguous.
9       THE WITNESS: I do not specifically recall
10 that part of it, no.
11  Q.  (BY MR. WINE) Does the government have reason
12 to dispute Mr. Wands' testimony as it relates to the
13 accounting treatment of costs associated with repair and
14 maintenance of electrical distribution equipment at the
15 site incurred in the mid- to late 1980s?
16      MR. BARR: Objection. Misstates -- the
17 transcript speaks for itself. Vague and ambiguous.
18      THE WITNESS: The government interprets
19 that statement as meaning that those costs were included
20 in the repair and maintenance category and not
21 specifically identified as environmental cost.
22  Q.  (BY MR. WINE) Does the government have an

Page 74

1       Q.  Okay. Do you recall Mr. McGill's testimony
2  with respect to the cost of environmental remediation,
3  environmental planning, and environmental reporting as
4  costs of doing business and that those costs were
5  allowable and allocable under applicable DCAA
6  regulations based on his direct experience at the site?
7       MR. BARR: Objection. Misstates
8  Mr. McGill's testimony; it speaks for itself.
9       THE WITNESS: Environmental costs are
10 considered to be allocable and allowable provided they
11 are reasonable.
12  Q.  (BY MR. WINE) Have any of the costs that I've
13 shown you -- does the government have a position as to
14 whether or not any of the costs described in any of the
15 exhibits before the government today represent
16 unreasonable costs?
17      MR. BARR: Objection. Assumes facts not
18 in evidence. Argumentative.
19      THE WITNESS: The language in the two
20 audit reports that were referenced to earlier
21 specifically says that the Defense Contract Audit Agency
22 determined those costs associated with the cleanup of

Page 76

1  understanding as to why those costs were incurred,
2  specifically the replacement of PCB laden transformers
3  and capacitors at the site?
4       MR. BARR: Objection. Outside the scope
5  of Matter No. 5.
6       THE WITNESS: The government specifically
7  does not know.
8   Q.  (BY MR. WINE) Does it have anything to do with
9  environmental regulations regarding the proper handling
10 of PCBs?
11      MR. BARR: Same objection. Also vague and
12 ambiguous.
13      THE WITNESS: Based upon this letter you
14 showed me a while ago, it was related to PCB
15 regulations.
16  Q.  (BY MR. WINE) Thank you. You reviewed
17 Mr. McGill's testimony that he gave in this matter on
18 the subject of cost accounting for overhead associated
19 with environmental compliance, did you not, sir?
20  A.  In the port litigation?
21  Q.  I believe in this litigation.
22  A.  Yes.

Page 75

1  the Convair Lagoon and approximately $300,000 associated
2  with storm drain cleanup were unreasonable and therefore
3  unallowable.
4   Q.  (BY MR. WINE) What's the government's
5  understanding as to why the storm drain cleanup was
6  deemed to be unreasonable?
7       MR. BARR: Objection. Assumes facts not
8  in evidence.
9       THE WITNESS: That rationale is spelled
10 out in the audit reports; and as I sit here today, I
11 can't recall specifically the language in that audit
12 report.
13  Q.  (BY MR. WINE) Mr. McGill also testified in
14 his deposition in this matter that to the extent the
15 company is performing 100 percent government contracts
16 at the site, that 100 percent of the environmental costs
17 incurred during a given period could be allocated or
18 burdened against those contracts. Sitting here today,
19 does the government have a position regarding that
20 testimony?
21      MR. BARR: Objection. Misstates --
22 Mr. McGill's testimony speaks for itself.

Page 77

Pages 74 to 77

12/16/2009          TDY Holdings LLC v. The United States of America          Tommy Jordan

1      THE WITNESS: I have -- the government
2  does not have any evidence relative to the percentage of
3  commercial costs versus government costs that were --
4  for contracts that were in effect during the 1990s.
5      Q. (BY MR. WINE) What analysis did the government
6  undertake at all in preparation for today's deposition
7  to determine the relative share of commercial versus
8  government contracting during any of the operation
9  periods at the site in order to determine allocability
10 under applicable DCAA cost accounting standards?
11     MR. BARR: Objection. That is outside the
12 scope of Matter No. 5.
13     MR. WINE: It's not.
14     THE WITNESS: In the government's opinion,
15 the issues of allowability and allocability and
16 reasonableness would not be impacted by the relative
17 percentage of government contracts versus nongovernment
18 contracts. Once that determination had been made that
19 costs were allowable, allocable, and reasonable, then in
20 the process of allocation, the relative percentage would
21 have made a difference. But in the basic determination
22 as to allowability, allocability, or reasonableness it's

Page 78

1  both as to the prior October 30(b)(6) deposition and in
2  the context today.
3      THE WITNESS: The government's position is
4  that the contracts to which the costs would be-- let me
5  read it specifically.
6      The contracts to which costs are allowable
7  and allocable would be all contracts for which those
8  costs had been -- all government contracts for which
9  those costs had been determined to be allowable,
10 allocable, and reasonable.
11     Q. (BY MR. WINE) Okay. So I think you testified
12 earlier today, sir, that in the late 1990s because there
13 was a mix of commercial contracts and government
14 contracts, that 100 percent of the costs associated with
15 environmental remediation of the site could not be
16 allocated to government contracts. Is that correct?
17     MR. BARR: Objection. Misstates the
18 witness' prior testimony.
19     Q. (BY MR. WINE) That's how you testified, is it
20 not, sir?
21     MR. BARR: Same objection.
22     THE WITNESS: I testified that the DCAA

Page 80

1  irrelevant as to the percentage of government contracts
2  versus commercial contracts.
3      Q. (BY MR. WINE) Well, when the Matter No. 5 asks
4  which contracts the costs were allocable to and
5  allowable under, what analysis did you perform in order
6  to determine for the 1940s, '50s, '60s '70s, '80s, and
7  '90s, sir?
8      A. Costs would be allowable to and allocable to
9  those contracts for which the costs had been determined
10 to be reasonable, and therefore allowable and allocable
11 to those government contracts that were in effect during
12 the relevant periods.
13     Q. (BY MR. WINE) Sir, you're aware, are you not,
14 under the express provisions of number 5 -- and if you'd
15 like to turn to Exhibit Number 1 -- or I believe it's
16 Exhibit Number 2, the Deposition Notice itself, and look
17 at Matter No. 5 where it specifically asks the
18 government to take a position on which contracts the
19 costs were allocable to and allowable under, I'd like to
20 know specifically what preparation you undertook in
21 order to answer that portion of Matter No. 5?
22     MR. BARR: Objection. Asked and answered,

Page 79

1  auditor had said that based upon her recollection, 90 to
2  95 percent of all of the contracts performed by Teledyne
3  Ryan during 1990 period were firm fixed price and that
4  the audits performed by DCAA were on overhead rate
5  projections and not on incurred costs. And since they
6  were on overhead rate projections against official fixed
7  price contracts, it would be virtually impossible to
8  determine how much of those costs actually were
9  allocated to government contracts and, in fact, paid to
10 Teledyne under public voucher submitted by Teledyne to
11 the government for payment.
12     Q. (BY MR. WINE) Did you also testify earlier
13 today, sir, that the commercial contracts were also
14 being performed during that time period?
15     A. The government believed that there were, in
16 fact, commercial contracts performed during the 1990s
17 that would have had an impact upon the allocation of
18 costs.
19     Q. Tell me specifically, and that's the -- that is
20 the precise issue that I want to determine both as to
21 the '90s and for each preceding decade, what analysis
22 the government performed to determine the split between

Page 81

Pages 78 to 81

1  commercial and noncommercial contracts that would have
2  had an impact, to use your words, sir, upon the
3  allocation of costs?
4    A.  The government believes that all contracts that
5  were held -- government contracts that were held by the
6  contractor when such costs were determined to be
7  allowable, allocable, and reasonable would have been
8  allocated to the government.  In the government's
9  opinion, the relative percentage of commercial contracts
10  to government contracts is immaterial for that
11  determination of allocability, reasonableness and
12  allowability.
13      MR. BARR:  Before he asks the next
14  question, the government also objects that the documents
15  produced in this matter also speak to the relative
16  percentages of contracts that you're asking about.
17      MR. WINE:  Right.  Exactly.
18    Q.  (BY MR. WINE)  So I believe in your preceding
19  answer, though, to my question, Mr. Jordan, you
20  testified that commercial contracts during the 1990s
21  would have had an impact upon the allocation of costs.
22  Correct?

