UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TDY HOLDINGS, LLC and TDY INDUSTRIES, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES OF AMERICA et al.,<br><br>Defendants. | Case No.: 07-CV-787-CAB-BGS<br><br>**ORDER ON REMAND** |

This matter is back before the Court on remand from the Ninth Circuit. Plaintiffs TDY Holdings LLC, TDY Industries, LLC and their predecessor, the Ryan Aeronautical Company (collectively, "TDY") seek to recover from Defendant the United States of America (the "government") an equitable allocation of the costs TDY incurred cleaning up hazardous wastes at an aeronautical manufacturing plant TDY operated in San Diego, California from 1939 to 1999 (the "Site"), pursuant to the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA").

### I. Procedural Background

Following a bench trial, the Court determined that TDY, as an owner of facilities and the sole operator of the Site, was the responsible party for the contamination at issue

1

in the litigation and the associated response costs. The Court further concluded that the government, although a past owner of facilities at the Site, was not the responsible party for the introduction of the contaminants of concern into the Site's soil, sediment and water that necessitated the remediation efforts. *TDY Holdings, LLC v. United States*, 122 F. Supp. 3d 998, 1022 (S.D. Cal. 2015). Accordingly, the Court in its discretion allocated 100% of the past and future response costs to TDY. *Id.*

On appeal to the Ninth Circuit, TDY argued that the Court abused its discretion when it allocated all cleanup costs to TDY. *TDY Holdings, LLC v. United States,* 885 F.3d. 1142, 1147 (Fed. Cir. 2018). TDY did not appeal the Court's factual findings regarding TDY's role as the sole operator of the manufacturing plant or the Court's findings that TDY's manufacturing, storage and disposal practices were the cause of the chemical contaminants seeping into the soil and groundwater beneath the plant. *Id.* at 1147, 1150. According to TDY, despite these undisturbed factual findings, the Court abused its discretion because it misunderstood CERCLA's strict liability statutory scheme by giving improper weight to the government's role as a past owner and TDY's role as the operator of the Site, thereby erroneously allocating based on "fault." *Id.* at 1147-48.

The Ninth Circuit rejected these arguments and found the Court did not misconstrue the concept of "fault" or misunderstand CERCLA's strict liability statutory scheme. *TDY Holdings*, 885 F.3d at 1147. It found the District Court appropriately considered the roles of the parties and properly applied the factors frequently considered by courts resolving contribution claims, known as the Gore Factors. *Id.* at 1147-48; *see also Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1187 (9th Cir 2000) (discussing the Gore factors).

Notwithstanding the foregoing, the Ninth Circuit ultimately concluded that the Court erred in allocating 100% of the remediation costs to TDY and remanded for further proceedings. *Id.* at 1048-49. Specifically, it found that the Court erred in its analysis and application of two Ninth Circuit cases involving the allocations of CERCLA cleanup costs between military contractors and the government: *United States v. Shell Oil Co.*, 294 F.3d 1045 (9th Cir. 2002); and *Cadillac Fairview/California, Inc. v. Dow Chemical Co.*, 299

F.3d 1019 (9th Cir. 2002). *TDY Holdings*, 885 F.3d at 1148. The Ninth Circuit focused on the fact the government's specifications required the use of two of the three chemical contaminants at issue, chromium compounds and chlorinated solvents, in the processing of certain parts and concluded the Court did not give sufficient consideration to that factor. *Id.* at 1148-49. Further the Ninth Circuit concluded that the Court did not give sufficient consideration to the course of contractual dealings between the government and TDY regarding environmental cleanup costs at the Site. *Id.* at 1149. The Court was therefore ordered to reevaluate its equitable allocation focusing on these particular factors.

## II. The Legal Standard

CERCLA was designed to promote the timely cleanup of hazardous waste sites and ensure that the costs of such cleanup efforts are borne by the parties responsible for the contamination. *Burlington N. & Santa Fe Ry. Co. v. United States,* 556 U.S. 599, 602 (2009). To be subject to liability under CERCLA, a party must be a statutorily-defined potentially responsible party ("PRP"). PRPs fall into four categories: (1) an owner or operator of a facility; (2) a past owner or operator at the time of the disposal of the hazardous substance; (3) an arranger of waste disposal; or (4) an entity that accepts the waste for treatment or disposal. 42 U.S.C. § 9607(a)(1)-(4); *TDY Holdings*, 885 F.3d at 1147. CERCLA does not recognize customers among the potentially responsible parties subject to CERCLA liability.