Page 82

1  amount of allocation.  So to determine how much of those
2  costs were actually paid by the government under any
3  such allocation would be -- would require a detailed
4  audit of the books and not just an analysis of the split
5  between commercial and government.
6    Q.  Did you do anything remotely close to any of
7  that, sir?
8      MR. BARR:  Objection.  Assumes that's
9  possible.  Assumes facts not in evidence.
10    Q.  (BY MR. WINE)  Well, counsel just said the
11  government's produced voluminous documents, numerous
12  documents, that represents the split between commercial
13  and government activity.  Did he share any of those
14  documents with you, sir?
15      MR. BARR:  Objection.  Misstates
16  testimony.
17    Q.  (BY MR. WINE)  Did he share any of those
18  documents that represented the split on given years and
19  decades of commercial contracting and government
20  contracting at the site?
21      MR. BARR:  Same objection.
22      THE WITNESS:  There -- the government did

Page 84

1    A.  Would have had impact upon how much costs were,
2  in fact, allocated to those contracts and paid by the
3  government.
4    Q.  So when looking at the quantum of costs
5  allocated to specific contracts, it's necessary to
6  determine the relative split between commercial and
7  contracting activity and government contracting
8  activity.  Correct?
9      MR. BARR:  Objection.  Argumentative.
10  Misstates the witness' prior testimony.
11    Q.  (BY MR. WINE)  Correct?
12    A.  To determine how much of those costs that were,
13  in fact, paid by the government you would have to do an
14  analysis of the split.
15    Q.  And what analysis did you perform, sir, for the
16  1940s, '50s --
17    A.  To do a detailed analysis, you would have to do
18  an audit of not only the split, but you would have to do
19  an in-depth analysis of the relative value of fixed
20  price contracts to cost-type contracts, and whether or
21  not Teledyne had, in fact, billed under their fixed
22  price contracts the negotiated rates that included some

Page 83

1  not make any attempt to do a compilation of
2  year-by-year, decade-by-decade of the split between
3  government contracts and commercial contracts relative
4  to Issue No. 5 because, in the government's opinion,
5  that is outside the scope of government issue number 5.
6    Q.  (BY MR. WINE)  How is it not within the scope
7  of -- second-to-last line of the last sentence -- of
8  Issue No. 5, specifically which contracts the costs were
9  allocable to and allowable under?
10    A.  And I stated that those costs would be
11  allocable to and allowable under all contracts -- all
12  contracts -- government contracts held by Teledyne Ryan
13  during the relevant period provided that there was an
14  explicit determination by the government that those
15  costs were not only allowable and allocable but
16  reasonable.  And so the answer to that question -- and
17  the government believes it is responsive to Issue No. 5,
18  that the answer to which contracts, it is all contracts,
19  whether it is one contract or a hundred contracts.
20    Q.  Now, with respect to the explicit determination
21  that you referred to in your prior testimony, can you
22  provide me with any explicit determinations that the

Page 85

204
Exhibit 6

12/16/2009          TDY Holdings LLC v. The United States of America          Tommy Jordan

1  government made regarding the allocability and allowable
2  of costs?
3        MR. BARR:  Objection.  Assumes facts not
4  in evidence.
5        THE WITNESS:  There is specific language
6  relative to the allowability and allocability of costs
7  in those two DCAA audits.  The Advance Agreement
8  executed by Teledyne and the administrative contracting
9  officer in 1996 is a way of avoiding that determination
10 relative to the environmental cleanup costs of the
11 Convair Lagoon because the document specifically says
12 that the parties agree that it is extremely difficult to
13 make a determination of reasonableness, so therefore in
14 order to preclude a continued discussion and
15 litigation -- possible litigation, that the parties
16 entered into an Advance Agreement.
17       MR. WINE:  Let me take a pause for one
18 second.
19       (Discussion off the record.)
20    Q.  (BY MR. WINE)  So, Mr. Jordan, if
21 Messrs. McGill, Mr. Wand, and Mr. Honrud testify under
22 oath in the trial in this matter that as executives
                                           Page 86

1        MR. WINE:  Correct.
2        THE WITNESS:  I have not.
3    Q.  (BY MR. WINE)  You're familiar with
4  Mr. Honrud's responsibilities with respect to the
5  submission of proposed overhead costs on behalf of the
6  company to DCAA during this tenure at the company?
7    A.  I saw a number of proposals with his signature
8  on them, yes.
9    Q.  Okay.  Is it fair to say that Mr. Honrud
10 possesses superior knowledge regarding the practices of
11 the company with respect to the treatment of overhead
12 costs, specifically as they are related to environmental
13 remediation matters?
14       MR. BARR:  Objection.  Argumentative.
15 Vague and ambiguous.
16       THE WITNESS:  I do not think that the
17 government will agree that he has superior knowledge to
18 contemporary documentation and/or government employees
19 that were resident at the site during the relevant
20 period of time.
21    Q.  (BY MR. WINE)  Do you know if Mr. Honrud
22 limited his interactions with the government with
                                           Page 88

1  responsible for dealing with the government and
2  submitting, in some instances Mr. Art [sic] and
3  Mr. Honrud's situation, sworn statements, regarding
4  overhead costs and allocability, allowability, and
5  reasonableness of costs incurred by the company; those
6  three gentleman testified they submitted costs
7  associated with environmental remediation expenditures
8  by the company to the government throughout the 1980s
9  and 1990s, and those costs were deemed to be reasonable,
10 allowable, and allocable and that they were paid by the
11 government, would the government have any basis to
12 dispute their testimony, sir?
13       MR. BARR:  Objection.  Calls for
14 speculation.  Hypothetical.
15       THE WITNESS:  Only to the extent that the
16 contemporary documents in those two audit reports is
17 contrary to that testimony.
18       MR. BARR:  Also calls for a legal opinion.
19    Q.  (BY MR. WINE)  You haven't had occasion to
20 speak to Mr. Honrud since our last deposition?
21       MR. BARR:  Objection.  He's represented by
22 you.
                                           Page 87

1  respect to the accounting for these costs to the two
2  individuals that you spoke with in preparation for your
3  deposition, sir?
4    A.  I don't understand the question.
5    Q.  Well, did Mr. Honrud's responsibilities require
6  him to interact with DCAA officials beyond Peter
7  Woodworth and Theresa Lawson while he worked as an
8  executive at the company?
9    A.  I do not know.
10   Q.  Are you privy to any of the conversations --
11 did Mr. Woodworth or Ms. Lawson speak to you regarding
12 any conversations they had with Mr. Honrud?
13   A.  Only to the extent that there is a memorandum
14 in the record prepared by Mr. Woodworth detailing the
15 discussions with Teledyne Ryan leading up to the Advance
16 Agreement, and Mr. Honrud was part of those discussions.
17   Q.  Did they share with you any discussions that
18 any of their colleagues had had with Mr. Honrud
19 regarding the treatment of overhead costs and
20 environmental matters at the site?
21   A.  Not specifically, no.
22   Q.  Did they speak with you regarding Mr. Honrud's
                                           Page 89