Moreover, the government can only be liable under 42 U.S.C. § 9607 "when it qualifies an owner or operator of a facility, an arranger of waste disposal, or an entity that accepts waste for treatment or disposal. Otherwise, it is not liable and it maintains its sovereign immunity." *Shell Oil*, 294 F.3d at 1053. Absent a PRP finding, the government cannot be held liable for CERCLA remediation costs resulting from the performance of contracts for the government, even if the contaminants were used in the production of products essential to national defense. *See id.* at 1059 (holding that the government was not an arranger under § 9607 for the disposal of certain contaminants that were by-products

of critical WWII national defense contracts, so it had no liability under CERCLA for the cleanup costs).

Even when the government is identified as a PRP, CERCLA does not, as TDY continues to argue, dictate that the government bear all or most of the remediation costs regardless of its contributions, involvement, and the negligence of other PRPs, when the work resulting in contamination was undertaken for the purpose of national defense. *See* Plaintiff's Brief on Remand, Doc. No. 305, at 5-6[1] (100% allocation to the government is an appropriate starting point for cases involving environmental contamination that occurred as the result of military production for the national war effort).

CERCLA provides that the district court "may allocate response costs among liable parties [PRPs] using such equitable factors as the court determines are appropriate." *Shell Oil,* 294 F.3d at 1060, citing 42 U.S.C. § 9613(f)(1). The district court has broad discretion in allocating costs among PRPs. *TDY Holdings,* 885 F.3d at 1149. The appellate court then reviews whether the district court abused its discretion in light of the reasons given for its allocation. *Cadillac Fairview*, 299 F.3d at 1026 ("We could not substitute our judgment, even if it were different, because our review is limited to considering whether the district court abused its discretion.")

When allocating response costs, the district court may properly consider such factors as each PRP's contribution to the discharge, release, or disposal of the hazardous waste; each PRP's degree of involvement in the generation, transportation, treatment, storage or disposal of the hazardous waste; and the care exercised by each PRP with respect to the hazardous waste concerned. *See Envtl. Transp. Sys., Inc. v. ENSCO, Inc.,* 969 F.2d 503, 508 (7th Cir. 1992) (listing the "Gore Factors" that may be considered in the equitable allocation of costs); *Boeing Co.*, 207 F.3d at 1187 (recognizing the application of the Gore Factors in an equitable allocation).

---

[1] Document numbers and page references are to those assigned by CM/ECF watermark at the top of the page for the docket entry.

# III. Allocation of Remediation Costs Resulting from the Performance of Government Defense Contracts

*Shell Oil* and *Cadillac Fairview* addressed allocation of CERCLA cleanup costs between military contractors and the government for environmental contamination that resulted from the production of products essential to the military's efforts in World War II. *See Shell Oil*, 294 F.3d at 1051; *Cadillac Fairview*, 299 F.3d at 1022. Neither case, however, requires a district court to start its equitable analysis by initially assessing 100% of the CERCLA liability to the government solely because the environmental contamination resulted from the production of products essential to a U.S. military effort. Rather, as discussed below, the equitable allocation in *Cadillac Fairview* was affirmed, and in *Shell Oil* was partially affirmed, based on the specific facts each case presented.

### A. *United States v. Shell Oil Co.*, 294 F.3d 1045 (9th Cir. 2002)

*Shell Oil* reviewed the equitable allocation of liability regarding the cleanup of the McColl Superfund Site in Fullerton, California. *Shell Oil*, 294 F.3d at 1048. From June 1942 until shortly before the end of WWII, the McColl dump site accepted acid waste generated from the production of avgas, a fuel product for airplanes used by the U.S. military. The production of avgas was critical to the war effort, and the acid wastes were generated in large quantities during WWII as a result.