Pages 86 to 89

205
Exhibit 6

1 dealings with the government with respect to
2 PCB remediation and electrical equipment at the site and
3 accounting for those costs in submissions to the
4 government?
5          MR. BARR:  Objection.  Assumes facts not
6 in evidence.
7          THE WITNESS:  No.
8     Q.  (BY MR. WINE)  If the site had not been sold to
9 Northrop Grumman and was still in operation today, still
10 producing the Global Hawk UAV or other aerial -- other
11 aerial materiel and was incurring costs such as soil
12 sampling and remediation, what's your understanding --
13 what's the government's position and understanding as to
14 the treatment of those costs by a current or going
15 concern in the handling of its overhead costs?
16          MR. BARR:  Objection.  Calls for
17 speculation.  Incomplete hypothetical.
18          THE WITNESS:  That's very difficult to
19 answer because each individual situation has to be
20 judged upon its own merits.  And the guidance to
21 government officials contained in the DCAA audit manual,
22 as well as in the Armed Services FARA, Federal

Page 90

1          There was an aborted attempt by the
2 Department of Defense to put more specific guidance in
3 Federal Acquisition Regulations in the early 1990s, but
4 it could never get consensus between industry
5 association groups and the Department of Defense in
6 those attempted regulations and the issues that were
7 promulgated.
8     Q.  Does the government have an understanding as to
9 one of the reasons why the treatment of environmental
10 costs of overhead were contentious from the private
11 sector's perspective was that such costs were being
12 incurred oftentimes at numerous sites throughout the
13 country as a result of historic operations of those
14 sites sometimes dating back decades?
15          MR. BARR:  Objection.  If the witness
16 knows.  It's vague and ambiguous and also assumes facts
17 not in evidence.
18          THE WITNESS:  I did read some of the
19 Congressional testimony by several contractors, and I
20 believe one of them was Aerojet General, relative to
21 some hearings that had been held by one of the
22 congressional subcommittees on environmental matters,

Page 92

1 Acquisition Regulation Act, today recognizes the fact
2 that the determination of reasonableness is a very
3 difficult judgment decision to make and can only be made
4 based on evaluation of all the facts, so each individual
5 circumstance would have to be judged individually.
6     Q.  (BY MR. WINE)  Is the government familiar with
7 the reasons behind the development of the '92 policy
8 guidance?
9     A.  Yes.
10          MR. BARR:  Objection.  Asked and answered.
11     Q.  (BY MR. WINE)  Can you describe to me the
12 purposes for the reasons why the '92 guidance was put
13 into place?
14     A.  This issue as to the treatment of environmental
15 costs had been a matter of consternation between
16 industry and DCAA on sites other than Teledyne Ryan and
17 that's what precipitated the basic policy guidance, and
18 then that basic policy guidance that was published in
19 1992 was carried forward.  And I believe that the first
20 treatment of those environmental issues in the DCAA
21 audit manuals was in 1997 and then it was carried
22 forward to the current edition of that manual.

Page 91

1 and there were a lot of opinions relative to how those
2 costs should be treated.
3     Q.  (BY MR. WINE)  And, in fact, contractors such
4 as Aerojet and industry groups representing government
5 contractors testified that many of the financial
6 expenditures being incurred by companies and being
7 sought via overhead rates were the result of releases of
8 hazardous substances due to past or ongoing
9 manufacturing and use of substances sometimes dating
10 back decades.  Correct, sir?
11          MR. BARR:  Objection.  That testimony
12 speaks for itself.
13     Q.  (BY MR. WINE)  The government is aware of that
14 testimony, is it not?
15          MR. BARR:  Same objection.  It also
16 mischaracterizes that testimony.
17          THE WITNESS:  You have to read the entire
18 deposition -- or the testimony in the record and those
19 documents that are included in the inventory of
20 documents; but yes, there were a lot of different issues
21 and a lot of contention between the government and
22 industry relative to how those costs should be treated.

Page 93

12/16/2009          TDY Holdings LLC v. The United States of America          Tommy Jordan

1  Q. (BY MR. WINE) And did the government review
2  the entire record with respect to the '92 guidance in
3  preparation for today's deposition?
4      MR. BARR: Objection. Vague and
5  ambiguous.
6      THE WITNESS: The government reviewed all
7  the documents that we could identify.
8  Q. (BY MR. WINE) So in preparing for today's
9  deposition, you're familiar with the type of testimony
10 that I've described to you, are you not, sir?
11     MR. BARR: Same objection. Vague and
12 ambiguous. Also the Congressional testimony speaks for
13 itself.
14     THE WITNESS: I'm aware -- the government
15 is aware of that testimony, yes.
16 Q. (BY MR. WINE) Was another purpose of the '92
17 guidance that laws such as CERCLA and RCRA impose
18 liability on contractors without regard to fault or
19 negligence on the part of the contractor?
20     MR. BARR: Objection. Calls for a legal
21 opinion.
22 Q. (BY MR. WINE) Do you remember that from the

Page 94

1      MR. WINE: Why don't we take a break here?
2      (Off the record at 4:13 p.m.)
3      (Back on the record at 4:23 p.m.)
4  Q. (BY MR. WINE) Mr. Jordan, returning to the
5  topic of fixed price versus cost plus contracts, it's
6  true, is it not that it's possible to determine if
7  environmental costs were included in setting overhead
8  rates for fixed price contracts. Correct?
9      MR. BARR: Objection. Calls for
10 speculation. Vague.
11     THE WITNESS: The government believes that
12 those costs, if any, would have been considered in the
13 establishment of those forward pricing rates. But what
14 I testified was that there is no way to determine how
15 much of those costs would have, in fact, been included
16 in vouchers submitted to the government for payment,
17 because the public vouchers didn't break out
18 specifically the -- all of the overhead costs that were
19 applied to the direct costs.
20 Q. (BY MR. WINE) You're aware based on your
21 experience, sir, that in order to set an overhead rate,
22 a proposed rate going forward, a contractor such as Ryan

Page 96

1  testimony you reviewed, sir?
2      MR. BARR: The testimony speaks for
3  itself.
4      THE WITNESS: I recall seeing some
5  references to the 85-804 indemnification issues on
6  environmental issues, but specifically what you mention
7  I don't recall.
8  Q. (BY MR. WINE) And the '92 guidance
9  acknowledges, sir, does it not, that environmental costs
10 incurred by a contractor to prevent contamination from
11 occurring, including altering its own practices or
12 adopting new practices to avoid or reduce adverse
13 environmental impact, aren't considered environmental
14 costs. Correct?
15     MR. BARR: Objection. The '92 document
16 speaks for itself.
17     THE WITNESS: They are considered to be
18 allowable and allocable provided they are determined to
19 be reasonable. But still you have to make a
20 case-by-case determination of reasonableness based upon
21 the individual circumstances surrounding each individual
22 event.

Page 95

1  does a cost buildup in proposing a rate going forward;
2  has to justify its rates based on capital expenditures.
3  Correct?
4  A. Yes and no. They make their overhead rate
5  projections based on historical costs, plus projected
6  costs based upon anticipated costs and plant volume and
7  those kinds of issues. So it's a combination of
8  historical costs and projected costs.
9  Q. And so when we looked at the document that
10 related to the PCB transformer replacement activity at
11 the site and it spread those costs over three to four
12 years, that's the type of exercise that a contractor
13 goes through in order to determine the types of costs
14 that it has been incurring in a certain area and that it
15 anticipates to incur in the future in establishing its
16 overhead rates. Correct?
17     MR. BARR: Objection. Vague.
18     THE WITNESS: At the risk of
19 generalization, those are the kinds of costs, but they
20 have to be individually examined and analyzed.
21 Q. (BY MR. WINE) Did you ask Ms. Lawson when you
22 spoke with her what her familiarity was, if any,