The government was aware that acid wastes were a byproduct of avgas production that required reprocessing or disposal. *Shell Oil*, 294 F.3d at 1049-51. "With at least the tacit approval from the government," oil companies contracted for the transporting and legally permitted dumping of avgas acid waste at the McColl site. *United States v. Shell Oil Co.,* 13 F.Supp. 2d 1018, 1023 (C.D. Cal. 1998). Neither the government nor the oil companies producing the waste foresaw that disposal of acid waste in the McColl dump site, done in a manner acceptable at the time, would years later be subject to a regulatory cleanup process. *Shell Oil,* 13 Supp.2d at 1030.

The district court found the government 100% responsible for the site cleanup of the acid wastes that were a byproduct of avgas production, because "such a result places the

5

cost of the war on the United States and thus on society as a whole" noting that the degree of government oversight of the avgas program was "extraordinarily high." *Id.* at 1027. Further the district court found that the government's war requirements created the waste and the government's acts or omissions foreclosed the alternative methods of disposal of the waste. *Id.* at 1027-28 ("Having created the problem and foreclosed the possible solutions, the Government will receive a 100 percent allocation of waste attributable to the avgas program.")

The Ninth Circuit reversed. *Shell Oil,* 294 F.3d at 1059. Despite the "pervasive activity of the government" in the oversight of the avgas program and its critical role in the war effort, the Ninth Circuit court found that the government was not a PRP, specifically not an arranger,[2] with regard to the disposal of acid waste that resulted from the avgas production. The Ninth Circuit therefore found the government had no liability under CERCLA for the cleanup of the acid waste from the avgas program. *Id.*

In a contract separate from the avgas program, Shell also manufactured benzol for the government. The government admitted liability as an arranger for the disposal of benzol wastes. Without further analysis, the district court found the government conceded 100% liability for the benzol waste. *See Shell Oil,* 13 F.Supp.2d at 1023-1024 ("[T]he Government is wholly responsible for acid waste resulting from acid treating in the production of benzol.") After the government objected to the 100% allocation, the district court extended the equitable factors it had applied to the avgas waste disposal to the benzol waste to justify the 100% allocation to the government. The district court concluded that the government's wartime need created the benzol waste, and the government conceded it was an arranger responsible for the disposal of this known toxic waste and provided for no alternative to dumping at the McColl site due to the extreme circumstances imposed by the

---

[2] An arranger under 42 U.S.C. § 9607(a)(3) is "any person who by contract, agreement or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substance owned or possessed by such person."

war effort. Thus, according to the district court, the facts and equities in *Shell Oil* supported a 100% allocation to the government of costs related to the cleanup of benzol waste at the McColl Site.[3] The Ninth Circuit affirmed this holding, concluding that the district court's allocation of 100% of the benzol waste cleanup cost to the government was not an abuse of discretion. *Shell Oil,* 294 F.3d at 1060 (citing 42 U.S.C. § 9613(f)(1)) (CERCLA provides that the district court "may allocate response costs among liable parties [PRPs] using such equitable factors as the court determines are appropriate.").

### B. *Cadillac Fairview/California, Inc. v. Dow Chemical Co.*, 299 F.3d 1019 (9th Cir. 2002)

*Cadillac Fairview* concerned allocation of the cleanup cost for contamination at a synthetic rubber facility in Torrance, California. The rubber shortage in WWII was considered "the greatest threat to the safety of our nation and the success of the Allied cause." 299 F.3d at 1022. The need for synthetic rubber was so urgent the government had Dow Chemical build a styrene plant (a necessary component to make synthetic rubber) and operate it as "an agent" of the government at the "expense and risk" of the government. *Id.*

The government's PRP liability under CERCLA was as the owner and operator of the site and an arranger for the disposal of the toxic wastes. *Id.* at 1025. The government owned the land, the plant, the raw materials, the byproducts and wastes, and the rubber. All activities at the site were subject to unrestricted control by the government. The government knew that the operation of the plant and the byproducts and wastes were polluting the soil and water but made the decision "not to divert scarce resources from the war effort to stop the pollution." *Id.* at 1022-23. The district court found that the

---

[3] The benzol waste made up between five and six percent of the waste at the McColl Site. *Shell Oil*, 13 F.Supp.2d at 1023. The district court opinion provides no factual analysis with regard to the benzol waste and its relationship to the war effort. The Ninth Circuit noted that so little evidence was produced at trial with respect to the benzol waste that the district court was under the impression the United States conceded complete liability with respect to those costs. *Shell Oil*, 294 F.3d at 1060.