Page 97

Pages 94 to 97

207
Exhibit 6

1  regarding Ryan's inclusion of environmental related
2  costs in performing its buildup for it's proposed
3  overhead rates in its fixed price contracts?
4      A.  She had no specific recollection
5  of environmental costs, outside of the cleanup of the
6  Convair Lagoon.
7      Q.  Did you specifically ask her, sir?
8      A.  Yes, I did.
9      Q.  What was her answer specifically, sir?
10     A.  She had no recollection of environmental costs
11  outside of the Convair Lagoon.
12     Q.  Did you ask her whether or not there was anyone
13  else she may know of who would have information on that
14  subject, sir?
15     A.  Specifically I did not ask her that question.
16     Q.  Why did you not ask her that question, sir?
17     A.  As I testified earlier, the audit reports that
18  we have on the record identify those auditors that had
19  participated in the audits, and so that's a matter of
20  record and I didn't think it was necessary to ask her
21  what her recollection was.
22     Q.  So aside from the question of how much was

Page 98

1          THE WITNESS:  That's the only one I
2  recall.
3      Q.  (BY MR. WINE)  How many people is it your
4  understanding that DOJ spoke with besides Ms. Thomas?
5          MR. BARR:  If you know.
6          THE WITNESS:  My recollection is that
7  there were a total of five or six.  I don't recall
8  specifically.
9      Q.  (BY MR. WINE)  Who did these five or six people
10  work for?
11     A.  Who they work for today, I do not know.
12     Q.  Who did they work for when they had relative
13  information when the DOJ was interviewing them?
14     A.  It's my understanding they were DCAA auditors.
15     Q.  When did these interviews take place?
16     A.  I don't know.
17     Q.  Who conducted these interviews?
18     A.  Michelle Lambert.
19     Q.  Did Ms. Lambert prepare notes of these
20  conversations?
21     A.  I do not know.
22     Q.  Did you ask Ms. Lambert for copies of any notes

Page 100

1  actually charged by Ryan under a fixed price contract
2  for an environmental cost -- I'm not asking you that
3  question -- did you undertake any efforts aside from
4  just asking Ms. Lawson to determine what costs of an
5  environmental nature Ryan included in its overhead rate
6  for fixed price contracts?
7      A.  I specifically asked Mr. Woodworth if he had
8  any recollection of any environmental costs, and his
9  recollection was that there were no costs outside of the
10  cleanup of the Convair Lagoon.  DOJ had interviewed
11  several people outside of the two that I talked to,
12  Ms. Lawson and Mr. Woodworth; I don't recall the names
13  of all those individuals.  The only one I can recall is
14  Ann Thomas, who was a previous DCAA auditor, and all of
15  the -- my understanding is that none of those
16  individuals that have been talked to by DOJ had a
17  recollection of any specific environmental cost issues
18  outside the Convair Lagoon.
19     Q.  Ann Thomas is the only specific individual that
20  you know the DOJ spoke to?
21          MR. BARR:  That's the only one that he
22  recalls.

Page 99

1  that she had from these conversations?
2      A.  The only thing that I understand from those
3  conversations, the only thing I specifically asked her,
4  was there any recollection of any environmental issues
5  and the answer was, no.
6      Q.  And what time period did these individuals work
7  for the DCAA?
8      A.  I do not know.
9      Q.  What questions were asked of these individuals?
10     A.  I do not know.
11     Q.  Why don't you know?
12     A.  Once we got to the point of determining that
13  they had no recollection, then, in my opinion, there was
14  no productive need of pursuing those issues any further
15  with those individuals.
16     Q.  What documents were shown to these individuals?
17     A.  I do not know.
18     Q.  What efforts were made to prepare these
19  individuals for their conversations?
20     A.  I do not know.
21     Q.  Were these individuals employed by the DCAA
22  during the 1970s?

Page 101

Pages 98 to 101

1   A.  I do not know.
2   Q.  Were these individuals employed by the DCAA
3   during the 1980s?
4   A.  I do not know specifically.
5   Q.  What were the titles of these individuals that
6   they held -- what titles did these individuals hold
7   while they were at the DCAA?
8   A.  If they were DCAA, they were auditors.
9   Q.  What responsibilities did they have with
10  respect to Ryan?
11  A.  If they were auditors at Ryan, it was auditing
12  Ryan proposals and overhead accounts.
13  Q.  Were these individuals resident at the Ryan
14  site?
15  A.  I do not know specifically.
16  Q.  Do these individuals -- were these individuals
17  managed by Ms. Lawson?
18  A.  My recollection is at that time she was not a
19  supervisor.
20  Q.  Who was the supervisor of these individuals?
21  A.  I do not know.
22  Q.  Did the DCAA divide into categories while

Page 102

1   auditing or supervising the Ryan site specific
2   categories of costs?
3         MR. BARR:  Objection.  Assumes facts not
4   in evidence.  Argumentative.
5   Q.  (BY MR. WINE)  In other words, was there a DCAA
6   responsible for labor-related costs, was there a DCAA
7   individual responsible for quality assurance-related
8   costs, different buckets of costs?
9   A.  I do not know how DCAA divided up their
10  workload.
11  Q.  Did you ask anyone?
12        MR. BARR:  Objection.  Relevance.
13        THE WITNESS:  No; because I didn't
14  consider it to be relevant to the issue I was interested
15  in.
16  Q.  (BY MR. WINE)  If I need to find out what
17  information those individuals did have regarding
18  auditing of the Ryan site, who would I go to speak to?
19        MR. BARR:  Objection.  Misstates the
20  witness' prior testimony.
21        THE WITNESS:  I do not know; other than
22  asking for a list of those individuals from DOJ, and you

Page 103

1   can interview them.
2   Q.  (BY MR. WINE)  Now, as the 30(b)(6)
3   representative of the government, it's your
4   understanding that you are responsible for obtaining
5   information from multiple sources, including the
6   Department of Justice, in responding to questions that
7   are relevant to and covered by matter 5 in this matter?
8         MR. BARR:  Objection.  Calls for a legal
9   opinion.
10  Q.  (BY MR. WINE)  Were you aware of that, sir?
11  A.  In my opinion, I have been responsive to Matter
12  No. 5.
13  Q.  Including the government's efforts to identify
14  all DCAA auditors with knowledge responsive to Matter
15  No. 5?
16        MR. BARR:  Same objection.  Calls for a
17  legal opinion.
18        THE WITNESS:  The government has made a
19  reasonable effort to obtain documents that are available
20  for review and/or discussions with individuals who have
21  a recollection, and I have testified to that effect.
22  Q.  (BY MR. WINE)  Is there any way of knowing

Page 104

1   whether the five or six individuals that Ms. Lawson
2   testified -- excuse me -- interviewed were at or had
3   responsibilities associated with Ryan for a period
4   different than the period that was covered by Ms. Lawson
5   and Mr. Woodworth?
6         MR. BARR:  Objection.  Calls for
7   speculation.
8   Q.  (BY MR. WINE)  The mid- to late 1990s?
9   A.  I do not know.
10  Q.  You understood prior to coming here today, sir,
11  that Ryan contended that it incurred environmental costs
12  and passed those costs along to the government as early
13  as the 1980s in this matter.  Correct?
14  A.  I am aware that the testimony of several Ryan
15  executives had alluded to that fact, yes.
16  Q.  Do you have any notes or work papers related to
17  the preparation that you've undertaken for your 30(b)(6)
18  testimony, sir?
19        MR. BARR:  Objection.  Asked and answered.
20        THE WITNESS:  I have some notes that I
21  prepared in preparation for my deposition that includes
22  not just the 30(b)(6) but the expert report deposition.