7

government was informed and approved of the dumping of the toxic tars and aqueous wastes, obtained monthly reports on the residues dumped, directed and coordinated the operations of the plants, and set policy on trade waste disposal. *Id.* at 1024.

The district court held that the government had an agency relationship with Dow Chemical[4] and had made an express written promise to hold Dow Chemical harmless for what Dow Chemical did at the rubber facility. Thus, the district court allocated 100% of the cleanup costs to the government, and the Ninth Circuit affirmed. *Id.* at 1026 ("On these facts (and allocation cases generally turn on their facts), there was no inequity in allocating 100% of the costs to the government.")

Relevant to the district court's analysis in *Cadillac Fairview* was the contract the government and Dow Chemical entered at the time the production and disposal of the hazardous substance occurred. The operating agreement contained a broad "hold harmless" provision protecting Dow Chemical from any liability arising from the styrene production. *Id.* at 1023. Although the district court did not, and could not, hold the government 100% liable based on this contact provision, it did consider the government's express contractual promise in its equity analysis as evidence of the parties' mutual intent that:

> the work done on the government's property, with government materials, producing rubber that the government at all times owned, and waste that at all times the government owned, which was disposed of in ways the government approved, subject to the unlimited control of the government and regular review and supervision of the government, as an agent for the government, be done entirely at the government's expense and risk.

*Id.* at 1028. The government expressly promised not to impose liability on Dow Chemical, whom it had "conscripted for a critical part of the great war effort," for the polluting conduct the government completely controlled. *Id.* at 1029. It was "well within the

---

[4] Dow Chemical's role was described as more nearly analogous to a soldier's than a commercial tenant's. *Id.* at 1027.

discretion [of the district court to consider] that promise as a factor in the equitable allocation. *Id.* at 1028

### C. Distinguishing Factors Here

"[A]llocation cases generally turn on their facts," *Cadillac Fairview*, 299 F.3d at 1026, and as the Ninth Circuit noted, there are important distinctions between the facts here and those presented in *Shell Oil* and *Cadillac Fairview*. *TDY Holdings*, 885 F.3d at 1148. For example, *Shell Oil* and *Cadillac Fairview* involved the allocation of cleanup costs resulting from the disposal of known toxic wastes during the critical years of WWII. Here, the cleanup costs arise out of operations at the Site over a sixty year period, and during most of that period, the wastes in question were not regulated. In *Shell Oil* and *Cadillac Fairview*, the government was the admitted arranger of the disposal plan and made conscious decisions to dispose of the wastes in landfills due to the immediate need to get rid of the excess wastes created by the urgent war requirements and the lack of time and resources to employ alternative solutions to the waste dumping. None of these circumstances existed here.

In addition, the contractual relationship between TDY and the government is not comparable to the relationship between the parties in *Cadillac Fairview*. The government never agreed to "hold harmless" TDY for its actions at the Site. Nor did the government otherwise waive sovereign immunity (explicitly or implicitly) to accept CERCLA responsibility for the polluting acts controlled by TDY. As part of their regular and established course of dealing from the 1970s to the Site closure in 1999, TDY included in its contracts, as overhead or indirect costs, expenses it incurred to comply with environmental regulations, reporting obligations, and remediation costs. *See TDY Holdings*, 122 F.Supp. at 1020. By paying these contractual overhead and indirect expenses, the government was not waiving its sovereign immunity and agreeing to pay any CERCLA mandated expenses for TDY's polluting conduct that occurred after the government was no longer a PRP. Nor did the government's acceptance of these overhead and indirect expenses in these later work contracts constitute an acceptance of

responsibility for the CERCLA response costs imposed on TDY for polluting conduct that may have occurred while the government still owned equipment on the Site. *Id*. Reconsidering these contractual provisions as directed by the Ninth Circuit's remand, the Court again concludes that, unlike the express "hold harmless" provision in *Cadillac Fairview*, the standard contractual assignment of overhead and indirect cost charges for environmental remediation contained in the TDY-government contracts provides no basis for an equitable shift of the responsibility for TDY's CERCLA remediation expenses to the government.