Page 105

Pages 102 to 105

209
Exhibit 6

12/16/2009          TDY Holdings LLC v. The United States of America          Tommy Jordan

1   Q.  (BY MR. WINE)  Where are those notes, sir?
2   A.  In my computer.
3   Q.  Were you aware that the 30(b)(6) Notice
4   propounded to the government, instructed the
5   government's witnesses being offered as 30(b)(6)
6   representatives to bring all documents associated with
7   their preparation for their testimony?
8   A.  I was not.
9   Q.  You were not informed of that?
10      MR. BARR:  Objection.  Misstates the
11  deposition notice.
12      THE WITNESS:  I was not aware of that.
13  Q.  (BY MR. WINE)  Did you -- have you destroyed
14  any notes that you've taken associated with your
15  preparation for your 30(b)(6) testimony, sir?
16  A.  Yes.
17  Q.  When did you destroy notes?
18  A.  I have been preparing and destroying notes ever
19  since I started preparation for my initial 30(b)(6)
20  deposition.
21  Q.  I ask you to turn to page 4 of Exhibit Number
22  2.  I want to call your attention to line number 6 on
                                                 Page 106

1   say notes, it says...
2   Q.  ...documents.  All documents.
3   A.  "Reviewed by, shown to, or provided to the
4   deponent in connection with the deposition," which all
5   of the documents that I have relied upon for my
6   deposition are included in the inventory of documents
7   provided with my initial deposition, as well as
8   inventory provided today.
9   Q.  Turn to page 2 the definition of the word
10  "Document".  I'd like you to review that definition, if
11  you would, sir.
12  A.  I see it.
13  Q.  Have you viewed that definition prior to today,
14  sir?
15  A.  I reviewed it, yes.
16  Q.  And is it your belief, sir, sitting here today
17  that this definition of "Document," which instructs the
18  government that it should be interpreted broadly, does
19  not include handwritten or typewritten notes that you
20  take?
21  A.  If the notes that I took were merely a summary
22  of a document that is included in an inventory, I do not
                                                 Page 108

1   page 4.  I'd like to read for the record that paragraph:
2      "Furthermore, pursuant to Federal Rule of
3   Civil Procedure 34, at the time of the deposition, the
4   government shall produce for inspection and copying all
5   documents reviewed by, showed to, or provided to the
6   deponents in connection with the deponent's preparations
7   for these depositions, as well as all documents reviewed
8   or considered by any individual assisting the
9   preparation of the deponents."
10      Have you seen that instruction prior to my
11  just reading it, sir?
12  A.  And in my -- yes, I have seen it.  And in my
13  opinion we have provided that by the inventory of
14  documents provided with my initial 30(b)(6) deposition,
15  as well as the inventory of documents.
16  Q.  Is it your belief, sir, that your notes taken
17  in conjunction with your preparation for your testimony
18  as a 30(b)(6) witness, sir, is not covered by this
19  paragraph?
20  A.  That is my belief.
21  Q.  What's the basis of that's belief, sir?
22  A.  That's not what the document says.  It does not
                                                 Page 107

1   consider that note to be a separate document.
2   Q.  Why not?
3      MR. BARR:  Objection.  Argumentative.
4      THE WITNESS:  I stated my opinion.  In my
5   opinion, I was responsive to this document and
6   everything that I relied upon for my deposition is
7   included in the inventory of documents.
8   Q.  (BY MR. WINE)  Describe for me the documents
9   that you destroy -- the notes that you've destroyed
10  prior to today.
11  A.  For example, I read Mr. Wands' deposition and
12  then I extracted that portion of the deposition where he
13  had testified relative to a treatment of environmental
14  costs, and I put that in a note.
15  Q.  Okay.  And what did you do with that note?
16  A.  I no longer have it.
17  Q.  What did you do with it?
18  A.  Most of it I used for scratch paper.
19  Q.  Okay.  What about phone conversations that you
20  had with Ms. Lawson or Mr. Woodworth?  Did you keep any
21  jotted notes that you took during that conversation?
22  A.  Not that I recall, no.
                                                 Page 109

Pages 106 to 109

210
Exhibit 6

12/16/2009            TDY Holdings LLC v. The United States of America            Tommy Jordan

1    Q.  Didn't write anything down at all about those
2  conversations?
3    A.  Not that I recall.
4    Q.  How about notes that you took during
5  conversations that you had with Ms. Lambert about the
6  conversations that she had with five or six DCAA
7  auditors she spoke with?
8    A.  A lot of that I didn't turn in notes because
9  that was privileged communication with my attorney.
10   Q.  Have you been advised with respect to documents
11 relied upon by a 30(b)(6) pursuant to Rule 34 and
12 whether or not a deponent under Rule 30(b)(6) can shield
13 as privileged documents that they review in preparing
14 for their testimony?  Have you been advised on that,
15 sir?
16   A.  Specifically, no.
17   Q.  At any point in time, did any attorney from the
18 Department of Justice advise you not to destroy any of
19 your notes that you used in the preparation of your role
20 as a 30(b)(6) representative, either on Matter No. 5 or
21 for any of the matters which you've been designated as
22 representative for the United States?

Page 110

1    A.  No.
2    Q.  Let me ask you the converse.  Did the
3  government advise you to destroy any of your notes, sir?
4    A.  No.
5    Q.  If I wanted any type of documentary evidence
6  regarding the substance of your conversations with
7  Ms. Lawson or Mr. Woodworth, is there any source that I
8  can go to for that information that you're aware of?
9    A.  Not that I'm aware of.
10   Q.  Is there any source of written information
11 pertaining to the communications with the five or six
12 DCAA auditors with whom the Department of Justice has
13 spoken with that you've seen?
14   A.  Not that I have seen.
15   Q.  Who advised you to designate as privileged all
16 or any portion of the notes that you had prepared for
17 your 30(b)(6) testimony, sir?
18       MR. BARR:  Objection.  Misstates the
19 witness' prior testimony.
20       THE WITNESS:  No one advised me that those
21 are privileged; I said, in my opinion, they were
22 privileged communication with my attorney.

Page 111

1    Q.  (BY MR. WINE)  Okay.  And what's the basis of
2  your privilege assertion, sir?
3    A.  It was discussion with attorneys for the
4  Department of Justice, and based upon my understanding,
5  any discussion that I have with my attorney is
6  privileged communication.
7    Q.  Even in preparation for a 30(b)(6) deposition,
8  that's your understanding, sir?
9    A.  My understanding is any communication between
10 me and my attorney is privileged communication.
11   Q.  Describe for me specifically the notes that
12 you're referring to.  What volume are we talking about?
13   A.  Specific for 30(b)(6)?
14   Q.  Correct.
15   A.  I have no idea.
16   Q.  Where is it stored?
17   A.  It resides in my computer.
18   Q.  Are there multiple files or is it one document?
19   A.  Predominantly one document.
20   Q.  But I take it that there are other documents,
21 from your answer.
22   A.  There are other documents.  I don't recall if

Page 112

1  there is any notes relative to Matter No. 5 in those
2  documents or not.
3    Q.  How about notes relative to the other matters
4  for which you were designated as a 30(b)(6) or did you
5  take any other notes?
6    A.  I think I had testified in my earlier
7  deposition that I did have some notes and they were
8  resident in my computer.  I think that's what I said in
9  my earlier deposition.
10   Q.  Okay.  Regarding hard copy documents, have you
11 taken any notes on or created any marginalia in any of
12 the hard copy documents that you've been provided in the
13 notes on the documents?
14   A.  You mean on the documents themselves?
15   Q.  On the documents themselves.  In the margins --
16   A.  No.
17   Q.  -- on Post-It notes --
18   A.  No.
19   Q.  -- anything like that?
20   A.  No.
21   Q.  Do you keep any hard copy notations in a
22 spiral-bound notebook or any other source of notes as