The specific facts in *Cadillac Fairview* supported an equitable allocation of 100% of the cleanup costs to the government. The specific facts in *Shell Oil* supported an equitable allocation of 100% of a small portion of the cleanup costs to the government. These allocations, however, were not premised, as TDY advocates, on a principle that such an outcome is the default in cases involving fulfillment of a government military contract. Rather, these allocations were based on facts specific to the wastes involved, the circumstances in which the wastes were generated, and the roles and responsibilities of the PRPs for the generation and disposal of the wastes. Comparable facts, circumstances and the contractual relationships are simply not present here. The unchallenged facts in this case are significantly different than the factual findings in *Shell Oil* and *Cadillac Fairview* and do not support a substantial allocation of the cleanup costs to the government.

**IV.    Reconsideration of the Allocation as Directed by the Ninth Circuit**

The government was neither the operator of the Site nor an arranger in the disposal of the waste. *See TDY Holdings*, 122 F.Supp. 3d at 1015-17. The government's role as a PRP is limited to its role as a past owner[5] of some equipment on the Site, and the equipment owned by the government did not in itself cause the contamination. *Id*. at 1014. The

---

[5] As a past owner, the United States can only be held liable under CERCLA for disposal of wastes that occurred while the United States was an owner of facilities, which ended in 1979. Consequently the United States has sovereign immunity from liability for any contamination that occurred after 1979. *Id.* at 1014.

contamination was caused by the way TDY operated and maintained the Site over a 60 year period. *Id.* at 1014-15. Unlike in *Shell Oil* and *Cadillac Fairview*, there is no evidence that any operational or disposal decisions were made by the government, that the government directed or allowed the environmental contamination because of an urgent and critical demand for wartime essentials, or that there was a lack of resources to provide alternative disposal practices.

Although the Court has found that the government's specifications required the use of chromium solutions in the manufacture of certain parts and recommended the use of chlorinated solvents to degrease parts as a step in the production process, *TDY Holdings*, 122 F.Supp. at 1018, this finding in itself is insufficient to confer PRP liability on the government. A customer who simply requires a manufacturer to employ certain chemicals in the production of goods is not a statutorily-defined PRP. If that customer owned the contaminants, controlled the actual operation that released the contaminants, or arranged for the disposal of the contaminants, and as a result the contaminants entered the environment, it have would CERCLA liability in relation to any other PRPs and their contributions to the contamination.

The Court's undisturbed factual findings are that equipment the government owned did not cause the contamination. The operation and maintenance of the equipment and the handling and disposal of the hazardous chemicals, i.e., the "general manufacturing processes and housekeeping practices," at the Site controlled solely by TDY were what resulted in the release of chemical contaminants into the environment over six decades. *Id.* at 2017; *see also TDY Holdings*, 885 F.3d at 1150 (noting the district court's unchallenged factual finding was that TDY was solely responsible for the acts that led to the environmental contamination) (Watford, J., concurring). Thus, because the government was neither the owner of these contaminants, nor the operator of the Site, nor the arranger of the disposal of these contaminants, the fact that it required use of the contaminants does not subject the government to PRP liability arising out of TDY's handling and disposal thereof.

Notwithstanding the foregoing, the Ninth Circuit remanded based in part on the fact that these contaminants were introduced into the environment because the government required or recommended TDY use them in the manufacturing process, and ordered this Court to reconsider the equities, instructing that some responsibility for the cleanup should be shouldered by the government. *See TDY Holdings,* 885 F.3d at 1149, 1150 ("[E]quity demands that the government bear at least some responsibility for having required an unsuspecting contractor to use chromium and chlorinated solvents in the first place.")(Watford, J., concurring).