Page 113

Pages 110 to 113

211
Exhibit 6

1  you're preparing for your 30(b)(6) testimony, sir?
2      A.  No.
3      Q.  Any other types of notes or other information
4  not identified on your list of documents, Exhibit 3,
5  that you've maintained in the preparation of your
6  30(b)(6) that you've not already testified about here
7  this afternoon, sir?
8      A.  Any documents other than on the inventory that
9  I relied upon?
10     Q.  The inventory that you relied upon and the
11  notes that you've testified about this afternoon.
12     A.  No.  No other documents.
13     Q.  Okay.  And when I use the term "documents," I'm
14  using the term as defined on page 2 of Exhibit 2.  So if
15  you'd like to look at that and refresh your recollection
16  and make sure you're not excluding anything.  Any
17  correspondence, any e-mail back and forth between you
18  and the DOJ, sir, regarding your 30(b)(6) preparation?
19     A.  There are some e-mails, but they basically
20  contain information like the call-in number for a
21  conference call, that kind of information.  I don't
22  recall any e-mails specifically covering the issues in
                                                    Page 114

1      Q.  How about voice mail messages?
2      A.  I do not have any voice mail messages.
3      Q.  Do you keep any logs of telephone calls that
4  you received, sir?
5      A.  I do not.
6      Q.  Any computer or network activity logs that you
7  keep, sir?
8      A.  I do not.
9      Q.  Do you back up your hard drive, sir?
10     A.  Occasionally, yes.
11     Q.  And how do you go about doing that?
12     A.  I have a memory device that I back up the
13  files.
14     Q.  Would that memory device be either a tape,
15  disk, or card?
16     A.  No.  It's a separate hard drive, part of my
17  computer system.
18     Q.  Any web pages that you maintain in conjunction
19  with your work as a 30(b)(6), sir?
20     A.  No.
21     Q.  How about databases or spreadsheets?
22     A.  Other than the inventory of documents, none.
                                                    Page 116

1  the 30(b)(6) deposition.
2      Q.  When you say call-in numbers, like the call-in
3  number for Mr. Woodworth or Ms. Lawson?
4      A.  That was a conference call and that was a
5  call-in number.
6      Q.  Did you delete that e-mail, sir?
7      A.  I don't recall.
8      Q.  Okay.  Is that e-mail still resident on your
9  computer, sir?
10     A.  Probably.
11     Q.  How about mail?  Written correspondence in hard
12  copy form between you and DOJ or any other individual
13  regarding your 30(b)(6) testimony, sir.
14     A.  None that I can recall.
15     Q.  How about memoranda?
16     A.  Other than those identified by Bates numbers
17  included in the inventory, none.
18     Q.  How about calendar entries or diary entries?
19     A.  I do not keep a diary, I keep a calendar; but
20  it would only have the time of a call, for example, when
21  I was scheduled for a deposition, those kinds of entries
22  in the calendar.
                                                    Page 115

1      Q.  Books or ledgers or journals, sir?
2      A.  None.
3      Q.  Worksheets or summaries?
4      A.  Other than my notes, none.
5      Q.  And when I say worksheets or summaries and
6  compilations, would that include summaries or
7  compilations of witness testimony that you reviewed and
8  summarized?
9      A.  That is an example of what would be included in
10  some of my notes.
11     Q.  Any drawings, maps, or depictions?
12     A.  I have a map of how to find Mr. Barr's hotel.
13     Q.  Not interested in that.  How about films,
14  charts, digital, chemical processed photographs?
15     A.  None.
16     Q.  Videos or phonographic tapes?
17     A.  None.
18     Q.  Any other types of digital recordings or
19  transcripts?
20     A.  None.
21     Q.  Drafts, jottings, or notes other than what
22  you've already discussed?
                                                    Page 117

Pages 114 to 117

212
Exhibit 6

1    A.  None other than what we've discussed.

2         MR. WINE:  Counsel, we requested this

3    information be produced at the first deposition, it was

4    not.  We requested that information be produced at this

5    deposition, pursuant to the Notice.  The Court ordered

6    the government to prepare and present a witness

7    consistent with the Notice, and that material was not

8    provided, and in some instances we understand that it

9    was destroyed.  We'd like all information that is kept

10   by the witness, and we'd like the government to

11   undertake efforts to restore materials that were

12   destroyed and provide for us a report as to those

13   documents that it cannot restore so that we can take

14   such corrective action as may be necessary.

15        MR. BARR:  You'll put that in a letter to

16   us, I'm sure, and then we'll consider it.

17        MR. WINE:  We put it in a Notice as well,

18   and apparently the government didn't consider it then

19   either.

20        (Exhibit 10 marked)

21   Q.  (BY MR. WINE)  I'd like to hand you another

22   document, sir.  Mr. Jordan, I'm handing you what's been

Page 118

1    marked as Exhibit 10 for your 30(b)(6).

2         MR. WINE:  Sorry, Counsel, I don't have

3    another copy.

4    Q.  (BY MR. WINE)  I'll describe it for the record

5    while you're reviewing it.

6         The document is a Defense Contract Audit

7    Agency Audit Report dated July 3rd, 1995, with the Bates

8    label US0190207 through 0221.  It's one of the documents

9    that appears on Exhibit 3, it's one of the audit reports

10   that you reviewed, and I believe you testified earlier

11   as to one of the audit reports upon which you were

12   relying with respect to the Convair Advance Agreement.

13        I'd like you to review the document, sir.

14   Once you have, let me know.

15   A.  Okay.

16   Q.  Sir, was this one of the audit reports you were

17   referring to earlier?

18   A.  Yes.

19   Q.  Does this audit review support your contention,

20   sir, that $300,000 associated with storm drain cleanup

21   was deemed to be unallowable by DCAA?

22   A.  I said there were two different audit reports,

Page 119

1    I didn't say which one referenced which costs.  This

2    audit report here references the $1.3 million for the

3    Convair Lagoon.  This report here does not mention

4    the storm drain, I don't think.  Oh, yes, it does.

5    Pardon me.

6         On page 4, Bates number ending in 211, it

7    says, "Since the contamination of the lagoon represents

8    a violation of the Basin Plan, the cleanup of the storm

9    drains and containment of Convair Lagoon are considered

10   unreasonable and, therefore, are unallowable costs."

11   Q.  Can you show me where in this report the DCAA

12   attached a 300,000-dollar charge associated with the

13   cleanout of storm drains?

14   A.  In this report, it's not there.  In the other

15   report it is.

16   Q.  It's not the other report that I showed you

17   earlier in your testimony, sir.  Correct?

18   A.  No.  There is another 1996 audit specifically

19   referencing the 300,000 for the storm drain.

20   Q.  Sir, I'll represent to you that we've looked at

21   all of the audit reports reflected on your matter --

22   Exhibit 3 chart, and none of the audit reports

Page 120

1    specifically reference a 300,000-dollar cost associated

2    with storm drain cleanup.  Where should we be looking

3    that we're not?

4    A.  It's my recollection that it was in the audit

5    report.

6    Q.  How sure are you of your recollection, sir?

7    A.  Fairly sure.

8    Q.  Mr. Jordan, subject to the review of the notes

9    that were ordered or were requested to be here pursuant

10   to our Deposition Notice that were not produced, it will

11   be produced at a later date either voluntarily by the

12   government or via court order, I have no further

13   questions; but we will reserve our right to recall you

14   if a review of your notes requires subsequent

15   questioning that we were deprived from undertaking

16   because those notes were not produced requested pursuant

17   to our deposition notice.

18        MR. BARR:  And we will consider that

19   request when the time comes.

20        I just have a few questions on cross

21   examination.  Actually let's take a break before we do

22   that.