The chromium contamination was the result of the cumulative release of hexavalent chromium into the environment during the operation at the site from 1939 to 1999. *TDY Holdings*, 122 F.Supp. at 1018. Any potential liability as a PRP for the government ended in 1979, at which time it ceased being an owner of the Site. During the first four decades of the Site operation, the Court finds that the government's role in the contamination resulting solely from its requirement that chromium be used in the manufacturing process is limited and most equitably related to contamination that resulted from aerating the chromium containing liquids in the processing line that released micro-quantities of chromic acid into the air which settled on nearby surfaces. *Id*. at 1005. This airborne contamination was inherent in the operation of the chromium processing line, unlike contamination resulting from TDY's failure to limit, contain and clean drips and spills in the plant. *Id.* at 1018. Consequently, the Court allocates five percent of the cleanup costs for the remediation of the chromium contamination in the Site soil and ground water to the government.

The chlorinated solvent contamination involved different types of chlorinated solvents used over the decades at the Site. *Id.* Initially these solvents were disposed of in the sanitary sewer as allowed by law until the mid-1970s when chlorinated solvents became regulated under the Clean Water Act. At approximately the same time the government's status as a PRP ended, TDY began collecting and recycling solvent instead of releasing it into the sewer line. *Id.* at 1006. During Site demolition, ground water contamination was

discovered due to unknown cracks in sewer pipe line that allowed the solvents to migrate into the ground water. The other site contamination was the result of TDY's operation and maintenance practices, both before and after solvents became regulated. *Id.* at 1006-07.

The government's role in the contamination resulting from its recommendation of the use of chlorinated solvents is limited and most equitably related the contamination that can be attributed to solvents that migrated into the ground water from the sewer line, where TDY made permitted discharge of solvents until the mid-1970s. A large ground water plume was discovered in the vicinity of the sanitary sewer line by Buildings 131 and 242, where TDY discharged solvents until the mid-1970s. *Id.* at 1007. The Court allocates ten percent of the cleanup cost for the remediation of this specific ground water plume that resulted from TDY's disposal of chlorinated solvents in the sewer system to the government.

The Court makes no allocation to the government for the remediation of PCBs. *See TDY Holdings*, 885 F.3d at 1150 (there is "no reason to disturb the district court's allocation of clean-up costs with respect to the contamination caused by PCBs.")(Watford, J., concurring).

At the time of trial, remediation of the chromium contamination was completed. *Id.,* at 1005. Remediation of the ground water plume identified in the vicinity of the sanitary server line by Buildings 131 and 242 was almost completed. *Id.* at 1007 (groundwater remediation goal had been achieved for over 95 percent of the area). Consequently, the cost of the remediation of these contaminants was fixed or calculable at the time of trial. The allocation herein applies to the costs calculable at the time of trial and includes no additional remediation expenses incurred by TDY after 2012.[6]

---

[6] The Court requested that the parties submit, in their briefing after remand, the actual costs attributable to the remediation of each contaminant to facilitate the determination of the dollar value of the Court's revised allocation. Neither side complied with the request. [Doc. No. 303, at 4:6-11.] Consequently, the Court at this time can only allocate the percent attributable to the United States but not determine the actual costs the United States is required to reimburse TDY.

13

### V. Conclusion

In assessing an appropriate allocation of response costs, the district court, in its discretion, may properly consider such factors as: (1) each PRP's contribution to the discharge, release or disposal of the hazardous waste; (2) each PRP's degree of involvement in the generation, transportation, treatment, storage or disposal of the hazardous waste; and (3) the care exercised by each PRP with respect to the hazardous waste concerned. *See Envtl. Transp. Sys.,* 969 F.2d at 508. Here, the government's specifications required or recommended the use of two of the contaminants in concern, chromium and chlorinated solvents, but TDY's management and handling of these contaminants resulted in their introduction to the environment. Based on the government's limited role in the introduction of the contaminants to the Site, the Court finds it equitable to allocate to the government five percent of the cleanup costs associated with the chromium remediation and ten percent of the chlorinated solvent remediation specific to the ground water plume associated with the sewer line failure.

It is **SO ORDERED**.

Dated: March 1, 2019

Hon. Cathy Ann Bencivengo
United States District Judge