Page 121

Pages 118 to 121

213
Exhibit 6

| | |
|---|---|
| 1   (Off the record at 4:57 p.m.) | 1   ambiguous. |
| 2   (Back on the record at 5:03 p.m.) | 2   Q.  (BY MR. BARR)  Do you have an understanding of |
| 3   EXAMINATION | 3   that, sir? |
| 4   BY MR. BARR: | 4   A.  It is my understanding that it was not limited |
| 5   Q.  Mr. Jordan, just a quick question before we get | 5   to the 1990s. |
| 6   into something -- some other things about the so-called | 6   Q.  Now, you were asked a number of questions by |
| 7   notes that you took. | 7   Mr. Wine pertaining to what you described as a detailed |
| 8   Was there anything in these notes other | 8   cost allocation analysis between commercial contracts |
| 9   than information contained in the documents themselves | 9   and government contracts.  Do you recall that series of |
| 10   that you reviewed? | 10   questions and answers? |
| 11   A.  No. | 11   MR. WINE: Objection. Misstates |
| 12   Q.  And the documents you reviewed for purposes of | 12   testimony.  Misstates questioning.  Mischaracterizes the |
| 13   your 30(b)(6) depositions, are those listed on the two | 13   record. |
| 14   inventories that you have provided? | 14   THE WITNESS:  I do understand that |
| 15   A.  Yes. | 15   discussion, yes. |
| 16   Q.  You were shown documents today, Exhibits 5, 6, | 16   Q.  (BY MR. BARR)  Just to summarize, if you could |
| 17   7; and if you could take those out, please? | 17   describe again what kind of a detailed cost allocation |
| 18   A.  Okay. | 18   analysis that you were referring to? |
| 19   Q.  With respect to the types of costs that are | 19   MR. WINE: Objection. Vague. Ambiguous. |
| 20   described on these documents, was -- are you aware of | 20   THE WITNESS:  It would require a review |
| 21   Justice Department efforts to locate documents in | 21   not only of the cost proposals prepared by Teledyne and |
| 22   addition to your own efforts? | 22   the audit reports of those cost proposals, but it would |
| Page 122 | Page 124 |

| | |
|---|---|
| 1   A.  Yes, I am. | 1   require a detailed audit of the cost accounting records |
| 2   Q.  With respect to the types of costs that are | 2   and books of Teledyne for the relevant period. |
| 3   described on these documents, are you aware of Justice | 3   Q.  (BY MR. BARR)  Have you seen sufficient |
| 4   Department efforts to find individuals who recalled | 4   information with which to prepare such an analysis? |
| 5   information pertinent to such costs in the context of | 5   A.  I have not seen any documentation that that |
| 6   Matter No. 5? | 6   kind of detail has survived on. |
| 7   A.  Yes.  And I testified earlier that Ms. Lambert | 7   MR. BARR:  That's all. |
| 8   had identified five or six people that she had | 8   FURTHER EXAMINATION |
| 9   interviewed, and none of those individuals had any | 9   BY MR. WINE: |
| 10   recollection of any environmental issues. | 10   Q.  Going back to the detailed cost analysis, |
| 11   Q.  Do you know if the five or six people | 11   detailed audit and cost accounting that Mr. Barr was |
| 12   referenced by Ms. Lambert include the two with whom you | 12   just asking you about, Mr. Jordan, were you aware, sir, |
| 13   spoke or are exclusive? | 13   that one of Mr. Honrud's job responsibilities was to |
| 14   A.  It includes Ms. Lawson, but it does not include | 14   perform or support such detailed cost analyses while he |
| 15   Mr. Woodworth. | 15   was an executive with the company? |
| 16   Q.  That's your understanding? | 16   A.  I'm aware that in his position as vice |
| 17   A.  That's my understanding. | 17   president, I believe comptroller, that he was required |
| 18   Q.  Do you have any understanding that the Justice | 18   to certify cost data submissions that they were |
| 19   Department limited their efforts to find persons with | 19   compliant with the Truth in Negotiations Act.  I do not |
| 20   recollections of matters within the scope of Matter No. | 20   know what level of detail he personally got into in |
| 21   5 to the 1990s? | 21   those and what he had delegated to his subordinates. |
| 22   MR. WINE: Objection. Vague and | 22   Q.  Do you know what Mr. Wands' responsibilities |
| Page 123 | Page 125 |

Pages 122 to 125

214
Exhibit 6

12/16/2009          TDY Holdings LLC v. The United States of America          Tommy Jordan

1  were with respect to those detailed cost analyses while
2  he was an executive with the company?
3      A.  I believe he was subordinate to Mr. Honrud in
4  that he was -- I believe his title was comptroller, and
5  that those cost data were prepared by his organization.
6  And, again, I don't know what level of detail he
7  personally got into in preparation of that data.
8      Q.  What about Mr. McGill?
9      A.  Mr. McGill, I believe I recall his
10  deposition.  It was a director of contracting for
11  Teledyne and had been responsible for proposals
12  submitted to the government for various products.
13      Q.  With respect to those three individuals, does
14  the government have an awareness as to whether or not
15  such detailed cost analyses were performed during the
16  operating period or operating history of the site?
17      A.  Performed by whom?
18      Q.  By either Ryan or the DCAA.
19      A.  I do not know.
20      Q.  How about the detailed audit that Mr. Barr
21  asked you about?  Do you know whether or not Mr. Honrud
22  had any dealings with the DCAA or other government

                                    Page 126

1  participated in or helped to facilitate the government's
2  detailed auditing of the company's cost accounting and
3  its books for periods predating the 1995 and 1996 audit
4  reports that you've testified here about today, sir?
5      A.  I believe that I saw his name on some Teledyne
6  proposals in the 1980 time frame.  I don't recall
7  specifically what period of time that he held the
8  position of vice president of Teledyne.
9      Q.  What about Mr. Honrud?  Did he have a role in
10  any of the detailed auditing performed by the federal
11  government at the site prior to the 1995 and 1996 audits
12  that you've referred to?
13          MR. BARR:  Objection.  Asked and answered.
14          MR. WINE:  Mr. Honrud.
15          MR. BARR:  Objection.  Asked and answered.
16      Q.  (BY MR. WINE) I'm sorry.  Mr. McGill.
17      A.  I don't recall seeing anything where
18  Mr. McGill had a role to play in the audit past this.
19      Q.  How about Mr. Wand?
20          MR. BARR:  Vague.
21          THE WITNESS:  Those audits were performed
22  on the books that were maintained by Mr. Wands'

                                    Page 128

1  agencies regarding detailed audits performed regarding
2  the government's -- excuse me -- regarding the company's
3  cost accounting, including an analysis of the company's
4  books for a particular period of time?
5          MR. BARR:  Objection.  Misstates the prior
6  question.
7          THE WITNESS:  The audit reports themselves
8  allude to discussion of the results of the audit with
9  individuals within Teledyne.  I don't recall seeing
10  anything where they had been discussed specifically with
11  Mr. Honrud.
12      Q.  (BY MR. WINE) When was the first time that a
13  resident auditor was at the Ryan site?
14          MR. BARR:  Objection.  Vague.
15          THE WITNESS:  The government does not have
16  any specific information relative to when they were
17  resident.  I do know that DCAA audited Teledyne books
18  going back to the establishment of the Defense Contract
19  Audit Agency, I believe, in the early '60s.  But whether
20  they were resident or itinerant, the government has no
21  information on that.
22      Q.  (BY MR. WINE) Do you know whether Mr. Honrud

                                    Page 127

1  organization.
2      Q.  (BY MR. WINE) What was Mr. Wands' -- what was
3  the government's understanding of Mr. Wands' role
4  regarding the audits performed on the books that he was
5  responsible for maintaining?
6          MR. BARR:  Objection.  Misstates the
7  witness' prior testimony.
8          THE WITNESS:  The organization that
9  Mr. Wands was in charge of was responsible for providing
10  those books and records to the auditors for review.
11  What role he personally played in that process, I don't
12  recall seeing any documentation that detailed that
13  involvement.
14      Q.  (BY MR. WINE) At what period of time did
15  Mr. Wands' organization first have cognizance of those
16  books that were audited by the government?
17          MR. BARR:  Objection.  Vague and
18  ambiguous.
19          THE WITNESS:  There may have been several
20  iterative changes in the organization of Teledyne, but
21  basically that function from beginning of the audit
22  responsibilities of DCAA sometime in the '50s and '60s

                                    Page 129

Pages 126 to 129

215
Exhibit 6

1  and those books were available for audit by DCAA.

2     Q.  (BY MR. WINE)  Does the government have a

3  position as to whether or not those books or records

4  reflect any entries for environmental-related costs for

5  the '80s and early '90s?

6     A.  I did testify that there was several entries in

7  the books relative to the legal costs associated with

8  the criminal complaint. I testified that there were two

9  separate audits that spoke to environmental costs

10  outside of those three references referencing the

11  documents that indicate that those costs were, in fact,

12  included in the Teledyne cost proposals.

13     Q.  I'm specifically talking about the books that

14  were maintained by Mr. Wands' organization, the detailed

15  backup for the proposals and the audits to which you're

16  referring, sir.  And specifically costs like PCB

17  transformer removals, storm drain cleanout in the '80s

18  and early '90s, and other consultants along the lines of

19  the exhibits that Mr. Barr asked you about, Exhibits 5,

20  6, 7, and 8.  Have you seen any of the detailed books

21  maintained by Mr. Wands' organization that would cover

22  those expenses, sir?

Page 130

1     A.  The government has not seen those books.

2     Q.  Was Mr. Wands' organization responsible for

3  accounting for those costs as part of the ordinary

4  course of his organizations?

5       MR. BARR:  Objection.  Vague and

6  ambiguous.

7       THE WITNESS:  Calls for speculation, but

8  his organization was responsible for accounting for all

9  incurred and projected costs that were included in

10  overhead rates that were passed to the government.

11     Q.  (BY MR. WINE)  And that was the under the

12  direct supervision of Arden Honrud.  Correct?

13       MR. BARR:  Objection.

14       THE WITNESS:  I think I stated Mr. Wands

15  was subordinate to Mr. Honrud, but I don't know, and

16  there are no documents that I'm aware of that detail the

17  specific relationship between those two individuals.

18       MR. WINE:  One final matter for the

19  record. Counsel has requested a letter requesting notes

20  maintained by this witness in preparation of his

21  30(b)(6) testimony.  That information was in writing in

22  the Notice that is attached as Exhibit 2 to this matter.

Page 131

1       The government has had that Notice for a

2  matter of months in writing.  The government had the

3  identical Notice with respect to Mr. Robertson, who also

4  testified that he maintained notes and used them in the

5  preparation of his 30(b)(6) testimony, and those notes

6  were not produced either.

7       MR. BARR:  I'll object to the

8  characterization Mr. Robertson's testimony.

9       MR. WINE:  Well, Mr. Robertson's testimony

10  speaks for itself.

11       MR. BARR:  Yes, it does.

12       MR. WINE:  And so if the government feels

13  that it's entitled to disregard a Deposition Notice

14  which it was duly served on August 19th, 2009, and which

15  it was ordered to comply with by court order on

16  November 19th, 2009, then we will take the

17  non-production of those notes as an election on the part

18  of the government to disregard that duly authorized

19  notice, and we'll take such corrective action as

20  necessary with the Court.

21       And with that, I have no further

22  questions, but I continue to reserve my rights and the

Page 132

1  rights of TDY to recall you, sir, if the review of your

2  notes indicates that such additional testimony is

3  required. Thank you for your time.

4       MR. BARR:  And we will certainly consider

5  your statements here at this deposition and the position

6  that you've taken, and we will get back to you.

7       MR. WINE:  Thank you.

8       MR. BARR:  The witness will read and sign.

9       MR. WINE:  Ten day turnaround?

10       MR. BARR:  That is fine.

11       MR. WINE:  Thank you.

12       MR. BARR:  Before we go off the record,

13  we'll need to see the transcript before we can get back

14  to you regarding this notes issue of yours.

15       MR. WINE:  While we're on the record, the

16  government's on notice.  We'll ask the government both

17  to rely on its understanding of the plain review of

18  Exhibit 2 served on the government in August, as well as

19  its review of the rough transcript, and not wait ten

20  business days, since especially the government's taken a

21  position that the close of expert testimony -- expert

22  discovery in this matter is complete in two days.  So

Page 133

Pages 130 to 133

216

Exhibit 6

12/16/2009          TDY Holdings LLC v. The United States of America          Tommy Jordan

1  we'd expect your prompt consideration in this matter,
2  which is of importance.
3          MR. BARR:  We will promptly consider it.
4  We can't guarantee exactly when.
5          (Proceedings concluded at 5:20 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
                                            Page 134

1  Tommy Jordan c/o
2  U.S. Department of Justice
3  601 D Street, NW, Suite 8000
   Washington, DC 20004
4  Case: TDY Holdings v. United States of America
5  Date of deposition: 12/16/09
6  Deponent: Tommy Jordan
7  Please be advised that the transcript in the above
8  referenced matter is now complete and ready for signature.
9  The deponent may come to this office to sign the transcript,
10 a copy may be purchased for the witness to review and sign,
11 or the deponent and/or counsel may waive the option of signing.
12 Please advise us of the option selected.
13 Please forward the errata sheet and the original signed
14 signature page to counsel noticing the deposition, noting the applicable
15 time period allowed for such by the governing Rules of Procedure.
16 If you have any questions, please do not hesitate to call our office at
17 (202)-232-0646.
18
19 Sincerely,
20
21 Digital Evidence Group
   Copyright 2009 Digital Evidence Group
22 Copying is forbidden, including electronically, absent express written consent.
                                            Page 136

1          REPORTER'S CERTIFICATE
2     ORAL DEPOSITION OF TOMMY JORDAN
3          December 16, 2009
4
5     I, the undersigned Certified Shorthand Reporter in
6  and for the State of Texas, certify that the facts
7  stated in the foregoing pages are true and correct.
8     I further certify that I am neither attorney or
9  counsel for, related to, nor employed by any parties to
10 the action in which this testimony is taken and,
11 further, that I am not a relative or employee of any
12 counsel employed by the parties hereto or financially
13 interested in the action.
14    It was stipulated by and between counsel that the
15 witness would read and sign a certified copy of the
   transcript and the original transcript would be sent to
16 the Department of Justice.
      SUBSCRIBED AND SWORN TO under my hand and seal of
17 office on this the _____ day of _____,
   _____.
18
   _____
19 Rebecca J. Callow, CSR, RPR, CRR
   Texas CSR 8925
   Expiration: 12/31/11
20 Digital Evidence Group
   1111 16th Street NW
21 Suite 410
   Washington, DC 20036
22 (202) 232-0646
                                            Page 135

1  Digital Evidence Group, L.L.C.
2  1111 16th Street, Northwest, Suite 410
3  Washington, D.C. 20036
4  (202) 232-0646
5
   SIGNATURE PAGE
6
7
8  Case Name: TDY Holdings v. United States of America
9  Witness Name: Tommy Jordan
10 Deposition Date: 12/16/09
11 I do hereby acknowledge that I have read
   and examined the foregoing pages
12 of the transcript of my deposition and that:
13
14 (Check appropriate box):
15 ( ) The same is a true, correct and
   complete transcription of the answers given by
16 me to the questions therein recorded.
17 ( ) Except for the changes noted in the
   attached Errata Sheet, the same is a true,
18 correct and complete transcription of the
   answers given by me to the questions therein
19 recorded.
20
21 _____    _____
22 DATE             WITNESS SIGNATURE
                                            Page 137

Pages 134 to 137

```
 1   Digital Evidence Group, L.L.C.
 2   1111 16th Street, Northwest, Suite 410
 3   Washington, D.C. 20036
 4   (202) 232-0646
 5
           E R R A T A   S H E E T
 6
 7
 8   Case Name: TDY Holdings v. United States of America
 9   Witness Name: Tommy Jordan
10   Deposition Date: 12/16/09
11     Page No.   Line No.        Change
12
13
14
15
16
17
18
19
20
21   _____          _____
22     Signature               Date
```

Page 138

Page 138